# Exhibit A

IN THE CIRCUIT COURT
OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2022-018881-CA-01

PAIGE FINKELSTEIN, M.D.,

   Plaintiff,

v.

MOUNT SINAI MEDICAL CENTER OF
FLORIDA, INC., a Florida Not For Profit
Corporation, and KFIR BEN-DAVID, M.D.,

   Defendants.

_____/

## PLAINTIFF'S, PAIGE FINKELSTEIN, M.D., VERIFIED AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

   COMES NOW the Plaintiff, PAIGE FINKELSTEIN, M.D., by and through her undersigned counsel, and files this her Verified Amended Complaint against the Defendants, MOUNT SINAI MEDICAL CENTER OF FLORIDA, INC., a Florida Not For Profit Corporation, and KFIR BEN-DAVID, M.D., for Injunctive Relief and Damages in the amount in excess of $30,000 which the minimum jurisdictional amount of this Court, and alleges as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

   1.  This is an action for injunctive relief and damages in excess of $30,000, which is the minimum jurisdictional amount of this Court.

   2.  The Plaintiff, Paige Finkelstein, M.D. ("Dr. Finkelstein" or "Plaintiff"), is a licensed physician in the State of Florida, a resident of the State of Florida, and otherwise *sui juris* in all respects.

3.    The Defendant, Mount Sinai Medical Center ("MSMC" or "Hospital"), is a Florida Not For Profit Corporation authorized and doing business in the State of Florida, with its principal place of business in Miami Beach, Florida.

4.    The Defendant, Dr. Kfir Ben-David ("Dr. Ben David" or "Residency Program Director"), is a physician licensed in the State of Florida, and an employee of the Defendant Mount Sinai, and a resident of Broward County, and otherwise *sui juris* in all respects.

5.    At all times material hereto, Dr. Finkelstein was a resident physician in the General Surgery Residency Program at MSMC (the "Surgical Residency Program") and completed two and a half (2.5) years of that general surgery residency.

6.    At all times material hereto, Dr. Ben-David was the Director of the Surgical Residency Program at, as well as the Chairman of the Department of Surgery at MSMC.  In those positions, Dr. Ben-David, on behalf of MSMC, exercised complete and total authority and control over the Surgical Residency Program at MSMC and, therefore, exercised complete and total authority and control over the Plaintiff, Dr. Paige Finkelstein, while she was a part of that Surgical Residency Program.

7.    Upon information and belief, while Dr. Finkelstein was a member of the Surgical Residency Program, where she planned on becoming a plastic surgeon upon completion of the program, both Defendants MSMC and Dr. Ben-David fostered a culture of conformity in which the personal and professional growth of the Residents were sacrificed in favor of bolstering purported "quality metrics" that allegedly augmented the prestige of Mount Sinai Medical Center and Dr. Ben-David personally.

8.      Upon information and belief, as Surgical Residency Program Director and Chief of Surgery, Dr. Ben-David has managed to consolidate power in such a way that most of MSMC's surgical staff must answer to him.

9.      Upon information and belief, MSMC's Surgical Residency Program is a work environment in which the voicing of legitimate concerns about patient care, hospital administration, discriminatory practices, or resident training is actively suppressed and met with retaliation by means of arbitrary disciplinary actions and ultimately termination or constructive dismissal by way of a forced resignation.

10.      Upon information and belief, Defendants impermissibly withheld documents which were required to be provided to Residents documenting their progress in the Surgical Residency Program, unless the Residents agreed to sign Non-Disclosure Agreements and/or General Releases, such that the true state of affairs and events taking place at the Surgical Residency Program at Mount Sinai, which was similar to the conduct of others such as Harvey Weinstein and others who have used non-disclosure agreements to avoid revealing their misconduct,  so that their conduct never reach the public view.

11.      In fact, Defendants refused to provide documents required to be provided to Dr. Finkelstein by the American Counsel of Graduate Medical Education (ACGME), including a Summative Evaluation, Proof of Completion for at least two years of surgical residency, and her Diploma for completing the intern year of the General Surgery Residency ("Completion Documents"), unless she agreed to sign a Non-Disclosure Agreement and General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her Surgical

Residency Program experience, as a pre-condition to receiving the Completion Documents, which Defendants were required to provide to her by law.

12.     Defendants MSMC and Dr. Ben-David (collectively, "Defendants") continually harassed and cajoled Dr. Finkelstein while she was a Resident, singling her out for unwarranted discipline, degrading criticism, and efforts designed solely to drive her out of the Surgical Residency Program.

13.     Dr. Finkelstein joined the Surgical Residency Program at Mount Sinai in June of 2018, as one of only three categorical female residents[1], after graduating from the University of Miami Miller School of Medicine with an MD Degree and Master of Public Health Degree. Prior to that time, she attended the Massachusetts Institute of Technology, where she graduated with Degrees in Chemical Engineering and Biology, and she has more than ten (10) years of experience as a Nationally Licensed Emergency Medical Technician.

14.     Upon her first meeting with Dr. Ben-David, Dr. Finkelstein was inappropriately questioned several times about her romantic relationships and whether she was single while also being told that she was not allowed to date "any of the surgery residents." Dr. Ben-David's inquiry about Plaintiff's personal life was completely unprompted and unrequired, thus causing profound discomfort to Dr. Finkelstein.

15.     Upon joining the Surgical Residency Program, Dr. Finkelstein was appointed the Class Representative of her Residency Class, and in that capacity, she was repeatedly warned by

---

[1] According to a report published by the Association for American Medical Colleges, the historical trend of medical school graduates by sex reached near parity in 2007-2008. In 2018-2019, 47.9% of graduates were female. *See* AAMC Diversity in Medicine: Facts and Figures 2019. (Available at https://www.aamc.org/data-reports/workforce/interactive-data/figure-12-percentage-us-medical-school-graduates-sex-academic-years-1980-1981-through-2018-2019#:~:text=Similar%20to%20the%20trend%20mentioned,47.9%25%20of%20graduates%20were%20female.)

Senior Residents and Attending Physicians to "keep her head down, avoid unneeded attention, and refrain from making waves."

16.     Within the first months of beginning her employment, Dr. Finkelstein was subjected to gender/sex and disability discrimination by members of the Surgical Residency Program leadership, including but not limited to Dr. Ben-David.

17.     Upon information and belief, Dr. Finkelstein, a woman, was subjected to dismissive and retaliatory actions by the Surgical Residency Program's director, Dr. Ben-David, a male notorious for engaging in similar discriminatory and harassing behavior of female staff.

18.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein, on multiple occasions, requested a reasonable accommodation for her disability, Attention Deficit/Hyperactivity Disorder (AD/HD), of additional time to complete certain examinations, which were required as a term of her employment with MSMC. Dr. Ben-David responded to these reasonable requests for accommodation by ridiculing and minimizing Plaintiff's disability.

19.     Upon information and belief, Dr. Ben-David's refusal to provide reasonable accommodations to Dr. Finkelstein's disabilities impacted her Surgical Residency Program's evaluation results, which ultimately resulted in her constructive dismissal.

20.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein voiced her concerns about the disparate treatment of female and male residents; while male residents were provided appropriate safety equipment, female residents were only provided ill-fitting equipment, including, but not limited to, gloves and lead aprons, which exposed female residents to the risk of thyroid cancer and other illnesses. Dr. Finkelstein and other female residents had to spend their own resources to purchase adequate equipment, such as thyroid shields and/or

appropriately sized lead aprons. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

21.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein observed and reported multiple instances in which female staff was unprofessionally addressed as "baby" and "sweetheart" and asked if they were pregnant for "acting hormonal." Defendants consistently dismissed these complaints, telling Dr. Finkelstein to "toughen up." On another such occasion, Dr. Ben-David also told Dr. Finkelstein that she was "deficient in her maintenance of emotional health." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

22.     The Defendants' pattern of discrimination is not limited to Dr. Ben-David. In fact, MSMC's Clinical Competency Committee ("CCC") placed Dr. Finkelstein on a remediation plan for being "too emotional." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

23.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein observed Dr. Ben-David repeatedly proffer comments discriminatory in nature, including, but not limited to, stating that "he favored hiring male residents and faculty members over female applicants".

24.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein filed multiple whistleblower complaints, all concerning or related to patient safety and staff training issues. Having observed multiple and substantial incidents concerning patient care and safety, some of which were illegal, Dr. Finkelstein felt compelled to report that conduct to Defendants.  In clear retaliatory fashion, the Surgical Residency Program's leadership not only repeatedly dismissed and disregarded Dr. Finkelstein's whistleblower complaints, but, instead of

remedying the issues, the Surgical Residency Program extended Dr. Finkelstein's probation while criticizing her for "being immature." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

25.     As a result of making such reports of misconduct, Dr. Finkelstein was formally disciplined and placed on probation for two (2) months and accused of being rude and unprofessional. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

26.     Dr. Finkelstein was punished on several occasions in a clear retaliatory fashion. Plaintiff suffered adverse actions from Defendants for either taking personal initiative as the class representative, for alerting Senior Staff to concerns within the Surgical Residency Program, for alerting Senior Staff to concerns in regard to issues of patient care and safety, and for voicing concerns or otherwise complaining about how female residents was treated while she was a member of and class representative of the Surgical Residency Program.  Dr. Finkelstein was met with retaliation, embarrassment, and ridicule, which ultimately resulted in her forced resignation from the Surgical Residency Program.

27.     Months after the initial unwarranted discipline described above, another incident occurred and was observed by Dr. Finkelstein with regard to a Code Blue in the Hospital's Psychiatric Ward.  This time, a patient died as a result of the absence of necessary tools, supervision, and training to administer proper CPR to a patient. This series of unfortunate failures to effectively and timely intervene led to that patient's death.

28.     Feeling compelled to report the death and the circumstances of the patient's death, Dr. Finkelstein was once again placed on probation, accused of being rude to Members of the

Mount Sinai Staff and exhibiting a lack of professionalism. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

29.     Shortly thereafter, on October 26, 2020, Dr. Finkelstein received a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon and potentially ending her ability to become a Plastic Surgeon anytime thereafter.  Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

30.     Despite Dr. Finkelstein's reports, she continued to observe events evidencing the lack of quality of care and safety provided to patients at MSMC. Dr. Finkelstein also was subjected to additional retaliation, harassment, and punishment by Defendants.  Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

31.     On January 13, 2021, Dr. Finkelstein was forced to submit her Resignation to Mount Sinai Medical Center as a General Surgical Resident.  This Resignation was forced by the actions of Defendants continually harassing and wrongfully punishing Dr. Finkelstein and creating an environment such that she was no longer able to continue with her training as a Surgical Resident at Mount Sinai. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

32.      Ultimately, Dr. Finkelstein was advised by Dr. Ben-David that if she did not resign, she would be terminated. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

33.     Upon her Resignation from the General Surgery Residency Program at Mount Sinai, Dr. Ben-David and MSMC Hospital Administration attempted to extort Dr. Finkelstein into signing a Non-Disclosure Agreement and General Release in exchange for being provided with

the Completion Documents.  These are documents that the ACGME requires a Residency Program to provide to any Resident upon request, and therefore the Defendants, Dr. Ben-David, and MSMC, were legally required to provide the Completion Documents to Dr. Finkelstein, and she had the corresponding legal right to receive them.  Therefore, the demand by Dr. Ben-David and Mount Sinai that she sign a Non-Disclosure Agreement and General Release in exchange for receiving the Completion Documents was extortion and blackmail by requiring her to give up something of value in exchange for something she was legally entitled to receive.

34.    Dr. Finkelstein refused to sign the Non-Disclosure Agreement and General Release, and, since this date, despite repeated demands, Defendants have refused to provide the Completion Documents to her.

35.    On June 29, 2022, Dr. Finkelstein notified the ACGME of Defendants' failure to provide her the Completion Documents.

36.    Upon information and belief, Defendants have produced the Completion Documents only after the filing of a complaint with the ACGME and the filing of this Complaint by Plaintiff.

37.    In an attempt to continue her residency, Dr. Finkelstein sought to join a program at an affiliated hospital in Delray Beach, where she was advised they had an immediate need for a third-year surgical resident. This hospital facilitated Dr. Finkelstein's taking the third-year ABSITE exam in anticipation of her continuing her residency there. Upon information and belief, Dr. Finkelstein's application was ultimately rejected due to a lack of support for that application from Dr. Ben-David and the false and defamatory comments he made to that Program about Dr. Finkelstein without justification.

38.     Upon information and belief, other physicians, faculty, and personnel affiliated with MSMC's Surgical Residency Program have provided favorable evaluations of Dr. Finkelstein's performance while a General Surgery Resident at MSMC.

39.     Upon information and belief, Dr. Ben-David's disparaging comments made about Dr. Finkelstein were intentionally false, made knowingly, with malice, and bad faith, in efforts to discredit her and force her to sign the Non-Disclosure Agreement and General Release releasing Defendants from any claims she may have.

40.     Upon information and belief, Dr. Ben-David continues to make such false, defamatory statements against Dr. Finkelstein in an effort to discredit her and force her to sign the Non-Disclosure Agreement and General Release releasing Defendants from any claims she may have.

41.     Dr. Finkelstein has continued to interview with other hospital systems across the country, and when she inquired as to whether or not Dr. Ben-David would provide her with a recommendation for that Program, she was told by the Defendants that if she did not sign the Non-Disclosure Agreement and General Release, Dr. Ben-David and Mount Sinai would not provide her with a reference, or would only provide defamatory comments about Plaintiff, and therefore without such a reference all of the applications which she submitted in order to continue her residency training were rejected.

42.     In July 2021, Dr. Finkelstein received an employment offer from Mount Sinai Beth Israel Hospital in New York to serve as a House Surgeon in the operating room of that Hospital. Although she was fully qualified for the position, having submitted her credentials and application for medical staff privileges needed for that position, Dr. Finkelstein's application was therefore denied, once again, because Dr. Ben-David either would not provide a reference or provided

defamatory comments about her to that Hospital, resulting in the Hospital rescinding its previous offer of employment for that position.

43.     Dr. Ben-David, as Director of the General Surgery Residency Program at MSMC, was responsible for supervising, educating, and mentoring the residents, both male and female.  A copy of the ACGME Common Program Requirements (Residency) is attached hereto as **Exhibit "A."**

44.     As Program Director, Ben-David had the ability to influence and direct the education and training of the General Surgery residents at Mount Sinai, including Plaintiff. *See* Exhibit A.

45.     As Program Director, Ben-David was responsible for the environment of MSMC's Surgical Residency Program and the moral standards which governed that environment. *See* Exhibit A.

46.     The ACGME maintains standards to which Program Directors are held as leaders, supervisors, and educators in ACGME Accredited Residency Programs. *See* Exhibit A.

47.     The standards of the ACGME include, but are not limited to, the ethics and morality standards applicable to one who works closely with and supervises and is responsible for the professional training and growth of young physicians, both males and females, and to evaluate their competency and professional development. *See* Exhibit A.

48.     Dr. Ben-David has failed to live up to or comply with the standards the ACGME placed upon a Program Director, as appears below.

49.     Upon information and belief, Dr. Ben-David, at all times material hereto, has been married and has young children.

11

50.     Upon information and belief, before and during the time Plaintiff was a General Surgery resident at MSMC, Dr. Ben-David created profiles on multiple online dating services seeking female companions with whom to "match," sometimes using the names of other physicians as an alias, while married, and serving as the Surgical Residency Program Director and Chief of Surgery.

51.     Upon information and belief, before and during the time Plaintiff was a General Surgery resident at MSMC, Dr. Ben-David met multiple women on the online dating services he used, and engaged in extra-marital relationships with them, sharing inappropriate photographs of sexual content with other women, of him in the nude, and while having sexual relations with various women.

52.     Upon information and belief, before and during the time Plaintiff was a General Surgery resident at MSMC, Dr. Ben-David's extra-marital relationship(s) included taking his "female companions" with him to professional conferences and meetings for which his expenses and salary were paid for by MSMC.

53.     Upon information and belief, MSMC, at all times material hereto, was aware of this conduct of Dr. Ben-David and that his conduct fell below the ACGME standards, making him unfit to be the Surgical Residency Program Director. *See* Exhibit A.

54.     Upon information and belief, MSMC, at all times material hereto, was aware of Dr. Ben-David's multiple sexual discrimination and sexual harassment incidents, making him unfit to be the Surgical Residency Program Director. *See* Exhibit A.

55.     Despite knowledge of Ben-David's immoral and inappropriate conduct, MSMC continued to employ Dr. Ben-David as its Director of the General Surgery Residency Program.

56.     It was inappropriate for Dr. Ben-David to accuse anyone of behaving inappropriately in light of this abhorrent pattern of unprofessional conduct.

57.     By retaining Dr. Ben-David as the Surgical Residency Program Director, the MSMC approved, endorsed, and even encouraged Dr. Ben-David's misconduct to continue.

58.     MSMC, therefore, exposed Dr. Finkelstein to a dangerous and hostile work environment created by Ben-David.

59.     MSMC, as the Operator of the Surgical Residency Program, had a duty to provide a safe environment in which Dr. Finkelstein and other residents would receive professional training and education from qualified professionals and that met the standards of leadership of the ACGME. *See* Exhibit A.

60.     By retaining Dr. Ben-David as Program Director, despite knowledge of his deviant and immoral behavior during his employment, MSMC violated its duty to Dr. Finkelstein and subjected her to the control and direction of Dr. Ben-David, which ultimately resulted in Plaintiff being forced out of the Surgical Residency Program, and the destruction of her career.

61.     The intentional actions of Dr. Ben-David and MSMC, as described hereinabove, have prevented Dr. Finkelstein from pursuing her training as a general surgeon and from eventually becoming a plastic surgeon, have caused her economic damage, damage to her reputation, and prevented her from becoming what her education and training to date have prepared her to be, namely a general surgeon.

62.     These actions of the Defendants' have effectively ended Dr. Finkelstein's career as a physician due to the Defendants' relentless campaign to damage her reputation, Defendants' actions to impede Dr. Finkelstein from completing her training by denying required records,

effectively holding Dr. Finkelstein in career limbo, with little or no prospects for employment, until such time she signs a Non-Disclosure Agreement and General Release in favor of Defendants.

63.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

64.     All of the actions of the Defendants described hereinabove were taken intentionally, with malice, and with the specific intent and objective to irreparably harm Dr. Finkelstein, which is exactly the damage she has suffered, presently suffers, and will continue to suffer in the future.

65.     Plaintiff asserts that she has timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and has received the Right to Sue Notice, thus complying with all conditions precedent to bringing all claims. *See* Fla. Stat. Ann. § 760.11 (West 2010); *Woodham v. Blue Cross & Blue Shield of Fla., Inc.*, 829 So. 2d 891, 894 (Fla. 2002). A copy of the EEOC's Notice of Right to Sue is attached hereto as **Exhibit "C."**

### COUNT I – WRONGFUL TERMINATION AND BREACH OF CONTRACT
### (Against Defendants MSMC and Dr. Ben-David)

66.     This is an action for injunctive relief and damages in excess of $30,000, which is the minimum jurisdictional amount of this Court.

67.     Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts.

68.     Plaintiff Paige Finkelstein, M.D. and the Defendant Mount Sinai Medical Center Inc. ("MSMC") entered into a Graduate Medical Education Program Agreement, pursuant to

which Dr. Finkelstein was to be a member of the surgical residency administrated and provided by MSMC. A copy of that Graduate Medical Education Program Agreement is attached hereto as Exhibit "B."

69.     Pursuant to that Graduate Medical Education Program Agreement, Dr. Finkelstein was to serve as a resident in Surgical Residency for a period of five (5) years. Pursuant to the Agreement, Dr. Ben-David, MSMC, and Dr. Finkelstein had certain obligations and responsibilities assigned to each of them respectfully.  *See* Exhibits A and B, generally.

70.     As part of the obligations imposed upon by the Agreement, the Defendants were required to provide a harassment-free work environment for Dr. Finkelstein to perform her duties as Resident Physician, pursuant to Paragraph 6 of the Graduate Medical Education Program Agreement. *See* Exhibit A.

71.     Also pursuant to that Graduate Medical Education Program Agreement, Dr. Finkelstein was to serve as a resident in Surgical Residency without the imposition of any restrictive covenants by Defendants.  *See* Exhibit B ¶15.

72.     As stated in the allegation to all counts, the work environment provided by the Defendants Mount Sinai and Ben-David was hostile, retaliatory and repressive, and subjected Dr. Finkelstein to constant reprisals, repercussion, retaliation, harassment, humiliation, and emotional distress on a daily basis, as a result of the actions of Defendants.

73.     Defendants' actions constitute a breach of the Graduate Medical Education Program Agreement and are additionally in violation of the obligations imposed upon the Defendants by the American Council of Graduate Medical Education (ACGME) and all Residency Programs to provide a safe and professional workplace for residents, free from the type of

harassment, retaliation, humiliation, oppression, and environment created by the Defendants with respect to Dr. Finkelstein's term as a Surgical Resident.

74.     Further, Defendants' withholding of Dr. Finkelstein's Completion documents in an attempt to force her into signing a Non-Disclosure Agreement and General Release releasing Defendants from any claims she may have, was a restrictive covenant, and as such, constituted a breach of the Graduate Medical Education Program Agreement. Further, the leveraging of the release of the Completion Documents is consistent with the conduct of others such as Harvey Weinstein, who have used non-disclosure agreements to avoid the revealing of their misconduct.

75.     As a result of Defendants' actions as herein described in the allegations common to all counts, Dr. Finkelstein has been unable to secure a position in another Residency Program, has been unable to secure any employment in the medical profession as a physician, and continues be unable to do so, as a result of the spreading of false and defamatory comments by the Defendants, in particular, Dr. Ben-David, about Dr. Finkelstein in response to requests for information about her from potential Residency Programs and/or employers or the failure of the Defendants and in particular Dr. Ben-David to respond to such requests in any way at all.

76.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000, for the damages hereinabove specified, plus mitigation

damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT II – EXTORTION
### (Against Defendants MSMC and Dr. Ben-David)

77.     Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

78.     As stated in the allegations common to all counts, the Defendants, until the filing of this action, had refused to provide Dr. Finkelstein with the Completion Documents unless she executed a General Release of All Claims and a Confidentiality Agreement as a precondition to receiving those documents. This is similar to the conduct of others such as Harvey Weinstein who have used non-disclosure agreements to avoid revealing their misconduct.

79.     Defendants have only produced the Completion Documents after Plaintiff filed a complaint with the ACGME and filed this action to obtain them.

80.     Defendants' actions were therefore unlawful, and by requiring Plaintiff to sign General Releases and Non-Disclosure Agreements as a condition to obtain documents to which Plaintiff was lawfully entitled to receive, these actions constitute extortion and blackmail.

81.     As a result of the actions of the Defendants, Dr. Finkelstein has suffered damage to her reputation, the inability to secure employment or obtain any position as a physician anywhere.

82.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendants MSMC and Dr. Ben-David)

83.     Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

84.     Dr. Finkelstein was the victim of a relentless campaign to discredit her, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

85.     The actions and conduct of the Defendants, as described in this Complaint, were outrageous and extreme and, under the circumstances, went beyond all possible bounds of decency, and are regarded as shocking, atrocious, and utterly intolerable in a civilized society.

86.     The Plaintiff has suffered, and continues to suffer an intense emotional distress as a result of Defendants' actions as is above described, of a nature no ordinary person should be expected to endure.

87.     As a result of these actions of the Defendants, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, loss of earnings, past, present, and future, loss of earning capacity, and damages to her reputation.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation

damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT IV – TORTIOUS INTERFERENCE
### (Against Defendants MSMC and Dr. Ben-David)

88.     Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

89.     The elements of the tort of intentional interference with an advantageous business relationship are (1) the existence of a business relationship not necessarily evidenced by an enforceable contract, (2) the knowledge of the relationship on the part of the defendant, (3) an intentional and unjustified interference with that relationship by the defendant, and (4) damage to the plaintiff as the result of the breach of the relationship. *Linafelt v. Beverly Enterprises-Fla., Inc.*, 745 So. 2d 386, 389 (Fla. Dist. Ct. App. 1999).

90.     In July 2021, Dr. Finkelstein received an offer from Mount Sinai Beth Israel Hospital in New York to serve as a House Surgeon in the operating room of that Hospital. Although she was fully qualified for the position, having submitted her credentials and application, Dr. Finkelstein's application was denied once again because Dr. Ben-David either would not provide a reference or provided defamatory comments about her to that Hospital, resulting in the Hospital rescinding its previous offer for that position.

91.     Upon information and belief, Dr. Ben-David's actions were taken in bad faith as part of his smear campaign motivated by discrediting Dr. Finkelstein and forcing her to sign a Non-Disclosure Agreement and General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience.

92.     Dr. Ben-David's interference conforms to the Defendants' pattern of behavior seeking to force Dr. Finkelstein to sign a Non-Disclosure Agreement and General Release in favor of Defendants by all means necessary.

93.     Upon information and belief, Defendants failed to provide the necessary documentation and information required by different residency programs that Dr. Finkelstein applied to.

94.     Upon information and belief, Defendants attempted to leverage Dr. Finkelstein's need for a proper reference and documentation to force her into signing a Non-Disclosure Agreement and General Release in favor of Defendants.

95.     Dr. Finkelstein has suffered, and continues to suffer, with being denied opportunities for alternative residency programs, as well as employment in her field, as a result of the actions of the Defendants as is above described.

96.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

**COUNT V – SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

**(Against Defendants MSMC and Dr. Ben-David)**

97.     Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

98.     In order to succeed on a claim of sex discrimination under Title VII or the FCRA, a plaintiff must first establish a prima facie case, which requires a showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside her protected class more favorably. *Nicholas v. Bd. of Trustees of Univ. of Alabama*, 251 F. App'x 637, 643 (11th Cir. 2007). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the adverse action. *Jiann Min Chang v. Alabama Agric. & Mech. Univ.*, 355 F. App'x 250, 252 (11th Cir. 2009). If the defendant meets this burden, then the plaintiff must show the proffered reason is merely a pretext for discrimination.

99.     An individual is "qualified" for a position, for purposes of employment discrimination law, if she meets the criteria that the employer has specified for the position. *Wright v. Southland Corp.*, 187 F.3d 1287, 1301 (11th Cir. 1999) n. 16 (11th Cir.1999) (citation omitted). The Eleventh Circuit also recognizes service for an extended period without complaint to establish that an individual is qualified for a position. *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1520 (11th Cir. 1990) (citing *Stanfield v. Answering Serv., Inc.*, 867 F.2d 1290, 1293–94 (11th Cir. 1989)).

100.     Given the importance of private enforcement in the statutory framework constructed by Congress, attorney's fee provisions in civil rights cases should be interpreted broadly to facilitate and encourage enforcement of civil rights laws. Wesley Grp. Home Ministries,

Inc. v. City of Hallandale, 670 So. 2d 1046, 1049 (Fla. Dist. Ct. App. 1996) (citing Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 417, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978) (In Title VII cases, a "prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances.").

101.    Dr. Finkelstein's credentials more than qualify her for a position with Defendant's Surgical Residency Program: she has more than 10 years of experience as a nationally licensed EMT, has graduated from MIT with degrees in chemical engineering and biology, and has obtained both MD and MPH degrees from the University of Miami's Miller School of Medicine. Further, prior to her constructive dismissal, Dr. Finkelstein was a member of the Defendants' Surgical Residency Program for over two (2) years as class representative.

102.    As stated in the allegations common to all counts, the Defendants have routinely subjected Dr. Finkelstein, a woman, to discrimination based on her gender.

103.    During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein voiced her concerns about the disparate treatment of female and male residents; while male residents were provided appropriate safety equipment, female residents were only provided ill-fitting equipment, such as gloves and lead aprons, which exposed female residents to the risk of thyroid cancer and other illnesses. Dr. Finkelstein and other female residents had to spend their own resources to purchase adequate equipment, such as thyroid shields and/or appropriately sized lead aprons. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

104.    During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein observed and reported multiple instances in which female staff was unprofessionally addressed as "baby" and "sweetheart" and asked if they were pregnant for "acting hormonal." Defendants

consistently dismissed these complaints, telling Dr. Finkelstein to "toughen up." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

105.    Further, upon information and belief, Dr. Ben-David has explicitly stated on separate occasions that he considered the female residents "trouble" and "not worth it."

106.    Plaintiff has suffered an adverse employment action by virtue of the non-renewal of her residency contract, which is considered to be an "adverse employment action" for purposes of her discrimination claims under Title VII and the Florida Civil Rights Act (FCRA). Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e (West) et seq.; Fla. Stat. Ann. § 760.11(5).

107.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, mitigation damages in the amount excess of $280,000, and attorney's fees, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT VI – SEX DISCRIMINATION IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT
### (Against Defendants MSMC and Dr. Ben-David)

108.    Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

109.     FCRA claims are subject to the same analysis as Title VII claims. *See Valenzuela v. GlobeGround N. Am., LLC*, 18 So. 3d 17, 21–22 (Fla. Dist. Ct. App. 2009) ("Because the FCRA is patterned after Title VII of the Civil Rights Act of 1964 ... we look to federal case law.... It is well-settled law that Florida courts follow the three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993), and its progeny, for establishing, by circumstantial evidence, a discrimination claim based on disparate treatment in the workplace.") (internal citations omitted).

110.     Given the importance of private enforcement in the statutory framework constructed by Congress, attorney's fee provisions in civil rights cases should be interpreted broadly to facilitate and encourage enforcement of civil rights laws. Wesley Grp. Home Ministries, Inc. v. City of Hallandale, 670 So. 2d 1046, 1049 (Fla. Dist. Ct. App. 1996) (citing Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 417, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978) (In Title VII cases, a "prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances.").

111.     As discussed further above, Dr. Finkelstein's credentials more than qualify her for a position with Defendant's Surgical Residency Program, she has suffered an adverse employment action, and Defendants have treated similarly situated male employees more favorably, as evidenced by practices tantamount to a hostile work environment, and also statistics pertaining to the Surgical Residency Program's retention of female residents compared to the retention of male residents.

112.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to

competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, mitigation damages in the amount excess of $280,000, and attorney's fees, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT VII – RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Against Defendants MSMC and Dr. Ben-David)

113.    Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

114.    In order to establish a prima facie showing of retaliation under Title VII, a claimant must show that: (1) she engaged in an activity protected under Title VII, (2) she suffered an adverse employment action, and (3) a causal connection existed between the protected activity and the adverse employment action. *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008).

115.    As stated in the allegations common to all counts, the Defendants have regularly perpetrated actions that constitute sexual discrimination and other impermissible unlawful employment practices, which Plaintiff has objected to and reported to her superiors, only to be met with retaliation by virtue of being placed under unwarranted probations, and eventually wrongfully forced out of the Surgical Residency Program.

116.    As retaliation for Dr. Finkelstein's reporting of sexual discrimination and harassment, she was the victim of a relentless campaign to discredit her, which ultimately led to

her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

117.    As further retaliation for Dr. Finkelstein's reporting of sexual discrimination and harassment, until after the filing of this action, Defendants had consistently refused to provide her with the Completion Documents, thus precluding Plaintiff from securing future employment and impeding Plaintiff's relocation to a new residency program.

118.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT VIII – RETALIATION IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT
### (Against Defendants MSMC and Dr. Ben-David)

119.    Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

120.    To establish a prima facie case of retaliation under section 760.10(7), a plaintiff must demonstrate: (1) that he or she engaged in statutorily protected activity; (2) that he or she

suffered adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *Blizzard v. Appliance Direct, Inc.*, 16 So. 3d 922, 926 (Fla. Dist. Ct. App. 2009).

121. As stated in the allegations common to all counts, the Defendants have regularly perpetrated actions that constitute sexual discrimination and other impermissible unlawful employment practices, which Plaintiff has objected to and reported to her superiors, only to be met with retaliation by virtue of being placed under unwarranted probations, and eventually wrongfully forced out of the Surgical Residency Program.

122. As retaliation for Dr. Finkelstein's reporting of bad hospital practices, sexual discrimination, and harassment, she was the victim of a relentless campaign to discredit her, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

123. As further retaliation for Dr. Finkelstein's reporting of sexual discrimination and harassment, until after the filing of this action, Defendants had consistently refused to provide her with the Completion Documents, thus precluding Plaintiff from securing future employment and impeding Plaintiff's relocation to a new residency program.

124. As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT IX –DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Against Defendants MSMC and Dr. Ben-David)

125.    Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

126.    The Americans with Disabilities Act ("ADA"), as amended, provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ... employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a) (West 2009); *Keeler v. Fla. Dep't of Health*, 324 F. App'x 850, 856 (11th Cir. 2009). In order to establish a prima facie case of employment discrimination under the ADA, a plaintiff must show that: (1) she has a disability; (2) she is a qualified individual; and (3) the employer discriminated against her because of her disability. *Id.* (citing *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007)) (interpreting prior version of Act).)

127.    A "disability" is defined by the ADA as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C.A. § 12102(1) (West). The Equal Employment Opportunity Commission ("EEOC") has further defined "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Greenberg*, 498 F.3d at 1264 (quoting 29 C.F.R. § 1630.2(i)). An employer unlawfully discriminates against an employee because of her disability by "not

making reasonable accommodations to the [employee's] known physical or mental limitations" if the employee is otherwise qualified to perform her job and the accommodation would not impose an undue hardship on the operation of the business. 42 U.S.C.A. § 12112(b)(5)(A); *see also Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007).

128.    Defendants have consistently violated the ADA by inappropriately denying Dr. Finkelstein's request for accommodations for her AD/HD.

129.    During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein, on multiple occasions, requested a reasonable accommodation for her disability, Attention Deficit/Hyperactivity Disorder (AD/HD), by way of additional time to complete certain examinations, which were required as a term of her employment with MSMC. Dr. Ben-David responded to these reasonable requests for accommodation by ridiculing and minimizing Plaintiff's disability.

130.    Upon information and belief, Dr. Ben-David's refusal to provide reasonable accommodations to Dr. Finkelstein's disabilities impacted her Surgical Residency Program's evaluation results, which ultimately resulted in her constructive dismissal.

131.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation

damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT X –RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Against Defendants MSMC and Dr. Ben-David)

132.    Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

133.    A *prima facie* case of retaliation under the ADA requires plaintiff to show that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was some causal relation between the two events. *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018).

134.    As stated in the allegations common to all counts, the Defendants have regularly perpetrated actions that constitute discrimination under the ADA, and other impermissible unlawful employment practices, which Plaintiff has objected to and reported to her superiors, only to be met with retaliation by virtue of being placed under unwarranted probations, and eventually wrongfully forced out of the Surgical Residency Program.

135.    As retaliation for Dr. Finkelstein's reporting of bad hospital practices, and discrimination based on disability, she was the victim of a relentless campaign to discredit her, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

136.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program,

suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT XI – SEXUAL HARASSMENT
### (Against Defendants MSMC and Dr. Ben-David)

137.    Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

138.    The grounds for a sexual harassment claim under either Title VII of the Civil Rights Act of 1964 or under Fla. Stat. Ann. § 760.10(7) (West 2007) can be either a tangible employment action or, as Plaintiff asserts in this case, the "creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work." *Blizzard*, 16 So. 3d at 926–27.

139.    To establish a hostile work environment sexual harassment claim based on harassment by a supervisor, Plaintiff must show: (1) that she is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there is a basis for holding the employer liable. *Blizzard*, 16 So. 3d at 927.

31

140.     As stated in the allegations common to all counts, the Defendants have routinely subjected Dr. Finkelstein, a woman, to a hostile environment caused by rampant sexual harassment.

141.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein voiced her concerns about the disparate treatment of female and male residents; while male residents were provided appropriate safety equipment, female residents were only provided ill-fitting equipment, such as gloves and lead aprons, which exposed female residents to the risk of thyroid cancer and other illnesses. Dr. Finkelstein and other female residents had to spend their own resources to purchase adequate equipment, such as thyroid shields and/or appropriately sized lead aprons. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

142.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein observed and reported multiple instances in which female staff was unprofessionally addressed as "baby" and "sweetheart" and asked if they were pregnant for "acting hormonal." Defendants consistently dismissed these complaints, telling Dr. Finkelstein to "toughen up." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

143.     Further, upon information and belief, Dr. Ben-David has explicitly stated on separate occasions that he considered the female residents "trouble" and "not worth it."

144.     Also, Dr. Ben-David made unrequired and unwarranted inquiries and comments about Dr. Finkelstein's romantic and sexual life.

145.     Additionally, Defendants' propensity to commit sex-based harassment can also be demonstrated by the fact that Plaintiff's Surgical Residency Program consisted of fifteen (15)

members, only three of which were female, with only one remaining female resident since Plaintiff's termination, being the only ever female resident to complete the Surgical Residency Program.

146.    As stated, Dr. Finkelstein was the victim of a relentless campaign to discredit her, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

147.    Likewise, there is ample evidence that the harassment was based on her sex, was sufficient to deem Plaintiff's former work environment as hostile, and Defendants are liable because the offensive conduct was at least in part perpetrated by Dr. Ben-David as the General Surgical Residency Program Director.

148.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT XII – DEFAMATION
### (Against Defendants MSMC and Dr. Ben-David)

149.     Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

150.     The elements of a defamation claim include "a false and defamatory statement concerning another." *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 803 (Fla. Dist. Ct. App. 1997). A defamatory statement is one that tends to harm someone's reputation in the community or deters others from associating with the person. *See id.* "When the words published concerning a person tend to degrade him, bring him into ill repute, destroy confidence in his integrity, or cause other like injury, such language is actionable per se." *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. Dist. Ct. App. 1978).

151.     Defendants have defamed Plaintiff by capriciously providing statements to prospective employers, statements that were "knowingly false," "deliberately misleading," or "rendered with a malicious purpose." *Linafelt*, 745 So. 2d at 389.

152.     Defendants' statements were not made in good faith, thus, are not privileged, and were made with the purpose of forcing Dr. Finkelstein into signing a Non-Disclosure Agreement and General Release in favor of Defendants and/or to discredit her.

153.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to complete her residency program, suffered damages consisting of loss of earnings, has suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation

damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT XIII – VICARIOUS LIABILITY
### (Against Defendant MSMC)

154.     Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

155.     The concept of vicarious liability can be described as follows: "A person whose liability is imputed based on the tortious acts of another is liable for the entire share of comparative responsibility assigned to the other." Restatement (Third) of Torts: Apportionment Liab. § 13 (2000). Vicarious liability is often justified on the policy grounds that it ensures that a financially responsible party will cover damages. *Id.* Restatement (Third) of Torts: Apportionment Liab. § 13 (2000) cmt. b. Thus, the vicariously liable party is liable for the entire share of the fault assigned to the active tortfeasor. *Id.* The vicariously liable party has not breached any duty to the plaintiff; its liability is based solely on the legal imputation of responsibility for another party's tortious acts. *Id.* Restatement (Third) of Torts: Apportionment Liab. § 13 (2000) cmt. c. The vicariously liable party is liable only for the amount of liability apportioned to the tortfeasor. *Id.* Restatement (Third) of Torts: Apportionment Liab. § 13 (2000) cmt. e.

156.     Under the doctrine of respondeat superior, an employer can be held liable for the tortious or criminal acts of an employee, when the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer. *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 356–57 (Fla. Dist. Ct. App. 2001) (citing *Nazareth v. Herndon Ambulance Serv., Inc.*, 467 So. 2d 1076, 1078 (Fla. Dist. Ct. App. 1985)). An employee's conduct is within the scope of his or her employment where: (1) the conduct is of the kind he or she was employed to perform; (2) the conduct occurs substantially

within the time and space limits authorized or required by the work to be performed; and (3) the conduct is activated at least in part by a purpose to serve the master. *Id.* at 357 (citing *Sussman v. Fla. E. Coast Properties, Inc.*, 557 So. 2d 74, 75–76 (Fla. Dist. Ct. App. 1990)).

157.    Defendant MSMC is vicariously liable for Dr. Ben-David's misconduct because his acts were committed during the course of his employment as the Director of the General Surgery Residency Program at MSMC and to further MSMC's interests in raising MSMC's Surgical Residency Program's prestige.

158.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT XIV – NEGLIGENT SUPERVISION
### (Against Defendant MSMC)

159.    Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

160.    Negligent supervision occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or

reassignment. *Acts Ret.-Life Communities Inc. v. Est. of Zimmer*, 206 So. 3d 112 (Fla. Dist. Ct. App. 2016).

161. Upon information and belief, several MCMC employees, including female physicians, nurses, and staff, have reported Dr. Ben-David to MSMC for inappropriate behavior tantamount to discrimination and harassment, only to later suffer retaliatory actions sanctioned by MSMC. Thus, MSMC negligently placed, and continued to place, employees, such as Plaintiff, under the supervision of a repeat offender when it either knew or should have known that Dr. Ben-David had the propensity to create a hostile work environment due to continuous sexual harassment of MSMC's female employees and other discriminatory practices.

162. Thus, MSMC is liable for any and all acts performed by Dr. Ben-David that this Court deems to have occurred outside the scope of his employment.

163. As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT XV – NEGLIGENT RETENTION
### (Against Defendant MSMC)

164.     Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

165.     Like claims for negligent supervision, to prevail on a claim for negligent hiring and retention Plaintiffs must show that the employer knew or should have known of the employee's unfitness. *Thomas v. City of Jacksonville*, No. 3:13-CV-737-J-32MCR, 2017 WL 3316478, at *9 (M.D. Fla. Aug. 3, 2017), *aff'd*, 731 F. App'x 877 (11th Cir. 2018). The terms negligent supervision and negligent retention are essentially interchangeable. *See Watts v. City of Hollywood, Fla.*, 146 F. Supp. 3d 1254, 1262 n.4 (S.D. Fla. 2015) (citing *Grimm v. City of Boca Raton*, No. 15-80608-CIV-MARRA, 2015 WL 4483974, at *8 (S.D. Fla. July 22, 2015)).

166.     Upon information and belief, several MCMC employees, including female physicians, nurses, and staff, have reported Dr. Ben-David to MSMC for inappropriate behavior tantamount to discrimination and harassment, only to later suffer retaliatory actions sanctioned by MSMC. Thus, MSMC negligently placed, and continued to place, employees, such as Plaintiff, under the supervision of a repeat offender when it either knew or should have known that Dr. Ben-David had the propensity to create a hostile work environment due to continuous sexual harassment of MSMC's female employees and other discriminatory practices.

167.     Thus, MSMC is liable for any and all acts performed by Dr. Ben-David that this Court deems to have occurred outside the scope of his employment.

168.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity,

loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $30,000 for the damages hereinabove specified, plus mitigation damages in the amount excess of $280,000, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT XVI – EMERGENCY INJUNCTION
### (Against Defendants MSMC and Dr. Ben-David)

169.    This is an action for the imposition of emergency injunctive relief.

170.    Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

171.    Plaintiff requests that an Emergency Injunction be entered by this Honorable Court prohibiting Dr. Ben-David from providing any information to Third Parties relating to the performance by Dr. Finkelstein as a General Surgery Resident at Mount Sinai and requiring another representative of MSMC to be agreed upon by Plaintiff and MSMC, to provide such information in a fair and objective way.

172.    Plaintiff is entitled Injunctive Relief because she is likely to prevail on the merits of this case and will suffer irreparable harm if Injunctive Relief is not granted.

173.    Without the requested remedy, Dr. Finkelstein faces irreparable harm as she is precluded from completing her Surgical Residency Program as required to fulfill her aspirations to become a plastic surgeon. This is the type of harm that has no adequate remedy at law in monetary damages.

174.    Here, the public interest in precluding the chilling effect that the defamatory campaigns perpetuated as retaliation for reporting discriminatory practices can cause weighs in favor of enjoining Defendants from any further violation of Dr. Finkelstein's rights.

WHEREFORE, the Plaintiff, Dr. Paige Finkelstein, respectfully requests that this Court grant her Emergency Injunctive Relief as hereinabove stated for the reasons provided above, together with all further relief deemed just and proper by this Court.

### COUNT XVII – TEMPORARY INJUNCTION
### (Against Defendants MSMC and Dr. Ben-David)

175.    This is an action for the imposition of temporary injunctive relief.

176.    Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

177.    Plaintiff requests that a Temporary Injunction be entered by this Honorable Court prohibiting Dr. Ben-David from providing any information to Third Parties relating to the performance by Dr. Finkelstein as a General Surgery Resident at Mount Sinai and requiring another representative of MSMC to be agreed upon by Plaintiff and MSMC, to provide such information in a fair and objective way.

178.    Plaintiff is entitled to injunctive relief because she is likely to prevail on the merits of this case and will suffer irreparable harm if injunctive relief is not granted.

179.    Without the requested remedy, Dr. Finkelstein faces irreparable harm as she is precluded from completing her Surgical Residency Program as required to fulfill her aspirations to become a plastic surgeon. This is the type of harm that has no adequate remedy at law in monetary damages.

180.    Here, the public interest in precluding the chilling effect that the defamatory campaigns perpetuated as retaliation for reporting discriminatory practices can cause weighs in favor of enjoining Defendants from any further violation of Dr. Finkelstein's rights.

WHEREFORE, the Plaintiff, Dr. Paige Finkelstein, respectfully requests that this Court grant her Temporary Injunctive Relief as hereinabove stated for the reasons provided upon, together with all further relief deemed just and proper by this Court, and that the Court convert that Temporary Injunction to a Permanent Injunction after the trial of this matter by the trier of fact.

## COUNT XVIII – PERMANENT INJUNCTION
### (Against Defendants MSMC and Dr. Ben-David)

181.    This is an action for the imposition of permanent injunctive relief.

182.    Plaintiff incorporates, reiterates, and restates all of the allegations common to all accounts as more fully as set forth and full.

183.    Plaintiff requests that a Permanent Injunction be entered by this Honorable Court prohibiting Dr. Ben-David from providing any information to Third Parties relating to the performance by Dr. Finkelstein as a General Surgery Resident at Mount Sinai and requiring another representative of MSMC to be agreed upon by Plaintiff and MSMC, to provide such information in a fair and objective way.

184.    Plaintiff is entitled to injunctive relief because she is likely to prevail on the merits of this case and will suffer irreparable harm if injunctive relief is not granted.

185.    Without the requested remedy, Dr. Finkelstein faces irreparable harm as she is precluded from completing her Surgical Residency Program as required to fulfill her aspirations to become a plastic surgeon. This is the type of harm that has no adequate remedy at law in monetary damages.

41

186.    Here, the public interest in precluding the chilling effect that the defamatory campaigns perpetuated as retaliation for reporting discriminatory practices can cause weighs in favor of enjoining Defendants from any further violation of Dr. Finkelstein's rights.

WHEREFORE, the Plaintiff, Dr. Paige Finkelstein, respectfully requests that this Court grant her Temporary Injunctive Relief as hereinabove stated for the reasons provided upon, together with all further relief deemed just and proper by this Court, and that the Court convert that Temporary Injunction to a Permanent Injunction after the trial of this matter by the trier of fact.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury for all claims so triable as of right.

Dated this 30th day of December, 2022.

*Attorney for Plaintiff/Paige Finkelstein, M.D.*

NASON, YEAGER, GERSON, HARRIS & FUMERO, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, Florida 33410
Telephone:      (561) 686-3307
Facsimile:      (561) 686-5442
Richard H. Levenstein, Esq.
Primary E-mail: rlevenstein@nasonyeager.com
Secondary E-mail: ptreadway@nasonyeager.com;
creyes@nasonyeager.com


By: /s/ *Richard H. Levenstein* _____
            Richard H. Levenstein
            Florida Bar No. 235296

42

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed with the Clerk of Court and served by E-Mail through the Florida Courts E-Filing Portal on December 30, 2022 to the following:

**_Attorneys for Defendants_**
Martin B. Goldberg, Esq.
David R. Ruffner, Esq.
Clark Splichal, Esq.
Lash & Goldberg LLP
Miami Tower
100 S.E. 2nd Street
Suite 1200
Miami, Florida 33131
Primary Email: mgoldberg@lashgoldberg.com; csplichal@lashgoldberg.com
druffner@lashgoldberg.com
Secondary Email: rdiaz@lashgoldberg.com; mwallace@lashgoldberg.com

*Attorneys for Plaintiff, Paige Finkelstein, M.D.*
NASON, YEAGER, GERSON,
HARRIS & FUMERO, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, Florida 33410
Telephone:      (561) 686-3307
Facsimile:      (561) 686-5442
Richard H. Levenstein, Esq.
Primary E-mail: rlevenstein@nasonyeager.com
Secondary E-mail: ptreadway@nasonyeager.com;
 creyes@nasonyeager.com


By:    /s/ Richard H. Levenstein
           Richard H. Levenstein
           Florida Bar No. 235296

## <u>VERIFICATION</u>

STATE OF FLORIDA        )

                                   )

COUNTY OF <u> PALM BEACH </u>    )

        Before me, the undersigned authority, personally appeared Paige Finkelstein, M.D., who was sworn and states the facts in the foregoing Amended Complaint in the case of Paige Finkelstein, M.D. vs Mount Sinai Medical Center of Florida, Inc. and Dr. Kfir Ben-David are true and correct.

> **Paige Finkelstein**
> Signed on 2022/12/30 10:17:59 -8:00

_____
PAIGE FINKELSTEIN, M.D.
Paige Finkelstein

_____
Print Name

        Sworn to (or affirmed) and subscribed before ☐ physical presence or ☒ online notarization me this <u>30TH</u> day of <u>  DECEMBER  </u>, 2022, by PAIGE FINKELSTEIN, M.D. who is ☒ personally known to me or ☐ provided the following identification: _____

_____.

**Michelle A. Narea**
**Commission # HH 226234**
Notary Public - State of Florida
My Commission Expires Apr 08, 2026



_____
Notary Public - State of Florida
Michelle A. Narea

NOTARY PUBLIC
State of Florida at Large

My Commission Expires:

Notarial act performed by audio-visual communication

C2639A3A-C2BC-4E39-B0E1-250C15017826 — 2022/12/30 08.37:25 -5:00 — Remote Notary

# EXHIBIT A



# ACGME

# Common Program Requirements

ACGME approved revisions to Sections I-V: effective 2007, 2013, 2015, 2016
ACGME approved major revision of Section VI: February, 2017; effective: July 1, 2017

Common Program Requirements

Note: The term "resident" in this document refers to both specialty residents and subspecialty fellows. Once the Common Program Requirements are inserted into each set of specialty and subspecialty requirements, the terms "resident" and "fellow" will be used respectively.

Where applicable, text in italics describes the underlying philosophy of the requirements in that section. These philosophic statements are not program requirements and are therefore not citable.

Introduction

Int.A.   Residency is an essential dimension of the transformation of the medical student to the independent practitioner along the continuum of medical education. It is physically, emotionally, and intellectually demanding, and requires longitudinally-concentrated effort on the part of the resident.

The specialty education of physicians to practice independently is experiential, and necessarily occurs within the context of the health care delivery system. Developing the skills, knowledge, and attitudes leading to proficiency in all the domains of clinical competency requires the resident physician to assume personal responsibility for the care of individual patients. For the resident, the essential learning activity is interaction with patients under the guidance and supervision of faculty members who give value, context, and meaning to those interactions. As residents gain experience and demonstrate growth in their ability to care for patients, they assume roles that permit them to exercise those skills with greater independence. This concept--graded and progressive responsibility--is one of the core tenets of American graduate medical education. Supervision in the setting of graduate medical education has the goals of assuring the provision of safe and effective care to the individual patient; assuring each resident's development of the skills, knowledge, and attitudes required to enter the unsupervised practice of medicine; and establishing a foundation for continued professional growth.

I.   Institutions

I.A.   Sponsoring Institution

One sponsoring institution must assume ultimate responsibility for the program, as described in the Institutional Requirements, and this responsibility extends to resident assignments at all participating sites. (Core)*

The sponsoring institution and the program must ensure that the program director has sufficient protected time and financial support for his or her educational and administrative responsibilities to the program. (Core)

I.B.   Participating Sites

I.B.1.   There must be a program letter of agreement (PLA) between the program and each participating site providing a required assignment. The PLA must be renewed at least every five years. (Core)

The PLA should:

I.B.1.a)   identify the faculty who will assume both educational and supervisory responsibilities for residents; (Detail)

I.B.1.b)   specify their responsibilities for teaching, supervision, and formal evaluation of residents, as specified later in this document; (Detail)

I.B.1.c)   specify the duration and content of the educational experience; and, (Detail)

I.B.1.d)   state the policies and procedures that will govern resident education during the assignment. (Detail)

I.B.2.   The program director must submit any additions or deletions of participating sites routinely providing an educational experience, required for all residents, of one month full time equivalent (FTE) or more through the Accreditation Council for Graduate Medical Education (ACGME) Accreditation Data System (ADS). (Core)

[As further specified by the Review Committee]

II.   Program Personnel and Resources

II.A.   Program Director

II.A.1.   There must be a single program director with authority and accountability for the operation of the program. The sponsoring institution's GMEC must approve a change in program director. (Core)

II.A.1.a)   The program director must submit this change to the ACGME via the ADS. (Core)

[As further specified by the Review Committee]

II.A.2.   The program director should continue in his or her position for a length of time adequate to maintain continuity of leadership and program stability. (Detail)

II.A.3.   Qualifications of the program director must include:

II.A.3.a)   requisite specialty expertise and documented educational and administrative experience acceptable to the Review Committee; (Core)

II.A.3.b)   current certification in the specialty by the American Board of _____, or specialty qualifications that are acceptable to the Review Committee; and, (Core)

II.A.3.c)   current medical licensure and appropriate medical staff appointment. (Core)

[As further specified by the Review Committee]

| | |
|---|---|
| II.A.4. | The program director must administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas. (Core) |

The program director must:

| | |
|---|---|
| II.A.4.a) | oversee and ensure the quality of didactic and clinical education in all sites that participate in the program; (Core) |
| II.A.4.b) | approve a local director at each participating site who is accountable for resident education; (Core) |
| II.A.4.c) | approve the selection of program faculty as appropriate; (Core) |
| II.A.4.d) | evaluate program faculty; (Core) |
| II.A.4.e) | approve the continued participation of program faculty based on evaluation; (Core) |
| II.A.4.f) | monitor resident supervision at all participating sites; (Core) |
| II.A.4.g) | prepare and submit all information required and requested by the ACGME. (Core) |
| II.A.4.g).(1) | This includes but is not limited to the program application forms and annual program updates to the ADS, and ensure that the information submitted is accurate and complete. (Core) |
| II.A.4.h) | ensure compliance with grievance and due process procedures as set forth in the Institutional Requirements and implemented by the sponsoring institution; (Detail) |
| II.A.4.i) | provide verification of residency education for all residents, including those who leave the program prior to completion; (Detail) |
| II.A.4.j) | implement policies and procedures consistent with the institutional and program requirements for resident duty hours and the working environment, including moonlighting, (Core) |

and, to that end, must:

| | |
|---|---|
| II.A.4.j).(1) | distribute these policies and procedures to the residents and faculty; (Detail) |
| II.A.4.j).(2) | monitor resident duty hours, according to sponsoring institutional policies, with a frequency sufficient to ensure compliance with ACGME requirements; (Core) |
| II.A.4.j).(3) | adjust schedules as necessary to mitigate excessive |

service demands and/or fatigue; and, (Detail)

II.A.4.j).(4)          if applicable, monitor the demands of at-home call and adjust schedules as necessary to mitigate excessive service demands and/or fatigue. (Detail)

II.A.4.k)          monitor the need for and ensure the provision of back up support systems when patient care responsibilities are unusually difficult or prolonged; (Detail)

II.A.4.l)          comply with the sponsoring institution's written policies and procedures, including those specified in the Institutional Requirements, for selection, evaluation and promotion of residents, disciplinary action, and supervision of residents; (Detail)

II.A.4.m)          be familiar with and comply with ACGME and Review Committee policies and procedures as outlined in the ACGME Manual of Policies and Procedures; (Detail)

II.A.4.n)          obtain review and approval of the sponsoring institution's GMEC/DIO before submitting information or requests to the ACGME, including: (Core)

II.A.4.n).(1)          all applications for ACGME accreditation of new programs; (Detail)

II.A.4.n).(2)          changes in resident complement; (Detail)

II.A.4.n).(3)          major changes in program structure or length of training; (Detail)

II.A.4.n).(4)          progress reports requested by the Review Committee; (Detail)

II.A.4.n).(5)          requests for increases or any change to resident duty hours; (Detail)

II.A.4.n).(6)          voluntary withdrawals of ACGME-accredited programs; (Detail)

II.A.4.n).(7)          requests for appeal of an adverse action; and, (Detail)

II.A.4.n).(8)          appeal presentations to a Board of Appeal or the ACGME. (Detail)

II.A.4.o)          obtain DIO review and co-signature on all program application forms, as well as any correspondence or document submitted to the ACGME that addresses: (Detail)

II.A.4.o).(1)          program citations, and/or, (Detail)

II.A.4.o).(2)          request for changes in the program that would have

significant impact, including financial, on the program or institution. (Detail)

[As further specified by the Review Committee]

II.B.        Faculty

II.B.1.        At each participating site, there must be a sufficient number of faculty with documented qualifications to instruct and supervise all residents at that location. (Core)

The faculty must:

II.B.1.a)        devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; and to demonstrate a strong interest in the education of residents; and, (Core)

II.B.1.b)        administer and maintain an educational environment conducive to educating residents in each of the ACGME competency areas. (Core)

II.B.2.        The physician faculty must have current certification in the specialty by the American Board of _____, or possess qualifications judged acceptable to the Review Committee. (Core)

[As further specified by the Review Committee]

II.B.3.        The physician faculty must possess current medical licensure and appropriate medical staff appointment. (Core)

II.B.4.        The nonphysician faculty must have appropriate qualifications in their field and hold appropriate institutional appointments. (Core)

II.B.5.        The faculty must establish and maintain an environment of inquiry and scholarship with an active research component. (Core)

II.B.5.a)        The faculty must regularly participate in organized clinical discussions, rounds, journal clubs, and conferences. (Detail)

II.B.5.b)        Some members of the faculty should also demonstrate scholarship by one or more of the following:

II.B.5.b).(1)        peer-reviewed funding; (Detail)

II.B.5.b).(2)        publication of original research or review articles in peer reviewed journals, or chapters in textbooks; (Detail)

II.B.5.b).(3)        publication or presentation of case reports or clinical series at local, regional, or national professional and scientific society meetings; or, (Detail)

II.B.5.b).(4)        participation in national committees or educational

organizations. (Detail)

II.B.5.c)     Faculty should encourage and support residents in scholarly activities. (Core)

     [As further specified by the Review Committee]

II.C.   Other Program Personnel

   The institution and the program must jointly ensure the availability of all necessary professional, technical, and clerical personnel for the effective administration of the program. (Core)

   [As further specified by the Review Committee]

II.D.   Resources

   The institution and the program must jointly ensure the availability of adequate resources for resident education, as defined in the specialty program requirements. (Core)

   [As further specified by the Review Committee]

II.E.   Medical Information Access

   Residents must have ready access to specialty-specific and other appropriate reference material in print or electronic format. Electronic medical literature databases with search capabilities should be available. (Detail)

III.  Resident Appointments

III.A.   Eligibility Criteria

   The program director must comply with the criteria for resident eligibility as specified in the Institutional Requirements. (Core)

III.A.1.    Eligibility Requirements – Residency Programs

III.A.1.a)     All prerequisite post-graduate clinical education required for initial entry or transfer into ACGME-accredited residency programs must be completed in ACGME-accredited residency programs, or in Royal College of Physicians and Surgeons of Canada (RCPSC)-accredited or College of Family Physicians of Canada (CFPC)-accredited residency programs located in Canada. Residency programs must receive verification of each applicant's level of competency in the required clinical field using ACGME or CanMEDS Milestones assessments from the prior training program. (Core)

III.A.1.b)     A physician who has completed a residency program that was not accredited by ACGME, RCPSC, or CFPC may enter an ACGME-accredited residency program in the same specialty at the PGY-1

level and, at the discretion of the program director at the ACGME-accredited program may be advanced to the PGY-2 level based on ACGME Milestones assessments at the ACGME-accredited program. This provision applies only to entry into residency in those specialties for which an initial clinical year is not required for entry. (Core)

| | |
|---|---|
| III.A.1.c) | A Review Committee may grant the exception to the eligibility requirements specified in Section III.A.2.b) for residency programs that require completion of a prerequisite residency program prior to admission. (Core) |
| III.A.1.d) | Review Committees will grant no other exceptions to these eligibility requirements for residency education. (Core) |
| III.A.2. | Eligibility Requirements – Fellowship Programs |

All required clinical education for entry into ACGME-accredited fellowship programs must be completed in an ACGME-accredited residency program, or in an RCPSC-accredited or CFPC- accredited residency program located in Canada. (Core)

| | |
|---|---|
| III.A.2.a) | Fellowship programs must receive verification of each entering fellow's level of competency in the required field using ACGME or CanMEDS Milestones assessments from the core residency program. (Core) |
| III.A.2.b) | Fellow Eligibility Exception |

A Review Committee may grant the following exception to the fellowship eligibility requirements:

An ACGME-accredited fellowship program may accept an exceptionally qualified applicant**, who does not satisfy the eligibility requirements listed in Sections III.A.2. and III.A.2.a), but who does meet all of the following additional qualifications and conditions: (Core)

| | |
|---|---|
| III.A.2.b).(1) | Assessment by the program director and fellowship selection committee of the applicant's suitability to enter the program, based on prior training and review of the summative evaluations of training in the core specialty; and (Core) |
| III.A.2.b).(2) | Review and approval of the applicant's exceptional qualifications by the GMEC or a subcommittee of the GMEC; and (Core) |
| III.A.2.b).(3) | Satisfactory completion of the United States Medical Licensing Examination (USMLE) Steps 1, 2, and, if the applicant is eligible, 3, and; (Core) |

III.A.2.b).(4)  For an international graduate, verification of Educational Commission for Foreign Medical Graduates (ECFMG) certification; and, [(Core)]

III.A.2.b).(5)  Applicants accepted by this exception must complete fellowship Milestones evaluation (for the purposes of establishment of baseline performance by the Clinical Competency Committee), conducted by the receiving fellowship program within six weeks of matriculation. This evaluation may be waived for an applicant who has completed an ACGME International-accredited residency based on the applicant's Milestones evaluation conducted at the conclusion of the residency program. [(Core)]

III.A.2.b).(5).(a)  If the trainee does not meet the expected level of Milestones competency following entry into the fellowship program, the trainee must undergo a period of remediation, overseen by the Clinical Competency Committee and monitored by the GMEC or a subcommittee of the GMEC. This period of remediation must not count toward time in fellowship training. [(Core)]

** An exceptionally qualified applicant has (1) completed a non-ACGME-accredited residency program in the core specialty, and (2) demonstrated clinical excellence, in comparison to peers, throughout training. Additional evidence of exceptional qualifications is required, which may include one of the following: (a) participation in additional clinical or research training in the specialty or subspecialty; (b) demonstrated scholarship in the specialty or subspecialty; (c) demonstrated leadership during or after residency training; (d) completion of an ACGME-International-accredited residency program.

[Each Review Committee will decide no later than December 31, 2013 whether the exception specified above will be permitted. If the Review Committee will not allow this exception, the program requirements will include the following statement]:

III.A.2.c) The Review Committee for _____ does not allow exceptions to the Eligibility Requirements for Fellowship Programs in Section III.A.2. [(Core)]

III.B.  Number of Residents

The program's educational resources must be adequate to support the number of residents appointed to the program. [(Core)]

III.B.1.  The program director may not appoint more residents than approved by the Review Committee, unless otherwise stated in the specialty-specific requirements. [(Core)]

[As further specified by the Review Committee]

III.C.               Resident Transfers

III.C.1.            Before accepting a resident who is transferring from another program, the program director must obtain written or electronic verification of previous educational experiences and a summative competency-based performance evaluation of the transferring resident. (Detail)

III.C.2.            A program director must provide timely verification of residency education and summative performance evaluations for residents who may leave the program prior to completion. (Detail)

III.D.               Appointment of Fellows and Other Learners

The presence of other learners (including, but not limited to, residents from other specialties, subspecialty fellows, PhD students, and nurse practitioners) in the program must not interfere with the appointed residents' education. (Core)

III.D.1.            The program director must report the presence of other learners to the DIO and GMEC in accordance with sponsoring institution guidelines. (Detail)

[As further specified by the Review Committee]

IV.          Educational Program

IV.A.              The curriculum must contain the following educational components:

IV.A.1.            Overall educational goals for the program, which the program must make available to residents and faculty; (Core)

IV.A.2.            Competency-based goals and objectives for each assignment at each educational level, which the program must distribute to residents and faculty at least annually, in either written or electronic form; (Core)

IV.A.3.            Regularly scheduled didactic sessions; (Core)

IV.A.4.            Delineation of resident responsibilities for patient care, progressive responsibility for patient management, and supervision of residents over the continuum of the program; and, (Core)

IV.A.5.            ACGME Competencies

The program must integrate the following ACGME competencies into the curriculum: (Core)

IV.A.5.a)            Patient Care and Procedural Skills

IV.A.5.a).(1)         Residents must be able to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health. Residents: (Outcome)

[As further specified by the Review Committee]

| | |
|---|---|
| IV.A.5.a).(2) | Residents must be able to competently perform all medical, diagnostic, and surgical procedures considered essential for the area of practice. Residents: (Outcome) |

[As further specified by the Review Committee]

| | |
|---|---|
| IV.A.5.b) | Medical Knowledge |

Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social-behavioral sciences, as well as the application of this knowledge to patient care. Residents: (Outcome)

[As further specified by the Review Committee]

| | |
|---|---|
| IV.A.5.c) | Practice-based Learning and Improvement |

Residents must demonstrate the ability to investigate and evaluate their care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and life-long learning. (Outcome)

Residents are expected to develop skills and habits to be able to meet the following goals:

| | |
|---|---|
| IV.A.5.c).(1) | identify strengths, deficiencies, and limits in one's knowledge and expertise; (Outcome) |
| IV.A.5.c).(2) | set learning and improvement goals; (Outcome) |
| IV.A.5.c).(3) | identify and perform appropriate learning activities; (Outcome) |
| IV.A.5.c).(4) | systematically analyze practice using quality improvement methods, and implement changes with the goal of practice improvement; (Outcome) |
| IV.A.5.c).(5) | incorporate formative evaluation feedback into daily practice; (Outcome) |
| IV.A.5.c).(6) | locate, appraise, and assimilate evidence from scientific studies related to their patients' health problems; (Outcome) |
| IV.A.5.c).(7) | use information technology to optimize learning; and, (Outcome) |
| IV.A.5.c).(8) | participate in the education of patients, families, students, residents and other health professionals. (Outcome) |

[As further specified by the Review Committee]

| | |
|---|---|
| IV.A.5.d) | Interpersonal and Communication Skills |

Residents must demonstrate interpersonal and communication skills that result in the effective exchange of information and collaboration with patients, their families, and health professionals. (Outcome)

Residents are expected to:

| IV.A.5.d).(1) | communicate effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds; (Outcome) |
|---|---|
| IV.A.5.d).(2) | communicate effectively with physicians, other health professionals, and health related agencies; (Outcome) |
| IV.A.5.d).(3) | work effectively as a member or leader of a health care team or other professional group; (Outcome) |
| IV.A.5.d).(4) | act in a consultative role to other physicians and health professionals; and, (Outcome) |
| IV.A.5.d).(5) | maintain comprehensive, timely, and legible medical records, if applicable. (Outcome) |

[As further specified by the Review Committee]

IV.A.5.e)            Professionalism

Residents must demonstrate a commitment to carrying out professional responsibilities and an adherence to ethical principles. (Outcome)

Residents are expected to demonstrate:

| IV.A.5.e).(1) | compassion, integrity, and respect for others; (Outcome) |
|---|---|
| IV.A.5.e).(2) | responsiveness to patient needs that supersedes self-interest; (Outcome) |
| IV.A.5.e).(3) | respect for patient privacy and autonomy; (Outcome) |
| IV.A.5.e).(4) | accountability to patients, society and the profession; and, (Outcome) |
| IV.A.5.e).(5) | sensitivity and responsiveness to a diverse patient population, including but not limited to diversity in gender, age, culture, race, religion, disabilities, and sexual orientation. (Outcome) |

[As further specified by the Review Committee]

IV.A.5.f)            Systems-based Practice

Residents must demonstrate an awareness of and responsiveness to the larger context and system of health care, as well as the ability to call effectively on other resources in the system to provide optimal health care. (Outcome)

Residents are expected to:

IV.A.5.f).(1)    work effectively in various health care delivery settings and systems relevant to their clinical specialty; (Outcome)

IV.A.5.f).(2)    coordinate patient care within the health care system relevant to their clinical specialty; (Outcome)

IV.A.5.f).(3)    incorporate considerations of cost awareness and risk-benefit analysis in patient and/or population-based care as appropriate; (Outcome)

IV.A.5.f).(4)    advocate for quality patient care and optimal patient care systems; (Outcome)

IV.A.5.f).(5)    work in interprofessional teams to enhance patient safety and improve patient care quality; and, (Outcome)

IV.A.5.f).(6)    participate in identifying system errors and implementing potential systems solutions. (Outcome)

[As further specified by the Review Committee]

IV.B.    Residents' Scholarly Activities

IV.B.1.    The curriculum must advance residents' knowledge of the basic principles of research, including how research is conducted, evaluated, explained to patients, and applied to patient care. (Core)

IV.B.2.    Residents should participate in scholarly activity. (Core)

[As further specified by the Review Committee]

IV.B.3.    The sponsoring institution and program should allocate adequate educational resources to facilitate resident involvement in scholarly activities. (Detail)

[As further specified by the Review Committee]

V.    Evaluation

V.A.    Resident Evaluation

V.A.1.    The program director must appoint the Clinical Competency Committee. (Core)

| | |
|---|---|
| V.A.1.a) | At a minimum the Clinical Competency Committee must be composed of three members of the program faculty. (Core) |
| V.A.1.a).(1) | The program director may appoint additional members of the Clinical Competency Committee. |
| V.A.1.a).(1).(a) | These additional members must be physician faculty members from the same program or other programs, or other health professionals who have extensive contact and experience with the program's residents in patient care and other health care settings. (Core) |
| V.A.1.a).(1).(b) | Chief residents who have completed core residency programs in their specialty and are eligible for specialty board certification may be members of the Clinical Competency Committee. (Core) |
| V.A.1.b) | There must be a written description of the responsibilities of the Clinical Competency Committee. (Core) |
| V.A.1.b).(1) | The Clinical Competency Committee should: |
| V.A.1.b).(1).(a) | review all resident evaluations semi-annually; (Core) |
| V.A.1.b).(1).(b) | prepare and ensure the reporting of Milestones evaluations of each resident semi-annually to ACGME; and, (Core) |
| V.A.1.b).(1).(c) | advise the program director regarding resident progress, including promotion, remediation, and dismissal. (Detail) |
| V.A.2. | Formative Evaluation |
| V.A.2.a) | The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment. (Core) |
| V.A.2.b) | The program must: |
| V.A.2.b).(1) | provide objective assessments of competence in patient care and procedural skills, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems-based practice based on the specialty-specific Milestones; (Core) |
| V.A.2.b).(2) | use multiple evaluators (e.g., faculty, peers, patients, self, and other professional staff); (Detail) |
| V.A.2.b).(3) | document progressive resident performance improvement |

appropriate to educational level; and, (Core)

V.A.2.b).(4)    provide each resident with documented semiannual evaluation of performance with feedback. (Core)

V.A.2.c)    The evaluations of resident performance must be accessible for review by the resident, in accordance with institutional policy. (Detail)

V.A.3.    Summative Evaluation

V.A.3.a)    The specialty-specific Milestones must be used as one of the tools to ensure residents are able to practice core professional activities without supervision upon completion of the program. (Core)

V.A.3.b)    The program director must provide a summative evaluation for each resident upon completion of the program. (Core)

This evaluation must:

V.A.3.b).(1)    become part of the resident's permanent record maintained by the institution, and must be accessible for review by the resident in accordance with institutional policy; (Detail)

V.A.3.b).(2)    document the resident's performance during the final period of education; and, (Detail)

V.A.3.b).(3)    verify that the resident has demonstrated sufficient competence to enter practice without direct supervision. (Detail)

V.B.    Faculty Evaluation

V.B.1.    At least annually, the program must evaluate faculty performance as it relates to the educational program. (Core)

V.B.2.    These evaluations should include a review of the faculty's clinical teaching abilities, commitment to the educational program, clinical knowledge, professionalism, and scholarly activities. (Detail)

V.B.3.    This evaluation must include at least annual written confidential evaluations by the residents. (Detail)

V.C.    Program Evaluation and Improvement

V.C.1.    The program director must appoint the Program Evaluation Committee (PEC). (Core)

V.C.1.a)    The Program Evaluation Committee:

V.C.1.a).(1)    must be composed of at least two program faculty members and should include at least one resident; (Core)

V.C.1.a).(2)                        must have a written description of its responsibilities; and, (Core)

V.C.1.a).(3)                        should participate actively in:

V.C.1.a).(3).(a)                        planning, developing, implementing, and evaluating educational activities of the program; (Detail)

V.C.1.a).(3).(b)                        reviewing and making recommendations for revision of competency-based curriculum goals and objectives; (Detail)

V.C.1.a).(3).(c)                        addressing areas of non-compliance with ACGME standards; and, (Detail)

V.C.1.a).(3).(d)                        reviewing the program annually using evaluations of faculty, residents, and others, as specified below. (Detail)

V.C.2.                The program, through the PEC, must document formal, systematic evaluation of the curriculum at least annually, and is responsible for rendering a written, annual program evaluation. (Core)

The program must monitor and track each of the following areas:

V.C.2.a)                resident performance; (Core)

V.C.2.b)                faculty development; (Core)

V.C.2.c)                graduate performance, including performance of program graduates on the certification examination; (Core)

V.C.2.d)                program quality; and, (Core)

V.C.2.d).(1)                        Residents and faculty must have the opportunity to evaluate the program confidentially and in writing at least annually, and (Detail)

V.C.2.d).(2)                        The program must use the results of residents' and faculty members' assessments of the program together with other program evaluation results to improve the program. (Detail)

V.C.2.e)                progress on the previous year's action plan(s). (Core)

V.C.3.                The PEC must prepare a written plan of action to document initiatives to improve performance in one or more of the areas listed in section V.C.2., as well as delineate how they will be measured and monitored. (Core)

V.C.3.a)                        The action plan should be reviewed and approved by the teaching faculty and documented in meeting minutes. (Detail)

VI.     The Learning and Working Environment

*Residency education must occur in the context of a learning and working environment that emphasizes the following principles:*

- *Excellence in the safety and quality of care rendered to patients by residents today*

- *Excellence in the safety and quality of care rendered to patients by today's residents in their future practice*

- *Excellence in professionalism through faculty modeling of:*

    o *the effacement of self-interest in a humanistic environment that supports the professional development of physicians*

    o *the joy of curiosity, problem-solving, intellectual rigor, and discovery*

- *Commitment to the well-being of the students, residents, faculty members, and all members of the health care team*

VI.A.       Patient Safety, Quality Improvement, Supervision, and Accountability

VI.A.1.          Patient Safety and Quality Improvement

*All physicians share responsibility for promoting patient safety and enhancing quality of patient care. Graduate medical education must prepare residents to provide the highest level of clinical care with continuous focus on the safety, individual needs, and humanity of their patients. It is the right of each patient to be cared for by residents who are appropriately supervised; possess the requisite knowledge, skills, and abilities; understand the limits of their knowledge and experience; and seek assistance as required to provide optimal patient care.*

*Residents must demonstrate the ability to analyze the care they provide, understand their roles within health care teams, and play an active role in system improvement processes. Graduating residents will apply these skills to critique their future unsupervised practice and effect quality improvement measures.*

*It is necessary for residents and faculty members to consistently work in a well-coordinated manner with other health care professionals to achieve organizational patient safety goals.*

VI.A.1.a)            Patient Safety

VI.A.1.a).(1)          Culture of Safety

*A culture of safety requires continuous identification of vulnerabilities and a willingness to transparently deal with them. An effective organization has formal mechanisms to assess the knowledge, skills, and attitudes of its personnel toward safety in order to identify areas for improvement.*

VI.A.1.a).(1).(a)    The program, its faculty, residents, and fellows must actively participate in patient safety systems and contribute to a culture of safety. (Core)

VI.A.1.a).(1).(b)    The program must have a structure that promotes safe, interprofessional, team-based care. (Core)

VI.A.1.a).(2)    Education on Patient Safety

Programs must provide formal educational activities that promote patient safety-related goals, tools, and techniques. (Core)

VI.A.1.a).(3)    Patient Safety Events

*Reporting, investigation, and follow-up of adverse events, near misses, and unsafe conditions are pivotal mechanisms for improving patient safety, and are essential for the success of any patient safety program. Feedback and experiential learning are essential to developing true competence in the ability to identify causes and institute sustainable systems-based changes to ameliorate patient safety vulnerabilities.*

VI.A.1.a).(3).(a)    Residents, fellows, faculty members, and other clinical staff members must:

VI.A.1.a).(3).(a).(i)    know their responsibilities in reporting patient safety events at the clinical site; (Core)

VI.A.1.a).(3).(a).(ii)    know how to report patient safety events, including near misses, at the clinical site; and, (Core)

VI.A.1.a).(3).(a).(iii)    be provided with summary information of their institution's patient safety reports. (Core)

VI.A.1.a).(3).(b)    Residents must participate as team members in real and/or simulated interprofessional clinical patient safety activities, such as root cause analyses or other activities that include analysis, as well as formulation and implementation of actions. (Core)

VI.A.1.a).(4)    Resident Education and Experience in Disclosure of Adverse Events

*Patient-centered care requires patients, and when appropriate families, to be apprised of clinical situations that affect them, including adverse events. This is an important skill for faculty physicians to model, and for*

*residents to develop and apply.*

VI.A.1.a).(4).(a)　　　　　All residents must receive training in how to disclose adverse events to patients and families. (Core)

VI.A.1.a).(4).(b)　　　　　Residents should have the opportunity to participate in the disclosure of patient safety events, real or simulated. (Detail)

VI.A.1.b)　　　　Quality Improvement

VI.A.1.b).(1)　　　　Education in Quality Improvement

*A cohesive model of health care includes quality-related goals, tools, and techniques that are necessary in order for health care professionals to achieve quality improvement goals.*

VI.A.1.b).(1).(a)　　　　Residents must receive training and experience in quality improvement processes, including an understanding of health care disparities. (Core)

VI.A.1.b).(2)　　　　Quality Metrics

*Access to data is essential to prioritizing activities for care improvement and evaluating success of improvement efforts.*

VI.A.1.b).(2).(a)　　　　Residents and faculty members must receive data on quality metrics and benchmarks related to their patient populations. (Core)

VI.A.1.b).(3)　　　　Engagement in Quality Improvement Activities

*Experiential learning is essential to developing the ability to identify and institute sustainable systems-based changes to improve patient care.*

VI.A.1.b).(3).(a)　　　　Residents must have the opportunity to participate in interprofessional quality improvement activities. (Core)

VI.A.1.b).(3).(a).(i)　　　　This should include activities aimed at reducing health care disparities. (Detail)

VI.A.2.　　　　Supervision and Accountability

*VI.A.2.a)*　　　　*Although the attending physician is ultimately responsible for the care of the patient, every physician shares in the responsibility and accountability for their efforts in the provision of care. Effective programs, in partnership with their Sponsoring*

*Institutions, define, widely communicate, and monitor a structured chain of responsibility and accountability as it relates to the supervision of all patient care.*

*Supervision in the setting of graduate medical education provides safe and effective care to patients; ensures each resident's development of the skills, knowledge, and attitudes required to enter the unsupervised practice of medicine; and establishes a foundation for continued professional growth.*

VI.A.2.a).(1) Each patient must have an identifiable and appropriately-credentialed and privileged attending physician (or licensed independent practitioner as specified by the applicable Review Committee) who is responsible and accountable for the patient's care. [Core]

VI.A.2.a).(1).(a) This information must be available to residents, faculty members, other members of the health care team, and patients. [Core]

VI.A.2.a).(1).(b) Residents and faculty members must inform each patient of their respective roles in that patient's care when providing direct patient care. [Core]

VI.A.2.b) *Supervision may be exercised through a variety of methods. For many aspects of patient care, the supervising physician may be a more advanced resident or fellow. Other portions of care provided by the resident can be adequately supervised by the immediate availability of the supervising faculty member, fellow, or senior resident physician, either on site or by means of telephonic and/or electronic modalities. Some activities require the physical presence of the supervising faculty member. In some circumstances, supervision may include post-hoc review of resident-delivered care with feedback.*

VI.A.2.b).(1) The program must demonstrate that the appropriate level of supervision in place for all residents is based on each resident's level of training and ability, as well as patient complexity and acuity. Supervision may be exercised through a variety of methods, as appropriate to the situation. [Core]

[The Review Committee may specify which activities require different levels of supervision.]

VI.A.2.c) Levels of Supervision

To promote oversight of resident supervision while providing for graded authority and responsibility, the program must use the following classification of supervision: [Core]

VI.A.2.c).(1) Direct Supervision – the supervising physician is physically

present with the resident and patient. (Core)

VI.A.2.c).(2)         Indirect Supervision:

VI.A.2.c).(2).(a)             with Direct Supervision immediately available – the supervising physician is physically within the hospital or other site of patient care, and is immediately available to provide Direct Supervision. (Core)

VI.A.2.c).(2).(b)             with Direct Supervision available – the supervising physician is not physically present within the hospital or other site of patient care, but is immediately available by means of telephonic and/or electronic modalities, and is available to provide Direct Supervision. (Core)

VI.A.2.c).(3)         Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered. (Core)

VI.A.2.d)         The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members. (Core)

VI.A.2.d).(1)         The program director must evaluate each resident's abilities based on specific criteria, guided by the Milestones. (Core)

VI.A.2.d).(2)         Faculty members functioning as supervising physicians must delegate portions of care to residents based on the needs of the patient and the skills of each resident. (Core)

VI.A.2.d).(3)         Senior residents or fellows should serve in a supervisory role to junior residents in recognition of their progress toward independence, based on the needs of each patient and the skills of the individual resident or fellow. (Detail)

VI.A.2.e)         Programs must set guidelines for circumstances and events in which residents must communicate with the supervising faculty member(s). (Core)

VI.A.2.e).(1)         Each resident must know the limits of their scope of authority, and the circumstances under which the resident is permitted to act with conditional independence. (Outcome)

VI.A.2.e).(1).(a)             Initially, PGY-1 residents must be supervised either directly, or indirectly with direct supervision immediately available. [Each Review Committee may describe the conditions and the achieved competencies under which PGY-1 residents

progress to be supervised indirectly with direct supervision available.] (Core)

VI.A.2.f)          Faculty supervision assignments must be of sufficient duration to assess the knowledge and skills of each resident and to delegate to the resident the appropriate level of patient care authority and responsibility. (Core)

VI.B.          Professionalism

VI.B.1.          Programs, in partnership with their Sponsoring Institutions, must educate residents and faculty members concerning the professional responsibilities of physicians, including their obligation to be appropriately rested and fit to provide the care required by their patients. (Core)

VI.B.2.          The learning objectives of the program must:

VI.B.2.a)          be accomplished through an appropriate blend of supervised patient care responsibilities, clinical teaching, and didactic educational events; (Core)

VI.B.2.b)          be accomplished without excessive reliance on residents to fulfill non-physician obligations; and, (Core)

VI.B.2.c)          ensure manageable patient care responsibilities. (Core)

          [As further specified by the Review Committee]

VI.B.3.          The program director, in partnership with the Sponsoring Institution, must provide a culture of professionalism that supports patient safety and personal responsibility. (Core)

VI.B.4.          Residents and faculty members must demonstrate an understanding of their personal role in the:

VI.B.4.a)          provision of patient- and family-centered care; (Outcome)

VI.B.4.b)          safety and welfare of patients entrusted to their care, including the ability to report unsafe conditions and adverse events; (Outcome)

VI.B.4.c)          assurance of their fitness for work, including: (Outcome)

VI.B.4.c).(1)          management of their time before, during, and after clinical assignments; and, (Outcome)

VI.B.4.c).(2)          recognition of impairment, including from illness, fatigue, and substance use, in themselves, their peers, and other members of the health care team. (Outcome)

VI.B.4.d)          commitment to lifelong learning; (Outcome)

VI.B.4.e)          monitoring of their patient care performance improvement

indicators; and, (Outcome)

VI.B.4.f)          accurate reporting of clinical and educational work hours, patient outcomes, and clinical experience data. (Outcome)

VI.B.5.          All residents and faculty members must demonstrate responsiveness to patient needs that supersedes self-interest. This includes the recognition that under certain circumstances, the best interests of the patient may be served by transitioning that patient's care to another qualified and rested provider. (Outcome)

VI.B.6.          Programs must provide a professional, respectful, and civil environment that is free from mistreatment, abuse, or coercion of students, residents, faculty, and staff. Programs, in partnership with their Sponsoring Institutions, should have a process for education of residents and faculty regarding unprofessional behavior and a confidential process for reporting, investigating, and addressing such concerns. (Core)

VI.C.          Well-Being

*In the current health care environment, residents and faculty members are at increased risk for burnout and depression. Psychological, emotional, and physical well-being are critical in the development of the competent, caring, and resilient physician. Self-care is an important component of professionalism; it is also a skill that must be learned and nurtured in the context of other aspects of residency training. Programs, in partnership with their Sponsoring Institutions, have the same responsibility to address well-being as they do to evaluate other aspects of resident competence.*

VI.C.1.          This responsibility must include:

VI.C.1.a)          efforts to enhance the meaning that each resident finds in the experience of being a physician, including protecting time with patients, minimizing non-physician obligations, providing administrative support, promoting progressive autonomy and flexibility, and enhancing professional relationships; (Core)

VI.C.1.b)          attention to scheduling, work intensity, and work compression that impacts resident well-being; (Core)

VI.C.1.c)          evaluating workplace safety data and addressing the safety of residents and faculty members; (Core)

VI.C.1.d)          policies and programs that encourage optimal resident and faculty member well-being; and, (Core)

VI.C.1.d).(1)          Residents must be given the opportunity to attend medical, mental health, and dental care appointments, including those scheduled during their working hours. (Core)

VI.C.1.e)          attention to resident and faculty member burnout, depression, and substance abuse. The program, in partnership with its Sponsoring

Institution, must educate faculty members and residents in identification of the symptoms of burnout, depression, and substance abuse, including means to assist those who experience these conditions. Residents and faculty members must also be educated to recognize those symptoms in themselves and how to seek appropriate care. The program, in partnership with its Sponsoring Institution, must: (Core)

VI.C.1.e).(1)          encourage residents and faculty members to alert the program director or other designated personnel or programs when they are concerned that another resident, fellow, or faculty member may be displaying signs of burnout, depression, substance abuse, suicidal ideation, or potential for violence; (Core)

VI.C.1.e).(2)          provide access to appropriate tools for self-screening; and, (Core)

VI.C.1.e).(3)          provide access to confidential, affordable mental health assessment, counseling, and treatment, including access to urgent and emergent care 24 hours a day, seven days a week. (Core)

VI.C.2.          There are circumstances in which residents may be unable to attend work, including but not limited to fatigue, illness, and family emergencies. Each program must have policies and procedures in place that ensure coverage of patient care in the event that a resident may be unable to perform their patient care responsibilities. These policies must be implemented without fear of negative consequences for the resident who is unable to provide the clinical work. (Core)

VI.D.          Fatigue Mitigation

VI.D.1.          Programs must:

VI.D.1.a)          educate all faculty members and residents to recognize the signs of fatigue and sleep deprivation; (Core)

VI.D.1.b)          educate all faculty members and residents in alertness management and fatigue mitigation processes; and, (Core)

VI.D.1.c)          encourage residents to use fatigue mitigation processes to manage the potential negative effects of fatigue on patient care and learning. (Detail)

VI.D.2.          Each program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in VI.C.2, in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue. (Core)

VI.D.3.          The program, in partnership with its Sponsoring Institution, must ensure adequate sleep facilities and safe transportation options for residents who

may be too fatigued to safely return home. (Core)

VI.E.        Clinical Responsibilities, Teamwork, and Transitions of Care

VI.E.1.      Clinical Responsibilities

The clinical responsibilities for each resident must be based on PGY level, patient safety, resident ability, severity and complexity of patient illness/condition, and available support services. (Core)

[Optimal clinical workload may be further specified by each Review Committee.]

VI.E.2.      Teamwork

Residents must care for patients in an environment that maximizes communication. This must include the opportunity to work as a member of effective interprofessional teams that are appropriate to the delivery of care in the specialty and larger health system. (Core)

[Each Review Committee will define the elements that must be present in each specialty.]

VI.E.3.      Transitions of Care

VI.E.3.a)    Programs must design clinical assignments to optimize transitions in patient care, including their safety, frequency, and structure. (Core)

VI.E.3.b)    Programs, in partnership with their Sponsoring Institutions, must ensure and monitor effective, structured hand-over processes to facilitate both continuity of care and patient safety. (Core)

VI.E.3.c)    Programs must ensure that residents are competent in communicating with team members in the hand-over process. (Outcome)

VI.E.3.d)    Programs and clinical sites must maintain and communicate schedules of attending physicians and residents currently responsible for care. (Core)

VI.E.3.e)    Each program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in VI.C.2, in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue or illness, or family emergency. (Core)

VI.F.        Clinical Experience and Education

*Programs, in partnership with their Sponsoring Institutions, must design an effective program structure that is configured to provide residents with educational and clinical experience opportunities, as well as reasonable*

*opportunities for rest and personal activities.*

| | |
|---|---|
| VI.F.1. | Maximum Hours of Clinical and Educational Work per Week |

Clinical and educational work hours must be limited to no more than 80 hours per week, averaged over a four-week period, inclusive of all in-house clinical and educational activities, clinical work done from home, and all moonlighting. (Core)

| | |
|---|---|
| VI.F.2. | Mandatory Time Free of Clinical Work and Education |

| | |
|---|---|
| VI.F.2.a) | The program must design an effective program structure that is configured to provide residents with educational opportunities, as well as reasonable opportunities for rest and personal well-being. (Core) |

| | |
|---|---|
| VI.F.2.b) | Residents should have eight hours off between scheduled clinical work and education periods. (Detail) |

| | |
|---|---|
| VI.F.2.b).(1) | There may be circumstances when residents choose to stay to care for their patients or return to the hospital with fewer than eight hours free of clinical experience and education. This must occur within the context of the 80-hour and the one-day-off-in-seven requirements. (Detail) |

| | |
|---|---|
| VI.F.2.c) | Residents must have at least 14 hours free of clinical work and education after 24 hours of in-house call. (Core) |

| | |
|---|---|
| VI.F.2.d) | Residents must be scheduled for a minimum of one day in seven free of clinical work and required education (when averaged over four weeks). At-home call cannot be assigned on these free days. (Core) |

| | |
|---|---|
| VI.F.3. | Maximum Clinical Work and Education Period Length |

| | |
|---|---|
| VI.F.3.a) | Clinical and educational work periods for residents must not exceed 24 hours of continuous scheduled clinical assignments. (Core) |

| | |
|---|---|
| VI.F.3.a).(1) | Up to four hours of additional time may be used for activities related to patient safety, such as providing effective transitions of care, and/or resident education. (Core) |

| | |
|---|---|
| VI.F.3.a).(1).(a) | Additional patient care responsibilities must not be assigned to a resident during this time. (Core) |

| | |
|---|---|
| VI.F.4. | Clinical and Educational Work Hour Exceptions |

| | |
|---|---|
| VI.F.4.a) | In rare circumstances, after handing off all other responsibilities, a resident, on their own initiative, may elect to remain or return to the clinical site in the following circumstances: |

VI.F.4.a).(1)          to continue to provide care to a single severely ill or unstable patient; (Detail)

VI.F.4.a).(2)          humanistic attention to the needs of a patient or family; or, (Detail)

VI.F.4.a).(3)          to attend unique educational events. (Detail)

VI.F.4.b)          These additional hours of care or education will be counted toward the 80-hour weekly limit. (Detail)

VI.F.4.c)          A Review Committee may grant rotation-specific exceptions for up to 10 percent or a maximum of 88 clinical and educational work hours to individual programs based on a sound educational rationale.

VI.F.4.c).(1)          In preparing a request for an exception, the program director must follow the clinical and educational work hour exception policy from the *ACGME Manual of Policies and Procedures*. (Core)

VI.F.4.c).(2)          Prior to submitting the request to the Review Committee, the program director must obtain approval from the Sponsoring Institution's GMEC and DIO. (Core)

VI.F.5.          Moonlighting

VI.F.5.a)          Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program, and must not interfere with the resident's fitness for work nor compromise patient safety. (Core)

VI.F.5.b)          Time spent by residents in internal and external moonlighting (as defined in the ACGME Glossary of Terms) must be counted toward the 80-hour maximum weekly limit. (Core)

VI.F.5.c)          PGY-1 residents are not permitted to moonlight. (Core)

VI.F.6.          In-House Night Float

                   Night float must occur within the context of the 80-hour and one-day-off-in-seven requirements. (Core)

                   [The maximum number of consecutive weeks of night float, and maximum number of months of night float per year may be further specified by the Review Committee.]

VI.F.7.          Maximum In-House On-Call Frequency

                   Residents must be scheduled for in-house call no more frequently than every third night (when averaged over a four-week period). (Core)

VI.F.8.               At-Home Call

VI.F.8.a)                          Time spent on patient care activities by residents on at-home call must count toward the 80-hour maximum weekly limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one day in seven free of clinical work and education, when averaged over four weeks. (Core)

VI.F.8.a).(1)                          At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident. (Core)

VI.F.8.b)                          Residents are permitted to return to the hospital while on at-home call to provide direct care for new or established patients. These hours of inpatient patient care must be included in the 80-hour maximum weekly limit. (Detail)

***

**Core Requirements:** Statements that define structure, resource, or process elements essential to every graduate medical educational program.

**Detail Requirements:** Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs and sponsoring institutions in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements.

**Outcome Requirements:** Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education.

# EXHIBIT B

# Mount Sinai
## MEDICAL CENTER

### GRADUATE MEDICAL EDUCATION PROGRAM AGREEMENT

For _____ Paige Finkelstein, M.D. _____

AGREEMENT entered into this ___11___ day of ___March___, 20__20__, by and between _____ Paige Finkelstein, M.D. _____ hereinafter referred to as "APPOINTEE" and MOUNT SINAI MEDICAL CENTER OF FLORIDA, INC., hereinafter referred to as the "MEDICAL CENTER." In consideration of the promises and mutual covenants and agreements contained herein, the parties agree as follows:

### 1. APPOINTMENT

The materials presented to the Medical Center demonstrate that the APPOINTEE has met the eligibility requirements as stated in the MEDICAL CENTER's Policy for the Selection, Evaluation, Promotion, and Dismissal of Residents. Based on the APPOINTEE having met those eligibility requirements, and in accordance with the recommendation of ___Kfir Ben-David, M.D.___, Program Director of ___Surgery___, the APPOINTEE will be designated as ___Third Year Resident in General Surgery (PGY3)___

This appointment will be for a one-year period commencing on ___June 24, 2020___ and terminating on ___June 23, 2021___ unless terminated as hereinafter stated. APPOINTEE acknowledges that during the term of this AGREEMENT he/she shall maintain a current license or maintain a current registration as an unlicensed physician with the Florida State Board of Medicine.

Final confirmation for appointment shall be subject to a satisfactory health examination conducted by the MEDICAL CENTER's Employee Health Services Department, such physical examination to include a screening test for the presence of non-prescribed substances, alcohol, and nicotine products. Offers of appointment to prospective employees who test positive for nicotine will be rescinded.

### 2. COMPENSATION AND BENEFITS

In consideration of this agreement, the MEDICAL CENTER shall pay the APPOINTEE an annual gross salary of ___$60,292.00___ paid bi-weekly in arrears. The MEDICAL CENTER shall deduct both FICA (Social Security) if applicable, and Federal Withholding Taxes. The APPOINTEE is provided three weeks (21 calendar days) annual paid vacation at the postgraduate year one ('PGY-1') level and four weeks (28 calendar days) annual paid vacation at all other levels. Such vacation shall be taken at a time determined by the APPOINTEE's Program Director during the year this AGREEMENT is in effect. For convenience, the MEDICAL CENTER may make such payments and provide the fringe benefits while APPOINTEE is temporarily assigned on a rotation to another institution.

The MEDICAL CENTER shall provide two weeks (14 calendar days) annual paid Sick Leave to be used only in the event of illness or injury.

Any on-duty accident will be covered by the MEDICAL CENTER's program for Worker's Compensation.

A group medical insurance plan shall be offered by the MEDICAL CENTER to the APPOINTEE. APPOINTEE may elect coverage for spouse and eligible children. The medical insurance plan coverage starts the first recognized day of the GME program. The medical plan offered will be determined by the MEDICAL CENTER and will be administered in accordance with the provisions of that plan. The MEDICAL CENTER reserves the right to change, alter, and/or amend the provisions of the plan including the plan's carrier at its sole discretion. APPOINTEE will have access to appropriate and confidential counseling and medical and psychological support services. Access to these services will be facilitated through either APPOINTEE's Program Director, primary care physician, or the Designated Institutional Official.

Medication stocked at the MEDICAL CENTER's Pharmacy shall be provided to the APPOINTEE, spouse and eligible children in accordance with the MEDICAL CENTER's current policy.

Dental insurance shall be offered by the MEDICAL CENTER to the APPOINTEE. APPOINTEE may elect coverage for spouse and eligible children. The dental insurance plan coverage starts the first recognized day of the GME program.

The MEDICAL CENTER provides group term life insurance to APPOINTEES to become effective on the first day they report for duty. The coverage for APPOINTEE is $50,000.00.

The MEDICAL CENTER provides Long Term Disability protection to APPOINTEES. The plan provides a $1500 monthly benefit after an elimination period of 180 days.

The MEDICAL CENTER will cover the APPOINTEE under its existing professional liability (malpractice) insurance program for services at the MEDICAL CENTER, which will cover the APPOINTEE's training activities under this Agreement. This includes claims made after the termination of this Agreement for actions that occurred during the term of this Agreement. It does not include claims made for actions occurring outside the APPOINTEE's full-time responsibility to the MEDICAL CENTER under this Agreement.

The APPOINTEE agrees to fully cooperate with the MEDICAL CENTER with respect to any litigation arising out of actions which occurred during the term of this Agreement (including claims made or investigations or proceedings on-going after termination of this Agreement). Such cooperation will include assistance with trial preparation, attendance at depositions and trial, and any other reasonable requests by the MEDICAL CENTER at no compensation to the APPOINTEE, provided that such preparation,

subsequent year.

The MEDICAL CENTER will reimburse APPOINTEE on a monthly basis to cover the cost of meals while taking in-house call. Amount of reimbursement is $10.00 per night on call. On-call sleep rooms shall be maintained by the MEDICAL CENTER.

## 3. LEAVE OF ABSENCE (LOA) POLICY

A leave of absence will be granted in the event of a medical or personal emergency. Each case will be evaluated by the Program Director on an individual basis. A written request for leave of absence should be submitted to the Program Director giving the reason, number of days required and address while away. The Office of Medical Education should be notified as soon as the individual arrangements have been made.

The MEDICAL CENTER may grant the APPOINTEE an unpaid medical leave of absence if the APPOINTEE is medically unable to work due to a non-occupational illness, injury or disability, but the APPOINTEE must first exhaust his/her sick time. The maximum duration for a medical leave is 3 months. In the event of a documented personal illness, APPOINTEE must take all remaining sick time before beginning a medical LOA. Paid vacation time may be taken if APPOINTEE so requests (subject to approval of vacation time by the MEDICAL CENTER), but the APPOINTEE does not have to exhaust vacation time before the LOA begins. A request for a medical LOA must be accompanied by the APPOINTEE'S personal physician's statement, which includes an estimated length of the LOA. A medical LOA is available only to APPOINTEES who are medically unable to work. Any APPOINTEE desiring additional time off following a period of disability may request a personal leave, which the MEDICAL CENTER, in its sole discretion, may grant. The MEDICAL CENTER has the right to request a certificate of continued disability by the physician on a regular basis during the medical LOA.

An unpaid personal leave of absence may be granted to give APPOINTEEs time to resolve personal or domestic problems or to address personal situations. Sick time may not be used to avoid a personal LOA or to delay one. Vacation time may be requested by APPOINTEE, but does not have to be exhausted before the LOA begins. A personal LOA may not be for a period longer than 3 months.

In the case of extended leave without pay, all other benefits will remain in effect. Returning to work part-time is an option that an APPOINTEE may discuss with the Program Director, but which shall be granted or denied at the sole discretion of the MEDICAL CENTER.

In the case of prolonged absence, APPOINTEE may have to make up the time in order to fulfill the Board requirements of his/her specialty. Access to information related to eligibility for specialty Board examinations is available on the specialty Board(s) website(s). The Program Director in consultation with the Designated Institutional Official will individually determine the necessary extra amount of time APPOINTEE will have to serve. APPOINTEE will receive full salary and benefits during the required extended time.

## 4. HOUSESTAFF PARENTAL LEAVE POLICY

The institution is supportive of APPOINTEEs during pregnancy, postpartum or adoption periods and the goal of this policy is to foster the health of the parent and child and at the same time protect adequate patient care and the educational requirements of the APPOINTEES. This policy should apply to maternal and paternal leave as well as to adoptions.

Pregnancy will be treated like any other disability, the duration of leave must be determined by the woman and her physician and according to the infant's health needs. In general, maternity leave begins approximately two weeks before delivery and ends six weeks postpartum. Each case will be evaluated by the Program Director on an individual basis, and the Office of Medical Education should be notified as soon as the individual arrangements have been made.

Parental leave should be requested and discussed with the Program Director as soon as the pregnancy is known, which may result in scheduling changes. Parental leave is not to exceed a maximum of 14 consecutive calendar days immediately following the birth or adoption of the infant, and each case will be evaluated by the Program Director on an individual basis. The APPOINTEE should immediately notify and discuss with the Program Director if there are any unexpected needs or changes in plans due to complicated pregnancy, delivery, or infant's health.

The APPOINTEE shall continue to receive salary and benefits during maternal/parental leave in accordance with the MEDICAL CENTER'S policy for disability. Accrual of vacation time and sick time will not continue during leave. In case of extended leave, the MEDICAL CENTER will make a decision as to salary and benefits on an individual basis. Returning to work part-time may be an option to be discussed with the Program Director.

In case of prolonged absence, APPOINTEE may have to make up the time required in order to fulfill the Board requirements of his/her specialty. Access to information related to eligibility for specialty Board examinations is available on the specialty Board(s) website(s). If the APPOINTEE has elective/selective time available following return from the maternal/parental leave, that time must be used to make up all required rotations in order to fulfill the Board requirement of her/his specialty. The Program Director in consultation with the Department Chair / Division Chief and the Designated Institutional Official will individually determine the necessary extra amount of time the APPOINTEE will have to serve. APPOINTEE will receive full salary and benefits during the required extended time.

## 5. PROFESSIONAL LEAVE POLICY

A professional leave with salary will be granted at the discretion of the Program Director for residents to attend an educational activity (seminar, course, scientific meeting) outside of the institution or for residents to submit a scientific presentation at a local, regional, national or international meeting. All requests for professional leave should be addressed in writing to the Program Director at least 5 weeks in advance to be considered. Each case will be evaluated by the Program Director on an individual basis as to the benefits accrued to the resident and/or the MEDICAL CENTER. Any planned absence greater than five days must have the prior approval of the Director of the Department of Medical Education and the DIO.

2

# 6. HARASSMENT-FREE WORK ENVIRONMENT

Mount Sinai Medical Center is committed to Equal Employment Opportunity (EEO). Discrimination on the basis of a person's race, religion, national origin, age, disability, veteran status, marital status, sex, or sexual orientation, or any other basis protected by federal, state or local law, including verbal or physical harassment on the basis of any of the above characteristics, is prohibited and will not be tolerated. Such prohibited harassment consists of unwelcome sexual advances or comments; ethnic jokes; ethnic, racial, religious or age-related slurs; and similar conduct. This policy is in accordance with the Mount Sinai Medical Center Harassment Free Work Environment Policy (#2.00.022) and in all instances will adhere to the terms and procedures of that policy.

The Vice President of Human Resources is our Equal Employment Opportunity Officer. Anyone who feels discriminated against, or who sees an act which may be interpreted to be discriminatory, has an absolute and unqualified duty to report it to the Vice President of Human Resources or his/her designee immediately. The Designated Institutional Official will be notified in each case.

# 7. ACCOMMODATION FOR DISABILITIES

APPOINTEE may request accommodation for disability under the MEDICAL CENTER's policy for disability accommodation.

# 8. RESIDENT PHYSICIAN RESPONSIBILITIES

With respect to participation in direct patient care activities, APPOINTEE shall be responsible to the pertinent Program Director, Division Chief, Department Chair, Department member(s) of the Medical Staff under whose supervision APPOINTEE may from time to time serve, and to the pertinent Senior APPOINTEE.

With respect to overall professional training and academic affairs, APPOINTEE shall be responsible to the Program Director or his/her designee. In all other respects, APPOINTEE shall be responsible to the Chief Executive Officer of the MEDICAL CENTER and his designee for the faithful and satisfactory performance of duties as a member of the MEDICAL CENTER.

APPOINTEE shall perform designated duties during such hours as the pertinent Program Director or his/her designee may direct and in accordance with the MEDICAL CENTER's policy on duty hours. Night and weekend duty shall be scheduled by the Program Director or his/her designee on a rotational, equitable basis. APPOINTEE may not engage in outside employment (moonlighting) except in limited specific cases in which the MEDICAL CENTER might, in its sole discretion, allow resident moonlighting; the APPOINTEE must file a written request with the Program Director to engage in moonlighting activities and must obtain in writing said Program Director's approval. This written approval must be made included within the limited specific cases in which the MEDICAL CENTER might, in its sole discretion, allow resident moonlighting; the APPOINTEE must file a written part of APPOINTEE's file. The Program Director must monitor the effect of moonlighting activities on a resident's fellow's performance in the program to ensure that the extracurricular activity does not interfere with the ability of APPOINTEE to achieve the goals and objectives of APPOINTEE's program of education. Adverse effects of moonlighting on APPOINTEE's performance, as observed by the Program Director or teaching faculty, may lead to withdrawal of permission to moonlight. All moonlighting must be counted toward the 80-hour weekly limit on duty hours. APPOINTEE will not be required to engage in moonlighting. If APPOINTEE does engage in moonlighting, he/she must be properly licensed in the state of Florida. When engaging in outside limited employment, APPOINTEE is an independent contractor, not an agent of the MEDICAL CENTER and thus not covered under the MEDICAL CENTER's professional liability insurance (malpractice), or other insurance.

PGY-1 residents are not permitted to moonlight.

In performing his/her designated duties, at all times the APPOINTEE must conduct himself/herself in compliance with the Bylaws and the Rules and Regulations of the MEDICAL CENTER or the rotating institution, its Medical Staff, all applicable Service, Departmental and Divisional Rules and Regulations, as well as all applicable policies, both personnel and operational, and such specific rules and regulations as from time to time may be established for APPOINTEEs. APPOINTEE agrees not to engage in any activities that interfere with or detract from APPOINTEE's duties to the MEDICAL CENTER or to the orderly and effective operation of the MEDICAL CENTER or of the APPOINTEE's educational program.

APPOINTEE understands that his/her position of house staff physician entails provision of care commensurate with the house staff physician's level of advancement and competence, under the general supervision of appropriately privileged attending staff. Specifically, APPOINTEE is expected to:

(a) Develop a personal program of self-study and professional growth with guidance from the teaching staff.

(b) Participate in safe, effective and compassionate patient care under supervision.

(c) Participate completely in the educational activities of the program and, as required, assume responsibility for teaching and supervising other resident physicians and medical students.

(d) Participate in institutional programs and activities involving the medical staff and adhere to established practices, procedures and policies of the institution.

(e) Participate in institutional committees and councils, especially those that relate to patient care review activities.

(f) Develop an understanding of ethical, socioeconomic and medical/legal issues that affect health care practice and of how to apply cost containment measures in the provision of patient care.

(g) Work harmoniously with other members of the health care team.

(h) Complete in a timely manner all responsibilities with respect to medical records and maintain the confidentiality of patient records and information as

APPOINTEE shall abide by the MEDICAL CENTER's policy on substance abuse.

## 9. CLINICAL EXPERIENCE AND EDUCATION HOURS POLICY

Each program's formal written policies governing resident clinical experience and education hours are designed to foster resident education and facilitate the care of patients. Clinical experience and education hours will be set to be consistent with the Institutional and Common Program Requirements of the specialties and subspecialties that apply to each program. Resident clinical experience and education hours and on-call time periods will not be excessive. The structuring of clinical experience and education hours and on-call schedules will be designed to focus on the needs of the patient, continuity of care, resident well-being, and the educational needs of the residents. These clinical experience and education hour policies will apply to all institutions to which a resident rotates.

Clinical experience and education hours are defined as all clinical and academic activities related to the residency program, such as patient care (both inpatient and outpatient), administrative duties related to patient care, the provision for transfer of patient care, time spent in-house during call activities, short call, time spent in the hospital on at-home call, night float and day float, and scheduled academic activities such as conferences. Residents should not be scheduled for more than six consecutive nights of night float. Clinical experience and education hours do not include reading and preparation time spent away from the duty site.

Clinical experience and education hours will be consistent with applicable regulations.

The program should not compromise its educational goals or the learning objectives of residents by excessive reliance on residents to fulfill institutional service obligations. Clinical experience and education hours are to reflect the fact that responsibilities for continuing patient care are not automatically discharged at specific times. Clinical experience and education hour assignments must recognize that faculty and residents collectively have responsibility for the safety and welfare of patients entrusted to their care.

Each program must establish a method approved by the Graduate Medical Education Committee that periodically monitors resident clinical experience and education hours to ensure compliance. Clinical experience and education hours must be monitored with a frequency sufficient to ensure an appropriate balance between education and service. If the results of the monitoring process reveal noncompliance with the clinical experience and education hour limits, the program must institute corrective measures. On a quarterly basis each program will report to the Graduate Medical Education Committee on the results of the monitoring of resident clinical experience and education hours.

## 10. SUBSTANCE ABUSE POLICY

All house staff candidates offered employment will be screened for the presence of non-prescribed substances/alcohol. Those candidates testing positive for same in the initial and confirmatory testing will not be employed at the medical center in the absence of a reasonable explanation acceptable to the medical center. Where a house staff member voluntarily reveals a current chemical dependency, rehabilitation may be offered.

Employed house staff reasonably suspected of substance abuse are required to submit to drug screening and those employed house staff who test positive for same on the initial and confirmatory tests and/or have in their possession illegal drugs or alcohol will be subject to disciplinary action up to and including immediate dismissal or be offered rehabilitation if the medical center believes it is warranted by the circumstances. Retention of the house staff member will depend on successful participation in a rehabilitation program to continue until completion of the residency program.

## 11. GRIEVANCE POLICY

The MEDICAL CENTER is committed to ensure an educational environment in which residents may raise and resolve issues without fear of intimidation or retaliation. To this end, the MEDICAL CENTER provides an organizational system to hear and address residents' concerns and grievances.

GRIEVANCE PROCEDURES
In order to provide a mechanism for communicating substantive issues and concerns between residents, the administration of graduate medical education programs, and the institution, without fear of retribution, the following procedures should be followed.

1. Program Directors have the primary responsibility for receiving, evaluating and addressing concerns and complaints about any aspect of their program. Residents should raise issues related to their working environment and educational programs through the program's chief resident(s) and Program Director.
2. When residents wish to communicate concerns without disclosure of names and do not wish to speak to their Program Directors, they should make a confidential communication with the Designated Institutional Official who will try to resolve the issue or issues in an appropriately confidential manner.
3. For concerns that resist resolution via these mechanisms, residents should request a hearing through the Designated Institutional Official. If such concerns are not appropriate for resolution in the manner set forth in items 1 or 2 above, the Designated Institutional Official may appoint a grievance subcommittee of the Graduate Medical Education Committee (GMEC) composed of two members of the Medical Staff (one of whom shall be designated by the chairperson of the GMEC to be chairperson of the subcommittee), and one member of administration. This grievance subcommittee will make recommendations for review and final decision by the GMEC.

4

management functions and formal educational activities, the competence of the house staff physician is evaluated on a regular basis. The program maintains a confidential record of the evaluation.

2. If the Program Director or designee is of the opinion that APPOINTEE's discharge of clinical responsibilities, conduct, or progress in the educational program is unsatisfactory, the Program Director or his/her designee shall meet with APPOINTEE and discuss the problems, including the ways in which improvement can be achieved. The fact of such meeting shall be reflected in APPOINTEE's file. If after this consultation the performance or conduct of APPOINTEE continues to be deemed unsatisfactory, the Program Director or his/her designee shall give written notice to APPOINTEE of the deficiencies, shall describe the improvement required, and specify a time when which improvement must be made. Continued or additional deficiencies in performance or conduct after consultation and written notice may result in one or more of the disciplinary actions described in paragraph three (3) below. Prior consultation and/or written notice are not necessary where a tentative determination is made that APPOINTEE's discharge of clinical responsibilities or conduct is so unsatisfactory that to allow him/her to continue his/her assignment would expose patients to unnecessary medical risks and/or the Medical Center to unnecessary liability or other detriment, in which case the Program Director or his/her designee has the right to take one or more of the disciplinary actions described in paragraph three (3) below.

3. APPOINTEE may be temporarily relieved from his/her clinical responsibilities and/or reassigned to other duties, reprimanded, suspended with or without stipend, or terminated by the Program Director or his/her designee for unsatisfactory performance and/or conduct in discharging clinical responsibilities, or unsatisfactory progress in the education program, or conduct unbecoming, or for excessive tardiness or absenteeism. Reassignments for reasons not related to the grounds for disciplinary action noted above shall not be considered disciplinary actions for the purpose of this paragraph and are not subject to the appeals procedure. A disciplinary action shall be in writing, setting forth the areas deemed unsatisfactory and the reasons why disciplinary action is being taken. This written notice of disciplinary action will be issued following the investigation, and should be issued within fifteen working days of the Program Director or his/her designee learning of the incident or the continued or additional deficiencies in performance or conduct after consultation and written notice which is the subject of the disciplinary action, and it must be delivered to the APPOINTEE within five working days after being written in accordance with paragraph five (5) below. A copy of the notice of disciplinary action must also be sent to the Designated Institutional Official and the Chief Executive Officer of the MEDICAL CENTER. Disciplinary action will be final as of the day of receipt of the notice by the APPOINTEE, which will be deemed to be received if evidenced by a signed receipt if personal delivery, or the certified mail return receipt, unless it is appealed pursuant to paragraph four (4) below. The issue of stipend will be determined by the Chief Operating Officer or his/her designee.

4. The APPOINTEE subject to a Disciplinary Action described above may petition the Chief Executive Officer of the MEDICAL CENTER for an appeal hearing before a Disciplinary Hearing Committee within ten working days of receiving written notice of the action. The Chief Executive Officer shall appoint a three member Disciplinary Hearing Committee which shall consist of two members of the medical staff chosen from the Graduate Medical Education Committee (one of whom shall be designated by the Chief Executive Officer to be the Chairperson of the Disciplinary Hearing Committee), and one member of the Administration of the MEDICAL CENTER. None of the members of the Committee shall be from the APPOINTEE's department. The hearing shall be conducted within fifteen working days after APPOINTEE's appeal. The parties to the hearing may call witnesses, present documentary evidence, and participate in the proceedings which will be recorded. After the hearing(s) have been concluded, the Disciplinary Hearing Committee shall deliberate and within fifteen working days shall make a final determination regarding the disposition of the disciplinary action. Any such determination shall be final and binding on all parties involved. In the case of a suspension without stipend or a termination, no compensation, whether stipend or other benefit, will be withheld from APPOINTEE until a final determination has been made by the Disciplinary Hearing Committee. If the Disciplinary Hearing Committee upholds the suspension or termination, any money paid to APPOINTEE from the date of the suspension or termination shall be repaid to the MEDICAL CENTER by the APPOINTEE. A final determination to terminate the appointment of the APPOINTEE shall also terminate any reappointment of the APPOINTEE to any subsequent year of training which may have occurred by the terms of this Agreement or otherwise.

5. All written notices required to be sent to APPOINTEE pursuant to this agreement shall be by certified mail or personal delivery by the Department Chairperson or his/her designee. The fact and date of receipt shall be noted in APPOINTEE's file. APPOINTEE shall also serve written notices sent pursuant to this agreement to the Chairperson or designee in this same manner.

6. No specially or sub-specially certifying board or national, state or local medical organization shall be notified of a Disciplinary Action until a final determination has been made by the Disciplinary Hearing Committee.

## 13.  REAPPOINTMENT

This AGREEMENT is binding to both parties only for the dates of service of APPOINTEE indicated herein. For purposes of this AGREEMENT, the term "Preliminary Appointee" means APPOINTEES who have been accepted into the MEDICAL CENTER's training program for one-year (and in some circumstances for longer than one year) as a PGY-1 APPOINTEE (and in some circumstances a PGY-2 APPOINTEE) to receive prerequisite training for advanced programs. Such Preliminary Appointees may have: (i) already been accepted into another specialty, but they are completing prerequisites for that specialty, or (ii) not been accepted into any specialty or other training program. Except for, and excluding, Preliminary Appointees (except to the extent explicitly stated):

If APPOINTEE is not to be reappointed or promoted to another year of training after the expiration date of this AGREEMENT for reasons not involving termination for disciplinary reasons, he/she must be given written notice by certified mail or personal delivery no later than three (3)  months prior to the expiration date of this AGREEMENT. If APPOINTEE is not to be reappointed or promoted to another year of training after the expiration date of this AGREEMENT, disciplinary reasons, he/she must be given written notice by certified mail or personal delivery no later than three (3)  months prior to the end of the contract, the MEDICAL CENTER will However, if the primary reason(s) for the non-renewal or non-promotion occur(s) within the three (3)  months prior to the end of the AGREEMENT, provide APPOINTEE with as much written notice of the intent not to renew or not to promote as the circumstances will reasonably allow, prior to the end of the AGREEMENT.

For APPOINTEEs and Preliminary Appointees, no prior notice is required in the case of non-reappointment or non-promotion due to termination for disciplinary reasons.

5

In case the MEDICAL CENTER intends to reduce the size of or close a residency program, or close the institution, the Graduate Medical Education Committee (GMEC), the Designated Institutional Official and the APPOINTEEs will be notified as soon as possible. The APPOINTEEs will be allowed to finish the remainder of the duration of this AGREEMENT and depending on the circumstances the MEDICAL CENTER will allow the APPOINTEEs to either complete the educational program or will assist the APPOINTEEs in enrolling in an ACGME accredited program in which the APPOINTEE can continue his/her education.

## 15.  RESTRICTIVE COVENANTS

Neither the MEDICAL CENTER nor its programs may require residents to sign a non-competition guarantee or restrictive covenant.

## 16.  INTERPRETATION OF AGREEMENT

Questions regarding the application or interpretation of the terms and conditions of this AGREEMENT shall be submitted in writing to the Designated Institutional Official for review. A final and binding written response will be rendered by the MEDICAL CENTER within thirty (30) days from the date the request was received by the Designated Institutional Official.

## 17.  TERMINATION OF THE AGREEMENT

Upon termination of the AGREEMENT by any of the mechanisms outlined above, the only obligation of the MEDICAL CENTER shall to be to pay the APPOINTEE's stipend earnings which may have accrued hereunder up to the date of such termination or suspension. The final clearance procedure as outlined in the House Staff Manual must be adhered to prior to termination of employment.

## 18.  APPLICABLE LAW

This AGREEMENT shall be construed in accordance with the laws of the State of Florida.

This AGREEMENT contains the entire understanding between the parties and no alteration or modification hereof shall be effected except by a subsequent written instrument executed by both parties hereto.

IN WITNESS WHEREOF, the parties have hereunto set their hands as of the date above written.

**APPOINTEE**

DATE  4/1/2020

**For Mount Sinai Medical Center of Florida, Inc.:**

**Program Director**

**Department Chairperson**

**Administrative Officer**

6

# EXHIBIT C

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Miami District Office**
100 SE 2nd St, Suite 1500
Miami, FL 33131
(800) 669-4000
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 10/26/2022

**To:** Paige Finkelstein
    3914 NW 53rd Street
    Boca Raton, FL 33496
Charge No: 510-2023-00555

EEOC Representative and email:    Jeanette Wooten
                                                Federal Investigator
                                              jeanette.wooten@eeoc.gov

---

## DISMISSAL OF CHARGE

The EEOC is closing this charge because your charge was not filed within the time limits under the law; in other words, you waited too long after the date of the alleged discrimination to file your charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 510-2023-00555.

On behalf of the Commission,

Digitally Signed By:Evangeline Hawthorne
10/26/2022

Evangeline Hawthorne
Acting District Director

**Cc:**
Nick  Duris
Mount Sinai Medical Center of Florida, Inc.
4300 Alton Road
Miami Beach, FL 33140

Richard H Levenstein
Nason, Yeager, Gerson, Harris & Fumero, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, FL 33410


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 510-2023-00555 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500

Miami, FL 33131.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ☞ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ☞ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**

- ☞ **Only one** major life activity need be substantially limited.

- ☞ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ☞ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ☞ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

Enclosure with EEOC Notice of Closure and Rights (01/22)

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ☉ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ☉ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ☉ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.