UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 23-cv-20188-ALTMAN/Reid

PAIGE FINKELSTEIN, M.D.,

    Plaintiff,

v.

MOUNT SINAI MEDICAL CENTER OF
FLORIDA, INC., a Florida Not For Profit
Corporation, and KFIR BEN-DAVID, M.D.,

    Defendants.

_____/

**PLAINTIFF'S, PAIGE FINKELSTEIN, M.D., AFFIDAVIT IN SUPPORT OF HER EXPEDITED MOTION FOR ENTRY OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS, MOUNT SINAI MEDICAL CENTER AND KFIR BEN-DAVID, M.D.**

I, Paige Finkelstein, MD, MPH state that the following is true and correct:

1. I am a licensed physician in the State of Florida and a former member of Defendant's, Mount Sinai Medical Center ("MSMC"), General Surgery Residency Program (the "Surgical Residency Program") and I submit this affidavit in support of my Expedited Motion for Entry of Temporary Restraining Order and Preliminary Injunction against Defendants, Mount Sinai Medical Center and Kfir Ben-David, M.D.

2. I joined the Surgical Residency Program in June of 2018, and was planning on doing fellowship after upon program completion in breast surgical oncology or reconstructive plastic surgery. I was one of only three categorical female residents in the program, after graduating from the University of Miami Miller School of Medicine with an MD Degree and Master of Public Health Degree (MPH).

3. Prior to that time, I attended the Massachusetts Institute of Technology ("MIT"), where I have graduated with Degrees in Chemical Engineering and Biology. Additionally, I have more than ten (10) years of experience as a Nationally Licensed Emergency Medical Technician.

4. I had to endure harassing and discriminatory conduct as a surgical resident at MSMC as a result of an ongoing campaign to discredit me and ruin my reputation and continue to do so as I attempt to salvage my medical career.

5. The facts stated herein are true and correct and based upon my own personal knowledge and/or upon my personal review of relevant records pertinent to this matter. If called as a witness to testify, I could and would competently testify to the facts set forth herein.

I.   **Preliminary Statement:**

6. I have effectively performed my duties as a surgical resident at Mount Sinai, and, but for the retaliation and subsequent intimidation and defamatory campaign against me, I would be well on my way to completing the general surgery residency program, either at MSMC or at a different residency program.  Copies of letters of recommendation, written just after my resignation, including several on MSMC letterhead, displaying an accurate depiction of my tenure at MSMC are attached hereto as **Exhibit "A."**

7. I do not have, nor ever have I ever had a "grudge" against the MSMC Surgical Residency Program and its faculty. I am merely trying to mitigate the damages inflicted upon me and my professional and academic career – as evidenced by multiple attempts to get back into residency/and non-residency surgery positions – but the actions of Dr. Ben-David & MSMC continue to impact my career prospects.  I was wrongfully forced to resign from the MSMC program, after performing my duties and responsibilities as a general surgery resident throughout the duration of my tenure and up until my untimely and wrongfully forced resignation.

8. While I was a resident at MSMC, I have experienced firsthand a level of discrimination, harassment, and unprofessionalism that no resident should be subjected to. A copy of documents evidencing my experience as a resident at MSMC is attached hereto as **Composite Exhibit "B."** This type of gender discrimination and the institutional support for double standards is commonplace. A compilation of news and scientific articles discussing gender bias and discrimination is attached hereto as **Exhibit "C."**

9. I was told very early on in my tenure at MSMC as a resident to keep my head down and that Dr. Ben David has been known to get people fired. True to his reputation, Dr. Ben-David proceeded to retaliate against me after I reported different incidents involving patient safety, inappropriate medical practices, ADA violations, hostile work environments, sexual discrimination, and sexual harassment.

## II. My tenure as a surgical resident at MSMC:

10. As my tenure in the Surgical Residency Program began in 2018, and, as reflected in faculty evaluations, I was recognized as "highly intelligent and enthusiastic about operating and learning." Still, there was a campaign to discredit me shortly thereafter, even though I haven't changed my demeanor or behavior. Within my first few weeks at MSMC, I had reported an issue with forged prescriptions for controlled substances. This resulted in Dr. Ben-David instructing me, a first year intern, to address the issue directly with my fellow residents instead of him addressing the issue and taking responsibility for it. Additionally, he berated me, telling me that bringing information about this issue to him could result in him losing his medical license and MSMC losing its ability to prescribe Schedule I medications; he told me to keep quiet about this at the time as he could lose his job. Dr. Ben-David instructed me to address the residents about this issue. In retrospect, it was absurd, that as program director and chief of surgery, he would even involve me with such a serious matter. I realize now it was one of his earliest examples of not

only failing to be an upstanding, moral program director, but also an example of his manipulation as he determined that I, the intern, should be the person to diffuse a situation that would have been extraordinarily detrimental to his own career had it been discovered by the appropriate hospital, state, or federal officials. A copy of this communication is attached hereto as **Exhibit "D."**

11. I received praise from team members inside and outside of the program for keeping them updated constantly and for taking the initiative by constantly requesting feedback. Similarly, I have never conducted myself in an unprofessional manner, nor did I have difficulty with time management. In almost three (3) years, I was only late fewer than a handful of times, all due to emergency circumstances or circumstances outside of my control (car accident, flat tire, and unexpected traffic). In all cases, I properly communicated to the chief resident on duty at the time that I would be late and by how much. Given the number of days and hours (typically, more than 80 per week, especially during the Pandemic) we worked, every resident has had times when they has had circumstances that have made them be late to rounds.

12. Still, under the guidance and instructions of MSMC and Dr. Ben-David, attending physicians I have never interacted with submitted harmful performance evaluations that, in my best assessment, were designed solely to harm my reputation and force me out of the program, as most of these attending physicians (70%) never bothered discussing their "feedback" with me, and I was not allowed the opportunity to review most of these. Copies of some of these evaluations are attached hereto as **Composite Exhibit "E."**

13. Any actions classified as "remediation" by MSMC and Dr. Ben-David served the purpose of humiliating me and setting an example so that others would not lodge complaints questioning their misconduct. Dr. Bao, the Assistant Program Director General Surgery, even noted in his reference letter I "was given weekly requirements for evaluations which she (I) completed and basically did everything that was asked, although this was apparently not enough".

The so-called "remediation plan" caused me to fall behind with my residency program requirements, as it caused me to miss out on cases/rounds and other educational opportunities.

14. While the only two female faculty members (out of ~20 attending surgeons) at that time were appointed to mentor me, one had very limited availability, being a mother of young children, and pregnant at the time. Further, Dr. Ben-David tainted this opportunity for me by representing, in no uncertain terms, that I was a burden to these doctors because I "required" mentorship. I remained in constant contact with my mentor, Dr. Muddasani, during my remaining time as a general surgery resident at MSMC. A copy of my communications with Dr. Muddasani is attached hereto as **Exhibit "F."**

15. I repeatedly asked for accommodations to be provided for my AD/HD as required under Federal ADA law, and which I was entitled to. When I first brought this up to Dr. Ben David, he summarily dismissed my request stating "You went to MIT, you are too smart to need accommodation" even though I became aware of accommodations made for another resident. While at that time, my AD/HD records were not readily available from MIT, and after my request was dismissed by Dr. Ben-David, I took it upon myself to be re-evaluated at MSMC. Again, I was given a conclusive AD/HD diagnosis, by a doctor actually qualified to render a diagnosis. A copy of my diagnosis from professionals from MIT and MSMC are attached hereto as **Exhibits "G" and "H."** I tried to present this diagnosis to Dr. Ben-David, but he refused to look at it and again reprimanded me and instructed me "To never bring this up again." This, without a doubt, impacted my test scores. Once again it is ironic that Dr. Bao, the Assistant Program Director General Surgery, in his reference letter could only explain my ABSITE scores by noting: "Sometimes it may be detrimental to know 'too much' when one still needs to mature the skills needed to choose how to use that information. I won't rationalize her ABSITE scores, but perhaps this explains some of it." Copies of a scientific articles discussing the ABSITE and the lack of correlation

between its scores and technical skills and surgical performance is attached hereto as **Exhibit "I," "J," and "K."** Furthermore, Dr. Bao's remarks are further evidence that MSMC's faculty and attending physicians were unaware that that the Program Director, Dr. Ben-David, wrongfully withheld accommodations I am entitled to under Federal law, which adversely impacted my scores and evaluations, and, as a result of Dr. Ben David's of retaliatory use of the scores, my future.

16. I endured disrespect daily due to the bullying I experienced from other residents, encouraged by the conduct of Dr. Ben-David and MSMC. This situation deteriorated rapidly after Dr. Ben-David decided to implement his "remediation" plans. In my view, these remediation plans were aimed further Dr. Ben-David's goal of forcing me out of the residency program. A copy of a communication between Dr. Ben-David and MSMC faculty evidencing MSMC's goal to force me out of the program is attached hereto as **Exhibit "L."** Dr. Ben-David's and MSMC's "remediation plan only serve the purpose of humiliating me, using me as an "example" so that others would not lodge complaints, causing me to fall behind on her residency program requirements, as the remediation plan routinely caused her to miss out on cases/rounds and other educational opportunities. Furthermore, Dr. Ben-David imposed an artificial ABSITE score imposition, which, coupled with his refusal to provide the appropriate accommodations to my AD/HD diagnosis, were intended to further MSMC's goal to force me out of the residency program. This was discriminatory (I am unaware of any other resident with a low ABSITE score given this type of remediation), arbitrary (it seems the basis for it was to improve the program's overall ranking), and certainly not a defined requirement in the contract I signed when I joined MSMC as a resident. Copies of MSMC's "remediation" plans are attached hereto as **Exhibits "M"** and **"N."**

17. During COVID I followed COVID-19 protocols put in place and never refused to wear protective gear, with the only exception being the time during in which I had an allergic reaction to the materials present in the masks provided to us by the program. This prompted me

to repeatedly request that different masks be provided to us. It is ironic to note that in a reference letter written by Dr. Zadeh, Chief Surgical Resident at the time, he noted: "Paige is also selfless and has proven that she is willing to risk her health for the benefit of others.  In the midst of this COVID-19 pandemic, there has been a great deal of fear related to performing invasive procedures in the COVID ICU.  While many residents would drag their feet and try to delegate such tasks to others, Paige has always been the first one to gown up and head over to care for those sickest of patients.  Even if it was a high risk procedure such as putting in a chest tube, she would rise to the call of duty without hesitation."

18. I am founder of, and at the time of my residency, was Medical Director of ERinfo Inc.  ERinfo Inc's ERinfoPRO, a multi-patented application used by medical first responders to identify and retrieve medical information during emergency situations, mass casualty incidents and natural disasters.  I have a long-standing interest in public health, and as indicated above, earned my Master's in Public Health concurrently with my MD degree at the University of Miami. When the Covid-19 pandemic hit, I recognized that there was an opportunity for ERinfo to help our medical first responder heroes and Covid-19 victims, by adding pandemic specific functionality to ERinfo (see attached **Exhibit "O"**).  To the best of my knowledge ERinfoPRO is the only non-government owned application approved by Google to include Covid-19 tracking and tracing capabilities for use by medical first responders and patients.  Not only did I work 90+ hours per week as a general surgery resident during the Pandemic, but in whatever non-hospital time I had, I provided medical direction to my company so we could participate in the largest global public health intervention in history.

19. As time went by, Dr. Ben-David & MSMC continued to weaponize every interaction I had with patients and staff members, even going so far as to completely misrepresent the facts about an incident which took place in the psychiatric unit.  My request for having a readily

equipment needed for adequate resuscitation, like an available IV pole (outside the unit so it could be secured away from patients, but still easily accessible during an emergency) and proper training to unlock the beds, stemmed from my concerns for patient safety as the patient being treated during this incident appeared to have died in part to improper resuscitation due to lack of equipment/supplies/appropriate training. A copy of my report about this incident, and Dr. Ben-David's retaliation to my complaint is attached hereto as **Exhibit "P."** MSMC had been under scrutiny for similar incidents. Copies of news articles evidencing this are attached hereto as **Exhibits "Q"** and **"R."**

20. Most importantly, the hospital is mandated by the ACGME to have a system in place supposed to provide a safe and non-retaliatory mechanism for physicians and other staff to report patient safety incidents. A copy of the ACGME's Program Director's Guide to the Common Program Requirements (Residency) is attached hereto as **Exhibit "S,"** at 93, 94, 231, and 232.

21. However, rather than use my report to improve patient safety or as a teaching opportunity, Dr. Ben-David & MSMC asked a charge nurse who was not present at the event to countermand my report. They then used this nurse's report to justify another probation period for me. A copy of this communication is attached hereto as **Exhibit "T."** This example so clearly shows the contempt they had for me by using the very system designed to improve upon safety and care, against me, demonstrating their complete disregard for patient safety, and their defensive nature. This type of behavior can result in more patient deaths – the exact thing I was trying in good faith, and through proper channels, to prevent!

22. After this alleged incident, I was placed on a second probation, which was, again, a pretext to intimidate me into not reporting the safety issues occurring at MSMC. I later received a letter of non-renewal of the GME Agreement, and after that, I was the subject of a series of anonymous complaints, most of which I was never aware of, to justify its pretextual decision to

force me to resign my position as a resident in lieu of termination. This is remarkable as during my tenure at MSMC, I was never asked to discuss any of these alleged incidents at Morbidity and Mortality ("M&M"), where cases are scrutinized by physicians inside and outside of the surgical department.

23. In another instance, Dr. Ben-David & MSMC attacked me about the circumstances in which I had performed a minor procedure on a patient in the emergency department. While they allege that I failed to follow proper procedures, I had obtained the patient's consent and subsequently, Dr. Ben-David signed off on the procedure. It should be noted that at all times there was an attending doctor present. I used my best judgement to do what was urgent for the patient at that time, which was collecting and sending a sample of pus off for culture to narrow antibiotic coverage. I furthermore communicated with the chief resident about this patient immediately after, as well as the attending in the ER where the patient was being actively managed – who had called us for urgent assistance. I additionally, called the orthopedic surgeon on that day, Dr. Shim, later on to follow up. She commended my efforts and told me that I did the right thing at the time, despite the patient subsequently needing surgery.

24. In a separate incident, it was claimed that a patient in ICU suffered from complications due to a femoral intravenous line I placed, which allegedly caused serious complications. They also state I failed to disclose to the patient's attending surgeon or other senior residents. This is, again, inaccurate. While I had an obligation to respond to this code blue and place an emergency line, as soon as the line was placed, the surgery team left the scene, as is protocol, and I returned to the Operating Room to assist in cases. Before leaving the room, I told the attending physician, Dr. Askari, to advise if any complications happened and that I would be happy to come back. Unfortunately, because this patient was not admitted to the surgery team, the nurse who received the patient thereafter continued to page the Medicine team who elected not to

alert the surgery team of any issues. Unbeknownst to me, the patient's line was bleeding because of medical mismanagement of his INR. As soon as I was made aware, I took this incident very seriously and took the initiative to address it with our vascular surgeon, who reassured me that the patient was going to be fine from a line placement standpoint, as well as the nurse, who indicated that next time she knew to call surgery (not Medicine). A year prior to this incident, I had noticed the dangers of placing a central line in a chaotic environment, and even made line safety a Quality Improvement project, which I and another attending authored and had turned into Dr. Ben-David in 2020. A copy of this project is attached hereto as **Exhibit "U."** I had urged Dr. Ben-David to provide the surgery residents with equipment for an alternative line placing method – with research on both the medical and financial benefits - to avoid these complications, which he and MSMC denied.

      25.     As I continued to report issues pertaining to patient safety and other misconducts committed by or otherwise endorsed by Dr. Ben-David & MSMC, they, under the guise of the Clinical Competency Committee **("CCC")**, moved to force my resignation in lieu of termination. It is interesting to note that the CCC letter was signed by Dr. Bao, who subsequently wrote me a reference letter supporting me moving on with surgery and denied specific knowledge as to why I was let go. During this final act, and throughout my tenure at MSMC, I was denied my rights to dispute the Committee's decisions or their account of the events. Dr. Ben David said that the decisions could not be appealed and that, therefore, I was already guaranteed to fail if I tried to appeal. Specifically, Dr. Ben David told me that he already made these decisions with the support of the CEO, Steve Sonnenreich (whom I had never met), and Dr. Goldzser, whom I had only met with once (ironically, to report Dr. Ben David's behavior and how I felt endangered by him). In that previous meeting, Dr. Goldzser told me he didn't believe me when I told him how Dr. Ben David had been treating myself and other residents, and further falsely documented words I never

spoke. *See* Exhibit L, where Dr. Ben-David misrepresents the contents of a confidential conversation to other MSMC employees.

26. A quick look at historical cases shows that almost since its inception, MSMC has had issues with residents experiencing discrimination and sexual harassment.[1] Further, a glimpse of the media's reporting of MSMC's recent past paints an unflattering picture, and one which Dr. Ben-David & MSMC try to conceal at all costs by silencing potential whistleblowers such as myself. The accusations against MSMC and its staff members range from hate crimes, sex trafficking, hiring unqualified people to fill pivotal leadership roles, to wrongful deaths and involvement with False Claims Act (FCA) violation allegations.[2] Some of the alleged misconduct is the same type of bad behavior I have previously complained about to MSMC's leadership, later suffering with their retaliation which, in hindsight, was designed to maintain this "well-reputed" façade.

---

[1] *See Zaklama v. Mount Sinai Med. Ctr.*, 906 F.2d 650 (11th Cir. 1990).

[2] *See* Razzano, Tiffany, PRO-TRUMP ANESTHESIOLOGIST, JENNIFER SUSAN WRIGHT OF MOUNT SINAI, CHARGED WITH HATE CRIME, The Miami Times (Feb. 23, 2021) (available at https://www.miamitimesonline.com/news/pro-trump-anesthesiologist-jennifer-susan-wright-of-mount-sinai-charged-with-hate-crime/article_179911e4-7619-11eb-bd8c-f3373e5a2b96.html); De Pacina, Michelle, MIAMI BEACH DOCTOR ARRESTED FOR ALLEGEDLY ATTEMPTING TO PURCHASE 12-YEAR-OLD AS SEX SLAVE, Yahoo! (May 31, 2022) (available at https://www.yahoo.com/now/miami-beach-doctor-arrested-allegedly-195239936.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAHwgqthyQHvp-M_JcwF7GQ7oxdSO38d_iTYMwL-LEwwMG43vSjXjTBObotjhyo3V0WLqKa1i9wfLjebVrn2DTcn2BYz6gDsBcGIGAHZ-gsKI7vUzkMXJft23FLHA1O29v2L5KMGSpWs36OH79VZOjCpm3SNbbfQ2pG_00mlv-MC3); Johnson, Jeffrey, FLORIDA WOMAN AWARDED #38M IN SPINAL SURGERY MEDICAL MALPRACTICE SUIT, Free Advice (Jul 16, 2021), (available at https://www.freeadvice.com/legal/florida-woman-awarded-38m-in-spinal-surgery-medical-malpractice-suit/); The Associated Press, HOSPITAL SUES RECRUITER FOR BAD CANDIDATE, Herald-Tribune (Dec. 25, 2002) (available at https://www.heraldtribune.com/story/news/2002/12/26/hospital-sues-recruiter-for-bad-candidate/28733935007/); Ramos, Roy, GRIEVING FAMILY FILES LAWSUIT AGAINST MEDICAL CENTER AFTER FATAL MIAMI-DADE CRASH, Local 10 (Dec 17, 2021) (available at https://www.local10.com/news/local/2021/12/18/grieving-family-files-lawsuit-against-medical-center-after-fatal-miami-dade-crash/); Office of Public Affairs, FIFTY-FIVE HOSPITALS TO PAY U.S. MORE THAN $34 MILLION TO RESOLVE FALSE CLAIMS ACT ALLEGATIONS RELATED TO KYPHOPLASTY, Department of Justice (Jul. 2, 2013) (available at https://www.justice.gov/opa/pr/fifty-five-hospitals-pay-us-more-34-million-resolve-false-claims-act-allegations-related);

27. Further, although Dr. Ben-David seems to have appointed himself as the gatekeeper to my medical career endeavors, he is not qualified to pass judgment on my qualifications reputation or professionalism, as he rarely interacted with me during my tenure at MSMC from a clinical standpoint, participating in a total of less than 2% of my procedures and less than a handful of clinics. Out of the 1,987 procedures I have been a part of as a surgical resident at Mount Sinai, Dr. Ben-David has only been in the operating room with me eleven (11) times, not including endoscopies performed by him. A copy of a table stipulating the procedures which Dr. Ben-David witnessed is attached hereto as **Exhibit "V."**

28. Further, far from being the reputable, beyond reproach, professional MSMC pretends Dr. Ben-David to be, he has misrepresented the truth on multiple occasions, thus making him a less than ideal person to assess and impart judgment on anyone's characters or reputation. Moreover, Dr. Ben-David's awareness of my personal knowledge of his personal affairs is further evidence that Dr. Ben-David is not a good fit to be a reference provider of my tenure as a resident at MSMC.

29. Dr. Ben-David continued to openly engage in discriminatory behavior by openly discussing his preference for recruiting male residents and also by consistently failing to address complaints about sexual harassment. This is precisely the type of behavior designed to driving female residents out of surgery residency programs. *See* Exhibit C.

30. MSMC has allowed Dr. Ben-David to continue as Program Director, to the detriment of its own staff and residents who, like me, become casualties, while MSMC continues to protect Dr. Ben-David.

31. MSMC and Dr. Ben-David are required and mandated by the ACGME to maintain the highest standards of professionalism as the operator and director of MSMC's General Surgery Residency Program, as Dr. Ben-David is responsible for supervising and training residents. As

program director, Dr. Ben-David is expected to serve as a role model to residents in addition to fulfilling the technical aspects of the role. *See* Exhibit S, at 52, 69, 72.

32. I also firmly believe that Dr. Ben-David is not an adequate choice to pass truthful and unbiased judgment on my professional qualification and/or reputation because he has demonstrated more than once his contempt for me, which stems from the fact that I have reported several negative events at MSMC, all of which could further damage his and MSMC's reputations, including, but not limited to, the inappropriate prescription of narcotics, rampant discriminatory and harassing practices against female residents, unfit patient care/management, and unprofessional conduct engaged in by other residents and surgical faculty.

### III. Defendants' campaign to derail my medical career continued even after my forced resignation:

33. I have not given up on my dream to become a surgeon and continue to seek opportunities to resume my medical education. However, getting credentials and being granted hospital operating privileges is a lengthy process, which has been made nearly impossible due to the actions of Dr. Ben-David & MSMC. Since the day I was forced to resign from the Surgical Residency program, I have actively pursued opportunities in other residency programs, only to have my attempts denied by their refusal to turn over necessary paperwork or continued defamatory campaign and retaliations. I have attached a copy of Dr. Ben-David's response to a residency program inquiry, hereto attached as **Exhibit "W."**

34. The Electronic Residency Application Service ("ERAS") is the centralized online application service used to deliver medical school graduates' applications, along with supporting documents, to residency programs. The application process begins in June, opening for submission sometime in mid-September, with interviews beginning in November, and candidates who are able to secure a match begin their training sometime the following year at the end of June/beginning of July. If a prospective candidate, such as myself, encounters issues with obtaining the required

documents in a timely manner, they have to wait until the following year's ERAS application process commences in June (of the following year). The ERAS match happens only once per year. Thus, Dr. Ben-David & MSMC once more accuse me of their own wrongdoing, as any potential delay in securing a new residency program has been caused by their impermissible interference with my application and/or by their intentional delay in providing the necessary information.

35. After my forced resignation from the Surgical Residency Program, Dr. Ben-David & MSMC refused to provide me with documents required to be provided to every resident by the American Counsel of Graduate Medical Education (ACGME). These essential documents include a Summative Evaluation, Proof of Completion for at least two years of surgical residency, and a Diploma for completing the intern year of the General Surgery Residency ("Completion Documents"), unless I agreed to sign a Non-Disclosure Agreement and General Release, agreeing not to divulge any events or facts concerning the Surgical residency Program, and releasing them from liability with respect to any and all claims related to my Surgical Residency Program experience.

36. I then immediately engaged legal representation to assist me in obtaining a copy of my records and the Completion Documents, which Dr. Ben-David & MSMC continued to withhold in a blatant attempt to force me into signing a Non-Disclosure Agreement and General Release forgoing any potential claim I may have against them. A copy of the communication between my legal representative, Barry Wax, and Defendants' counsel is attached hereto as **Exhibit "X."** Only after I filed a Complaint with the ACGME, a complaint with the EEOC and this lawsuit, did Dr. Ben-David & MSMC, recently provide me with these documents.

37. Although I have applied to different residency programs, including programs in Florida and California, I could not succeed in such endeavors due to Dr. Ben-David & MSMC continuous failure to provide relevant information to inquiring institutions, combined with Dr.

Ben-David's defamatory campaign against me. As a result of their impermissible withholding of the Completion Documents, I could not complete my residency application for the 2021 Match as they continued to withhold this vital information only until the filing of a complaint with the ACGME and a lawsuit. I was already in school and already had a job offer in hand from Mount Sinai Beth Israel ("MSBI") (an unrelated institution) – but that fell through after Dr. Ben-David interfered.

38.     Since I had completed more than two (2) years of residency and was, therefore, qualified for my unrestricted medical license, I was able to apply for house surgeon positions. This was my new attempt to still obtain a General Surgeon education, as I hoped to, and in due time, demonstrate my skills and restore my reputation away from Dr. Ben-David's unacceptable conduct and thus be able to secure a place within a new residency program.

39.     Based on my experience and education, I interviewed at MSBI, and they were very excited to have me join their staff. I was extremely hopeful that, by working at MSBI, I would not only be able to mitigate some of my damages by being able to pay down my student loans while there was no interest being applied, but I also hoped that I would finally manage to continue my General Surgery education by working with a completely different Program Director, who could write a supportive, accurate and objective program director letter on my behalf. A copy of an electronic communication discussing my application is attached hereto as **Exhibit "Y."** To that extent, after a lengthy application and vetting process, I was offered a position as a house surgeon at MSBI. A copy of a letter of employment provided by MSBI is attached hereto as **Exhibit "Z."** However, unbeknownst to me, Dr. Ben-David & MSMC continued to hinder my future career and educational prospects by conducting a defamatory campaign to tarnish my reputation with prospective employers. A copy of communication confirming Dr. Ben-David's interference is attached hereto as **Exhibit "AA."**

40. Solely due to Dr. Ben-David's interference with my application process, MSBI withdrew its job offer, costing me not only this job opportunity but potentially my ultimate return to a General Surgery Residency Program. On March 2022, one of the attending doctors that was involved with this job application process at MSBI, and was intimately familiar with its details, later advised me to switch to a different medical specialty as he directly advised that, as long as Dr. Ben-David was involved/ providing my references, I would never get a job or residency in surgery again. A copy of communication indicating that Dr. Ben-David's interference was responsible for MSBI withdrawal is attached hereto as **Exhibit "BB."**

41. Because of the intentional interference by Dr. Ben-David & MSMC with my ability to work as a surgeon or continue my training as one, and in an effort to mitigate damages, I had little choice other than to continue my academic endeavors while I sought legal advice. For now, I am completing my MBA concentrating in healthcare, at Columbia University, in hopes of being able to apply such education to my medical career once MSMC and Dr. Ben-David's interference stops. At the advice of many mentors familiar with my situation and Dr. Ben-David's continued interference I have been forced to give up on my dream. I decided in a last ditch effort to try to continue any form of a medical career, to apply through the ERAS match process for anesthesiology residency programs in September, 2022, so as not to miss out on a potential match for 2023. I now fear, more than ever, not only for my physical safety for exposing the misgivings of Dr. Ben David and MSMC, but that Dr. Ben-David's ongoing retaliation will be amplified, motivated by the very existence of my legal complaints and by my documented knowledge of his immoral and unprofessional behavior.

42. Defendants' misconduct has caused, and continues to cause, me irreparable harm by not only directly interfering with her attempts to secure a spot with a new residency program but also actively interfering with Plaintiff's attempt to earn an income with her medical training.

*See* Exhibits Q, R, S, T. Absent this Court granting the requested relief under this Motion, I will continue to suffer irreparable harm to my professional and academic endeavors as Defendants continue to spread falsities about my tenure as a resident on the Surgical Residency Program. Furthermore, the record reflects that I have been unable to continue my medical training without obtaining a truthful verification of my tenure at MSMC. Since securing a match with a new residency program is an integral aspect of becoming a reconstructive surgeon, I will suffer irreparable harm if the requested relief is not granted.

## **VERIFICATION**

STATE OF FLORIDA )
)
COUNTY OF __PALM BEACH__ )

  Before me, the undersigned authority, personally appeared Paige Finkelstein, M.D., who was sworn and states the facts in the foregoing Affidavit are true and correct.

_Paige Finkelstein_
Signed on 2023/02/23 14:42:34 -5:00
PAIGE FINKELSTEIN, M.D.

Paige Finkelstein
Print Name

Sworn to (or affirmed) and subscribed before ☐ physical presence or ☒ online notarization me this **23** day of February, 2023, by PAIGE FINKELSTEIN, M.D. who is ☒ personally known to me or ☐ provided the following identification: _____.


Signed on 2023/02/23 14:42:34 -5:00
Notary Public - State of Florida

Michelle A. Narea
NOTARY PUBLIC
State of Florida at Large

My Commission Expires:

**Michelle A. Narea**
**Commission # HH 226234**
Notary Public - State of Florida
My Commission Expires Apr 08, 2026

Notary Stamp 2023/02/23 12:42:34 PST   7DF27DED33F1

Page 18 of 18

