# Tab 39

19 F.4th 324
United States Court of Appeals, Fourth Circuit.

George HENGLE; Sherry Blackburn; Willie
Rose; Elwood Bumbray; Tiffani Myers; Steven
Pike; Sue Collins; Lawrence Mwethuku,
on behalf of themselves and all individuals
similarly situated, Plaintiffs – Appellees,
v.
Sherry TREPPA, Chairperson of the Habematolel
Pomo of Upper Lake Executive Council, in her official
capacity; Tracey Treppa, Vice-Chairperson of the
Habematolel Pomo of Upper Lake Executive Council, in
her official capacity; Kathleen Treppa, Treasurer of the
Habematolel Pomo of Upper Lake Executive Council,
in her official capacity; Carol Munoz, Secretary of the
Habematolel Pomo of Upper Lake Executive Council,
in her official capacity; Jennifer Burnett, Member-
At-Large of the Habematolel Pomo of Upper Lake
Executive Council, in her official capacity; Aimee
Jackson-Penn, Member-At-Large of the Habematolel
Pomo of Upper Lake Executive Council, in her official
capacity; Veronica Krohn, Member-At-Large of the
Habematolel Pomo of Upper Lake Executive Council,
in her official capacity, Defendants – Appellants,
and
Scott Asner; Joshua Landy, Defendants.

State of New Mexico; Habematolel Pomo of Upper Lake
Consumer Financial Services Regulatory Commission;
Native American Finance Officers Association;
National Congress of American Indians; National
Center For American Indian Economic Development;
National Indian Gaming Association; Association on
American Indian Affairs, Amici Supporting Appellants,
v.
United States of America,
Amicus Supporting Affirmance.
George Hengle; Sherry Blackburn; Willie Rose; Elwood
Bumbray; Tiffani Myers; Steven Pike; Sue Collins;
Lawrence Mwethuku, on behalf of themselves and all
individuals similarly situated, Plaintiffs – Appellees,
v.
Scott Asner; Joshua Landy, Defendants – Appellants,
and

Sherry Treppa, Chairperson of the Habematolel Pomo
of Upper Lake Executive Council, in her official
capacity; Tracey Treppa, Vice-Chairperson of the
Habematolel Pomo of Upper Lake Executive Council,
in her official capacity; Kathleen Treppa, Treasurer
of the Habematolel Pomo of Upper Lake Executive
Council, in her official capacity; Carol Munoz, Secretary
of the Habematolel Pomo of Upper Lake Executive
Council, in her official capacity; Jennifer Burnett,
Member-At-Large of the Habematolel Pomo of Upper
Lake Executive Council, in her official capacity;
Aimee Jackson-Penn, Member-At-Large of the
Habematolel Pomo of Upper Lake Executive Council,
in her official capacity; Veronica Krohn, Member-
At-Large of the Habematolel Pomo of Upper Lake
Executive Council, in her official capacity, Defendants.

State of New Mexico; Habematolel Pomo of Upper Lake
Consumer Financial Services Regulatory Commission;
Native American Finance Officers Association;
National Congress of American Indians; National
Center For American Indian Economic Development;
National Indian Gaming Association; Association on
American Indian Affairs, Amici Supporting Appellants,
v.
United States of America,
Amicus Supporting Affirmance.
George Hengle; Sherry Blackburn; Willie Rose; Elwood
Bumbray; Tiffani Myers; Steven Pike; Sue Collins;
Lawrence Mwethuku, on behalf of themselves and all
individuals similarly situated, Plaintiffs – Appellees,
v.
Scott Asner; Joshua Landy, Defendants – Appellants,
and
Sherry Treppa, Chairperson of the Habematolel Pomo
of Upper Lake Executive Council, in her official
capacity; Tracey Treppa, Vice-Chairperson of the
Habematolel Pomo of Upper Lake Executive Council,
in her official capacity; Kathleen Treppa, Treasurer
of the Habematolel Pomo of Upper Lake Executive
Council, in her official capacity; Carol Munoz, Secretary
of the Habematolel Pomo of Upper Lake Executive
Council, in her official capacity; Jennifer Burnett,
Member-At-Large of the Habematolel Pomo of Upper
Lake Executive Council, in her official capacity;
Aimee Jackson-Penn, Member-At-Large of the

Habematolel Pomo of Upper Lake Executive Council,
in her official capacity; Veronica Krohn, Member-
At-Large of the Habematolel Pomo of Upper Lake
Executive Council, in her official capacity, Defendants.

State of New Mexico; Habematolel Pomo of Upper Lake
Consumer Financial Services Regulatory Commission;
Native American Finance Officers Association;
National Congress of American Indians; National
Center For American Indian Economic Development;
National Indian Gaming Association; Association on
American Indian Affairs, Amici Supporting Appellants,

v.

United States of America,
Amicus Supporting Affirmance.

George Hengle; Sherry Blackburn; Willie Rose; Elwood
Bumbray; Tiffani Myers; Steven Pike; Sue Collins;
Lawrence Mwethuku, on behalf of themselves and all
individuals similarly situated, Plaintiffs – Appellees,

v.

Sherry Treppa, Chairperson of the Habematolel Pomo
of Upper Lake Executive Council, in her official
capacity; Tracey Treppa, Vice-Chairperson of the
Habematolel Pomo of Upper Lake Executive Council, in
her official capacity; Kathleen Treppa, Treasurer of the
Habematolel Pomo of Upper Lake Executive Council,
in her official capacity; Carol Munoz, Secretary of the
Habematolel Pomo of Upper Lake Executive Council,
in her official capacity; Jennifer Burnett, Member-
At-Large of the Habematolel Pomo of Upper Lake
Executive Council, in her official capacity; Aimee
Jackson-Penn, Member-At-Large of the Habematolel
Pomo of Upper Lake Executive Council, in her official
capacity; Veronica Krohn, Member-At-Large of the
Habematolel Pomo of Upper Lake Executive Council,
in her official capacity, Defendants – Appellants,

and

Scott Asner; Joshua Landy, Defendants.

State of New Mexico; Habematolel Pomo of Upper Lake
Consumer Financial Services Regulatory Commission;
Native American Finance Officers Association;
National Congress of American Indians; National
Center For American Indian Economic Development;
National Indian Gaming Association; Association on
American Indian Affairs, Amici Supporting Appellants,

v.

United States of America,
Amicus Supporting Affirmance.

No. 20-1062, No. 20-1063, No. 20-1358, No. 20-1359
|
Argued: January 26, 2021
|
Decided: November 16, 2021

**Synopsis**

**Background:** Borrowers who received short-term loans from
online lenders affiliated with a federally-recognized Native
American tribe brought putative class action against tribal
officials and two non-members affiliated with tribal lenders,
asserting violations of Virginia and federal law and seeking
declaratory and injunctive relief. The United States District
Court for the Eastern District of Virginia, David J. Novak,
District Judge, 433 F. Supp. 3d 825, denied defendants'
motions to compel arbitration and to dismiss. Defendants
appealed.

**Holdings:** The Court of Appeals, Rushing, Circuit Judge,
held that:

delegation clause of arbitration agreement was unenforceable
as violation of public policy;

arbitration agreement required application of tribal law to
the exclusion of federal law and thus was invalid as a
prospective waiver of borrowers' rights to pursue federal
statutory remedies;

as a matter of first impression, tribal sovereign immunity
does not bar state-law claims for prospective injunctive
relief against tribal officials for conduct occurring off the
reservation;

under Virginia law, as predicted by Court of Appeals,
governing-law clause of loan agreement violated Virginia
public policy and thus was unenforceable; and

as a matter of first impression, provision of Racketeer
Influenced and Corrupt Organizations Act (RICO)
authorizing private parties to bring action for treble damages
does not authorize such parties to seek prospective injunctive
relief.

Affirmed.

**Procedural Posture(s):** Interlocutory Appeal; Motion to Compel Arbitration; Motion to Dismiss for Failure to State a Claim.

 **\*330** Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. David J. Novak, District Judge. (3:19-cv-00250-DJN)

**Attorneys and Law Firms**

ARGUED: Rakesh N. Kilaru, WILKINSON STEKLOFF LLP, Washington, D.C.; Matthew E. Price, JENNER & BLOCK, LLP, Washington, D.C., for Appellants. Matthew W. H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellees. ON BRIEF: James Rosenthal, Kosta Stojilkovic, Beth Wilkinson, Matthew Skanchy, Betsy Henthorne, Jaclyn Delligatti, WILKINSON STEKLOFF LLP, Washington, D.C., for Appellants. Leonard Anthony Bennett, CONSUMER LITIGATION ASSOCIATES, P.C., Newport News, Virginia; Kristi Cahoon Kelly, Andrew J. Guzzo, Casey Shannon Nash, KELLY GUZZO PLC, Fairfax, Virginia, for Appellees. Brian C. Rabbitt, Acting Assistant Attorney General, Teresa A. Wallbaum, Assistant Chief, Organized Crime and Gang Section, Criminal Division, Jeffrey Bossert Clark, Assistant Attorney General, Eric Grant, Deputy Assistant Attorney General, Brian C. Toth, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus United States of America. Hector Balderas, Attorney General, Tania Maestas, Chief Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico; William H. Hurd, TROUTMAN SANDERS LLP, Richmond, Virginia, for Amicus State of New Mexico. Bruce A. Finzen, Minneapolis, Minnesota, Brendan V. Johnson, Timothy W. Billion, ROBINS KAPLAN LLP, Sioux Falls, South Dakota; Sarah J. Auchterlonie, BROWNSTEIN HYATT FARBER SCHRECK LLP, Denver, Colorado, for Amicus Habematolel Pomo of Upper Lake Consumer Financial Services Regulatory Commission. Jonodev Chaudhuri, Washington, D.C., E. King Poor, Chicago, Illinois, Nicole Simmons, QUARLES & BRADY LLP, Phoenix, Arizona, for Amici The Native American Finance Officers Association, National Congress of American Indians, National Center for American Indian Economic Development, National Indian Gaming Association, and Association on American Indian Affairs.

Before NIEMEYER, KING, AND RUSHING, Circuit Judges.

**Opinion**

Affirmed by published opinion. Judge Rushing wrote the opinion, in which Judge Niemeyer and Judge King joined.

RUSHING, Circuit Judge:

 **\*331** The named plaintiffs in this case, all Virginia consumers, received short-term loans from online lenders affiliated with a federally recognized Native American tribe. Eventually the borrowers defaulted and brought a putative class action against tribal officials and two non-members affiliated with the tribal lenders to avoid repaying their debts, which they alleged violated Virginia and federal law. The defendants moved to compel arbitration under the terms of the loan agreements and to dismiss the complaint on various grounds.

The district court denied the motions to compel arbitration and, with one significant exception relevant here, denied the motions to dismiss. Four of those rulings are now before us in this interlocutory appeal. First, the district court found the arbitration provision unenforceable as a prospective waiver of the borrowers' federal rights. Second, the district court denied the tribal officials' motion to dismiss the claims against them on the ground of tribal sovereign immunity. Third, the district court held the loan agreements' choice of tribal law unenforceable as a violation of Virginia's strong public policy against unregulated lending of usurious loans. Fourth, the district court dismissed the federal claim against the tribal officials, ruling that the Racketeer Influenced and Corrupt Organizations Act (RICO) does not authorize private plaintiffs to sue for injunctive relief. For the reasons explained below, we affirm all four rulings on appeal.

I.

The Habematolel Pomo of Upper Lake (the Tribe) is a federally recognized Native American tribe in northern California. Through its Tribal Executive Council, the Tribe started an online lending business consisting of four incorporated lending portfolios: Golden Valley Lending, Inc., Silver Cloud Financial, Inc., Mountain Summit Financial, Inc., and Majestic Lake Financial, Inc. (collectively, the Tribal Lenders). The Tribal Lenders were allegedly operated by

non-tribal companies owned by non-tribal Defendants Scott Asner and Joshua Landy on non-tribal land in Overland Park, Kansas. Eventually, Upper Lake Processing Service, Inc. (ULPS)—a tribal entity—acquired the **\*332** Tribal Lenders, although ULPS allegedly continues to operate out of Overland Park, Kansas, employing non-tribal employees and distributing most of its revenues to non-tribal entities and individuals.

The Tribal Lenders extend low-dollar, high-interest loans that must be repaid on a short timeline. Plaintiffs are Virginia consumers who each received an online loan from one of the Tribal Lenders while living in Virginia. Although Virginia usury law generally prohibits interest rates over 12%, the law of the Tribe contains no usury limit. The interest rates on Plaintiffs' loans—which varied in principal amounts from $300 to $1,575—ranged from 544% to 920%. For example, Plaintiff George Hengle borrowed $600 at an interest rate of 636%, with the result that he owed $2,400 over the roughly 10-month life of the loan.

To obtain their loans, Plaintiffs each electronically signed a "Consumer Loan and Arbitration Agreement," which we refer to as the "loan agreement." The "Governing Law" provision of the loan agreement stipulates that the agreement "shall be governed by applicable tribal law, including but not limited to the Habematolel Tribal Consumer Financial Services Regulatory Ordinance." J.A. 1186.

The loan agreements each also contain a materially identical "Arbitration Provision," under which borrowers waive their right to resolve disagreements in court and agree to submit "all disputes, including the scope and validity of this Arbitration Provision," to an arbitrator. J.A. 1184; *see* J.A. 1184 (defining "disputes" subject to arbitration to include "the validity and scope of this Arbitration Provision and any claim or attempt to set aside this Arbitration Provision"). But in addition to selecting the arbitral forum and specifying the procedures to be used therein, the arbitration provision also contains its own choice-of-law clauses. To begin, the arbitration provision states that

> dispute[s] will be governed by the laws of the Habematolel Pomo of Upper Lake and such rules and procedures used by the applicable arbitration organization applicable to consumer disputes, to the extent

those rules and procedures do not contradict the express terms of this Arbitration Provision or the law of the Habematolel Pomo of Upper Lake, including the limitations on the arbitrator below.

J.A. 1185. Immediately below that paragraph, the arbitration provision explains that a borrower may request the arbitration take place close to his or her residence but

> such election to have binding arbitration occur somewhere other than on Tribal land shall in no way ... allow for the application of any other law other than the laws of the Habematolel Pomo of Upper Lake.

J.A. 1185. Directly below that paragraph, the arbitration provision specifies:

> The arbitrator shall apply applicable substantive Tribal law consistent with the Federal Arbitration Act (FAA), and applicable statutes of limitation, and shall honor claims of privilege recognized at law.... If allowed by statute or applicable law, the arbitrator may award statutory damages and/or reasonable attorneys' fees and expenses.

J.A. 1185. Regarding confirmation of an award, the arbitration provision authorizes the parties "to enforce an arbitration award before the applicable governing body of the Habematolel Pomo of Upper Lake Tribe." J.A. 1885. As for enforcement of the agreement to arbitrate, the provision states:

> This Arbitration Provision is made pursuant to a transaction involving both **\*333** interstate commerce and

Indian commerce under the United States Constitution and other federal and tribal laws. Thus, any arbitration shall be governed by the FAA and subject to the laws of the Habematolel Pomo of Upper Lake. If a final non-appealable judgment of a court having jurisdiction over this transaction and the parties finds, for any reason, that the FAA does not apply to this transaction, then Our agreement to arbitrate shall be governed by the laws of the Habematolel Pomo of Upper Lake Tribe.

J.A. 1185. Finally, the arbitration provision contains a severability clause, stating that "[i]f any of this Arbitration Provision is held invalid, the remainder shall remain in effect." J.A. 1185.

After receiving their loans from the Tribal Lenders, Plaintiffs, on behalf of themselves and a putative class of similarly situated individuals, brought suit in the U.S. District Court for the Eastern District of Virginia against Asner, Landy, and the members of the Tribal Executive Council in their official capacity (the Tribal Officials), alleging violations of RICO and Virginia usury and consumer finance laws. From the Tribal Officials, Plaintiffs sought only prospective declaratory and injunctive relief. From Asner and Landy, Plaintiffs sought prospective and monetary relief.

In response, all Defendants moved to compel arbitration. Alternatively, both the tribal and non-tribal Defendants moved to dismiss Plaintiffs' claims against them on numerous grounds. As relevant to this appeal, all Defendants argued that Tribal law, rather than Virginia law, applied to the loan agreements, therefore the interest rates were not usurious and the loans were not unlawful debts for purposes of RICO. The Tribal Officials separately asserted that sovereign immunity precluded Plaintiffs' claims against them and that, in any event, RICO did not permit private plaintiffs to seek prospective injunctive relief.

The district court denied Defendants' motions to compel arbitration. *Hengle v. Asner*, 433 F. Supp. 3d 825, 845–859 (E.D. Va. 2020). The court acknowledged that the arbitration provision delegates threshold questions of arbitrability to the arbitrator, but the court found the delegation clause

unenforceable because the arbitration provision prospectively waives federal and state law defenses to arbitrability. Assessing the validity of the arbitration provision as a whole, the court concluded that it similarly accomplished an impermissible waiver of otherwise available statutory claims, including RICO claims. Because it found the offending provisions inseverable, the district court held the arbitration provision unenforceable in its entirety.

Moving to the various motions to dismiss, the district court held that the loan agreement's selection of tribal law violated Virginia's compelling public policy against the unregulated lending of usurious loans. *Id.* at 864–868. Applying Virginia's choice-of-law rules, the court determined that Virginia law applies to the loan agreements, therefore Plaintiffs stated a plausible claim that the loans violate Virginia usury law and constitute an unlawful debt under RICO. The district court also rejected the Tribal Officials' assertion of sovereign immunity, holding that the Tribal Officials were subject to suits for prospective injunctive relief. *Id.* at 871–880. But the court dismissed the RICO claim against the Tribal Officials, reasoning that RICO authorizes private plaintiffs to sue only for money damages, not injunctive or declaratory relief. *Id.* at 880–886. The court certified its RICO and choice-of-law rulings for interlocutory appeal. *Hengle v. Asner*, No. 3:19-cv-250, 2020 WL 855970 (E.D. Va. Feb. 20, 2020); *see* 28 U.S.C. § 1292(b).

**\*334**  II.

We now have jurisdiction to review the four rulings appealed: (1) denial of Defendants' motions to compel arbitration, (2) denial of the Tribal Officials' motion to dismiss the claims against them on sovereign-immunity grounds, (3) denial of Defendants' motions to dismiss pursuant to the governing-law clause, and (4) dismissal of Plaintiffs' RICO claim against the Tribal Officials. *See* 9 U.S.C. § 16(a)(1) (denial of motion to compel arbitration); 28 U.S.C. § 1292(b) (orders certified for interlocutory appeal); *Eckert Int'l Inc. v. Gov't of the Sovereign Democratic Republic of Fiji*, 32 F.3d 77, 79 (4th Cir. 1994) (denial of sovereign immunity). We review de novo the district court's decision declining to compel arbitration and its rulings on the motions to dismiss for failure to state a claim. *Chorley Enter., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 563 (4th Cir. 2015); *Buscemi v. Bell*, 964 F.3d 252, 262 (4th Cir. 2020), *cert. denied sub nom. Kopitke v. Bell*, ––– U.S. ––––, 141 S. Ct. 1388, 209 L.Ed.2d 129 (2021). As for the district court's denial of the Tribal Officials'

motion to dismiss for lack of subject matter jurisdiction on immunity grounds, we review "factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (internal quotation marks omitted).

III.

We begin with Defendants' motions to compel arbitration under the terms of the parties' agreements. "[A]rbitration is a matter of contract." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013). In the Federal Arbitration Act (FAA), Congress provided that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts therefore must enforce arbitration agreements "on an equal footing with other contracts," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006)), and "may invalidate an arbitration agreement based on 'generally applicable contract defenses,' " *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, ––– U.S. ––––, 137 S. Ct. 1421, 1426, 197 L.Ed.2d 806 (2017) (quoting *Concepcion*, 563 U.S. at 339, 131 S.Ct. 1740).

One such generally applicable defense is the so-called "prospective waiver" doctrine, under which an agreement that prospectively waives "a party's right to pursue statutory remedies" is unenforceable as a violation of public policy. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 637 n.19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *see also Italian Colors*, 570 U.S. at 235–236, 133 S.Ct. 2304; *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273–274, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Although parties possess broad latitude to specify the rules under which their arbitration will be conducted, they must preserve the ability to assert federal statutory causes of action so that "the statute[s] will continue to serve both [their] remedial and deterrent function[s]." *Gilmer*, 500 U.S. at 28, 111 S.Ct. 1647 (quoting *Mitsubishi Motors*, 473 U.S. at 637, 105 S.Ct. 3346). If a "prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum,"

then courts should enforce **\*335** the parties' agreement to arbitrate. *Mitsubishi Motors*, 473 U.S. at 637, 105 S.Ct. 3346. But where an arbitration agreement prevents a litigant from vindicating federal substantive statutory rights, courts will not enforce the agreement. *Id.*; *see also Italian Colors*, 570 U.S. at 236, 133 S.Ct. 2304 (recognizing that federal courts would invalidate an agreement "forbidding the assertion of certain statutory rights"); *14 Penn Plaza*, 556 U.S. at 273, 129 S.Ct. 1456 (acknowledging that "a substantive waiver of federally protected civil rights will not be upheld"). Pursuant to the prospective waiver doctrine, courts—including this one —have refused to enforce "arbitration agreements that limit a party's substantive claims to those under tribal law, and hence forbid federal claims from being brought." *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 238 (3d Cir. 2020); *see Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 339–345 (4th Cir. 2020); *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 292–294 (4th Cir. 2020); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 333–337 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673–676 (4th Cir. 2016); *see also Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126–128 (2d Cir. 2019).

Of course, "parties may agree to have an arbitrator decide ... gateway questions of arbitrability," such as the validity and scope of the agreement, and the parties here have clearly done so. *Henry Schein v. Archer & White Sales, Inc.*, ––– U.S. ––––, 139 S. Ct. 524, 529, 202 L.Ed.2d 480 (2019) (internal quotation marks omitted); *see* J.A. 1184 (agreeing to arbitrate "all disputes, including the scope and validity of this Arbitration Provision"; defining "disputes" subject to arbitration to include "the validity and scope of this Arbitration Provision and any claim or attempt to set aside this Arbitration Provision"). An agreement to arbitrate gateway questions—called a "delegation clause"—is " 'simply an additional, antecedent the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.' " *Henry Schein*, 139 S. Ct. at 529 (quoting *Rent-A-Center*, 561 U.S. at 70, 130 S.Ct. 2772). As with any other agreement to arbitrate, when a party challenges a delegation clause specifically, the court must evaluate the validity of the delegation "before ordering compliance" with the clause. *Rent-A-Center*, 561 U.S. at 71, 130 S.Ct. 2772; *see Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 867 F.3d 449, 455 (4th Cir. 2017).[1]

A party may contest the enforceability of the delegation clause with the same arguments it employs to contest the enforceability of the overall arbitration agreement. *Sequoia Cap.*, 966 F.3d at 291. For example, in *Rent-A-Center*, the plaintiff argued that the entire arbitration agreement was unconscionable, in part because of limitations on arbitral discovery. *Rent-A-Center*, 561 U.S. at 74, 130 S.Ct. 2772. Those allegedly unconscionable limits applied both during arbitration of the underlying **\*336** employment dispute and during arbitration of the threshold enforceability question under the delegation clause. As the Court explained, the plaintiff could have challenged the delegation provision specifically by arguing that the discovery limitations "*as applied* to the delegation provision rendered *that provision* unconscionable." *Id.* To make such a claim, the plaintiff "would have had to argue that the limitation upon the number of depositions causes the arbitration of his claim that the [arbitration agreement] is unenforceable to be unconscionable. That would be, of course, a much more difficult argument to sustain than the argument that the same limitation renders arbitration of his factbound employment-discrimination claim unconscionable." *Id.* Because the plaintiff did not contest the validity of the delegation clause in particular, the Court was required to enforce the delegation, leaving the plaintiff's challenges to the arbitration agreement as a whole for the arbitrator to decide. *Id.* at 72, 130 S.Ct. 2772.

Plaintiffs here have specifically challenged the validity of the delegation clause—and the arbitration provision as a whole—as a prospective waiver of their right to pursue federal substantive statutory remedies. So we must assess the enforceability of the delegation clause before we may compel arbitration under its terms. *See Minnieland*, 867 F.3d at 455. Because we do not write on a clean slate, a brief examination of our relevant precedent is in order.

### A.

This is not the first time this Court has encountered a prospective waiver challenge to an arbitration provision with a delegation clause in a tribal lending agreement. In four prior cases, this Court has assessed arbitration provisions requiring application of tribal law to the practical exclusion of other law and, in each case, has held the arbitration provision (including the delegation clause) invalid as a prospective waiver of federal rights. [2]

The inaugural case in this uniform line of precedent was *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016). The arbitration agreement there, which included a delegation clause, required the arbitrator to apply " 'the laws of the [tribe] and the terms of this Agreement' " and confirmed that the arbitrator would not apply " 'any law other than the law of the [tribe] to this Agreement' " no matter where the arbitration occurred. *Id.* at 675; *see id.* at 670, 671 n.1. The *Hayes* Court concluded that these " 'choice of law' provision[s] ... waive[d] all of a potential claimant's federal rights." *Id.* at 675. The Court acknowledged that a party to an arbitration agreement "may of course agree to waive certain rights," but it "may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." *Id.* Because the arbitration **\*337** agreement at issue in *Hayes* took this step "plainly forbidden" by public policy, the Court held it "invalid and unenforceable" as a whole. *Id.* The Court further refused to sever the errant provisions because contravening public policy was an animating purpose of the arbitration agreement, as illustrated by provisions in the underlying loan agreement claiming that " 'no United States state or federal law applies to this Agreement.' " *Id.* at 676.

A year later, the Court in *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017), considered an arbitration agreement that "implicitly accomplish[ed] what the [*Hayes* agreement] explicitly stated, namely, that the arbitrator shall not allow for the application of any law other than tribal law." *Dillon*, 856 F.3d at 335. [3] The arbitration agreement provided that " 'any dispute ... will be resolved by arbitration in accordance with the law of the [tribe]' " and instructed the arbitrator to " 'apply the laws of the [tribe] and the terms of this Agreement.' " *Id.* at 332, 335. The underlying loan agreement also stated that both it " 'and the Agreement to Arbitrate are governed by [tribal law]' and '[n]either this Agreement nor the Lender is subject to the laws of any state of the United States.' " *Id.* at 335 (alterations in original). The *Dillon* Court found these provisions indistinguishable in substance from the provisions held unenforceable in *Hayes* and likewise interpreted the terms as "an unambiguous attempt to apply tribal law *to the exclusion of federal and state law.*" *Id.* at 336. The Court further noted that other terms in the underlying loan agreement "evince[d] an explicit attempt to disavow the application of federal or state law to any part of the contract," such as a provision stating that " 'no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation.' " *Id.* at 336. Viewing the arbitration agreement in light of the whole contract, the *Dillon* Court concluded that the arbitration agreement functioned "as

a prospective waiver of federal statutory rights and, therefore, [was] unenforceable as a matter of law." *Id.* As in *Hayes*, the Court refused to sever the unenforceable choice-of-law provisions from the remainder of the arbitration agreement. *See id.* at 336–337.

Most recently, this Court considered arbitration agreements in loan contracts issued by two online lenders associated with Native American tribes in *Gibbs v. Haynes Investments, LLC*, 967 F.3d 332 (4th Cir. 2020), and *Gibbs v. Sequoia Capital Operations, LLC*, 966 F.3d 286 (4th Cir. 2020). In both cases, which involved the same agreements, the Court determined that "because the choice-of-law provisions contained in both [lenders'] arbitration agreements operate as prospective waivers, the delegation clauses (and therefore the arbitration agreements) are unenforceable." *Haynes Invs.*, 967 F.3d at 341; *see also Sequoia Cap.*, 966 F.3d at 293–294. The arbitration agreements in both cases contained choice-of-law provisions stating that the agreements " 'shall be governed by tribal law' "; requiring the arbitrator to " 'apply Tribal law and the terms of this Agreement' "; mandating that the arbitrator's decision " 'be consistent with ... Tribal Law,' " including the " 'remedies available under Tribal Law' "; and providing that any award inconsistent with tribal law may be " 'set aside by a Tribal court upon judicial review.' " *Haynes Invs.*, 967 F.3d at 342 (ellipses in original); *see also Sequoia Cap.*, 966 F.3d at 293. However, **\*338** the arbitration agreements were "careful to state that they [did] not explicitly disclaim federal law" and even included an agreement that the parties would "look to the [FAA] and judicial interpretation thereof for guidance" in any arbitration. *Haynes Invs.*, 967 F.3d at 342 n.6; *see also Haynes Invs.* J.A. 341 (loan agreement stating that "[t]he Agreement to Arbitrate also comprehends the application of the [FAA], as provided below"). Still the Court concluded that the choice-of-law provisions practically precluded application of federal law because they "provide[d] that tribal law preempts the application of any contrary law—including contrary federal law." *Haynes Invs.*, 967 F.3d at 342; *see also Sequoia Cap.*, 966 F.3d at 293.

The Court noted other clauses within the arbitration agreements that "reinforce[d] this point." *Haynes Invs.*, 967 F.3d at 343. For example, the arbitration agreements provided "that arbitration may be held within thirty miles of the claimant's residence, but only to the extent that such accommodation will not be construed 'to allow for the application of any law other than Tribal Law.' " *Id.*; *see also Sequoia Cap.*, 966 F.3d at 293. The agreements limited appeal and confirmation of arbitral awards to tribal courts applying

tribal law. *Haynes Invs.*, 967 F.3d at 343; *see also Sequoia Cap.*, 966 F.3d at 293. And the Court's review of tribal law indicated that "the relevant tribal codes would not permit [the borrowers] to effectively vindicate the federal protections and remedies they seek—that is, the borrowers could not assert a RICO claim seeking treble damages" against the defendants. *Haynes Invs.*, 967 F.3d at 343; *see also Sequoia Cap.*, 966 F.3d at 293. Because the arbitration agreements "provide[d] that tribal law shall preempt the application of any contrary law, and the effect of such provisions [was] to thereby make unavailable to the borrowers the effective vindication of federal statutory protections and remedies," the Court in both cases concluded the arbitration agreements "amount[ed] to a prospective waiver," rendering those "agreements, including the delegation clauses, ... unenforceable." *Haynes Invs.*, 967 F.3d at 344–345; *see also Sequoia Cap.*, 966 F.3d at 294.

**B.**

We see no material distinction between the case at hand and the precedent set forth in *Haynes Investments*, *Sequoia Capital*, *Dillon*, and *Hayes*. As in those cases, the choice-of-law clauses of this arbitration provision, which mandate exclusive application of tribal law during any arbitration, operate as prospective waivers. In effect, those clauses would require the arbitrator to determine whether the arbitration provision impermissibly waives federal substantive rights without recourse to federal substantive law. As a result, the delegation clause is unenforceable as a violation of public policy. And as we shall see below in Part III.C, the entire arbitration provision is similarly invalid as a prospective waiver of Plaintiffs' rights to pursue federal statutory remedies.

The arbitration provision here states that any arbitration "will be governed by the laws of the [Tribe]" and the rules and procedures of the arbitration organization administering the arbitration "to the extent those rules and procedures do not contradict the express terms of this Arbitration Provision or the law of the [Tribe], including the limitations on the arbitrator below." J.A. 1185. The two immediately subsequent paragraphs dictate that "[t]he arbitrator shall apply applicable substantive Tribal law" and, regardless of where the arbitration occurs, shall "in no way ... allow for the application of any other law other than the laws of the [Tribe]." J.A. **\*339** 1185.[4] These clauses mirror those of the arbitration agreement in *Hayes*, which the Court found "almost surreptitiously waive[d] a potential claimant's federal

rights through the guise of a choice of law clause." *811 F.3d at 675*. Specifically, the *Hayes* Court quoted two provisions that together created an "outright prohibition" on asserting federal rights: (1) a provision stating that the arbitration agreement " 'shall be governed by the law of the [tribe]' " and the arbitrator " 'will apply the laws of the [tribe] and the terms of this Agreement,' " and (2) a clause stating that "no matter where the arbitration occurs, the arbitrator will not apply 'any law other than the law of the [tribe].' " *Id.* In accord with *Hayes*, we understand the clause prohibiting application of "any other law," in tandem with the clauses requiring the arbitrator to apply tribal law, to require exclusive application of tribal law in arbitration. *See id.*; *Dillon*, 856 F.3d at 336 ("Just as we did in *Hayes*, we interpret these terms in the arbitration agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*.").

Like the arbitration agreements in *Haynes Investments* and *Sequoia Capital*, the terms of the arbitration provision here "do not explicitly disclaim the application of federal law," but "the practical effect is the same" because this arbitration provision demands exclusive application of tribal law, thereby preempting application of other authority. *Haynes Invs.*, 967 F.3d at 342; *see also Williams*, 965 F.3d at 240 ("Because the arbitration agreement mandates that only tribal law applies in arbitration, federal law does not."). A prospective waiver may be "implicitly accomplish[ed]" by provisions that disallow "application of any law other than tribal law." *Dillon*, 856 F.3d at 335; *see also Williams*, 965 F.3d at 241 (rejecting the argument that an agreement "must affirmatively disclaim federal law" to "be invalid under the prospective waiver doctrine"). That is the case here. By requiring the arbitrator to apply tribal law, expressly prohibiting "the application of any other law other than the laws of the [Tribe]," and accommodating other rules and procedures only "to the extent [they] do not contradict the express terms of this Arbitration Provision or the law of the [Tribe]," J.A. 1185, the arbitration provision requires application of tribal law to the exclusion of federal (and state) law.

As a result, the choice-of-law clauses of the arbitration provision operate as a prospective waiver twice over, waiving not only a borrower's right to pursue federal statutory remedies (as we shall see below) but also the very federal and state defenses to arbitrability that preserve that right. *See Williams*, 965 F.3d at 243 n.14 (reasoning that enforcing the delegation clause in an arbitration provision that excludes reliance on federal or state law "would effectively allow [the lender] to subvert federal public policy and deny

[the borrower] the effective vindication of her federal statutory rights before the arbitration of her claims even began" (alterations in original) (internal quotation marks omitted)). A delegation clause that requires an arbitrator to determine whether a valid and enforceable arbitration agreement exists without access to the substantive federal law necessary to make that determination results in the "sort of farce" we have previously refused to enforce under the FAA. *Hayes*, 811 F.3d at 674. The delegation clause is therefore unenforceable as a violation of public policy. *See Haynes Invs.*, 967 F.3d at 345 (holding delegation clause **\*340** unenforceable as a violation of public policy); *Sequoia Cap.*, 966 F.3d at 294 (same); *Hayes*, 811 F.3d at 675 (same); *Williams*, 965 F.3d at 243 (same); *Gingras*, 922 F.3d at 126–127 (same).

Defendants counter that the arbitration provision explicitly refers to the FAA, thereby giving the arbitrator access to the only law he or she needs for deciding enforceability. We disagree that the two clauses referencing the FAA, in context of the arbitration provision as a whole, can be construed to save the delegation clause. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (applying the "cardinal principle of contract construction" that "a document should be read to give effect to all its provisions and to render them consistent with each other"); *Doctors Co. v. Women's Healthcare Assocs., Inc.*, 285 Va. 566, 740 S.E.2d 523, 526 (2013) ("[W]hen considering the meaning of any part of a contract, we will construe the contract as a whole." (internal quotation marks omitted)). [5]

The first clause Defendants highlight states that "[t]he arbitrator shall apply applicable substantive Tribal law consistent with the Federal Arbitration Act (FAA)." J.A. 1185. But this clause does not require the content of tribal law *to be* consistent with the FAA or limit its application in the arbitration *to the extent* it is consistent with the FAA. Rather, the clause merely asserts that applying tribal law is consistent with the FAA's requirements. The context of the arbitration provision confirms this interpretation, as other paragraphs require the arbitrator to apply tribal law and forbid the arbitrator to apply "any other law." J.A. 1185.

The second clause on which Defendants rely appears in a paragraph about judicial enforcement of the arbitration provision. In full, it provides:

This Arbitration Provision is made pursuant to a transaction involving both interstate commerce and Indian commerce under the United States Constitution and other federal and tribal laws. Thus, any arbitration shall be governed by the FAA and subject to the laws of the [Tribe]. If a final non-appealable judgment of a court having jurisdiction over this transaction and the parties finds, for any reason, that the FAA does not apply to this transaction, then Our agreement to arbitrate shall be governed by the laws of the [Tribe].

J.A. 1185. The first sentence of the paragraph pertains to the FAA's jurisdictional requirement that an arbitration provision be part of a "maritime transaction or a contract evidencing a transaction involving commerce" for a court to enforce it. 9 U.S.C. § 2; *see* 9 U.S.C. § 1 (defining "commerce"). [6] The second sentence confirms that, because the loan agreement falls within the FAA's jurisdictional bounds, the FAA governs enforceability of the arbitration provision. And the third sentence clarifies that, should a court find the loan agreement does not involve interstate **\*341** or Indian commerce as asserted, the laws of the Tribe will determine the validity of the arbitration provision. *See Hengle*, 433 F. Supp. 3d at 854–855.

Defendants would have us take the clause stating that "any arbitration shall be governed by the FAA" out of its context and construe it as a portal through which all federal and state law defenses to arbitrability are imported into the agreement and made available for application by the arbitrator. But that interpretation would create conflict with the other terms of the arbitration provision, which require that the arbitration be "governed by the laws of the [Tribe]" and forbid the arbitrator to apply "any other law other than the laws of the [Tribe]." J.A. 1185. We must read the arbitration provision to give effect to all its terms and "to render them consistent with each other." *Mastrobuono*, 514 U.S. at 63, 115 S.Ct. 1212; *see also Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 788 S.E.2d 237, 244 & n.8 (2016) (affirming that each part of a contract must, if possible, be given effect and interpreted in light of all the other parts). Reading these clauses together, the

most harmonious construction that gives effect to each clause is to read the "governed by the FAA" clause as asserting that the arbitration provision falls within the purview of the FAA and should accordingly be enforced by a court of competent jurisdiction, but, once the court conveys the dispute to the arbitrator, he or she "must apply only the laws of the Tribe to the exclusion of Plaintiffs' potential federal and state statutory rights, including defenses to arbitrability arising under federal and state law." *Hengle*, 433 F. Supp. 3d at 855.

In response, Defendants contend that we overread the clause forbidding application of "any other law," which they say merely prevents application of the forum State's law if the arbitration occurs off tribal land. But the text of the clause proscribes "application of *any* other law other than the laws of the [Tribe]," not only the law of the forum State. J.A. 1185 (emphasis added). Defendants' interpretation is also in considerable tension with our precedent finding similar clauses indicative of a prospective waiver of federal law. For example, the *Hayes* Court construed a materially identical clause stating that, although a borrower could choose the arbitration be conducted within thirty miles of his or her residence, such accommodation "shall not be construed in any way ... to allow for the application of any law other than the law of the [tribe]." *Hayes* J.A. 155; *see Hayes*, 811 F.3d at 675. The Court held that this clause, in conjunction with a provision requiring application of tribal law, "almost surreptitiously waive[d] a potential claimant's federal rights." *Hayes*, 811 F.3d at 675. And in *Haynes Investments* and *Sequoia Capital*, we found a similar clause "reinforce[d] th[e] point" that "tribal law preempts the application of any contrary law—including contrary federal law." *Haynes Invs.*, 967 F.3d at 342; *see id.* at 343 (describing a clause "provid[ing] that arbitration may be held within thirty miles of the claimant's residence, but only to the extent that such accommodation will not be construed 'to allow for the application of any law other than Tribal Law'"); *see also Sequoia Cap.*, 966 F.3d at 293. Absent a contrary indication in the contract, precedent constrains us to give the equivalent clause in this arbitration provision an equivalent construction.

Finally, we note that some of the arbitration agreements in *Haynes Investments* and *Sequoia Capital* provided that "the parties additionally agree to look to the [FAA] and judicial interpretations thereof for guidance in any arbitration." *Haynes Invs.* J.A. 343; *see id.* at 341 ("The Agreement to Arbitrate also comprehends **\*342** the application of the [FAA], as provided below."); *Haynes Invs.*, 967 F.3d at 342 n.6 (acknowledging these provisions). Despite these explicit

Case 1:23-cv-20188-RKA Document 102-43 Entered on FLSD Docket 06/30/2023 Page 12 of 23
Hengle v. Treppa, 19 F.4th 324 (2021)

RICO Bus.Disp.Guide 13,574

references to the FAA, the Court held that the "practical effect" of the arbitration agreements' terms requiring the arbitrator to apply tribal law and render a decision consistent with tribal law was to preempt the application of contrary federal law, thereby invalidating the delegation clause. *Haynes Invs.*, 967 F.3d at 342. We follow those precedents here in concluding that the arbitration provision's references to the FAA, read in context, do not mend the prospective waiver of federal law wrought by the arbitration provision's other terms. [7] Although "we remain cognizant of the 'strong federal policy in favor of enforcing arbitration agreements,'" we must interpret the arbitration provision according to its terms and our precedent. *Hayes*, 811 F.3d at 671 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)). By preventing the arbitrator from applying federal law, the arbitration provision necessarily restrains the arbitrator from considering federal law defenses to arbitrability, thereby precluding Plaintiffs from effectively vindicating their federal statutory rights. The delegation clause is therefore unenforceable as a violation of public policy.

### C.

Because the delegation clause is unenforceable, we must address Plaintiffs' challenge to the validity of the arbitration provision as a whole. We agree with the district court that the choice-of-law clauses previously discussed operate as a prospective waiver of the borrowers' federal statutory rights and remedies. Therefore, the entire arbitration provision is unenforceable.

As previously discussed, by requiring the arbitrator to apply tribal law, expressly prohibiting "the application of any other law other than the laws of the [Tribe]," and accommodating other rules and procedures only "to the extent [they] do not contradict the express terms of this Arbitration Provision or the law of the [Tribe]," J.A. 1185, the arbitration provision unambiguously attempts to apply tribal law to the exclusion of substantive federal law. *See Hayes*, 811 F.3d at 675; *cf. Dillon*, 856 F.3d at 336. As a result, it functions as a prospective waiver of the borrowers' rights to pursue federal statutory remedies, including the remedies under RICO that Plaintiffs seek here. *See Haynes Invs.*, 967 F.3d at 344 (holding arbitration agreement prospectively waived RICO claims); *Sequoia Cap.*, 966 F.3d at 294 (same); *Williams*, 965 F.3d at 240–243 (same); *Gingras*, 922 F.3d at 127 (same). [8]

**\*343** Defendants emphasize that the disputes subject to arbitration explicitly include "all tribal, *federal* or state law claims" and "all claims based upon a violation of any tribal, state or *federal* constitution, statute or regulation." J.A. 1184 (emphases added). Thus, they urge, the arbitration provision contemplates arbitration of federal claims. But as we reasoned in *Sequoia Capital*, "such language does not counteract the effect of the choice-of-law provisions." 966 F.3d at 293. Indeed, the arbitration agreements in *Hayes*, *Dillon*, *Haynes Investments*, and *Sequoia Capital* each required federal claims to be sent to arbitration, but the Court in each case nevertheless found that the agreements prevented effective vindication of federal statutory claims. *See Sequoia Cap.*, 966 F.3d at 293; *see also Hayes* J.A. 155; *Dillon* J.A. 184; *Haynes Invs.* J.A. 342. If anything, such language highlights the arbitration provision's impermissible tactic of compelling arbitration of federal claims only to then nullify those claims by precluding application of federal law. *See Hayes*, 811 F.3d at 673–674 ("With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away.").

Reading the arbitration provision as encompassing disputes it does not empower the arbitrator to resolve is far from fanciful. As another example, the provision requires that all class claims be sent to arbitration but, a few paragraphs later, explicitly forbids class arbitration. *See* J.A. 1184. We offer this example not to criticize the contractual waiver of class proceedings, which is unquestionably permissible, *see Concepcion*, 563 U.S. at 344– 352, 131 S.Ct. 1740, but merely to illustrate that interpreting this arbitration provision to waive claims explicitly within its scope is not contradictory but rather, in some instances, exactly what the contract intends. The difference, of course, is that waiver of a party's substantive federal rights in arbitration is forbidden. *See Italian Colors*, 570 U.S. at 235–236, 133 S.Ct. 2304.

Defendants further argue that the arbitration provision's invocation of tribal law cannot be interpreted to displace federal law because the Tribe's Consumer Financial Services Ordinance incorporates federal law in many respects. But although the Ordinance requires lending businesses to comply with various federal laws, it would not permit Plaintiffs to assert their RICO claim for treble damages. First, although Section 7.1 of the Ordinance requires lenders to "comply with ... all other applicable Tribal, and federal laws as applicable," J.A. 267, RICO is "noticeably absent from the list [in Section 7.2] of federal consumer protection statutes

with which a lender must comply," *Haynes Invs.*, 967 F.3d at 343; *see* J.A. 267–268. Second, the Ordinance does not include a private right of action for violations of its provisions or any federal laws. *Cf. Haynes Invs.*, 967 F.3d at 344. Although the Ordinance includes a consumer complaint procedure, the tribal commission tasked with reviewing a lender's handling of a complaint may "grant or deny any relief as the Commission determines appropriate," and its award "may not exceed the amount of the Consumer's debt plus reimbursement of payments." J.A. 280. The Ordinance authorizes arbitration to review the tribal commission's decision but limits the arbitrator's award to "the maximum value of the Loan at **\*344** issue" and forbids the award of "punitive damages" or "equitable relief." J.A. 281.

In line with our review of materially similar tribal ordinances in *Haynes Investments* and *Sequoia Capital*, we conclude that a claimant proceeding under tribal law would be unable to assert a RICO claim against individuals associated with a tribal lender and certainly could not pursue RICO's treble damages remedy. *See Haynes Invs.*, 967 F.3d at 343–344; *Sequoia Cap.*, 966 F.3d at 293. As the district court correctly determined, the Ordinance "precludes consumers from vindicating their federal statutory rights by replacing the remedial and deterrent remedies selected by Congress with the Tribe's own remedial scheme—the exact concern that gave rise to the prospective waiver doctrine." *Hengle*, 433 F. Supp. 3d at 859.

Finally, we reject Defendants' plea to compel arbitration on the premise that estoppel will prevent them from arguing to the arbitrator that federal law does not apply. The Tribal Lenders drafted an invalid contract that strips borrowers of their substantive federal statutory rights; we cannot save that contract by revising it on appeal. We have refused similar invitations in previous cases, and we do so again here. *See Sequoia Cap.*, 966 F.3d at 293 n.4; *Dillon*, 856 F.3d at 336.

### D.

The question then becomes whether we can sever the errant clauses and enforce the remainder of the arbitration provision. Like the arbitration agreements in *Hayes* and *Dillon*, this arbitration provision contains a severability clause stating that "[i]f any of this Arbitration Provision is held invalid, the remainder shall remain in effect." J.A. 1185; *see Hayes* J.A. 156; *Dillon* J.A. 185. But the existence of a severability clause cannot save an arbitration provision if the invalid terms are

integral to the agreement. *See Schuiling v. Harris*, 286 Va. 187, 747 S.E.2d 833, 836–837 (2013); *Eschner v. Eschner*, 146 Va. 417, 131 S.E. 800, 802 (1926); *see also Williams*, 965 F.3d at 244 n.17.

In line with *Hayes*, *Dillon*, and every court of appeals to consider the question, we conclude that the choice-of-law clauses applying tribal law to the exclusion of federal law cannot be severed because they "go[ ] [to] the 'essence' " of the agreement to arbitrate. *Hayes*, 811 F.3d at 676 (quoting 8 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 19:73 (4th ed. 1993)); *see Dillon*, 856 F.3d at 336 (concluding "the offending provisions go to the core of the arbitration agreement" (internal quotation marks omitted)); *Williams*, 965 F.3d at 243–244 & n.17 (finding terms requiring exclusive application of tribal law to be inseverable, despite severability clause); *Gingras*, 922 F.3d at 128 (rejecting severability); *cf. MacDonald*, 883 F.3d at 230–232 (finding clause selecting illusory tribal arbitral forum to be inseverable, despite severability clause). Read as a whole, the arbitration provision communicates an intent to require arbitration of all disputes, including those arising under federal law, while depriving borrowers of any remedy under federal law. That forbidden purpose to squelch federal claims in contravention of public policy goes to the core of the agreement to arbitrate. We accordingly cannot sever the invalid clauses and, as a result, the entire arbitration provision is unenforceable.

### IV.

We move next to the question of tribal sovereign immunity. Plaintiffs sought declaratory and injunctive relief against the Tribal Officials under Virginia law and RICO, which, as relevant here, defines **\*345** "unlawful debt" by reference to state law. *See* 18 U.S.C. § 1961(6). In the district court, the Tribal Officials moved to dismiss Plaintiffs' claims against them for lack of subject matter jurisdiction, contending that they enjoy the same immunity from suit as the Tribe and such immunity extends to suits seeking to enjoin violations of state law. This presents a question of first impression in our Circuit.

Indian tribes possess a unique status in our federal system. As "domestic dependent nations," they "exercise inherent sovereign authority," yet they are "subject to plenary control by Congress." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788, 134 S.Ct. 2024, 188 L.Ed.2d 1071 (2014) (internal quotation marks omitted). One of the "core aspects

of sovereignty" afforded to tribes is "the 'common-law immunity from suit,' " not only in tribal courts but also in state and federal courts. *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)). Absent waiver or congressional abrogation, tribal immunity extends even to suits arising from a Tribe's commercial activities off tribal lands. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 760, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998).

But the Supreme Court has consistently recognized that tribal immunity does not bar suits against "*individuals*, including tribal officers, responsible for unlawful conduct." *Bay Mills*, 572 U.S. at 796, 134 S.Ct. 2024. For example, tribal immunity does not immunize individual tribal members from suits "to enjoin violations of state law." *Puyallup Tribe v. Dep't of Game*, 433 U.S. 165, 171–172, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) (suit to enjoin off-reservation fishing in violation of state law); *cf. Okla. Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe*, 498 U.S. 505, 514, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) ("We have never held that individual agents or officers of a tribe are not liable for damages in actions brought by the State."); *Lewis v. Clarke*, ––– U.S. ––––, 137 S. Ct. 1285, 1291–1292, 197 L.Ed.2d 631 (2017) (denying immunity in negligence action brought against tribal employee under state law for tort committed within the scope of his employment). And, by analogy to *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), tribal officers are "not protected by the tribe's immunity from suit" when a plaintiff seeks to enjoin a violation of federal law. *Santa Clara Pueblo*, 436 U.S. at 59, 98 S.Ct. 1670 (suit for declaratory and injunctive relief alleging that tribal ordinance violated federal law).

The Tribal Officials assert that sovereign immunity bars Plaintiffs' claims against them seeking prospective relief to enjoin violations of *state* law. We agree with the district court that the Supreme Court's decision in *Bay Mills* forecloses the Tribal Officials' argument. Tribal sovereign immunity does not bar state law claims for prospective injunctive relief against tribal officials for conduct occurring off the reservation. *See Gingras*, 922 F.3d at 120; *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015).

In *Bay Mills*, the Bay Mills Indian Community—a federally recognized Native American tribe—opened an off-reservation gaming facility in Michigan on land the tribe had purchased. Michigan sued to enjoin operation of the new casino. It alleged Bay Mills violated the Indian Gaming

Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, and the compact between the parties pursuant to that law because the facility was located beyond Indian lands. Congress adopted the IGRA in response to *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), "which held that States lacked **\*346** any regulatory authority over gaming on Indian lands" but "left fully intact a State's regulatory power over tribal gaming outside Indian territory," *Bay Mills*, 572 U.S. at 794, 134 S.Ct. 2024. Through the IGRA, Congress granted States " 'some measure of authority over gaming on *Indian* lands,' " thereby abrogating tribal sovereign immunity to that extent. *Id.* (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). But, the Court held, a State's suit to enjoin gaming activity *off* Indian lands does not fall within the IGRA and is accordingly outside the statute's abrogation of immunity. *Id.* at 791, 134 S.Ct. 2024.

Even so, the Court explained, Michigan was not without recourse for the tribe's alleged violations of state law. Though the State could not sue the *tribe* for illegal gaming, it could "resort to other mechanisms, including legal actions against the responsible individuals." *Id.* at 785, 134 S.Ct. 2024. Because "Indians going beyond reservation boundaries are subject to any generally applicable state law[,] ... Michigan could, in the first instance, deny a license to Bay Mills for an off-reservation casino." *Id.* at 795–796, 134 S.Ct. 2024 (internal quotation marks omitted). "And if Bay Mills went ahead anyway, Michigan could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gambling without a license." *Id.* at 796, 134 S.Ct. 2024 (citing Mich. Comp. Laws Ann. §§ 432-220, 600.3801(1)(a)). The Court explained: "As [we] ha[ve] stated before, analogizing to *Ex parte Young*, ... tribal immunity does not bar such a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct." *Id.* at 796, 134 S.Ct. 2024 (citing *Santa Clara Pueblo*, 436 U.S. at 59, 98 S.Ct. 1670).

We agree with the Second and Eleventh Circuits that this "plain statement" by the Supreme Court "blessed *Ex parte Young*-by-analogy suits against tribal officials for violations of state law." *Gingras*, 922 F.3d at 121; *see also PCI Gaming Auth.*, 801 F.3d at 1290 ("[T]ribal officials may be subject to suit in federal court for violations of state law under the fiction of *Ex parte Young* when their conduct occurs outside of Indian lands."). Though the tribe itself retains sovereign immunity, it cannot shroud its officials with immunity in federal court when those officials violate

applicable state law. [9] Accordingly, sovereign immunity does not bar Plaintiffs' claims for prospective injunctive relief to restrain the Tribal Officials from off-reservation conduct that allegedly violates state law.

The Tribal Officials assert that we should not follow *Bay Mills* because its statements about suing tribal officials to enforce state law were dicta and, if taken seriously, would "silently overrul[e]" multiple settled precedents. Opening Br. 68. We are not persuaded.

As an initial matter, we cannot ignore the Supreme Court's explicit guidance simply by labeling it "dicta." Although the Court's extended discussion of the alternative **\*347** remedies available to Michigan may not have been strictly "necessary to the outcome" in *Bay Mills*, neither was it "peripheral" or so cursory as to suggest the Court gave less than "full and careful consideration" to the matter. *Payne v. Taslimi*, 998 F.3d 648, 654–655 (4th Cir. 2021) (internal quotation marks omitted). Indeed, the availability of alternative remedies featured in both of the Court's holdings. Regarding the IGRA, the Court explained that Congress abrogated tribal immunity solely with respect to gaming on Indian lands because States already had other ways to vindicate gaming-law violations outside Indian territory. *See Bay Mills*, 572 U.S. at 795–797, 134 S.Ct. 2024. And regarding the Court's decision not to overrule *Kiowa*, it reasoned that "[a]dhering to *stare decisis* is particularly appropriate here given that the State ... has many alternative remedies," but "the situation [c]ould be different if no alternative remedies were available." *Id.* at 799, 134 S.Ct. 2024 n.8.

Even if the Supreme Court's discussion of alternative remedies were dicta, we are "obliged to afford 'great weight to Supreme Court dicta.' " *Fusaro v. Cogan*, 930 F.3d 241, 254 (4th Cir. 2019) (quoting *Nat'l Labor Rels. Bd. v. Bluefield Hosp. Co.*, 821 F.3d 534, 541 n.6 (4th Cir. 2016)); *see also Manning v. Caldwell*, 930 F.3d 264, 281 (4th Cir. 2019) (en banc) ("[W]e routinely afford substantial, if not controlling deference to dicta from the Supreme Court."); *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008) (acknowledging that Supreme Court dicta "should have considerable persuasive value in the inferior courts" (internal quotation marks omitted)). "[W]e cannot simply override a legal pronouncement endorsed ... by a majority of the Supreme Court," particularly when the supposed dicta " 'is recent and not enfeebled by later statements.' " *McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181 n.2 (4th Cir. 2012) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th

Cir. 1996)). The lengthy discussion of alternative remedies, including a suit against tribal officers to restrain violations of state law, was important, if not essential, to the Court's analysis in *Bay Mills*. We see no ground on which we can disregard the Court's clear endorsement of such suits.

The Tribal Officials caution that following *Bay Mills* would contravene the Supreme Court's instruction that the overriding basis for the *Ex parte Young* doctrine is to vindicate the supreme authority of federal law. *See Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 105–106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In *Pennhurst*, the Supreme Court refused to extend the *Ex parte Young* rationale to suits against state officials alleging violations of their own State's laws. As the Court explained, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law," a result that "conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* at 106, 104 S.Ct. 900. But the sovereignty and federalism concerns underpinning *Pennhurst* are not implicated here. In suits against tribal officials like *Bay Mills* envisioned, federal courts are called upon to instruct *tribal* officials on how to conform their conduct to *state* law. The Court's recognition in *Bay Mills* that tribal officials may be sued for violations of state law "thus stands in harmony with *Pennhurst*." *Gingras*, 922 F.3d at 123; *see also PCI Gaming Auth.*, 801 F.3d at 1290.

*Bay Mills* also does not upset core principles of tribal sovereign immunity as the Tribal Officials contend. *Ex parte Young*-style **\*348** claims do not accomplish an extra-congressional abrogation of tribal immunity but rather present a long-recognized *exception* to sovereign immunity. *Cf. Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002) (describing *Ex parte Young* as an "exception to sovereign immunity" based on the "fiction" that a state officer acting in violation of federal law "loses the cloak of [s]tate immunity" (internal quotation marks omitted)); *Santa Clara Pueblo*, 436 U.S. at 59, 98 S.Ct. 1670 ("[A]n officer of the [tribe] ... is not protected by the tribe's immunity from suit."); *Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16, 30 (1st Cir. 2006) ("Whatever the scope of a tribal officer's official capacity, it does not encompass activities that range beyond the authority that a tribe may bestow."). And though the Supreme Court has applied the same "general rules" to States and tribes when it comes to individual- and official-capacity suits, *Lewis*, 137 S. Ct. at 1292, it has acknowledged that tribal immunity is not identical to the immunity the States enjoy, *see Three Affiliated Tribes of Fort Berthold Rsrv. v.*

*Wold Eng'g*, 476 U.S. 877, 890, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986).

Alternatively, accepting that the Supreme Court meant what it said in *Bay Mills*, the Tribal Officials attempt to distinguish the case on two primary grounds. First, the Tribal Officials argue that *Bay Mills* addressed only a *State's* ability to sue tribal officials for violations of state law, whereas Plaintiffs here are private individuals. But "there is no warrant in [precedent] for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff." *Va. Off. of Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011). Indeed, the principle that a tribe cannot authorize its officials to violate applicable state law applies equally regardless of who sues to enforce state law. *Cf. Gingras*, 922 F.3d at 124 (noting that States often authorize private parties to "act as 'private attorneys general' to enforce state law"). That the Supreme Court spoke in terms of a State's ability to sue tribal officials—because that was the posture of the case before it—does not limit the principle it recognized in *Bay Mills* to those facts. As the Court explained elsewhere in its opinion, "tribal immunity applies no less to suits brought by States ... than to those by individuals." *Bay Mills*, 572 U.S. at 789, 134 S.Ct. 2024.

Second, the Tribal Officials assert that the conduct at issue here occurred on the reservation, unlike the off-reservation gaming in *Bay Mills*. *See Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–149, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) ("Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State."). They note in particular that each loan agreement states it was "made and accepted in the sovereign territory of the Habematolel Pomo of Upper Lake." J.A. 1186. But as the district court aptly observed, the conduct alleged is not limited to where the parties "made and accepted" the agreements. *See Hengle*, 433 F. Supp. 3d at 875–876 & n.13. For example, Defendants allegedly marketed their lending businesses throughout the country, including in Virginia, and Plaintiffs resided on non-Indian lands when they applied for their loans online. Defendants allegedly collected loan payments from Plaintiffs while they resided in Virginia from bank accounts maintained there, and the effects of Defendants' allegedly illegal activities were felt by Plaintiffs in Virginia. These activities are "directly analogous to the lending activity that other courts have **\*349** found to clearly constitute off-reservation conduct subject to nondiscriminatory state regulation." *Id.* at 876; *see, e.g.,*

*Gingras*, 922 F.3d at 121; *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 360–361 (S.D.N.Y. 2013); *Colorado v. W. Sky Fin., LLC*, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011); *United States v. Hallinan*, No. 16-cr-130, 2016 WL 7477767, at \*1 n.2 (E.D. Pa. Dec. 29, 2016). Indeed, the Tribal Officials have not brought to our attention any court reaching a contrary conclusion. Plaintiffs seek to enjoin off-reservation conduct, bringing their suit within *Bay Mills*' ambit.

In sum, substantive state law applies to off-reservation conduct, and although the Tribe itself cannot be sued for its commercial activities, its members and officers can be. *Cf. Kiowa*, 523 U.S. at 755, 118 S.Ct. 1700 ("There is a difference between the right to demand compliance with state laws and the means available to enforce them."). The Supreme Court has explicitly blessed suits against tribal officials to enjoin violations of federal and state law. *See Bay Mills*, 572 U.S. at 795–796, 134 S.Ct. 2024. We therefore affirm the district court's ruling that tribal sovereign immunity does not bar Plaintiffs' claims for injunctive and declaratory relief against the Tribal Officials.

V.

All Defendants moved to dismiss the complaint because Plaintiffs' claims depend on Virginia usury law, while the governing-law clause of the loan agreements elects tribal law to govern the loans. The district court held the governing-law clause unenforceable as a violation of "Virginia's compelling public policy against the unregulated lending of usurious loans." *Hengle*, 433 F. Supp. 3d at 867. Because the complaint stated a plausible claim that the loans violate Virginia's usury statute and are an "unlawful debt" under RICO, the court denied Defendants' motions to dismiss on this ground. *See* 18 U.S.C. § 1961(6) (defining "unlawful debt" as a debt incurred in connection with the business of lending money "at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate"); Va. Code Ann. § 6.2-303. The district court certified for interlocutory review the question of law whether enforcement of the governing-law clause would violate Virginia's compelling public policy.

The parties agree that Virginia's choice-of-law rules direct our inquiry. *See ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983). Under Virginia law, parties to a contract are free to specify the law that governs their agreement. *See Union Cent. Life Ins. Co. v. Pollard*, 94 Va.

146, 26 S.E. 421, 422 (1896). Virginia courts accordingly give contractual choice-of-law clauses "full effect except in unusual circumstances." *Hitachi Credit Am. Corp. v. Signet Bank,* 166 F.3d 614, 624 (4th Cir. 1999) (citing *Tate v. Hain,* 181 Va. 402, 25 S.E.2d 321, 324 (1943)); *see also Paul Bus. Sys., Inc. v. Canon USA, Inc.,* 240 Va. 337, 397 S.E.2d 804, 807 (1990). One such circumstance occurs when a foreign law not only differs from Virginia law but is contrary to compelling public policy of the Commonwealth; in that case, Virginia courts will not lend their aid to enforce the obligation under foreign law. *See Willard v. Aetna Cas. & Sur. Co.,* 213 Va. 481, 193 S.E.2d 776, 778 (1973) ("Comity does not require the application of another state's substantive law if it is contrary to the public policy of the forum state."); *Tate,* 25 S.E.2d at 325 (recognizing that the parties' choice of law is controlling "unless it be so much in conflict with the public policy of Virginia **\*350** that it would not be given recognition in its courts").

The loan agreements here obligate Plaintiffs to pay interest at rates between 544% and 920% on principal amounts ranging from $300 to $1,575 over the course of ten months. The governing-law clause in the loan agreements selects tribal law, which contains no usury cap or limits of any kind on the interest a lender can charge. Virginia law caps general interest rates at 12%. Va. Code Ann. § 6.2-303(A). The Supreme Court of Virginia has not addressed whether unregulated usurious lending of low-dollar loans with triple-digit interest rates violates compelling Virginia public policy so as to overcome a contractual choice of foreign law. We therefore must apply Virginia law to predict how that court would rule. *See Wells v. Liddy,* 186 F.3d 505, 527–528 (4th Cir. 1999).

Defendants assert that the Supreme Court of Virginia's decision in *Settlement Funding, LLC v. Von Neumann-Lillie,* 274 Va. 76, 645 S.E.2d 436 (2007), forecloses Plaintiffs' argument at the outset but, like other courts, we conclude that *Settlement Funding* does not answer the public policy question presented here. *See Hengle,* 433 F. Supp. 3d at 865–866; *Gibbs v. Haynes Invs., LLC,* 368 F. Supp. 3d 901, 929 n.49 (E.D. Va. 2019); *Commonwealth v. NC Fin. Sols. of Utah, LLC,* 100 Va. Cir. 232, 2018 WL 9372461, at \*12 (Va. Cir. Ct. 2018). In *Settlement Funding,* a bank extended a $29,000 loan to the borrower at an effective annual interest rate of 22.531%, to be repaid over a period of 178 months. 645 S.E.2d at 437; *see Commonwealth v. Settlement Funding, LLC,* 70 Va. Cir. 203, 2006 WL 727873, at \*1 (Va. Cir. Ct. 2006). The loan agreement contained a Utah choice-of-law clause. The borrower eventually defaulted on the loan and raised several

affirmative defenses to the bank's collection action, including a usury defense based on Virginia law. *Settlement Funding,* 645 S.E.2d at 438. The bank responded that the usury defense was improper because the loan agreement designated Utah law as controlling and Utah law did not contain a usury cap but instead provided that the unconscionability of consumer loan interest rates "be determined by the market conditions." *Id.* at 438–439 (internal quotation marks omitted). The trial court declined to apply Utah law. Though it acknowledged that Utah law would apply pursuant to the choice-of-law clause, the trial court found the bank produced no proper proof of Utah law at trial and, without proof of Utah law, the court applied a presumption that Utah law was identical to Virginia law. The Supreme Court of Virginia reversed. The court held that the bank had "provided the circuit court with sufficient information regarding the substance of Utah law[,] ... [t]herefore, the circuit court erred in refusing to apply Utah law in the construction of the loan agreement." *Id.* at 439.

From this, Defendants contend that the Supreme Court of Virginia has concluded that a choice-of-law clause selecting foreign law that permits interest rates above Virginia's usury cap never violates public policy. We cannot agree. The *Settlement Funding* court said nothing about public policy but addressed only the evidentiary question whether the bank had met its burden to prove the substance of Utah law. Although the borrower asserted public policy as an alternative argument on appeal, the bank replied that the trial court did not address this issue. Br. of Appellee at 2–5, *Settlement Funding,* 645 S.E.2d 436, 2006 WL 4701777; Reply Br. of Appellant at 2, *Settlement Funding,* 645 S.E.2d 436, 2007 WL 2296007. The Supreme Court of Virginia likewise did not address the public policy point but ruled solely on the issue raised and decided below. Moreover, the interest charged under Utah law in **\*351** *Settlement Funding* was roughly 10 percentage points greater than Virginia's 12% cap. In stark contrast, the interest charged here under tribal law exceeds Virginia's cap by roughly *500 to 900* percentage points. We can infer no directive on the question before us from the decision in *Settlement Funding.*

We therefore must discern Virginia public policy by reference to its statutes and caselaw. *See Paul Bus. Sys.,* 397 S.E.2d at 808. Of course, in one sense every statutory enactment expresses the public policy of the Commonwealth. But "[m]erely because one state's law differs from Virginia's does not, *ipso facto,* justify refusal to adhere to comity principles," or choice-of-law clauses would rarely be

enforced. *Chesapeake Supply & Equip. Co. v. J.I. Case Co.*, 700 F. Supp. 1415, 1421 (E.D. Va. 1988). Virginia public policy must be "compelling" to override the parties' selection of a different State's laws, *Willard*, 193 S.E.2d at 779, such that enforcement of the foreign law would be "shocking to one's sense of right," *Tate*, 25 S.E.2d at 325; *see Chesapeake Supply*, 700 F. Supp. at 1421.

Since as early as 1734, the Virginia legislature has regulated usurious loans based upon "considerations of public policy." *See Town of Danville v. Pace*, 66 Va. 1, 19–20 (1874). "The usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and [a] court should therefore be chary in permitting this policy to be thwarted." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 312 S.E.2d 282, 285 (1984) (brackets omitted) (quoting *Heubusch v. Boone*, 213 Va. 414, 192 S.E.2d 783, 789 (1972)). Current Virginia law prohibits loans with interest rates greater than 12%. *See* Va. Code Ann. § 6.2- 303(A). The General Assembly exempts certain entities from the general usury cap but subjects those entities to specific licensure and regulatory requirements, including separate interest-rate limits. *See id.* § 6.2-303(B); *see, e.g., id.* § 6.2-1500 *et seq.* (licensure and regulation of consumer finance companies); *id.* § 6.2-1800 *et seq.* (licensure and regulation of short-term lenders); *id.* § 6.2-2200 *et seq.* (licensure and regulation of motor vehicle title lenders). Any contract violating the usury limit is "void," meaning the lender cannot collect "any principal, interest, fees, or other charges in connection with the contract." *Id.* § 6.2-303(F) (effective Jan. 1, 2021). And a borrower who paid usurious interest may sue to recover not only the excess interest paid but also "[t]wice the total amount of interest paid" during the two years preceding the lawsuit, in addition to court costs and attorney's fees. *Id.* § 6.2-305(A).

Virginia's legislature has signaled the importance it attaches to the usury laws by enacting an anti-waiver provision, which states that "[a]ny agreement or contract in which the borrower waives the benefits of [Virginia's usury laws] or releases any rights he may have acquired under [those laws] shall be deemed to be against public policy and void." *Id.* § 6.2-306(A). [10] An anti-waiver provision can be evidence that a state usury statute represents a fundamental policy of the State that overcomes **\*352** a contractual choice-of-law clause. *See, e.g., Kaneff v. Del. Title Loans*, 587 F.3d 616, 622–624 (3d Cir. 2009) (concluding that Pennsylvania's "antipathy to high interest rates such as the 300.01 percent interest charged in the contract at issue, represents such a fundamental policy that we must apply Pennsylvania law"

after assessing, *inter alia*, the Pennsylvania usury statute's anti-waiver provision and enforcement mechanisms); *Clerk v. First Bank of Del.*, 735 F. Supp. 2d 170, 178 (E.D. Pa. 2010) (applying *Kaneff* to conclude that Pennsylvania's fundamental public policy against usury overcame the parties' selection of Delaware law in the contract). Importantly, Virginia's anti-waiver provision does more than prohibit waivers of Virginia's usury laws: it specifically instructs that contracts in derogation of those laws are "against public policy and void." Va. Code Ann. § 6.2-306(A). We have previously found a similar statement by the legislature, combined with an anti-waiver provision, to evince a State's fundamental public policy. *See Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 609–610 (4th Cir. 2004) (analyzing the Arkansas Franchise Act). As we observed in that case, "a legislature simplifies the task of determining whether a state statute embodies fundamental policy when it expressly states" as much. *Id.* at 609 (discussing a Maine law providing that a contract "in violation of this chapter is deemed against public policy and is void and unenforceable" (internal quotation marks omitted)).

Considering the foregoing evidence of Virginia policy, at least one Virginia court has held that Virginia's "long-recognized ... public policy against allowing usury by unregulated lenders" rendered a Utah choice-of-law provision unenforceable. *NC Fin. Sols.*, 2018 WL 9372461, at \*11–\*12. In that case, a Chicago-based internet lender allegedly provided closed-end installment loans to Virginia consumers at annual interest rates ranging from 35% to 155%. *Id.* at \*1. Virginia sued the lender, alleging violations of the Virginia Consumer Protection Act, and in defense the lender relied on a Utah choice-of-law clause in its loan agreements. The court acknowledged that the parties' contractual choice of law should generally be enforced but found that two independent special circumstances compelled rejection of Utah law: first, Utah law was not reasonably related to the purpose of the agreement and, second, application of Utah law was "barred by the strong public policy of the forum state, Virginia." *Id.* at \*10. The court discerned Virginia's strong policy against unregulated usurious lending from the Commonwealth's statutory usury cap, extensive regulation of entities entitled to charge higher rates, anti-waiver statute, caselaw expounding the importance of the usury laws, and broader statutory scheme regulating "deceptive trade practices connected to a usurious loan transaction." *Id.* at \*11–\*12. In view of this strong public policy, the Virginia court declined to enforce the Utah choice-of-law clause.

Our review likewise leads us to conclude that the Supreme Court of Virginia would not enforce the governing-law clause because it violates Virginia's compelling public policy against unregulated usurious lending. We acknowledge that contractual choice-of-law clauses should be enforced absent unusual circumstances, but the circumstances here — unregulated usurious lending of low-dollar short-term loans at triple-digit interest rates to Virginia borrowers— unquestionably "shock[s] ... one's sense of right" in view of Virginia law. *Tate*, 25 S.E.2d at 325. We accordingly affirm the district court's judgment declining to enforce the governing-law **\*353** clause. [11]



## VI.

Plaintiffs also seek prospective injunctive relief against the Tribal Officials pursuant to RICO. The district court granted the Tribal Officials' motion to dismiss the RICO claims against them, ruling that RICO does not give private plaintiffs a right to injunctive relief. Our sister circuits are evenly divided on this question, which presents an issue of first impression for our Court. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 138–139 (2d Cir. 2016) (holding that equitable relief is available); *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 697 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003) (same); *Dixie Carriers, Inc. v. Channel Fueling Serv., Inc.*, 843 F.2d 821, 829–830 (5th Cir. 1988) (holding that equitable relief is not available); *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1084 (9th Cir. 1986) (same).

As Plaintiffs do not contest, they may not seek equitable remedies under RICO unless Congress has authorized them to do so. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) ("[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."); *cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."). We thus begin with "a careful consideration" of the statutory text. *Brnovich v. Democratic Nat'l Comm.*, ––– U.S. ––––, 141 S. Ct. 2321, 2337, 210 L.Ed.2d 753 (2021).

RICO's civil remedies section provides, in pertinent part:

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in ... ; or ordering dissolution or reorganization of any enterprise ....

(b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee ....

18 U.S.C. § 1964(a)–(c).

Section 1964(a) authorizes district courts to employ a broad range of equitable remedies to prevent and restrain violations of RICO's substantive provisions. *Cf.* **\*354** *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (explaining that a similarly worded provision "specif[ies] the remedial *powers* of the court"). But this provision, by itself, says nothing about who may invoke the court's remedial powers.

Subsections (b) and (c) create the causes of action specifying who may sue for which forms of relief. Section 1964(b) provides that the Attorney General "may institute proceedings under this section"—a clear cross-reference to the broad remedial powers authorized in Section 1964(a). It also specifies that district courts may order interim forms of equitable relief while the Attorney General's "proceedings under this section" are pending.

In contrast, Section 1964(c), which applies to private litigants, does not refer to the remedial powers authorized in Section 1964(a). *See Wollersheim*, 796 F.2d at 1082 ("In contrast to part (b), there is no express authority [in part (c)] to *private plaintiffs* to seek the equitable relief available under part

(a).").") It instead creates a cause of action for private parties injured by violations of Section 1962 to "sue therefor" and "recover ... damages." 18 U.S.C. § 1964(c). By authorizing the government to "institute proceedings under" Section 1964 and not giving private plaintiffs the same authority, Congress expressed its intent to withhold from private plaintiffs the ability to invoke the injunctive power granted to the courts in Section 1964(a). We accordingly cannot agree with the Seventh Circuit that the opening sentence of Section 1964(b), authorizing the Attorney General to "institute proceedings under this section," and the opening clause of Section 1964(c), authorizing plaintiffs injured by RICO violations to "sue therefor," are "equivalent." Scheidler, 267 F.3d at 697. We refuse to read such material differences out of the statutory text.

As this Court has previously observed, Section 1964(c) "makes no mention whatever of injunctive or declaratory relief." Johnson v. Collins Ent. Co., 199 F.3d 710, 726 (4th Cir. 1999); see also Dan River, Inc. v. Icahn, 701 F.2d 278, 290 (4th Cir. 1983) (observing that Section 1964(c) "has nothing to say about injunctive relief," in "sharp contradistinction to" Section 1964(b)). Of course, that subsection also does not expressly limit private plaintiffs to the treble damages and costs authorized there. But Congress's use of significantly different language to create the governmental right of action in Section 1964(b) and the private right of action in Section 1964(c) compels us to conclude by negative implication that, although the government may sue for prospective relief, private plaintiffs may sue only for treble damages and costs.

For similar reasons, we cannot agree with the Seventh and Second Circuits that Section 1964(a) by itself authorizes private parties to seek equitable relief. Those courts reason that Section 1964(b) "mentions only *interim* remedies," Scheidler, 267 F.3d at 696, so the government's authority to seek permanent injunctions must proceed from Section 1964(a) alone and, "[b]y parity of reasoning," Section 1964(a) must also authorize private parties to seek equitable relief, Donziger, 833 F.3d at 138–139. But a flawed premise leads to a flawed conclusion. It is Section 1964(b)'s cross-reference to Section 1964(a) that authorizes the government to seek permanent injunctions. See 18 U.S.C. § 1964(b) ("The Attorney General may institute *proceedings under this section*." (emphasis added)). Section 1964(c) tellingly contains no similar language or any other reference to equitable relief. Because we reject the Seventh and Second Circuits' restrictive reading of Section 1964(b), we also

necessarily reject their conclusion that *355 Section 1964(a) by itself authorizes private parties to seek injunctive relief.

Our reading of the statute does not reduce Section 1964(a) to a merely jurisdictional provision. See Donziger, 833 F.3d at 138; Scheidler, 267 F.3d at 697. Instead, it honors the distinct text Congress used in each subsection—describing courts' remedial powers under RICO in (a) and creating two different causes of action with corresponding remedies for two different categories of plaintiffs in (b) and (c). Further, while we recognize that RICO's "terms are to be 'liberally construed to effectuate its remedial purposes,' " Boyle v. United States, 556 U.S. 938, 944, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009) (quoting Section 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961), even a liberal construction of Section 1964 cannot import into the statute a remedy that Congress has chosen not to provide.

Plaintiffs urge us to consider by analogy the antitrust statutes. Indeed, the Supreme Court has acknowledged that Congress "modeled" Section 1964(c) on Section 4 of the Clayton Act, 15 U.S.C. § 15, which borrowed its language from Section 7 of the Sherman Act. Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 267, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). But a comparison to the antitrust statutes does not help Plaintiffs' cause.

Like Section 1964(a), the introductory clause of Section 4 of the Sherman Act (currently codified at 15 U.S.C. § 4) grants district courts authority to "prevent and restrain" violations of the Act. See Ch. 647, 26 Stat. 209, 209–210 (1890) (Section 4 of the Sherman Act as originally enacted). Subsequent clauses of 15 U.S.C. § 4 vest the Attorney General with the duty to "institute proceedings in equity" and authorize interim relief, paralleling RICO's Section 1964(b). See also 26 Stat. at 209–210. By contrast, under 15 U.S.C. § 15—the analogue to Section 1964(c)—any person injured in his business or property by a violation of the antitrust laws "may sue therefor in any district court of the United States ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." See also 26 Stat. at 210 (Section 7 of the Sherman Act as originally enacted).

The Supreme Court has recognized that neither of these provisions authorize private parties to sue for injunctive relief. See Gen. Inv. Co. v. Lake Shore & Mich. S. Ry. Co., 260 U.S. 261, 286, 43 S.Ct. 106, 67 L.Ed. 244 (1922) (explaining that a "suit for an injunction, brought by a private corporation,"

could not be maintained under the Sherman Act because its civil remedies were "exclusive" and "consisted only of [ ] suits for injunctions brought by the United States in the public interest under section 4" and "private actions to recover damages brought under section 7"); *Paine Lumber Co. v. Neal*, 244 U.S. 459, 471, 37 S.Ct. 718, 61 L.Ed. 1256 (1917) (holding that "a private person cannot maintain a suit for an injunction under" Section 4 of the Sherman Act). Congress's use of parallel language in Section 1964(a), (b), and (c) suggests that these provisions similarly do not authorize private RICO plaintiffs to sue for injunctive relief. *See Northcross v. Bd. of Educ.*, 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973) (reasoning that "similarity of language" between two statutes is "a strong indication that the two statutes should be interpreted pari passu"); *see also Holmes*, 503 U.S. at 268, 112 S.Ct. 1311 ("We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4.").

Plaintiffs would have us look to 15 U.S.C. § 26, wherein the Clayton Act explicitly **\*356** provides that private parties "shall be entitled to sue for and have injunctive relief" against loss or damage threatened by a violation of the antitrust laws. But this provision has no analogue in the RICO statute. Notably, this provision was not part of the Sherman Act but was added to the Clayton Act to "fill[ ] a gap in the Sherman Act by authorizing equitable relief in private actions." *California v. Am. Stores Co.*, 495 U.S. 271, 287, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990); *see also Gen. Inv. Co.*, 260 U.S. at 287, 43 S.Ct. 106. The problem for Plaintiffs is that this gap remains unfilled in RICO. Unlike 15 U.S.C. §§ 4 and 15, this provision of the Clayton Act has no RICO counterpart; nowhere in the RICO statute has Congress explicitly authorized private actions for injunctive relief as it has done in 15 U.S.C. § 26. That provision of the Clayton Act, and the absence of a parallel provision in RICO, cuts against Plaintiffs' interpretation of Section 1964(a). Were the text in Section 1964(a) and (c) sufficient to create a right for private parties to seek injunctive relief, as Plaintiffs urge, Congress would not have needed to enact 15 U.S.C. § 26.

We may accept as true that "the Supreme Court regularly treats the remedial sections of RICO and the Clayton Act identically, regardless of superficial differences in language." *Scheidler*, 267 F.3d at 700. But the differences between RICO and the Clayton Act in this instance are not superficial. That Congress provided private antitrust plaintiffs a separate

right to prospective injunctive relief under a materially similar remedial structure confirms that RICO, by lacking that separate provision, also lacks the separate right. *See Wollersheim*, 796 F.2d at 1087.

Because the text of Section 1964 is unambiguous and the statutory scheme is coherent and consistent, "[o]ur inquiry must cease." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *see also Alexander v. Sandoval*, 532 U.S. 275, 288 n.7, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("[T]he interpretive inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action." (internal citation omitted)). The Tribal Officials and the United States as amicus curiae point out that, on at least two occasions, Congress declined to pass legislation that would have added to RICO an explicit right for private plaintiffs to seek injunctive relief, and the Fifth and Ninth Circuits have found this history persuasive. *See Dixie Carriers, Inc.*, 843 F.2d at 829–830; *Wollersheim*, 796 F.2d at 1084–1086. Although we agree with those courts that Congress has not authorized private RICO plaintiffs to seek injunctive relief, *see Dixie Carriers*, 843 F.2d at 830; *Wollersheim*, 796 F.2d at 1084, we do so based on the text of the statute and without considering these failed legislative proposals, which "are 'a particularly dangerous ground on which to rest' " statutory interpretation, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169–170, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)). Congress's intention is revealed in the text of the statute it enacted, and for the reasons explained here, Section 1964 does not authorize private RICO plaintiffs to sue for prospective injunctive relief.

## VII.

For the foregoing reasons, we affirm the district court's judgment on each of the four issues raised in this interlocutory appeal. The arbitration provision's delegation clause and the provision as a whole are **\*357** unenforceable under our precedent because they prospectively waive Plaintiffs' substantive federal statutory rights. Tribal sovereign immunity does not shield the Tribal Officials from Plaintiffs' claims to enjoin violations of state law. Under Virginia law, the district court cannot enforce the loan agreement's choice of tribal law to govern these loans because tribal law's authorization of triple-digit interest rates on low-dollar,

short-term loans violates Virginia's compelling public policy against unregulated usurious lending. And the district court correctly dismissed Plaintiffs' RICO claim against the Tribal Officials because RICO does not authorize private plaintiffs to sue for injunctive relief.

*AFFIRMED*

**All Citations**

19 F.4th 324, RICO Bus.Disp.Guide 13,574

# Footnotes

1   Relying on *Henry Schein*, Defendants argue that if an agreement delegates arbitrability questions to an arbitrator, that ends the matter and the court may proceed no further. But while *Henry Schein* emphasized that courts may not "short-circuit" valid delegation clauses, 139 S. Ct. at 527, it did not undermine the principle that a court must consider a litigant's challenge to the validity of a delegation clause "before ordering compliance with that agreement under § 4" of the FAA, *Rent-A-Center*, 561 U.S. at 71, 130 S.Ct. 2772. *Accord Haynes Invs.*, 967 F.3d at 339 n.4 (calling *Henry Schein* "inapposite"); *Williams*, 965 F.3d at 237 n.7 (noting that "[s]everal appellate courts have rejected similar arguments" and "we agree with them").

2   Other circuits have reached the same conclusion. *See*, *e.g.*, *Williams*, 965 F.3d at 240–241, 243 n.14 (3d Cir.) (holding delegation clause and arbitration agreement unenforceable as prospective waiver); *Gingras*, 922 F.3d at 127 (2d Cir.) (holding arbitration agreement, including delegation clause, unenforceable as prospective waiver). After oral argument in this case, the Ninth Circuit upheld a delegation clause in a tribal lending agreement by construing the arbitration agreement's definition of "dispute" to "not clearly foreclose[ ]" the arbitrator from considering the borrowers' prospective waiver argument, although it acknowledged that the arbitrator may "decide the prospective-waiver doctrine has no application to the parties' contract because it arises under federal law." *Brice v. Haynes Invs., LLC*, 13 F.4th 823, 830–831 (9th Cir. 2021). As the Ninth Circuit acknowledged, our Court reached the opposite conclusion when considering "identical" loan agreements in *Haynes Investments*. *Id.* at 833.

3   The *Dillon* agreement also contained a delegation clause, but the Court did not separately address it.

4   The arbitrator's decision is not appealable, and the parties "retain the right to enforce an arbitration award before the applicable governing body of the [Tribe]." J.A. 1185.

5   Pursuant to the governing-law clause of the loan agreement, tribal law controls interpretation of the agreement. However, the parties have not provided the Court with any tribal law concerning contract interpretation. Therefore, we will apply the contract interpretation principles of the forum, Virginia. *See MacDonald v. CashCall, Inc.*, 883 F.3d 220, 228 (3d Cir. 2018).

6   Similarly, the arbitration agreements in *Haynes Investments*, *Sequoia Capital*, *Dillon*, and *Hayes* generally stated either that they were made pursuant to "a transaction involving interstate commerce" or "a transaction involving the Indian Commerce Clause of the Constitution of the United States of America." *See*, *e.g.*, *Dillon*, 856 F.3d at 335; *Hayes*, 811 F.3d at 675; *Haynes Invs.* J.A. 343, 384.

7   Defendants' reliance on *Porter Hayden Co. v. Century Indemnification Co.*, 136 F.3d 380 (4th Cir. 1998), is unavailing. There, no party contested the validity or enforceability of the arbitration agreement, and the Court applied the "presumption of arbitrability" to construe the agreement to require arbitration of the appellant's timeliness defenses. *Id.* at 382 (internal quotation marks omitted); *see id.* at 383 (applying the "federal policy favoring arbitration" to resolve ambiguity in the scope of the arbitration clause (internal quotation marks

omitted)). Here, by contrast, we are asked to determine the enforceability—not the scope—of the delegation clause, which the presumption of arbitrability does not resolve. *See Granite Rock v. Int'l Bhd. of Teamsters, 561 U.S. 287, 301–303, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010)*.

8   Citing cases that involved international arbitration agreements, Defendants contend that courts cannot entertain prospective waiver challenges prior to arbitration but may do so only afterward, at the award-enforcement stage. We have previously rejected this argument in the context of tribal lending arbitration agreements because considerations about the difficulty of applying the public policy defense " 'neutrally on an international scale' " at the arbitration-enforcement stage "are not at play here." *Haynes Invs.*, 967 F.3d at 344 n.10 (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 373 (4th Cir. 2012)); *see also Sequoia Cap.*, 966 F.3d at 294.

9   The Tribal Officials assert that Plaintiffs' lawsuit is in substance a suit against the Tribe because Plaintiffs seek to avoid repaying money loaned from the tribal treasury and because the lawsuit aims to prevent the Tribe from enforcing its laws. Without commenting on the legality of any particular relief that may eventually be awarded in this suit, we observe that the fact some relief permissible under *Ex parte Young* will affect a sovereign's treasury or prevent an official from enforcing a duly enacted law does not transform a suit against an official into one against the sovereign itself. *See Edelman v. Jordan*, 415 U.S. 651, 667–668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ex parte Young*, 209 U.S. at 159–160, 28 S.Ct. 441.

10   Defendants argue that the anti-waiver provision does not apply to their loan agreements because they were not made under Virginia law. But the question currently before us is the strength and import of Virginia's public policy against unregulated usurious lending, not the proper application of Virginia law to these loan agreements. For similar reasons, the parties' dispute about whether Virginia's licensure requirement for consumer finance companies applied to the Tribal Lenders before the recent amendment to the statute is inapposite to the question before this Court. *See* Va. Code Ann. § 6.2-1501(A) (effective Jan. 1, 2021).

11   The district court also ruled that the governing-law clause does not violate the prospective waiver doctrine— a conclusion Plaintiffs resist on appeal. Because we hold the governing-law clause unenforceable on other grounds, we need not address Plaintiffs' alternative argument.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.