# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION

PAIGE FINKELSTEIN, M.D.,                )
                                        )
        Plaintiff,                      )    Case No. 1:23-CV-20188-RKA
                                        )
v.                                      )
                                        )
MOUNT SINAI MEDICAL CENTER OF           )
FLORIDA, INC., a Florida Not For Profit )
Corporation, and KFIR BEN-DAVID, M.D.,  )
                                        )
        Defendants.

## PLAINTIFF'S, PAIGE FINKELSTEIN, M.D., VERIFIED SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Page(s)

Cases

*Alabama v. U.S. Army Corps of Engineers*,
 424 F.3d 1117 (11th Cir. 2005) ............................................................................ 84
*Axelrod v. Califano*,
 357 So. 2d 1048 (Fla. Dist. Ct. App. 1978) ................................................... 34, 35
*Baker v. Sears, Roebuck & Co.*,
 903 F.2d 1515 (11th Cir. 1990) ............................................................................ 42
*Batson v. Salvation Army*,
 897 F.3d 1320 (11th Cir. 2018) ............................................................................ 60
*BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*,
 425 F.3d 964 (11th Cir. 2005) ......................................................................... 71, 77
*Blizzard v. Appliance Direct, Inc.*,
 16 So. 3d 922 (Fla. Dist. Ct. App. 2009) ............................................................. 63
*Bruce v. Reese*,
 431 F. App'x 805 (11th Cir. 2011) .................................................................. 71, 78
*Burke-Fowler v. Orange Cnty., Fla.*,
 447 F.3d 1319 (11th Cir. 2006) ............................................................................ 45
*Canosa v. Ziff*,
 No. 18 CIV. 4115 (PAE), 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) .................. 37
*Carter v. Health Mgmt. Assocs.*,
 989 So. 2d 1258 (Fla. Dist. Ct. App. 2008) ......................................................... 51
*Cedric Kushner Promotions, Ltd. v. King*,
 533 U.S. 158, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001) ...................................... 39
*Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*,
 434 U.S. 412, 98 S. Ct. 694, 54 L. Ed. 2d 648 (1978) .................................... 44, 47
*Cunningham v. Adams*,
 808 F.2d 815 (11th Cir. 1987) ......................................................................... 71, 78
*Deauville Hotel Mgmt., LLC v. Ward*,
 219 So. 3d 949 (Fla. Dist. Ct. App. 2017) ...................................................... 27, 28
*Delaware State Coll. v. Ricks*,
 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980) .................................. 41, 48
*Devose v. Herrington*,
 42 F.3d 470 (8th Cir. 1994) ................................................................. 71, 77, 78
*Diaz v. Inch*,
 No. 19-23954-CV, 2019 WL 12361883 (S.D. Fla. Oct. 11, 2019) ............... 71, 77, 78
*Eagle Fire Co. v. Lewallen*,
 56 Fla. 246, 47 So. 947 (1908) ............................................................................. 21
*Fowler v. Taco Viva, Inc.*,
 646 F. Supp. 152 (S.D. Fla. 1986) .................................................................. 41, 48
*Gossard v. JP Morgan Chase & Co.*,
 612 F. Supp. 2d 1242 (S.D. Fla. 2009) ................................................................ 47

*Greenberg v. BellSouth Telecommunications, Inc.*,
  498 F.3d 1258 (11th Cir. 2007).................................................................................. 54, 55
*Hart v. United States*,
  894 F.2d 1539 (11th Cir. 1990).................................................................................. 26, 28
*Hatfield v. AutoNation, Inc.*,
  939 So. 2d 155 (Fla. Dist. Ct. App. 2006)........................................................ 73, 80, 86
*Holly v. Clairson Indus., L.L.C.*,
  492 F.3d 1247 (11th Cir. 2007).................................................................................. 55, 59
*Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*,
  783 So. 2d 353 (Fla. Dist. Ct. App. 2001).................................................................... 66
*Infant Formula Antitrust Litig., MDL 878 v. Abbott,
  Lab'ys*, 72 F.3d 842 (11th Cir. 1995) ...................................................................... 71, 78
*Jiann Min Chang v. Alabama Agric. & Mech. Univ.*,
  355 F. App'x 250 (11th Cir. 2009) ................................................................................ 41
*JonJuan Salon, Inc. v. Acosta*,
  922 So. 2d 1081 (Fla. Dist. Ct. App. 2006) ............................................................ passim
*Keeler v. Fla. Dep't of Health*,
  324 F. App'x 850 (11th Cir. 2009) ................................................................................ 54
*Keeton v. Anderson-Wiley*,
  664 F.3d 865 (11th Cir. 2011).................................................................................... 71, 77
*Langfitt v. Fed. Marine Terminals, Inc.*,
  647 F.3d 1116 (11th Cir. 2011)..................................................................................... 65
*Leon v. Cont'l AG*,
  301 F. Supp. 3d 1203 (S.D. Fla. 2017)...................................................................... 37, 38
*Linafelt v. Beverly Enterprises-Fla., Inc.*,
  745 So. 2d 386 (Fla. Dist. Ct. App. 1999)................................................ 29, 31, 34, 36
*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) ............................................... 45
*Meyer v. Holley*,
  537 U.S. 280, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003) ............................................. 66
*Nazareth v. Herndon Ambulance Serv., Inc.*,
  467 So. 2d 1076 (Fla. Dist. Ct. App. 1985) ................................................................. 66
*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
  896 F.2d 1283 (11th Cir. 1990).................................................................................. 71, 78
*New Orleans, M & C R Co v. Hanning*,
  82 U.S. 649, 21 L. Ed. 220 (1872) ............................................................................... 66
*Nicholas v. Bd. of Trustees of Univ. of Alabama*,
  251 F. App'x 637 (11th Cir. 2007) ................................................................................ 41
*Noah v. Assor*,
  379 F. Supp. 3d 1284 (S.D. Fla. 2019)...................................................................... 26, 28
*Olson v. Dex Imaging, Inc.*,
  63 F. Supp. 3d 1353 (M.D. Fla. 2014) ................................................................ 45, 51, 52
*Ray v. Spirit Airlines, Inc.*,
  836 F.3d 1340 (11th Cir. 2016)............................................................................ 37, 39, 40
*Shedrick v. Dist. Bd. of Trustees of Miami-Dade Coll.*,
  941 F. Supp. 2d 1348 (S.D. Fla. 2013)................................................................ 42, 48, 49

*Special Purpose Accts. Receivable Co-op. Corp. v. Prime One Cap. Co.*,
    202 F. Supp. 2d 1339 (S.D. Fla. 2002)....................................................... 37
*Stanfield v. Answering Serv., Inc.*,
    867 F.2d 1290 (11th Cir. 1989)............................................................... 42
*Sussman v. Fla. E. Coast Properties, Inc.*,
    557 So. 2d 74 (Fla. Dist. Ct. App. 1990)................................................. 66
*Thomas v. Cooper Lighting, Inc.*,
    506 F.3d 1361 (11th Cir. 2007)............................................................... 52
*Thomas v. Jacksonville Television, Inc.*,
    699 So. 2d 800 (Fla. Dist. Ct. App. 1997)........................................ 33, 35
*UBS Fin. Servs., Inc. v. Bounty Gain Enterprises, Inc.*,
    No. 14-81603-CIV, 2016 WL 1541438 (S.D. Fla. Apr. 11, 2016) .......................... 84
*United States v. Turkette*,
    452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981) ............................ 40
*Valenzuela v. GlobeGround N. Am., LLC*,
    18 So. 3d 17 (Fla. Dist. Ct. App. 2009)................................................... 45
*Verna v. Pub. Health Tr. of Miami-Dade Cnty.*,
    539 F. Supp. 2d 1340 (S.D. Fla. 2008)............................................... 51, 52
*Watts v. City of Port St. Lucie, Fla.*,
    No. 2:15-CV-14192, 2016 WL 633716 (S.D. Fla. Feb. 17, 2016) ................... 67, 68
*Wesley Grp. Home Ministries, Inc. v. City of Hallandale*,
    670 So. 2d 1046 (Fla. Dist. Ct. App. 1996) ....................................... 44, 47
*Witover v. Celebrity Cruises, Inc.*,
    161 F. Supp. 3d 1139 (S.D. Fla. 2016)..................................................... 69
*Wolfe v. Postmaster Gen.*,
    488 F. App'x 465 (11th Cir. 2012) ......................................................... 56
*Woodham v. Blue Cross & Blue Shield of Fla., Inc.*,
    829 So. 2d 891 (Fla. 2002)....................................................................... 17
*Wright v. Southland Corp.*,
    187 F.3d 1287 (11th Cir. 1999)............................................................... 42
*Yule v. Ocean Reef Cmty. Ass'n*,
    No. 19-10138-CIV, 2020 WL 3051505 (S.D. Fla. June 8, 2020) ..................... 26, 28
*Yusko v. NCL (Bahamas), Ltd.*,
    4 F.4th 1164 (11th Cir. 2021).......................................................... 65, 66

Statutes

18 U.S.C. §§ 1961 ................................................................................ 37, 38
18 U.S.C.A. § 1962 ...................................................................................... 38
18 U.S.C.A. § 1962(a)-(d) (West) ................................................................ 37
18 U.S.C.A. § 1964(c) (West)...................................................................... 37
42 U.S.C.A. § 12102(1) (West) ................................................ 54, 56, 59, 61
42 U.S.C.A. § 12102(3)(A)............................................................ 56, 57, 62
42 U.S.C.A. § 12112(a) (West 2009)........................................................... 54
42 U.S.C.A. § 12112(b)(5)(A)................................................................ 55, 59
42 U.S.C.A. § 2000e (West) ................................................................... 44, 47
42 U.S.C.A. § 2000e-3(a) (West) .......................................................... 48, 49

Fla. Stat. Ann. § 760.10(7) (West) ........................................................................... 48, 63

Fla. Stat. Ann. § 760.11 (West 2010) ............................................................................ passim

Fla. Stat. Ann. § 760.11(5) ........................................................................................ 44, 47

PL 110–325 ................................................................................................................ 55

Rules

Fed. R. Civ. P. 9(b) ................................................................................................... 38

Regulations

29 C.F.R. § 1630.2(i) ................................................................................................ 55

Other Authorities

1 American Law of Torts § 4:1 .................................................................................. 65

Restatement (Third) of Torts: Apportionment Liab. § 13 (2000) ................................................ 65

COMES NOW the Plaintiff, PAIGE FINKELSTEIN, M.D., by and through her undersigned counsel, and files this her Verified Amended Complaint against the Defendants, MOUNT SINAI MEDICAL CENTER OF FLORIDA, INC., a Florida Not For Profit Corporation, and KFIR BEN-DAVID, M.D., for Injunctive Relief and Damages in the amount in excess of $75,000 which the minimum jurisdictional amount of this Court, and alleges as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

1.      This is an action for injunctive relief and damages in excess of $75,000, which is the minimum jurisdictional amount of this Court.

2.      The Plaintiff, Paige Finkelstein, M.D. ("Dr. Finkelstein" or "Plaintiff"), is a licensed physician in the State of Florida, a resident of the State of Florida, and otherwise *sui juris* in all respects.

3.      The Defendant, Mount Sinai Medical Center ("MSMC" or "Hospital"), is a Florida Not For Profit Corporation authorized and doing business in the State of Florida, with its principal place of business in Miami Beach, Florida.

4.      The Defendant, Dr. Kfir Ben-David ("Dr. Ben David" or "Residency Program Director"), is a physician licensed in the State of Florida, and an employee of the Defendant Mount Sinai, and a resident of Broward County, and otherwise *sui juris* in all respects.

5.      At all times material hereto, Dr. Finkelstein was a resident physician in the General Surgery Residency Program at MSMC (the "Surgical Residency Program") and completed two and a half (2.5) years of that general surgery residency.

6.      At all times material hereto, Dr. Ben-David was the Director of the Surgical Residency Program at, as well as the Chairman of the Department of Surgery at MSMC.  In those positions, Dr. Ben-David, on behalf of MSMC, exercised complete and total authority and control

over the Surgical Residency Program at MSMC and, therefore, exercised complete and total authority and control over the Plaintiff, Dr. Paige Finkelstein, while she was a part of that Surgical Residency Program.

7.       Upon information and belief, while Dr. Finkelstein was a member of the Surgical Residency Program, where she planned on becoming a reconstructive surgeon upon completion of the program, both Defendants MSMC and Dr. Ben-David fostered a culture of conformity in which the personal and professional growth of the Residents were sacrificed in favor of bolstering purported "quality metrics" that allegedly augmented the prestige of Mount Sinai Medical Center and Dr. Ben-David personally.

8.       Upon information and belief, as Surgical Residency Program Director and Chief of Surgery, Dr. Ben-David has managed to consolidate power in such a way that most of MSMC's surgical staff must answer to him.

9.       Upon information and belief, MSMC's Surgical Residency Program is a work environment in which the voicing of legitimate concerns about patient care, hospital administration, discriminatory practices, or resident training is actively suppressed and met with retaliation by means of arbitrary disciplinary actions and ultimately termination or constructive dismissal by way of a forced resignation.

10.       Upon information and belief, Defendants impermissibly withheld documents which were required to be provided to Residents documenting their progress in the Surgical Residency Program, unless the Residents agreed to sign General Releases, such that the true state of affairs and events taking place at the Surgical Residency Program at Mount Sinai, which was similar to the conduct of others who have used agreements to avoid revealing their misconduct,  so that their conduct never reaches the public view.

11.     In fact, Defendants refused to provide documents required to be provided to Dr. Finkelstein by the American Counsel of Graduate Medical Education (ACGME), including a Summative Evaluation, Proof of Completion for at least two years of surgical residency, and her Diploma for completing the intern year of the General Surgery Residency ("Completion Documents"), unless she agreed to sign a General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience, as a pre-condition to receiving the Completion Documents, which Defendants were required to provide to her by law.

12.     Defendants MSMC and Dr. Ben-David (collectively, "Defendants") continually harassed and cajoled Dr. Finkelstein while she was a Resident, singling her out for unwarranted discipline, degrading criticism, and efforts designed solely to drive her out of the Surgical Residency Program.

13.     Dr. Finkelstein joined the Surgical Residency Program at Mount Sinai in June of 2018, as one of only three categorical female residents[1], after graduating from the University of Miami Miller School of Medicine with an MD Degree and Master of Public Health Degree. Prior to that time, she attended the Massachusetts Institute of Technology, where she graduated with Degrees in Chemical Engineering and Biology, and she has more than ten (10) years of experience as a Nationally Licensed Emergency Medical Technician.

---

[1] According to a report published by the Association for American Medical Colleges, the historical trend of medical school graduates by sex reached near parity in 2007-2008. In 2018-2019, 47.9% of graduates were female. *See* AAMC Diversity in Medicine: Facts and Figures 2019. (Available at     https://www.aamc.org/data-reports/workforce/interactive-data/figure-12-percentage-us-medical-school-graduates-sex-academic-years-1980-1981-through-2018-2019#:~:text=Similar%20to%20the%20trend%20mentioned,47.9%25%20of%20graduates%20were%20female.)

14.     Upon her first meeting with Dr. Ben-David, Dr. Finkelstein was inappropriately questioned several times about her romantic relationships and whether she was single while also being told that she was not allowed to date "any of the surgery residents." Dr. Ben-David's inquiry about Plaintiff's personal life was completely unprompted and unrequired, thus causing profound discomfort to Dr. Finkelstein.

15.     Upon joining the Surgical Residency Program, Dr. Finkelstein was appointed the Class Representative of her Residency Class, and in that capacity, she was repeatedly warned by Senior Residents and Attending Physicians to "keep her head down, avoid unneeded attention, and refrain from making waves."

16.     Within the first months of beginning her employment, Dr. Finkelstein was subjected to gender/sex and disability discrimination by members of the Surgical Residency Program leadership, including but not limited to Dr. Ben-David.

17.     Upon information and belief, Dr. Finkelstein, a woman, was subjected to dismissive and retaliatory actions by the Surgical Residency Program's director, Dr. Ben-David, a male notorious for engaging in similar discriminatory and harassing behavior of female staff.

18.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein, on multiple occasions, requested a reasonable accommodation for her disability, Attention Deficit/Hyperactivity Disorder (AD/HD), of additional time to complete certain examinations, which were required as a term of her employment with MSMC. Dr. Ben-David responded to these reasonable requests for accommodation by ridiculing and minimizing Plaintiff's disability.

19.     Upon information and belief, Dr. Ben-David's refusal to provide reasonable accommodations to Dr. Finkelstein's disabilities impacted her Surgical Residency Program's evaluation results, which ultimately resulted in her constructive dismissal.

20.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein voiced her concerns about the disparate treatment of female and male residents; while male residents were provided appropriate safety equipment, female residents were only provided ill-fitting equipment, including, but not limited to, gloves and lead aprons, which exposed female residents to the risk of thyroid cancer and other illnesses. Dr. Finkelstein and other female residents had to spend their own resources to purchase adequate equipment, such as thyroid shields and/or appropriately sized lead aprons. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

21.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein observed and reported multiple instances in which female staff, including herself, were unprofessionally addressed as "baby" and "sweetheart" and asked if they were pregnant for "acting hormonal." Defendants consistently dismissed these complaints, telling Dr. Finkelstein to "toughen up." On another such occasion, Dr. Ben-David also told Dr. Finkelstein that she was "deficient in her maintenance of emotional health." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

22.     The Defendants' pattern of discrimination is not limited to Dr. Ben-David. In fact, MSMC's Clinical Competency Committee ("CCC") placed Dr. Finkelstein on a remediation plan for being "too emotional." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

23.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein observed Dr. Ben-David repeatedly proffer comments discriminatory in nature, including, but not limited to, stating that "he favored hiring male residents and faculty members over female applicants."

24.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein filed multiple whistleblower complaints, all concerning or related to patient safety and staff training issues. Having observed multiple and substantial incidents concerning patient care and safety, some of which were illegal, Dr. Finkelstein felt compelled to report that conduct to Defendants.  In clear retaliatory fashion, the Surgical Residency Program's leadership not only repeatedly dismissed and disregarded Dr. Finkelstein's whistleblower complaints, but, instead of remedying the issues, the Surgical Residency Program extended Dr. Finkelstein's probation while criticizing her for "being immature." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

25.     As a result of making such reports of misconduct, Dr. Finkelstein was formally disciplined and placed on probation for two (2) months and accused of being rude and unprofessional. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

26.     Dr. Finkelstein was punished on several occasions in a clear retaliatory fashion. Plaintiff suffered adverse actions from Defendants for either taking personal initiative as the class representative, for alerting Senior Staff to concerns within the Surgical Residency Program, for alerting Senior Staff to concerns in regard to issues of patient care and safety, and for voicing concerns or otherwise complaining about how female residents was treated while she was a member of and class representative of the Surgical Residency Program.  Dr. Finkelstein was met with retaliation, embarrassment, and ridicule, which ultimately resulted in her forced resignation from the Surgical Residency Program.

27.     Months after the initial unwarranted discipline described above, another incident occurred and was observed by Dr. Finkelstein with regard to a Code Blue in the Hospital's

Psychiatric Ward.  This time, a patient died as a result of the absence of necessary tools, supervision, and training to administer proper CPR to a patient. This series of unfortunate failures to effectively and timely intervene led to that patient's death.

28.     Feeling compelled to report the death and the circumstances of the patient's death, Dr. Finkelstein was once again placed on probation, accused of being rude to Members of the Mount Sinai Staff and exhibiting a lack of professionalism. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

29.     Shortly thereafter, on October 26, 2020, Dr. Finkelstein received a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon and potentially ending her ability to become a reconstructive Surgeon anytime thereafter.  Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

30.     Despite Dr. Finkelstein's reports, she continued to observe events evidencing the lack of quality of care and safety provided to patients at MSMC. Dr. Finkelstein also was subjected to additional retaliation, harassment, and punishment by Defendants.  Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

31.     On January 13, 2021, Dr. Finkelstein was forced to submit her Resignation to Mount Sinai Medical Center as a General Surgical Resident.  This Resignation was forced by the actions of Defendants continually harassing and wrongfully punishing Dr. Finkelstein and creating an environment such that she was no longer able to continue with her training as a Surgical Resident at Mount Sinai. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

32.      Ultimately, Dr. Finkelstein was advised by Dr. Ben-David and Dr. Goldzser that if she did not resign, she would be terminated. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

33.      Upon her Resignation from the General Surgery Residency Program at Mount Sinai, Dr. Ben-David and MSMC Hospital Administration attempted to extort Dr. Finkelstein into signing a General Release in exchange for being provided with the Completion Documents.  These are documents that the ACGME requires a Residency Program to provide to any Resident simply upon request, and therefore the Defendants, Dr. Ben-David, and MSMC, were legally required to provide the Completion Documents to Dr. Finkelstein, and she had the corresponding legal right to receive them.  Therefore, the demand by Dr. Ben-David and Mount Sinai that she sign a General Release in exchange for receiving the Completion Documents was extortion and blackmail by requiring her to give up something of value in exchange for something she was legally entitled to receive.

34.      Dr. Finkelstein refused to sign the General Release, and, until the filing of this action and a complaint was filed with the ACGME, despite repeated demands, Defendants have refused to provide the Completion Documents to her.

35.      On June 29, 2022, Dr. Finkelstein notified the ACGME of Defendants' failure to provide her the Completion Documents.

36.      Upon information and belief, during November of 2022, Defendants produced the Completion Documents only after the filing of a complaint with the ACGME and the filing of this action by Plaintiff in October of 2022.

37.      In an attempt to continue her residency, Dr. Finkelstein sought to join a program at an affiliated hospital in Miami, where she was advised they had an immediate need for a third-year

surgical resident in Delray Beach, Fl. This hospital facilitated Dr. Finkelstein's taking the third-year ABSITE exam. Upon information and belief, Dr. Finkelstein's application was ultimately rejected due to a lack of support for that application from Dr. Ben-David and the false and defamatory comments he made to that Program about Dr. Finkelstein without justification.

38.     Upon information and belief, other physicians, faculty, and personnel affiliated with MSMC's Surgical Residency Program have provided favorable evaluations and excellent letters of reference about Dr. Finkelstein's performance while a General Surgery Resident at MSMC.

39.     Upon information and belief, Dr. Ben-David's disparaging comments made about Dr. Finkelstein were intentionally false, made knowingly, with malice, and bad faith, in efforts to discredit her and force her to sign the General Release releasing Defendants from any claims she may have, and to prevent her from continuing in a residency program and/or obtaining employment as a physician.

40.     Upon information and belief, Dr. Ben-David continues to make such false, defamatory statements against Dr. Finkelstein in an effort to discredit her and to prevent her from continuing in a residency program and/or obtaining employment as a physician.

41.     Dr. Finkelstein has continued to interview with other hospital systems across the country, and when she inquired as to whether or not Dr. Ben-David would provide her with a recommendation for that Program, she was told by the Defendants that if she did not sign the General Release, Dr. Ben-David and Mount Sinai would not provide her with a reference, or would only provide defamatory comments about Plaintiff, and therefore without such a reference all of the applications which she submitted in order to continue her residency training and/or obtaining employment as a physician were rejected.

42.     In July 2021, Dr. Finkelstein received an employment offer from Mount Sinai Beth Israel Hospital in New York to serve as a House Surgeon.  Although she was fully qualified for the position, having submitted her credentials and application for medical staff privileges needed for that position, Dr. Finkelstein's application was therefore denied, once again, because Dr. Ben-David either would not provide a reference or provided defamatory comments about her to that Hospital, resulting in the Hospital rescinding its previous offer of employment for that position.

43.     Dr. Ben-David, as Director of the General Surgery Residency Program at MSMC, was responsible for supervising, educating, and mentoring the residents, both male and female.  A copy of the ACGME Common Program Requirements (Residency) is attached hereto as **Exhibit "A."**

44.     Plaintiff Paige Finkelstein, M.D. and the Defendant Mount Sinai Medical Center Inc. ("MSMC") entered into a Graduate Medical Education Program Agreement, pursuant to which Dr. Finkelstein was to be a member of the surgical residency administrated and provided by MSMC. A copy of that Graduate Medical Education Program Agreement is attached hereto as **Exhibit "B."**

45.     As Program Director, Ben-David had the ability to influence and direct the education and training of the General Surgery residents at Mount Sinai, including Plaintiff. *See* Exhibit A.

46.     As Program Director, Ben-David was responsible for the environment of MSMC's Surgical Residency Program and the moral standards which governed that environment. *See* Exhibit A.

47.     The ACGME maintains standards to which Program Directors are held as leaders, supervisors, and educators in ACGME Accredited Residency Programs. *See* Exhibit A.

48.     The standards of the ACGME include, but are not limited to, the ethics and morality standards applicable to one who works closely with and supervises and is responsible for the professional training and growth of young physicians, both males and females, and to evaluate their competency and professional development. *See* Exhibit A.

49.     The intentional actions of Dr. Ben-David and MSMC, as described hereinabove, have prevented Dr. Finkelstein from pursuing her training as a general surgeon and from eventually becoming a reconstructive surgeon, have caused her economic damage, damage to her reputation, and prevented her from becoming what her education and training to date have prepared her to be, namely a surgeon.

50.     These actions of the Defendants' have effectively ended Dr. Finkelstein's career as a physician due to the Defendants' relentless campaign to damage her reputation, Defendants' actions to impede Dr. Finkelstein from completing her training by denying required records, effectively holding Dr. Finkelstein in career limbo, with little or no prospects for employment, until such time she signs a General Release in favor of Defendants.

51.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered, and has continued to suffer, damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

52.     All of the actions of the Defendants described hereinabove were taken intentionally, with malice, and with the specific intent and objective to irreparably harm Dr. Finkelstein, which is exactly the damage she has suffered, presently suffers, and will continue to suffer in the future.

53. Plaintiff asserts that she has timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and has received the Right to Sue Notice, thus complying with all conditions precedent to bringing all claims. *See* Fla. Stat. Ann. § 760.11 (West 2010); *Woodham v. Blue Cross & Blue Shield of Fla., Inc.*, 829 So. 2d 891, 894 (Fla. 2002). A copy of the EEOC's Notice of Right to Sue is attached hereto as **Exhibit "C."** While the EEOC issued a decision rescinding the initial right to sue notice because the agency decided to reopen the investigation with respect to Dr. Finkelstein's retaliation claims, Plaintiff has complied with all conditions precedent to the bringing of all claims, as the enforcement supervisor assigned to Dr. Finkelstein's EEOC charge has clarified that the agency cannot deny Dr. Finkelstein's right to proceed to court upon completion of the required attempt to seek administrative remedy, which Plaintiff did by filing a charge with the EEOC. A copy of undersigned counsel's communications with the EEOC's Enforcement Supervisor, Max Feige, is attached hereto as **Exhibit "D."**

## COUNT I – WRONGFUL TERMINATION AND BREACH OF CONTRACT
### (Against Defendant Dr. Ben-David)

54. This is an action for damages in excess of $75,000, which is the minimum jurisdictional amount of this Court.

55. Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts.

56. Plaintiff Paige Finkelstein, M.D. and the Defendant Mount Sinai Medical Center Inc. ("MSMC") entered into a Graduate Medical Education Program Agreement, pursuant to which Dr. Finkelstein was to be a member of the surgical residency administrated and provided by MSMC.

17

57.     Dr. Ben-David is the Surgical Residency Program Director and, in that capacity, his actions while leading the program are attributable to MSMC, and he was bound by the terms of the GME agreement in the same was MSMC was.

58.     Dr. Ben-David signed the Graduate Medical Education Program Agreement as program director and on behalf of MSMC. *See* Exhibit B. Dr. Ben-David's signature to the GME Agreement was endorsed and assumed by MSMC when Dr. Finkelstein joined the Surgical Residency Program.

59.     Pursuant to that Graduate Medical Education Program Agreement, Dr. Finkelstein was to serve as a resident in Surgical Residency for a period of five (5) years. Pursuant to the Agreement, Dr. Ben-David, MSMC, and Dr. Finkelstein had certain obligations and responsibilities assigned to each of them respectfully.  *See* Exhibits A and B, generally. However, and as stated in the allegation to all counts, the work environment provided by the Defendants Mount Sinai and Ben-David was hostile, retaliatory and repressive, and subjected Dr. Finkelstein to constant reprisals, repercussion, retaliation, harassment, humiliation, and emotional distress on a daily basis, as a result of the actions of Defendants. The following GME Agreement provisions were violated by Dr. Ben-David, individually and on behalf of MSMC: (6) Harassment-free Work Environment; (7) Accommodation for Disabilities; (9) Clinical Experience and Education Hours Policy; and (15) Restrictive Covenants. *See* Exhibit B.

60.     As part of the obligations imposed upon by the Agreement, Dr. Ben- David, as program director, was required to provide a harassment-free work environment for Dr. Finkelstein to perform her duties as Resident Physician, pursuant to Paragraph 6 of the Graduate Medical Education Program Agreement. *See* Exhibit A.

61.     Dr. Ben-David has breached the above-mentioned GME Agreement provision by both fostering a hostile work environment in which sexual discrimination and harassment ran rampant, as well as by virtue of failing to ensure an educational environment in which residents such as Dr. Finkelstein could raise and resolve issues without fear of intimidation or retaliation.

62.     Under Dr. Ben-David's guidance and supervision, the Surgical Residency Program consistently distinguished the treatment dispensed to male residents, who were provided with the appropriate safety equipment and not required to submit to remediation or probation based on conduct which professional males are consistently praised for and even promoted, such as being passionate, advocating for patient safety and care, etc.

63.     Also pursuant to that Graduate Medical Education Program Agreement, Dr. Finkelstein was to serve as a resident in Surgical Residency without the imposition of any restrictive covenants by Defendants.   *See* Exhibit B ¶15. Dr. Ben-David violated the GME Agreement's restrictive covenants provision when its associates tried to force Dr. Finkelstein into signing a General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience, as a pre-condition to receiving the Completion Documents, in clear breach of the GME restrictive covenant provision.

64.     Additionally, Defendant's breach of the GME Agreement was such that Plaintiff was not afforded the opportunity to exhaust her contractual remedies, as she was never advised that she had the right to such remedies, nor was she provided with a valid venue to dispute Defendants' findings and decisions, which ultimately led to her forced resignation. Quite the opposite, when Dr. Finkelstein inquired about her rights to appeal Defendants' decisions, which ultimately forced her to resign her position as a resident under the Surgical Residency Program,

she was intimidated against seeking any remedy, being told that she would not be able to secure a favorable recommendation unless she left quietly. Defendants went on to act on this veiled threat by both refusing to release Dr. Finkelstein's records and Completion Documents, as well as providing incomplete or intentionally erroneous information to other residency programs or prospective employers as a means to force Dr. Finkelstein to agree to sign a General Releases so that their conduct never reached the public view.

65. Dr. Ben-David's actions, individually and on behalf of MSMC, constitute a breach of the Graduate Medical Education Program Agreement and are additionally in violation of the obligations imposed upon the Defendants by the American Council of Graduate Medical Education (ACGME) and all Residency Programs to provide a safe and professional workplace for residents, free from the type of harassment, retaliation, humiliation, oppression, and environment created by the Defendants with respect to Dr. Finkelstein's term as a Surgical Resident.

66. As a result of Dr. Ben-David's actions, individually and on behalf of MSMC, as herein described in the allegations common to all counts, Dr. Finkelstein has been unable to secure a position in another Residency Program, has been unable to secure any employment in the medical profession as a physician, and continues be unable to do so, as a result of the spreading of false and defamatory comments by the Defendants, in particular, Dr. Ben-David, about Dr. Finkelstein in response to requests for information about her from potential Residency Programs and/or employers or the failure of the Defendants and in particular Dr. Ben-David to respond to such requests in any way at all.

67. As a result of the Dr. Ben-David's actions, individually and on behalf of MSMC, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation

and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000, for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT II – WRONGFUL TERMINATION AND BREACH OF CONTRACT
### (Against Defendant MSMC)

68.    This is an action for injunctive relief and damages in excess of $75,000, which is the minimum jurisdictional amount of this Court.

69.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts.

70.    Plaintiff Paige Finkelstein, M.D. and the Defendant Mount Sinai Medical Center Inc. ("MSMC") entered into a Graduate Medical Education Program Agreement, pursuant to which Dr. Finkelstein was to be a member of the surgical residency administrated and provided by MSMC.

71.    Dr. Ben-David is the Surgical Residency Program Director and, in that capacity, his actions while leading the program are attributable to MSMC. *See Eagle Fire Co. v. Lewallen*, 56 Fla. 246, 47 So. 947 (1908) (holding that "The acts of an agent, performed within the scope of his real or apparent authority, are binding on the principal.")

72.    Dr. Ben-David signed the Graduate Medical Education Program Agreement as program director and on behalf of MSMC. *See* Exhibit B. Dr. Ben-David's signature to the GME

Agreement was endorsed and assumed by MSMC when Dr. Finkelstein joined the Surgical Residency Program. It was material to Dr. Finkelstein that Dr. Ben-David was going to be held to the standards of the ACGME when she signed her employment agreement at MSMC.

73.      Pursuant to that Graduate Medical Education Program Agreement, Dr. Finkelstein was to serve as a resident in Surgical Residency for a period of five (5) years. Pursuant to the Agreement, Dr. Ben-David, MSMC, and Dr. Finkelstein had certain obligations and responsibilities assigned to each of them respectfully.  *See* Exhibits A and B, generally. However, the following GME Agreement provisions were violated by MSMC: (6) Harassment-free Work Environment; (7) Accommodation for Disabilities; (9) Clinical Experience and Education Hours Policy; and (15) Restrictive Covenants. *See* Exhibit B.

74.      As part of the obligations imposed upon by the Agreement, MSMC was required to provide a harassment-free work environment for Dr. Finkelstein to perform her duties as Resident Physician, pursuant to Paragraph 6 of the Graduate Medical Education Program Agreement. *See* Exhibit A. MSMC have breached the above-mentioned GME Agreement provision by both fostering a hostile work environment in which sexual discrimination and harassment ran rampant, as well as by virtue of failing to ensure an educational environment in which residents such as Dr. Finkelstein could raise and resolve issues without fear of intimidation or retaliation. Upon information and belief, under the MSMC's faculty guidance and supervision, the Surgical Residency Program consistently distinguished the treatment dispensed to male residents, who were provided with the appropriate safety equipment and not required to submit to remediation or probation based on conduct which professional males are consistently praised for and even promoted, such as being passionate, advocating for patient safety and care, etc.

75.     Also, while Dr. Finkelstein trusted that the Surgical Residency Program provided a retaliation-free environment in which she could continue to act as her class representative, the opposite occurred and, therefore, Dr. Finkelstein has been, and continues to be, a victim of MSMC's retaliatory and intimidation campaign, which violates multiple GME Agreement provisions. Dr. Finkelstein suffered retaliation by reporting such instances of sexual discrimination and harassment by being falsely accused of being unprofessional and too emotional, all terms which are routinely used to perpetuate stereotypes based on gender and further discriminate against female professionals. All instances in which Dr. Finkelstein was ordered to engage in remediation and probation, and even her forced resignation, were triggered by Dr. Finkelstein complaining about discriminatory practices, sexual harassment, and even conduct that compromised patient care and safety.  Further, on each of these instances of outrageous retaliation against Plaintiff, Defendants failed to advise Dr. Finkelstein of her right to dispute the findings of the committee charged with investigating her complaints or even the punishments imposed on her, including her imposed resignation to the Surgical Residency Program. Because of this omission, Dr. Finkelstein could not exhaust the remedies as provided by the GME Agreement, nor could she try to reverse the mischaracterization of her tenure as a general surgery resident.

76.     Also pursuant to that Graduate Medical Education Program Agreement, Dr. Finkelstein was to serve as a resident in Surgical Residency without the imposition of any restrictive covenants by MSMC.  *See* Exhibit B ¶15. MSMC violated the GME Agreement's restrictive covenants provision when they tried to force Dr. Finkelstein into signing a General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her

23

Surgical Residency Program experience, as a pre-condition to receiving the Completion Documents, in clear breach of the GME restrictive covenant provision.

77.     As stated in the allegation to all counts, the work environment provided by MSMC was hostile, retaliatory and repressive, and subjected Dr. Finkelstein to constant reprisals, repercussion, retaliation, harassment, humiliation, and emotional distress on a daily basis, as a result of the actions of Defendants.

78.     MSMC's actions constitute a breach of the Graduate Medical Education Program Agreement and are additionally in violation of the obligations imposed upon the Defendants by the ACGME and all Residency Programs to provide a safe and professional workplace for residents, free from the type of harassment, retaliation, humiliation, oppression, and environment created by the Defendants with respect to Dr. Finkelstein's term as a Surgical Resident.

79.     Further, MSMC's withholding of Dr. Finkelstein's Completion documents in an attempt to force her into signing a General Release releasing Defendants from any claims she may have, was a restrictive covenant, and as such, constituted a breach of the Graduate Medical Education Program Agreement. Although MSMC's agents initially argued that Dr. Finkelstein had no legal right to a copy of her records and Completion Documents, an obvious subterfuge designed to intimidate and silence Dr. Finkelstein, Defendants have since conceded to Dr. Finkelstein's legal right to these documents after Dr. Finkelstein filed a Complaint with the ACGME, a separate Complaint with the EEOC, as well as Plaintiff's Complaint and Amended Complaint in this action. The fact that Defendants felt compelled to finally comply with Plaintiff's request for the Completion Documents is further evidence that the Surgical Residency Program, Defendants, and the GME Agreement provisions are subject to ACGME oversight and must abide by ACGME Guidelines. It is also indicative of Defendants' knowledge that, by withholding Plaintiff's records

and Completion Documents, it violated Dr. Finkelstein's rights under both the GME Agreement and the ACGME guidelines.

80.     Additionally, Defendant's breach of the GME Agreement was such that Plaintiff was not afforded the opportunity to exhaust her contractual remedies, as she was never advised that she had the right to such remedies, nor was she provided with a valid venue to dispute Defendants' findings and decisions, which ultimately led to her forced resignation. Quite the opposite, when Dr. Finkelstein inquired about her rights to appeal Defendants' decisions, which ultimately forced her to resign her position as a resident under the Surgical Residency Program, she was intimidated against seeking any remedy, being told that she would not be able to secure a favorable recommendation unless she left quietly. Defendants went on to act on this veiled threat by both refusing to release Dr. Finkelstein's records and Completion Documents, as well as providing incomplete or intentionally erroneous information to other residency programs or prospective employers as a means to force Dr. Finkelstein to agree to sign a General Releases so that their conduct never reached the public view.

81.     As a result of MSMC's actions as herein described in the allegations common to all counts, Dr. Finkelstein has been unable to secure a position in another Residency Program, has been unable to secure any employment in the medical profession as a physician, and continues be unable to do so, as a result of the spreading of false and defamatory comments by the Defendants, in particular, Dr. Ben-David, as program director and on behalf of MSMC, about Dr. Finkelstein in response to requests for information about her from potential Residency Programs and/or employers or the failure of the Defendants and in particular Dr. Ben-David to respond to such requests in any way at all.

82.     As a result of the MSMC's actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000, for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendant Dr. Ben-David)

83.     Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

84.     To state a claim for intentional infliction of emotion distress under Florida law, Dr. Finkelstein must allege that: (1) Defendants engaged in intentional or reckless conduct; (2) the conduct was "outrageous"; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. *Yule v. Ocean Reef Cmty. Ass'n*, No. 19-10138-CIV, 2020 WL 3051505, at *5 (S.D. Fla. June 8, 2020) (citing *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990).) What constitutes "outrageous" conduct is a question of law. *Id.* (citing *Noah v. Assor*, 379 F. Supp. 3d 1284, 1299 (S.D. Fla. 2019).)

85.     Dr. Ben-David's series of misconducts, individually and on behalf of MSMC, coupled with their egregious attempts to avoid these facts from ever coming to light, definitely rise to the level of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond

all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 955 (Fla. Dist. Ct. App. 2017).

86.     Here, Dr. Finkelstein was the victim of a relentless campaign to discredit her perpetrated by Dr. Ben-David, individually and on behalf of MSMC, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

87.     The actions and conduct of Dr. Ben-David, individually and on behalf of MSMC, as described in this Complaint, were outrageous and extreme and, under the circumstances, went beyond all possible bounds of decency, and are regarded as shocking, atrocious, and utterly intolerable in a civilized society.

88.     The Plaintiff has suffered, and continues to suffer an intense emotional distress as a result of Defendants' actions as is above described, of a nature no ordinary person should be expected to endure.

89.     As a result of these actions of the Defendants, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, loss of earnings, past, present, and future, loss of earning capacity, and damages to her reputation.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendant MSMC)

90.     Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

91.     To state a claim for intentional infliction of emotion distress under Florida law, Dr. Finkelstein must allege that: (1) Defendants engaged in intentional or reckless conduct; (2) the conduct was "outrageous"; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. *Yule v. Ocean Reef Cmty. Ass'n*, No. 19-10138-CIV, 2020 WL 3051505, at *5 (S.D. Fla. June 8, 2020) (citing *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990).) What constitutes "outrageous" conduct is a question of law. *Id.* (citing *Noah v. Assor*, 379 F. Supp. 3d 1284, 1299 (S.D. Fla. 2019).)

92.     MSMC's continuous misconducts, coupled with their egregious attempts to prevent these facts from ever coming to light, definitely rise to the level of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 955 (Fla. Dist. Ct. App. 2017).

93.     Here, while Dr. Finkelstein was still a resident at MSMC, Dr. Finkelstein was subjected to constant outrageous verbal harassment, often lewd or sexual in nature, both directly by Defendants, or indirectly, by Defendants' agents, and with Defendants' consent and/or knowledge. Specifically, in separate occasions, Dr. Finkelstein was verbally assaulted by her coworkers with obscene comments regarding female organs as well as threatening comments. Additionally, Dr. Finkelstein was the victim of a relentless campaign to discredit her perpetrated MSMC and its agents, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

28

94.     The actions and conduct of the Defendants, as described in this Complaint, were outrageous and extreme and, under the circumstances, went beyond all possible bounds of decency, and are regarded as shocking, atrocious, and utterly intolerable in a civilized society.

95.     The Plaintiff has suffered, and continues to suffer an intense emotional distress as a result of Defendants' actions as is above described, of a nature no ordinary person should be expected to endure.

96.     As a result of these actions of MSMC, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, loss of earnings, past, present, and future, loss of earning capacity, and damages to her reputation.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT V – TORTIOUS INTERFERENCE
### (Against Defendant Dr. Ben-David)

97.     Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

98.     The elements of the tort of intentional interference with an advantageous business relationship are (1) the existence of a business relationship not necessarily evidenced by an enforceable contract, (2) the knowledge of the relationship on the part of the defendant, (3) an intentional and unjustified interference with that relationship by the defendant, and (4) damage to the plaintiff as the result of the breach of the relationship. *Linafelt v. Beverly Enterprises-Fla., Inc.*, 745 So. 2d 386, 389 (Fla. Dist. Ct. App. 1999).

99.     In July 2021, Dr. Finkelstein received an offer from Mount Sinai Beth Israel Hospital in New York to serve as a House Surgeon.  A copy of Mount Sinai Beth Israel Hospital letter is attached hereto as **Exhibit "E."** Although she was fully qualified for the position, having submitted her credentials and application, Dr. Finkelstein's application was denied once again because Dr. Ben-David either would not provide a reference or provided defamatory comments about her to that Hospital, resulting in the Hospital rescinding its previous offer for that position. A copy of communications between Dr. Finkelstein and Mount Sinai Beth Israel Hospital are attached hereto as **Exhibit "F"** and **"G."** Specifically, Dr. Ben-David made representations so disparaging of Dr. Finkelstein's professionalism, which, although not based in factual evidence, resulted in Dr. Finkelstein losing her position due to Dr. Ben-David's actions.

100.    Upon information and belief, Dr. Ben-David's actions, individually and on behalf of MSMC, were taken in bad faith as part of his smear campaign motivated by discrediting Dr. Finkelstein and forcing her to sign a General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience. A copy of the email communication between Dr. Finkelstein's then legal counsel, Barry Wax, and MSMC general counsel, Arnie Jaffe, including attachments, is attached hereto as **Exhibit "H."** Dr. Ben-David's interference conforms to the Defendants' pattern of behavior seeking to force Dr. Finkelstein to sign a General Release in favor of Defendants by all means necessary.

101.    Dr. Ben-David's interference, individually and on behalf of MSMC, was not privileged or justified, as it was perpetrated as part of Defendants' efforts to induce Dr. Finkelstein to signing a General Release benefitting Defendants. Further, Dr. Ben-David's actions were taken in bad faith and with specific intent to harm Dr. Finkelstein.

102.   Dr. Finkelstein has suffered, and continues to be harmed, by being denied opportunities for alternative residency programs, as well as employment in her field, as a result of the actions of the Defendants as is above described.

103.   As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT VI – TORTIOUS INTERFERENCE
### (Against Defendant MSMC)

104.   Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

105.   The elements of the tort of intentional interference with an advantageous business relationship are (1) the existence of a business relationship not necessarily evidenced by an enforceable contract, (2) the knowledge of the relationship on the part of the defendant, (3) an intentional and unjustified interference with that relationship by the defendant, and (4) damage to the plaintiff as the result of the breach of the relationship. *Linafelt v. Beverly Enterprises-Fla., Inc.*, 745 So. 2d 386, 389 (Fla. Dist. Ct. App. 1999).

106.     In July 2021, Dr. Finkelstein received an offer from Mount Sinai Beth Israel Hospital in New York to serve as a House Surgeon. *See* Exhibit E. Although she was fully qualified for the position, having submitted her credentials and application, Dr. Finkelstein's application was denied once again because Dr. Ben-David either would not provide a reference or provided defamatory comments about her to that Hospital, resulting in the Hospital rescinding its previous offer for that position. *See* Exhibits F and G. Specifically, Dr. Ben-David, individually and on behalf of MSMC, made representations so disparaging of Dr. Finkelstein's professionalism, which, although not based in factual evidence, costed Dr. Finkelstein her position due to Dr. Ben-David's position as program director.

107.     Upon information and belief, Dr. Ben-David's actions, individually and on behalf of MSMC, were taken in bad faith as part of Dr. Ben-David and MSMC's smear campaign motivated by discrediting Dr. Finkelstein and forcing her to sign a General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience. *See* Exhibit H.

108.     Additionally, upon information and belief, MSMC willfully withheld material documentation and information required by different residency programs that Dr. Finkelstein applied to.

109.     Upon information and belief, MSMC attempted to leverage Dr. Finkelstein's need for a proper reference and documentation to force her into signing a General Release in favor of Defendants.

110.     MSMC's interference was not privileged or justified as it was perpetrated as part of Defendants' bad faith efforts to induce Dr. Finkelstein into signing a General Release benefitting Defendants.

111.     Dr. Finkelstein has suffered, and continues to suffer, by being denied opportunities for alternative residency programs, as well as employment in her field, as a result of the actions of the Defendants as is above described.

112.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT VII – DEFAMATION
### (Against Defendant Dr. Ben-David)

113.     Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

114.     The elements of a defamation claim include "a false and defamatory statement concerning another." *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 803 (Fla. Dist. Ct. App. 1997). A defamatory statement is one that tends to harm someone's reputation in the community or deters others from associating with the person. *See id.* "When the words published

concerning a person tend to degrade him, bring him into ill repute, destroy confidence in his integrity, or cause other like injury, such language is actionable per se." *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. Dist. Ct. App. 1978).

115.    Dr. Ben-David, individually and on behalf of MSMC, has defamed Dr. Finkelstein by capriciously providing statements to prospective employers, statements that were "knowingly false," "deliberately misleading," or "rendered with a malicious purpose." *Linafelt*, 745 So. 2d at 389. Specifically, Dr. Ben David's misrepresentations pertaining to Dr. Finkelstein lack of professionalism or abilities as a prospective resident or medical professional to residency programs or prospective employers, whether done individually or on behalf of MSMC, were knowingly false and not based on her experience as a member of the Surgical Residency Program. This is easily verifiable by comparing Dr. Ben-David's assessment, who had observed Dr. Finkelstein as a resident only a handful of times, to the assessment made by Dr. Finkelstein's faculty and mentors, as she has received several recommendation letters which debunk the falsities divulged by Dr. Ben-David with the purpose of tarnishing Dr. Finkelstein's reputation. Copies of letters of recommendation, written after Dr. Finkelstein's forced resignation, including several on MSMC letterhead, displaying an accurate depiction of her tenure at MSMC are attached hereto as **Exhibit "I."** Further, Dr. Ben-David's defamatory statements about Dr. Finkelstein cannot be considered to be privileged as they were made as a concerted effort by Dr. Ben-David to induce Dr. Finkelstein into signing a General Release benefitting Defendants, among other bad faith motives as appears below.

116.    Defendants' statements were not made in good faith, thus, are not privileged, and were made with the further purpose of forcing Dr. Finkelstein into signing a General Release in

favor of Defendants and/or to discredit her, and prevent her from continuing her residency training and/or obtaining employment as a physician.

117.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to complete her residency program, suffered damages consisting of loss of earnings, has suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT VIII – DEFAMATION
### (Against Defendant MSMC)

118.     Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

119.     The elements of a defamation claim include "a false and defamatory statement concerning another." *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 803 (Fla. Dist. Ct. App. 1997). A defamatory statement is one that tends to harm someone's reputation in the community or deters others from associating with the person. *See id.* "When the words published concerning a person tend to degrade him, bring him into ill repute, destroy confidence in his integrity, or cause other like injury, such language is actionable per se." *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. Dist. Ct. App. 1978).

120.    MSMC has defamed Plaintiff by capriciously having its agents provide statements to prospective employers, statements that were "knowingly false," "deliberately misleading," or "rendered with a malicious purpose." *Linafelt*, 745 So. 2d at 389.

121.    Specifically, MSMC's agents misrepresentations pertaining to Dr. Finkelstein's lack of professionalism or abilities as a prospective resident or medical professional, whether done individually or on behalf of MSMC, were knowingly false, not based on her experience as a member of the Surgical Residency Program, as she has received several recommendation letters which debunk this falsity. *See* Exhibit I.

122.    Further, MSMC's defamatory statements about Dr. Finkelstein cannot be considered to be privileged as they were done as a concerted effort from Defendants to induce Dr. Finkelstein to signing a General Release benefitting Defendants.

123.    Defendants' statements were not made in good faith, thus, are not privileged, and were made with the purpose of forcing Dr. Finkelstein into signing a General Release in favor of Defendants and/or to discredit her, and prevent her from continuing her residency training and/or obtaining employment as a physician.

124.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to complete her residency program and/or obtaining employment as a physician, suffered damages consisting of loss of earnings, has suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with

interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT IX – EXTORTION
### (Against Defendants, MSMC and Dr. Ben-David)

125.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

126.    The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq., provides civil and criminal liability for persons engaged in "a pattern of racketeering activity". 18 U.S.C.A. § 1962(a)-(d) (West). *Special Purpose Accts. Receivable Co-op. Corp. v. Prime One Cap. Co.*, 202 F. Supp. 2d 1339, 1346 (S.D. Fla. 2002). RICO provides a civil remedy to "[a]ny person injured in [her] business or property by" a RICO violation. 18 U.S.C.A. § 1964(c) (West) (emphasis added). *Canosa v. Ziff*, No. 18 CIV. 4115 (PAE), 2019 WL 498865, at *25 (S.D.N.Y. Jan. 28, 2019).

127.    Congress enacted RICO in 1970, prohibiting racketeering activity connected to interstate commerce. *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1232 (S.D. Fla. 2017) (citing *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016).) Although initially enacted to fight organized crime, the Supreme Court has rejected a reading of RICO that applies only where the pattern of conduct is 'characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator.' *Leon*, 301 F. Supp. 3d at 1232. Indeed, "the RICO statute provides that its terms are to be liberally construed to effectuate its remedial purpose." *Leon*, 301 F. Supp. 3d at 1232.

128.    To state a civil RICO claim, Plaintiff must successfully allege that Defendants: (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity. *Leon*, 301 F. Supp. 3d 1232. An enterprise, for purposes of civil claim under RICO, must possess three

37

qualities: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. 18 U.S.C.A. § 1962. Id. Similarly, a pattern of racketeering activity is shown when a racketeer commits at least two distinct but related predicate acts. *Leon*, 301 F. Supp. 3d at 1232. Because civil claims under RICO sound in fraud, plaintiffs must offer heightened specificity in the facts supporting their claim and must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the plaintiffs; and (4) what the defendants gained by the alleged fraud. 18 U.S.C.A. § 1961 et seq.; Fed. R. Civ. P. 9(b). *Leon*, 301 F. Supp. 3d at 1232.

129.   Both MSMC and Dr. Ben-David know that the medical residency application process is a lengthy one, beginning in June, and that, should a prospective candidate, such as Dr. Finkelstein, encounter issues with obtaining the required documents in a timely manner, she has to wait until the following year's application process resumes in June of the following year. The Electronic Residency Application Service ("ERAS") match happens once per year.  With that in mind, MSMC and Dr. Ben-David, both individually and through their agents, with the purpose of forcing Dr. Finkelstein into signing a General Release, sought to employ all means necessary to obtaining that goal, and have continued to do so since her forced resignation.

130.   As stated in the Allegations Common to All Counts, the Defendants, until the filing of this action, had refused to provide Dr. Finkelstein with the Completion Documents unless she executed a General Release of All Claims and a Confidentiality Agreement as a precondition to receiving those documents. *See* Exhibit H. MSMC and Dr. Ben-David, through MSMC's counsel, Arnie Jaffe, had open conversations with Dr. Finkelstein's former legal counsel, Barry Wax, representing more than once that the Completion Documents would only be provided after she

signed a General Release. On January 27, 2021, Mr. Jaffe, on behalf of MSMC, had even drafted an agreement title "Full and Final Release of All Claims," which Mr. Jaffe shared with Dr. Finkelstein's counsel so that she would return it signed, as the condition of providing her with documents that MSMC was legally required to provide unconditionally.

131.    Dr. Ben-David, individually and on behalf of MSMC, engaged in this concerted effort by disseminating disparaging comments about her to prospective employers and residency programs across the country, including California, Florida, and New York, mischaracterizing Dr. Finkelstein's tenure as a resident at MSMC, consistently referring to her  as unprofessional, in efforts to discredit her. A copy a form submitted by Dr. Ben-David as response to an inquiry from a prospective residency program is attached hereto as **Exhibit "J."**  The falsities spread by Dr. Ben-David as part of this illegal enterprise were so injurious that a prospective employer advised Dr. Finkelstein that she should consider a career outside of clinical medicine.

132.    Dr. Ben-David's action, individually and on behalf of MSMC, used his position and influence as Program Director to conduct MSMC's affairs through an unlawful RICO pattern of activity, using MSMC as a vehicle. *See Ray*, 836 F.3d at 1356. (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–62, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001).)

133.    Defendants have only produced the Completion Documents after Plaintiff filed a complaint with the ACGME and filed this action, and as a result of the delay in not producing them, Dr. Finkelstein missed out on being matched with a new program. This effort, combined with Dr. Ben-David's cross-country defamatory campaign, were designed to place Dr. Finkelstein in a precarious position in which she would be much more likely to sign Defendant's General Release, and to be prevented from continuing her residency, and/or obtaining employment as a physician.

134.     Defendants' actions, as a continuing unit functioning with a common purpose, were therefore unlawful, and by requiring Plaintiff to sign General Releases as a condition to obtain documents to which Plaintiff was lawfully entitled to receive, these actions constitute extortion and blackmail, in violation of RICO. *See Ray*, 836 F.3d at 1352 (citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981).)

135.     As a result of the actions of Dr. Ben-David, individually and on behalf of MSMC, and MSMC, individually and/or through its authorized agents, Dr. Finkelstein has suffered damages to her reputation, the inability to secure employment, match with a new residency program, or obtain any position as a physician anywhere.

136.     As a result of the actions of Dr. Ben-David, individually and on behalf of MSMC, and MSMC, individually or through its authorized agents, acting as an enterprise, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake, and Plaintiff is further entitled to statutory damages and treble damages pursuant to RICO statutes.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

**COUNT X – SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(Against Defendants, MSMC and Dr. Ben-David)**

137.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

138.    Federal law determines when a civil rights violation accrues for actions brought under Title VII and, therefore, when the statute of limitations begins to run. *See Fowler v. Taco Viva, Inc.*, 646 F. Supp. 152, 155 (S.D. Fla. 1986). Generally, the limitations period commences in Title VII cases when the prohibited deprivation of employment rights occurs. *Id.* (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258, 101 S. Ct. 498, 504, 66 L. Ed. 2d 431 (1980).) The appropriate state limitations statute is then applied to calculate the time frame within which the judicial claim must be brought. *Id.* In this case, the applicable statute is Fla. Stat. Ann. § 760.11 (West), which provides a 180 day period after the filing of the complaint with the commission in which to bring suit. Dr. Finkelstein filed her charge with the Equal Employment Opportunity Commission ("EEOC") on July 22, 2022, and filed the Amended Complaint on December 30, 2022. Likewise, Dr. Finkelstein's Amended Complaint, including the Title VII violation claims was filed several days before the January 18, 2023 cutoff date.

139.    In order to succeed on a claim of sex discrimination under Title VII or the FCRA, a plaintiff must first establish a prima facie case, which requires a showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside her protected class more favorably. *Nicholas v. Bd. of Trustees of Univ. of Alabama*, 251 F. App'x 637, 643 (11th Cir. 2007). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the adverse action. *Jiann Min Chang v. Alabama Agric. & Mech. Univ.*, 355 F. App'x 250, 252 (11th Cir. 2009). If the defendant

meets this burden, then the plaintiff must show the proffered reason is merely a pretext for discrimination.

140.    An individual is "qualified" for a position, for purposes of employment discrimination law, if she meets the criteria that the employer has specified for the position. *Wright v. Southland Corp.*, 187 F.3d 1287, 1301 (11th Cir. 1999) n. 16 (11th Cir.1999) (citation omitted). The Eleventh Circuit also recognizes service for an extended period without complaint to establish that an individual is qualified for a position. *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1520 (11th Cir. 1990) (citing *Stanfield v. Answering Serv., Inc.*, 867 F.2d 1290, 1293–94 (11th Cir. 1989)).

141.    A plaintiff may prove a claim of intentional discrimination under Title VII through direct evidence, through circumstantial evidence, or through statistical proof." *Shedrick v. Dist. Bd. of Trustees of Miami-Dade Coll.*, 941 F. Supp. 2d 1348, 1366 (S.D. Fla. 2013). Direct evidence is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Shedrick*, 941 F. Supp. 2d at 1366. An employer's discriminatory intent can be shown with circumstantial evidence through either the *McDonnell Douglas* burden-shifting framework or by producing enough circumstantial evidence to raise a reasonable inference of, and thus triable issue of, intentional discrimination. *Shedrick*, 941 F. Supp. 2d at 1366.

142.    Dr. Finkelstein's credentials more than qualify her for a position with Defendant's Surgical Residency Program: She was selected from the Match Program by MSMC (being part of the GME Match program certifies here qualifications for the program), she has more than 10 years of experience as a nationally licensed EMT, has graduated from MIT with degrees in chemical engineering and biology, and has obtained both MD and MPH degrees from the University of

Miami's Miller School of Medicine. Further, prior to her constructive dismissal, Dr. Finkelstein was a member of the Defendants' Surgical Residency Program for over two (2) years and was chosen as class representative.

143.    As stated in the Allegations Common to all Counts, the Defendants have routinely subjected Dr. Finkelstein, a woman, to discrimination based on her gender. During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein voiced her concerns about the disparate treatment of female and male residents; while male residents were provided appropriate safety equipment, female residents were only provided ill-fitting equipment, such as gloves and lead aprons, which exposed female residents to the risk of thyroid cancer and other illnesses.

144.    Dr. Finkelstein and other female residents had to spend their own resources to purchase adequate equipment, such as thyroid shields and/or appropriately sized lead aprons. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

145.    During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein observed and reported multiple instances in which female staff was unprofessionally addressed as "baby" and "sweetheart" and asked if they were pregnant for "acting hormonal." Defendants consistently dismissed these complaints, telling Dr. Finkelstein to "toughen up." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

146.    Further, upon information and belief, Dr. Ben-David has explicitly stated on separate occasions that he considered the female residents "trouble" and "not worth it."

147.    Plaintiff has suffered an adverse employment action by virtue of the non-renewal of her residency contract, which is considered to be an "adverse employment action" for purposes

of her discrimination claims under Title VII and the Florida Civil Rights Act (FCRA). Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e (West) et seq.; Fla. Stat. Ann. § 760.11(5).

148.    Given the importance of private enforcement in the statutory framework constructed by Congress, attorney's fee provisions in civil rights cases should be interpreted broadly to facilitate and encourage enforcement of civil rights laws. *Wesley Grp. Home Ministries, Inc. v. City of Hallandale*, 670 So. 2d 1046, 1049 (Fla. Dist. Ct. App. 1996) (citing *Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*, 434 U.S. 412, 417, 98 S. Ct. 694, 698, 54 L. Ed. 2d 648 (1978) (In Title VII cases, a "prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances.").

149.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, and attorney's fees, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT XI – SEX DISCRIMINATION IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT
### (Against Defendants MSMC and Dr. Ben-David)

150.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

151.     FCRA claims are subject to the same analysis as Title VII claims. *See Valenzuela v. GlobeGround N. Am., LLC*, 18 So. 3d 17, 21–22 (Fla. Dist. Ct. App. 2009) ("Because the FCRA is patterned after Title VII of the Civil Rights Act of 1964 ... we look to federal case law.... It is well-settled law that Florida courts follow the three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), , and its progeny, for establishing, by circumstantial evidence, a discrimination claim based on disparate treatment in the workplace.") (internal citations omitted). To plead a claim for disparate treatment based on gender discrimination under the FCRA, plaintiff must show that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside her protected class more favorably than she was treated; and (4) she was qualified for the job." *Olson v. Dex Imaging, Inc.*, 63 F. Supp. 3d 1353, 1362 (M.D. Fla. 2014) (citing *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).)

152.     The appropriate state limitations statute to calculate the time frame within which the discrimination claim must be brought is Fla. Stat. Ann. § 760.11 (West), which provides a 180 day period after the filing of the complaint with the commission in which to bring suit. Dr. Finkelstein filed her charge with the Equal Employment Opportunity Commission ("EEOC") on July 22, 2022, and filed the Amended Complaint on December 30, 2022. Likewise, Dr. Finkelstein's Amended Complaint, including the Title VII violation claims was filed several days before the January 18, 2023 cutoff date.

153.     As discussed further above, Dr. Finkelstein's credentials more than qualify her for a position with Defendant's Surgical Residency Program: She was selected from the Match Program by MSMC (being part of the GME Match program certifies here qualifications for the program), she has more than 10 years of experience as a nationally licensed EMT, has graduated

45

from MIT with degrees in chemical engineering and biology, and has obtained both MD and MPH degrees from the University of Miami's Miller School of Medicine. Further, prior to her constructive dismissal, Dr. Finkelstein was a member of the Defendants' Surgical Residency Program for over two (2) years as class representative.

154.    As stated in the Allegations Common to all Counts, the Defendants have routinely subjected Dr. Finkelstein, a woman, to discrimination based on her gender. During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein voiced her concerns about the disparate treatment of female and male residents; while male residents were provided appropriate safety equipment, female residents were only provided ill-fitting equipment, such as gloves and lead aprons, which exposed female residents to the risk of thyroid cancer and other illnesses.

155.    Dr. Finkelstein and other female residents had to spend their own resources to purchase adequate equipment, such as thyroid shields and/or appropriately sized lead aprons. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

156.    During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein observed and reported multiple instances in which female staff was unprofessionally addressed as "baby" and "sweetheart" and asked if they were pregnant for "acting hormonal." Defendants consistently dismissed these complaints, telling Dr. Finkelstein to "toughen up." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

157.    Further, upon information and belief, Dr. Ben-David has explicitly stated on separate occasions that he considered the female residents "trouble" and "not worth it."

158.     Plaintiff has suffered an adverse employment action by virtue of the non-renewal of her residency contract, which is considered to be an "adverse employment action" for purposes of her discrimination claims under Title VII and the Florida Civil Rights Act (FCRA). Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e (West) et seq.; Fla. Stat. Ann. § 760.11(5). *See also Gossard v. JP Morgan Chase & Co.*, 612 F. Supp. 2d 1242, 1249 (S.D. Fla. 2009), *aff'd,* 389 F. App'x 936 (11th Cir. 2010).

159.     Given the importance of private enforcement in the statutory framework constructed by Congress, attorney's fee provisions in civil rights cases should be interpreted broadly to facilitate and encourage enforcement of civil rights laws. *Wesley Group Home Ministries, Inc.*, 670 So. 2d at 1049 (citing *Christiansburg Garment Co.*, 434 U.S. at 417 (In Title VII cases, a "prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances.").

160.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, and attorney's fees, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

**COUNT XII – RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

**(Against Defendants MSMC and Dr. Ben-David)**

161.   Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

162.   Federal law determines when a civil rights violation accrues for actions brought under Title VII and, therefore, when the statute of limitations begins to run. *See Fowler*, 646 F. Supp. at 155. Generally, the limitations period commences in Title VII cases when the prohibited deprivation of employment rights occurs. *Id.* (citing *Delaware State College*, 449 U.S. at 258.) The appropriate state limitations statute is then applied to calculate the time frame within which the judicial claim must be brought. *Id.* In this case, the applicable statute is Fla. Stat. Ann. § 760.11 (West), which provides 180 days period after the filing of the complaint with the commission in which to bring suit. Dr. Finkelstein filed her charge with the Equal Employment Opportunity Commission ("EEOC") on July 22, 2022, and filed the Amended Complaint on December 30, 2022. Likewise, Dr. Finkelstein's Amended Complaint, including the Title VII violation claims was filed several days before the January 18, 2023 cutoff date.

163.   Plaintiffs asserting retaliation claim under Title VII or Florida Civil Rights Act (FCRA) must show that (1) she engaged in protected activity, (2) she suffered an adverse action, and (3) causal link exists between protected activity and adverse action; "protected activity" may involve opposing unlawful employment practices or participating in making charge, testifying, assisting, or participating in any manner in investigation, proceeding, or hearing regarding unlawful employment practices. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a) (West); Fla. Stat. Ann. § 760.10(7) (West). *See also Shedrick*, 941 F. Supp. 2d 1348.

164.   Establishing causal link between protected activity and adverse action is not difficult, and retaliation plaintiffs under Title VII need only show that activity and adverse action

are not wholly unrelated; in order to demonstrate connection, plaintiffs must demonstrate that a decisionmaker was aware of protected activity at the time the adverse decision was made, although close temporal proximity between the protected activity and the adverse action can satisfy the burden of demonstrating causation. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a). *See also Shedrick*, 941 F. Supp. 2d 1348.

165.     As stated in the allegations common to all counts, the Defendants have regularly perpetrated actions that constitute sexual discrimination and other impermissible and unlawful employment practices, which Plaintiff has objected to and reported to her superiors, only to be met with retaliation by virtue of being placed under unwarranted probations, and eventually wrongfully forced out of the Surgical Residency Program.  As retaliation for Dr. Finkelstein's reporting of sexual discrimination and harassment, she was the victim of a relentless campaign to discredit her, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

166.     Specifically, on separate occasions, Dr. Finkelstein reported that female residents did not have the appropriately sized protection equipment, including lead vests and thyroid guards. Instead of addressing this issue, Dr. Ben-David prescribed a retaliation disguised as a legitimate "remediation plan," utilizing Dr. Finkelstein's "perceived deficiencies," which, if any, were actually caused by Dr. ben-David's and MSMC refusal to accommodate Dr. Finkelstein's well-documented AD/HD. The remediation is in fact, retaliation because, although disguised as a way of helping Dr. Finkelstein bridge any "gaps" in which Dr. Ben-David alleged she was lacking, it actually served the purpose of humiliating Plaintiff, using her as an "example" so that others would not lodge complaints, causing Dr. Finkelstein to fall behind on her residency program

requirements, as the remediation plan routinely caused her to miss out on cases/rounds and other educational opportunities.

167.    Dr. Finkelstein continued to report wrongdoing and discrimination including on February 28, 2019. A copy of Dr. Paige's electronic communication is attached hereto as **Exhibit "K."**  On that day, Dr. Finkelstein reported several incidents of sexual harassment and discrimination based on gender stereotypes, which Dr. Ben-David quickly dismissed. Dr. Finkelstein later reported a different incident of sexual harassment to Dr. Ben-David on December 21, 2019 when a nurse verbally harassed her with lewd comments, and, again, Dr. Ben-David and MSMC used this incident to require a new remediation plan, which further harmed Dr. Finkelstein's progress as a resident at MSMC.

168.    Ultimately, Dr. Ben-David's retaliation plan succeeded, as he effectively "convinced" the Clinical Competency Committee **("CCC")** to force Dr. Finkelstein to resign in lieu of termination.

169.    As further retaliation for Dr. Finkelstein's reporting of sexual discrimination and harassment, until after the filing of this action, MSMC and Dr. Ben-David consistently refused to provide her with the Completion Documents, thus precluding Plaintiff from securing future employment and impeding Plaintiff's relocation to a new residency program.

170.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon, attorneys fees, and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT XIII – RETALIATION IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT
### (Against Defendants MSMC and Dr. Ben-David)

171.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

172.    The appropriate state limitations statute to calculate the time frame within which the retaliation claim must be brought is Fla. Stat. Ann. § 760.11 (West), which provides 180 days period after the filing of the complaint with the commission in which to bring suit. Dr. Finkelstein filed her charge with the Equal Employment Opportunity Commission ("EEOC") on July 22, 2022, and filed the Amended Complaint on December 30, 2022. Likewise, Dr. Finkelstein's Amended Complaint, including the Title VII violation claims was filed several days before the January 18, 2023 cutoff date.

173.    Florida courts follow federal case law when examining FCRA retaliation claims. *Olson*, 63 F. Supp. 3d at 1362–63 (citing *Carter v. Health Mgmt. Assocs.*, 989 So. 2d 1258, 1262 (Fla. Dist. Ct. App. 2008).) Under Florida Civil Rights Act (FCRA), prima facie case of retaliation requires that the plaintiff prove, by a preponderance of the evidence: (1) that she engaged in a statutorily protected activity; (2) that an adverse employment action occurred; and, (3) that the adverse action was related to the protected activities *Verna v. Pub. Health Tr. of Miami-Dade Cnty.*, 539 F. Supp. 2d 1340 (S.D. Fla. 2008).

174.    Close temporal proximity between the protected activity and adverse *1363 action can satisfy the burden of demonstrating causation. *Olson*, 63 F. Supp. 3d at 1362–63 (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).)

175.    To establish that one has engaged in statutorily protected activity, a plaintiff asserting retaliation claim under Florida Civil Rights Act (FCRA) must show that she opposed conduct by the employer based upon an objectively reasonable belief that the employer was engaged in unlawful employment practices; additionally, plaintiff must show that the decision-maker responsible for the adverse employment action was actually aware of the protected activity at the time he took the adverse action. *Verna*, 539 F. Supp. 2d 1340

176.    As stated in the allegations common to all counts, the Defendants have regularly perpetrated actions that constitute sexual discrimination and other impermissible unlawful employment practices, which Plaintiff has objected to and reported to her superiors, only to be met with retaliation by virtue of being placed under unwarranted probations, and eventually wrongfully forced out of the Surgical Residency Program.  As retaliation for Dr. Finkelstein's reporting of sexual discrimination and harassment, she was the victim of a relentless campaign to discredit her, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

177.    Specifically, on separate occasions, Dr. Finkelstein reported that female residents did not have the appropriately sized protection equipment, including lead vests and thyroid guards. Instead of addressing this issue, Dr. Ben-David prescribed a retaliation disguised as a legitimate "remediation plan," utilizing Dr. Finkelstein's "perceived deficiencies," which, if any, were actually caused by Dr. ben-David's and MSMC refusal to accommodate Dr. Finkelstein's well-

documented AD/HD. The remediation is in fact, retaliation because, although disguised as a way of helping Dr. Finkelstein bridge any "gaps" in which Dr. Ben-David alleged she was lacking, it actually served the purpose of humiliating Plaintiff, using her as an "example" so that others would not lodge complaints, causing Dr. Finkelstein to fall behind on her residency program requirements, as the remediation plan routinely caused her to miss out on cases/rounds and other educational opportunities.

178.    Dr. Finkelstein continued to report wrongdoing and discrimination including on February 28, 2019. On that day, Dr. Finkelstein reported several incidents of sexual harassment and discrimination based on gender stereotypes, which Dr. Ben-David quickly dismissed. Dr. Finkelstein later reported a different incident of sexual harassment to Dr. Ben-David on December 21, 2019 when a nurse verbally harassed her with lewd comments, and, again, Dr. Ben-David and MSMC used this incident to require a new remediation plan, which further harmed Dr. Finkelstein's progress as a resident at MSMC.

179.    Ultimately, Dr. Ben-David's retaliation plan succeeded, as he effectively "convinced" the Clinical Competency Committee **("CCC")** to force Dr. Finkelstein to resign in lieu of termination.

180.    As further retaliation for Dr. Finkelstein's reporting of sexual discrimination and harassment, until after the filing of this action, MSMC and Dr. Ben-David consistently refused to provide her with the Completion Documents, thus precluding Plaintiff from securing future employment and impeding Plaintiff's relocation to a new residency program.

181.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program,

suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon, attorneys fees, and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT XIV –DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Against Defendants MSMC and Dr. Ben-David)

182.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

183.    The Americans with Disabilities Act ("ADA"), as amended, provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ... employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a) (West 2009); *Keeler v. Fla. Dep't of Health*, 324 F. App'x 850, 856 (11th Cir. 2009). In order to establish a prima facie case of employment discrimination under the ADA, a plaintiff must show that: (1) she has a disability; (2) she is a qualified individual; and (3) the employer discriminated against her because of her disability. *Id.* (citing *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007)) (interpreting prior version of Act).)

184.    A "disability" is defined by the ADA as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C.A. § 12102(1) (West). The Equal Employment Opportunity Commission ("EEOC") has further defined "major life activities" as

"functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Greenberg*, 498 F.3d at 1264 (quoting 29 C.F.R. § 1630.2(i)).

185.    An employer unlawfully discriminates against an employee because of her disability by "not making reasonable accommodations to the [employee's] known physical or mental limitations" if the employee is otherwise qualified to perform her job and the accommodation would not impose an undue hardship on the operation of the business. 42 U.S.C.A. § 12112(b)(5)(A); *see also Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007).

186.    Congress amended the standard for determining whether a person is disabled under the ADA (and derivatively under the Rehabilitation Act) in the ADA Amendments Act of 2008, ADA AMENDMENTS ACT OF 2008, PL 110–325, September 25, 2008, 122 Stat 3553. *See also* Department of Justice, FINAL REGULATORY ASSESSMENT, FINAL RULE - AMENDMENT OF ADA TITLE II AND TITLE III REGULATIONS TO IMPLEMENT ADA AMENDMENTS ACT OF 2008 (available at https://archive.ada.gov/regs2016/final_ra_adaaa.html#_ftnref5).

187.    The amended version of the ADA statute now reads in relevant part:

"For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, *learning, reading, concentrating, thinking, communicating, and working*.
(…)
An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
(…)
The definition of 'disability' in paragraph (1) shall be construed in accordance with the following:
"(A) The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.
"(B) The term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

"(C) *An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.*

"(D) *An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.*

"(E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—

"(I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

"(II) use of assistive technology;

"(III) reasonable accommodations or auxiliary aids or services; or

"(IV) learned behavioral or adaptive neurological modifications.

"(ii) The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

"(iii) As used in this subparagraph—

"(I) the term 'ordinary eyeglasses or contact lenses' means lenses that are intended to fully correct visual acuity or eliminate refractive error; and

"(II) the term 'low-vision devices' means devices that magnify, enhance, or otherwise augment a visual image.".

42 U.S.C.A. § 12102(3)(A) (emphasis added). Because of that amendment, a plaintiff need demonstrate only that the employer regarded him as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity. *See Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012).

188.   Dr. Finkelstein's AD/HD condition qualifies her for ADA accommodations because it is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C.A. § 12102(1) (West). Dr. Finkelstein has been diagnosed with AD/HD since her time as an undergraduate at MIT. While, with the appropriate accommodations, she mostly managed to cope with her conditions as an undergrad and a medical student, it does not follow that her condition did not significantly impacted major life activity. Unlike Dr. Finkelstein's experience with undergrad and medical school exams, which averaged two (2) hours of open book examinations with concise questions, the United States Medical Licensing Examination ("USMLE

Step 1") and the ABSITE exams are day-long exams, with extensive and elaborate questions, which, due to Dr. Finkelstein's AD/HD status, she had to reread for several times before she could begin to comprehend. Likewise, Dr. Finkelstein's AD/HD status substantially limited a major life activity, due to the nature of standardized tests such as the United States Medical Licensing Examination ("USMLE Step 1") and the ABSITE.

189.    In fact, most, if not all of the perceived "flaws" or "deficiencies" pointed to by Dr. Ben-David or MSMC's agents are easily explained by Dr. Finkelstein's AD/HD status, including her American Board of Surgery In-Training Examination ("ABSITE") scores, her perceived issues with communication, etc. The Mayo Clinic describes ADHD as a mental health disorder that includes a combination of persistent problems, such as difficulty paying attention, hyperactivity and impulsive behavior. *See* Mayo Clinic, Adult Attention-Deficit/Hyperactivity Disorder. (available at https://www.mayoclinic.org/diseases-conditions/adult-adhd/symptoms-causes/syc-20350878). Adults with ADHD *may score lower on academic testing* than would be expected for their age, intelligence and education. Learning disabilities can include problems with *understanding and communicating*. Id. (emphasis added). Likewise, Dr. Ben-David and MSMC not only violated the ADA by failing to provide the appropriate accommodations that Dr. Finkelstein needed and appropriately required, but used her AD/HD status as a pretext to force her resignation.

190.    During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein, on multiple occasions, requested a reasonable accommodation for her disability, Attention Deficit/Hyperactivity Disorder (AD/HD) to Dr. Ben-David, by way of additional time to complete certain examinations, which were required as a term of her employment with MSMC. Dr. Ben-David responded to these reasonable requests for accommodation by ridiculing and minimizing

Plaintiff's disability. Defendants have consistently violated the ADA by inappropriately denying Dr. Finkelstein's request for accommodations for her AD/HD, even though she offered to present two separate medical opinions diagnosing her with AD/HD, which were not even considered by Dr. Ben-David.

191.     Likewise, Dr. Finkelstein meets the requirement of being regarded as having an impairment because, without the appropriate accommodations, which were provided by Dr. Ben-David and MSMC to other similarly situated residents, her ABSITE scores suffered, which Dr. Ben-David and MSMC used as a pretext to justify forcing Dr. Finkelstein into resigning. Upon information and belief, while Dr. Finkelstein had only five (5) hours to take the ABSITE, her fellow resident with AD/HD accommodations had double of the allotted time to take the same exam. This is a clear indication that, all things equal, Dr. Finkelstein could have secured higher scores with the proper accommodations. Furthermore, when retaking the exam questions without a time constraint as directed by Dr. Ben-David, Dr. Finkelstein performance improved significantly.

192.     Dr. Ben-David's continuous refusal to provide reasonable accommodations to Dr. Finkelstein's disabilities impacted her ABSITE scores, ultimately impacting her Surgical Residency Program's evaluation results, which ultimately resulted in her constructive dismissal.

193.     Dr. Finkelstein's credentials more than qualify her for a position with Defendant's Surgical Residency Program: she has more than 10 years of experience as a nationally licensed EMT, has graduated from MIT with degrees in chemical engineering and biology, and has obtained both MD and MPH degrees from the University of Miami's Miller School of Medicine. Further, prior to her constructive dismissal, Dr. Finkelstein was a member of the Defendants' Surgical Residency Program for over two (2) years as class representative.

194.     Likewise, Dr. Finkelstein successfully alleges as ADA violation claim because: (1) her AD/HD status is a significant mental impairment that substantially limits one or more major life; (2) she is fully qualified to hold a position as a resident; and (3) Dr. Ben-David and MSMC's agents unlawfully discriminated against her because of her disability by not making reasonable accommodations to her knows mental limitations when Dr. Finkelstein was otherwise qualified to perform her job and the accommodations would not impose an undue hardship on the operation of the General Surgery Residency Program. *See* 42 U.S.C.A. § 12112(b)(5)(A); see also *Holly*, 492 F.3d at 1262; 42 U.S.C.A. § 12102(1) (West).

195.     As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon, attorneys fees, and costs of this action, together with all further relief deemed just and proper by this Court.

### COUNT XV –RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Against Defendants MSMC and Dr. Ben-David)

196.     Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

197.     A *prima facie* case of retaliation under the ADA requires plaintiff to show that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was some causal relation between the two events. *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018).

198.     As stated in the allegations common to all counts, the Defendants have regularly perpetrated actions that constitute discrimination under the ADA, and other impermissible unlawful employment practices, which Plaintiff has objected to and reported to her superiors, only to be met with retaliation by virtue of being placed under unwarranted probations, and eventually wrongfully forced out of the Surgical Residency Program.

199.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein, on multiple occasions, requested a reasonable accommodation for her disability, Attention Deficit/Hyperactivity Disorder (AD/HD), by way of additional time to complete certain examinations, which were required as a term of her employment with MSMC. Dr. Ben-David responded to these reasonable requests for accommodation by ridiculing and minimizing Plaintiff's disability.

200.     Dr. Finkelstein has been diagnosed with AD/HD since her time as an undergraduate at MIT. While she managed her conditions during her tenure as an undergrad and a medical student, Dr. Finkelstein's AD/HD substantially limited a major life activity, due to the nature of standardized tests such as the United States Medical Licensing Examination ("USMLE Step 1") and the ABSITE. Unlike Dr. Finkelstein's undergrad and medical school exams, which averaged two (2) hours of open book examinations with concise questions, the USMLE Step 1 and ABSITE exams are day-long exams, with extensive and convoluted questions, causing Dr. Finkelstein to have to reread them several times before she comprehends.

201.    Dr. Finkelstein's AD/HD condition qualifies her for ADA accommodations because it is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C.A. § 12102(1) (West). Dr. Finkelstein's AD/HD because, without the appropriate accommodations, which were provided by Dr. Ben-David and MSMC to other similarly situated residents, her American Board of Surgery In-Training Examination ("ABSITE") scores suffered, which Dr. Ben-David and MSMC used as a pretext to justify forcing Dr. Finkelstein into resigning. Upon information and belief, while Dr. Finkelstein had only five (5) hours to take the ABSITE, her fellow resident with AD/HD accommodations had double of the allotted time to take the same exam. This is a clear indication that, all things equal, Dr. Finkelstein could have secured higher scores with the proper accommodations.

202.    Defendants have consistently violated the ADA by inappropriately denying Dr. Finkelstein's request for accommodations for her AD/HD.

203.    Dr. Ben-David's continuous refusal to provide reasonable accommodations to Dr. Finkelstein's disabilities impacted her ABSITE scores, ultimately impacting her Surgical Residency Program's evaluation results, which ultimately resulted in her constructive dismissal.

204.    As retaliation for Dr. Finkelstein's reporting of bad hospital practices, and discrimination based on disability, she was the victim of a relentless campaign to discredit her, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

205.    In fact, most, if not all of the perceived "flaws" or "deficiencies" pointed to by Dr. Ben-David or MSMC's agents are easily explained by Dr. Finkelstein's AD/HD status, including her American Board of Surgery In-Training Examination ("ABSITE") scores, her perceived issues

with communication, etc. The Mayo Clinic describes ADHD as a mental health disorder that includes a combination of persistent problems, such as difficulty paying attention, hyperactivity and impulsive behavior. *See* Mayo Clinic, Adult Attention-Deficit/Hyperactivity Disorder. (available at https://www.mayoclinic.org/diseases-conditions/adult-adhd/symptoms-causes/syc-20350878). Adults with ADHD *may score lower on academic testing* than would be expected for their age, intelligence and education. Learning disabilities can include problems with *understanding and communicating*. Id. (emphasis added). Likewise, Dr. Ben-David and MSMC not only violated the ADA by failing to provide the appropriate accommodations that Dr. Finkelstein needed and appropriately required, but used her AD/HD status as a pretext to force her resignation.

206.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon, attorneys fees, and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT XVI – SEXUAL HARASSMENT
### (Against Defendants MSMC and Dr. Ben-David)

207.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

208.     The grounds for a sexual harassment claim under either Title VII of the Civil Rights Act of 1964 or under Fla. Stat. Ann. § 760.10(7) (West 2007) can be either a tangible employment action or, as Plaintiff asserts in this case, the "creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work." *Blizzard v. Appliance Direct, Inc.*, 16 So. 3d 922, 926–27 (Fla. Dist. Ct. App. 2009).

209.     To establish a hostile work environment sexual harassment claim based on harassment by a supervisor, Plaintiff must show: (1) that she is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there is a basis for holding the employer liable. *Blizzard*, 16 So. 3d at 927.

210.     As stated in the allegations common to all counts, the Defendants have routinely subjected Dr. Finkelstein, a woman, to a hostile environment caused by rampant sexual harassment.

211.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein voiced her concerns about the disparate treatment of female and male residents; while male residents were provided appropriate safety equipment, female residents were only provided ill-fitting equipment, such as gloves and lead aprons, which exposed female residents to the risk of thyroid cancer and other illnesses. Dr. Finkelstein and other female residents had to spend their own resources to purchase adequate equipment, such as thyroid shields and/or appropriately sized lead aprons. Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

212.     During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein observed and reported multiple instances in which female staff was unprofessionally addressed as "baby" and "sweetheart" and asked if they were pregnant for "acting hormonal." Defendants consistently dismissed these complaints, telling Dr. Finkelstein to "toughen up." Upon information and belief, male members of the Surgical Residency Program were not subjected to the same treatment.

213.     Further, upon information and belief, Dr. Ben-David has explicitly stated on separate occasions that he considered the female residents "trouble" and "not worth it."

214.     Also, Dr. Ben-David made unrequired and unwarranted inquiries and comments about Dr. Finkelstein's romantic and sexual life, including, but not limited to, directing her about whom she could and could not date.

215.     Additionally, Defendants' propensity to commit sex-based harassment can also be demonstrated by the fact that Plaintiff's Surgical Residency Program consisted of fifteen (15) members, only three of which were female, with only one remaining female resident since Plaintiff's termination, soon to be the only ever female resident to fully complete the Surgical Residency Program while under Dr. Ben David's tenure.

216.     As stated, Dr. Finkelstein was the victim of a relentless campaign to discredit her, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

217.     Likewise, there is ample evidence that the harassment was based on her sex, was sufficient to deem Plaintiff's former work environment as hostile, and Defendants are liable

because the offensive conduct was at least in part perpetrated by Dr. Ben-David as the General Surgical Residency Program Director.

218.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT XVII – VICARIOUS LIABILITY
### (Against Defendant MSMC)

219.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

220.    When the tortfeasor is an employee, the principle of vicarious liability allows "an otherwise non-faulty employer" to be held liable "for the negligent acts of [that] employee acting within the scope of employment." *Yusko v. NCL (Bahamas), Ltd.*, 4 F.4th 1164, 1169 (11th Cir. 2021) (citing *Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1121 (11th Cir. 2011). Unlike a party that is directly liable for a tort, a party that is vicariously liable "has not committed any breach of duty to the plaintiff but is held liable simply as a matter of legal imputation of responsibility for another's tortious acts." Restatement (Third) of Torts: Apportionment Liab. § 13 (2000) cmt. b (2000); see also 1 American Law of Torts § 4:1 (" 'Vicarious liability' is a term

65

generally applied to legal liability that arises solely because of a relationship and not because of any act of negligence by the person held vicariously liable for the act of another."). In other words, an employer can be held liable under a vicarious liability theory even if it has not violated any duty at all. See *Yusko*, 4 F.4th at *New Orleans, M & C R Co v. Hanning*, 82 U.S. 649, 21 L. Ed. 220 (1872) *Meyer v. Holley*, 537 U.S. 280, 285–86, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003) ("The principal is liable for the acts and negligence of the agent in the course of his employment, although he did not authorize or did not know of the acts complained of[.]" (quoting New Orleans, M., & C.R. Co. v. Hanning, 82 U.S. 649, 15 Wall. 649, 657, 21 L.Ed. 220 (1873)).

221.    Under the doctrine of respondeat superior, an employer can be held liable for the tortious or criminal acts of an employee, when the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer. *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 356–57 (Fla. Dist. Ct. App. 2001) (citing *Nazareth v. Herndon Ambulance Serv., Inc.*, 467 So. 2d 1076, 1078 (Fla. Dist. Ct. App. 1985)). An employee's conduct is within the scope of his or her employment where: (1) the conduct is of the kind he or she was employed to perform; (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed; and (3) the conduct is activated at least in part by a purpose to serve the master. *Id.* at 357 (citing *Sussman v. Fla. E. Coast Properties, Inc.*, 557 So. 2d 74, 75–76 (Fla. Dist. Ct. App. 1990)).

222.    Defendant MSMC is vicariously liable for Dr. Ben-David's misconduct because, as further discussed supra, the following alleged misconduct was committed during the course of his employment as the Director of the General Surgery Residency Program at MSMC and to further MSMC's interests in raising MSMC's Surgical Residency Program's prestige:

      a.   Breach of the GME Agreement;

    b.   Intentional Infliction of Emotional Distress;

    c.   Tortious Interference with business relationship;

    d.   Defamation.

223.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT XVIII – NEGLIGENT SUPERVISION
### (Against Defendant MSMC)

224.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

225.    To prove a cause of action for negligent supervision under Florida law, a plaintiff must show '(1) the existence of a relationship giving rise to a legal duty to supervise; (2) negligent breach of that duty; and (3) proximate causation of injury by virtue of the breach. *Watts v. City of Port St. Lucie, Fla.*, No. 2:15-CV-14192, 2016 WL 633716, at *3 (S.D. Fla. Feb. 17, 2016). A breach occurs only "when during the course of employment, the employer becomes aware, or should have become aware of problems with an employee that indicates his unfitness, and the

employer fails to take further actions such as investigation, discharge, or reassignment." *Watts*, 2016 WL 633716, at *3.

226.    Upon information and belief, several MCMC employees, including female physicians, nurses, and staff, have reported Dr. Ben-David to MSMC for inappropriate behavior tantamount to discrimination and harassment, only to later suffer retaliatory actions sanctioned by MSMC. Further, Dr. Ben-David and MSMC, though its agents, used their position of power to extort General Releases, similar to the conduct carried out by MSMC's counsel, Arnie Jaffe. Mr. Jaffe, on behalf of MSMC and Dr. Ben-David, had open conversations with Dr. Finkelstein's former legal counsel, Barry Wax, representing more than once that the Completion Documents would only be provided after she signed a General Release. On January 27, 2021, Mr. Jaffe, on behalf of MSMC, have drafted an agreement title "Full and Final Release of All Claims," which Mr. Jaffe shared with Dr. Finkelstein's counsel so that she would return it signed.

227.    Thus, MSMC negligently placed, and continued to place, employees, such as Plaintiff, under the supervision of a repeat offender when it either knew or should have known that Dr. Ben-David had the propensity to create a hostile work environment due to continuous sexual harassment of MSMC's female employees and other discriminatory practices.

228.    Thus, MSMC is liable for any and all acts performed by Dr. Ben-David and Arnie Jaffe that this Court deems to have occurred outside the scope of his employment.

229.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity,

loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT XIX – NEGLIGENT RETENTION
### (Against Defendant MSMC)

230.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

231.    Like claims for negligent supervision, to state a claim for negligent hiring or retention against a principal, a plaintiff must prove that "(1) the agent/employee/contractor was incompetent or unfit to perform the work; (2) the employer knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate cause of the plaintiff's injury." *Witover v. Celebrity Cruises, Inc.*, 161 F. Supp. 3d 1139, 1148 (S.D. Fla. 2016). To satisfy the second element of a negligent hiring or retention claim, a plaintiff must allege facts "showing that the employer was put on notice of the *harmful propensities* of the [agent/employee/contractor]." *Id.*  Liability for negligent retention "occurs after employment begins, where the employer knows or should know of an employee's unfitness and fails to take further action such as investigating, discharge or reassignment." *Id.*

232.    Upon information and belief, several MCMC employees, including female physicians, nurses, and staff, have reported Dr. Ben-David to MSMC for inappropriate behavior tantamount to discrimination and harassment, only to later suffer retaliatory actions sanctioned by MSMC. Further, Dr. Ben-David and MSMC, though its agents, used their position of power to

extort General Releases, similar to the conduct carried out by MSMC's counsel, Arnie Jaffe. Mr. Jaffe, on behalf of MSMC and Dr. Ben-David, had open conversations with Dr. Finkelstein's former legal counsel, Barry Wax, representing more than once that the Completion Documents would only be provided after she signed a General Release. On January 27, 2021, Mr. Jaffe, on behalf of MSMC, have drafted an agreement title "Full and Final Release of All Claims," which Mr. Jaffe shared with Dr. Finkelstein's counsel so that she would return it signed.

233.    Thus, MSMC is liable for any and all acts performed by Dr. Ben-David and Arnie Jaffe that this Court deems to have occurred outside the scope of his employment.

234.    As a result of the Defendants' actions, Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

WHEREFORE, Plaintiff, Dr. Paige Finkelstein, requests that this Court enter judgment in her favor in the amount excess of $75,000 for the damages hereinabove specified, together with interest thereon and costs of this action, together with all further relief deemed just and proper by this Court.

## COUNT XX – EMERGENCY INJUNCTION
### (Against Defendants MSMC and Dr. Ben-David)

235.    This is an action for the imposition of emergency injunctive relief.

236.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

237.    A district court may grant a preliminary injunction only when the moving party demonstrates: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest. *See Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011) (citing *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005).)

238.    The purpose of preliminary injunctive relief is to preserve the status quo between the parties and to prevent irreparable injury until the merits of the lawsuit itself can be reviewed. *See Diaz v. Inch*, No. 19-23954-CV, 2019 WL 12361883, at *2 (S.D. Fla. Oct. 11, 2019) (citing *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994).) This necessitates that the relief sought in the motion be closely related to the conduct complained of in the actual complaint. *Id.* It should further be noted that the persons from whom the injunctive relief is sought must be a party to the underlying action. *Id.* (citing *Infant Formula Antitrust Litig., MDL 878 v. Abbott Lab'ys*, 72 F.3d 842, 842–42 (11th Cir. 1995).)

239.    A showing of irreparable harm is "the sine qua non of injunctive relief." *Id.* (citing *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990).) The injury must be "[n]either remote nor speculative, but actual and imminent." *Id.* (citing *Bruce v. Reese*, 431 F. App'x 805, 807 (11th Cir. 2011).) An injury is "irreparable" only if it cannot be undone through monetary remedies. *Id.* (citing *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987).)

240.    Plaintiff requests that an Emergency Injunction be entered by this Honorable Court prohibiting Dr. Ben-David from providing any information to Third Parties relating to the

performance by Dr. Finkelstein as a General Surgery Resident at Mount Sinai and requiring another representative of MSMC to be agreed upon by Plaintiff and MSMC, to provide such information in a fair and objective way whenever MSMC is asked about Dr. Finkelstein.

i.   Merits Of The Claim

241.   Plaintiff is entitled Injunctive Relief because she is likely to prevail on the merits of this case and will suffer irreparable harm if Injunctive Relief is not granted.

242.   There is a substantial likelihood that Dr. Finkelstein would succeed on all counts it brings against Defendants, including for: (1) Count I- Wrongful Termination and Breach Of Contract (against Dr. Ben-David); (2) Count II- Wrongful Termination and Breach Of Contract (Against MSMC); (3) Count III- Intentional Infliction of Emotional Distress (against Dr. Ben-David); (4) Count IV- Intentional Infliction of Emotional Distress (against MSMC); (5) Count V – Tortious Interference (against Dr. Ben-David); (6) Count VI – Tortious Interference (against MSMC); (7) Count VII- Defamation (against Dr. Ben-David); (8) Count VIII- Defamation (against MSMC); (9) Count IX- Extortion (against Dr. Ben-David and MSMC); (10) Count X – Sex Discrimination in Violation of Title VII of The Civil Rights Act Of 1964; (11) Count XI – Sex Discrimination in Violation of The Florida Civil Rights Act; (12) Count XII – Retaliation in Violation of Title VII of The Civil Rights Act Of 1964; (13) Count XIII – Retaliation in Violation of The Florida Civil Rights Act; (14) Count XIV –Discrimination in Violation of The Americans with Disabilities Act; (15) Count XV –Retaliation in Violation of The Americans With Disabilities Act; (16) Count XVI – Sexual Harassment; (17) Count XVII –Vicarious Liability; (18) Count XVIII – Negligent Supervision; (19) Count XIX- Negligent Retention; (20) Count XX- Emergency Injunction; (21) Count XXI- Temporary Injunction; (22) Count XXII- Permanent Injunction. Each one of the counts brought by Dr. Finkelstein against Defendants represents the violation of a

cognizable substantive claim to which she can successfully demonstrate a likelihood of success on the merits. Likewise, this Court must grant the relief sought under Plaintiff's Motion.

ii.   <u>Likelihood Of Immediate And Irreparable Harm</u>

243.   Without the requested remedy, Dr. Finkelstein faces irreparable harm as she is precluded from completing her Surgical Residency Program as required to fulfill her aspirations to become a reconstructive surgeon. This is the type of harm that has no adequate remedy at law in monetary damages.

244.   Defendants' misconduct has caused, and continues to cause, Dr. Finkelstein irreparable harm by not only directly interfering with her attempts to secure a spot with a new residency program but also actively interfering with Plaintiff's attempt to earn an income with her medical training. Absent this Court granting the requested relief under Plaintiff's Motion, Dr. Finkelstein will continue to suffer irreparable harm to her professional and academic endeavors as Defendants continue to spread falsities about her tenure as a resident on the Surgical Residency Program.

245.   The type of harm the Defendants continue to inflict upon Dr. Finkelstein is irreparable because it is the kind of damage is not entirely reduced to a perfect calculation. *Hatfield v. AutoNation, Inc.*, 939 So. 2d 155, 157 (Fla. Dist. Ct. App. 2006) (citing to *JonJuan Salon, Inc. v. Acosta*, 922 So. 2d 1081, 1084 (Fla. Dist. Ct. App. 2006), holding that "[A]n injury is irreparable where the damage is estimable only by conjecture, and not by any accurate standard.")

246.   In fact, the harm inflicted on Plaintiff caused by Defendants' misconduct is so pervasive and widespread that Dr. Finkelstein can only speculate on the magnitude of the ramifications of Defendants' intimidation tactics and defamatory campaigns because it is still undetermined the extent to which Defendants misrepresented relevant facts pertaining to Dr. Finkelstein's tenure as a general surgery resident at MSMC, and to how many potential employers

and residency programs these falsities have intentionally been shared with. Defendants' persistence in extorting Dr. Finkelstein's signature and agreement to a General Release exonerating Defendants from any potential claims Dr. Finkelstein may otherwise have had against Defendants have likely cost her surgical career and continue to stop her from earning an income as a medical professional.

247. Additionally, since Defendant's misconduct has precluded Dr. Finkelstein from earning an income as a medical professional and continue to develop her career as a physician, she has also been denied the right to make more favorable student loans payment which is only available for a limited period of time, a right that cannot be reduced to a monetary amount, and which continues to cause Plaintiff harm that can only be speculated. At the outset of the Covid-19 pandemic, and as one of the measures implemented to address some of the financial hardships imposed by the then-novel Global epidemic, the Federal Government ordered that federal student loan borrowers be allowed to skip payments. *See* Haverstock, Eliza, "WHEN DO STUDENT LOAN PAYMENTS RESUME?" (Jan 10, 2023). (Available at https://www.nerdwallet.com/article/loans/student-loans/federal-student-loan-forbearance-extended-yet-again).

248. The interest loans were set to 0%, and collections activities have been halted on default loans. *Id.* Since then, the federal government, via both the Trump and Biden administrations, has renewed this student loan forbearance program several times, and it was supposed to expire by January 2023. *Id.* However, this latest expiration date has expired without further guidance, placing loaners such as Plaintiff in limbo. This occurred due to a policy providing partial relief to loaners, as this policy is currently being challenged for its constitutionality and pending Supreme Court decision. Thus, this ongoing constitutional challenge to the proposed

policy, which has effectively extended the original federal student loan program indefinitely, allows thousands of loaners such as Plaintiff to repay federal loans faster as any payments submitted during this forbearance period go directly towards the loan's principle. Likewise, but for Defendants' continuous interference with Plaintiff's attempt secure new employment and be able to earn an income with her surgical and medical training precludes Plaintiff from submitting loan payment under these indisputably more beneficial conditions like others similarly situated.

249.    Defendants' misconduct, which includes, but is not limited to, intentionally delaying the release of Dr. Finkelstein's records and the Completion Documents, as well as a continuous defamatory campaign, far from an innocent mistake, was intentionally executed by Defendants by utilizing questionable methods which have caused, and continue to cause, Dr. Finkelstein to suffer mental anguish, emotional distress, humiliation and embarrassment, as Dr. Finkelstein was rendered unable to complete her residency program by Defendants' conduct, has suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

250.    Additionally, any allegations that Plaintiff is not entitled to a temporary injunction because she delayed seeking this injunction are wholly unfounded and not supported by the facts because Defendants continued to withhold her access to her records and Completion Documents until after the filing of Plaintiff's Motion. Further, until the parties have fully complied with the discovery process, this Court cannot determine with any degree of certainty that Defendants are not still engaged in the alleged misconduct.

251.    Because the harm to which the relief sought by Plaintiff's Motion is the type to which Plaintiff can only estimate by conjecture, Plaintiff did not impermissibly delay seeking this

remedy, and Dr. Finkelstein has requested a permanent injunction, this Court must find that the type of harm being inflicted by Defendants upon Dr. Finkelstein is irreparable, thus justifying the granting of Plaintiff's Motion.

iii.   The Threatened Injury To Defendant If The Emergency Injunction Is Granted, If Any, Is Minimal, Speculative, And Remote.

252.   Dr. Finkelstein's educational and professional background sufficiently show that she is qualified to either join a new residency program, where she could continue her education under more impartial circumstances, but that she is also qualified to act as a medical professional, as indicated by MSBI's job offer. Likewise, instead of having the intention of protecting society at large, Defendants' misconduct is solely designed to intimidate Dr. Finkelstein into signing a General Release, thus avoiding the medical community and the community at large, learning of Defendants' impermissible misconduct.

253.   Clearly, Dr. Finkelstein's injury without an injunction outweighs the impact an injunction would have on Defendants. Indeed, Defendants would not suffer any injury at all if Dr. Ben-David were enjoined from divulging defamatory remarks about Dr. Finkelstein. Dr. Finkelstein's statements to residency programs and prospective employers are false, and he should not be making them to begin with.

iv.   An Injunction Is Consistent With The Public Interest

254.   Here, the public interest in precluding the chilling effect that the defamatory campaigns perpetuated as retaliation for reporting discriminatory practices can cause weighs in favor of enjoining Defendants from any further violation of Dr. Finkelstein's rights.

255.   Granting the Injunctive Relief sought pursuant to Plaintiff's Motion serves the public interest by avoiding the chilling effect that Defendants' misconduct was designed to have on any potential witnesses. Here, Public Interest is served when this Court avoids the chilling effect

that intimidation, extortion, and defamatory campaigns, such as the one being used by MSMC and Dr. Ben-David, individually and on behalf of MSMC, can have on potential witnesses or victims of similar misconduct and/or discriminatory practices. Further, the public interest is further served by virtue of exposing the alleged misconduct to potential applicants to the Surgical Residency Program so that applicants can be fully informed of the program's conditions before committing to a match with MSMC.

WHEREFORE, the Plaintiff, Dr. Paige Finkelstein, respectfully requests that this Court grant her Emergency Injunctive Relief as hereinabove stated for the reasons provided above, together with all further relief deemed just and proper by this Court.

## COUNT XXI – TEMPORARY INJUNCTION
### (Against Defendants MSMC and Dr. Ben-David)

256.    Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

257.    A district court may grant a preliminary injunction only when the moving party demonstrates: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest. *See Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011) (citing *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005).)

258.    The purpose of preliminary injunctive relief is to preserve the status quo between the parties and to prevent irreparable injury until the merits of the lawsuit itself can be reviewed. *See Diaz v. Inch*, No. 19-23954-CV, 2019 WL 12361883, at *2 (S.D. Fla. Oct. 11, 2019) (citing *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994).) This necessitates that the relief sought in

the motion be closely related to the conduct complained of in the actual complaint. *Id.* It should further be noted that the persons from whom the injunctive relief is sought must be a party to the underlying action. *Id.* (citing *Infant Formula Antitrust Litig., MDL 878 v. Abbott Lab'ys*, 72 F.3d 842, 842–42 (11th Cir. 1995).)

259.    A showing of irreparable harm is "the sine qua non of injunctive relief." *Id.* (citing *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990).) The injury must be "[n]either remote nor speculative, but actual and imminent." *Id.* (citing *Bruce v. Reese*, 431 F. App'x 805, 807 (11th Cir. 2011).) An injury is "irreparable" only if it cannot be undone through monetary remedies. *Id.* (citing *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987).)

260.    Plaintiff requests that an Emergency Injunction be entered by this Honorable Court prohibiting Dr. Ben-David from providing any information to Third Parties relating to the performance by Dr. Finkelstein as a General Surgery Resident at Mount Sinai and requiring another representative of MSMC to be agreed upon by Plaintiff and MSMC, to provide such information in a fair and objective way.

i.   Merits Of The Claim

261.    Plaintiff is entitled Injunctive Relief because she is likely to prevail on the merits of this case and will suffer irreparable harm if Injunctive Relief is not granted.

262.    There is a substantial likelihood that Dr. Finkelstein would succeed on all counts it brings against Defendants, including for: (1) Count I- Wrongful Termination and Breach Of Contract (against Dr. Ben-David); (2) Count II- Wrongful Termination and Breach Of Contract (Against MSMC); (3) Count III- Intentional Infliction of Emotional Distress (against Dr. Ben-David); (4) Count IV- Intentional Infliction of Emotional Distress (against MSMC); (5) Count V – Tortious Interference (against Dr. Ben-David); (6) Count VI – Tortious Interference (against

MSMC); (7) Count VII- Defamation (against Dr. Ben-David); (8) Count VIII- Defamation (against MSMC); (9) Count IX- Extortion (against Dr. Ben-David and MSMC); (10) Count X – Sex Discrimination in Violation of Title VII of The Civil Rights Act Of 1964; (11) Count XI – Sex Discrimination in Violation of The Florida Civil Rights Act; (12) Count XII – Retaliation in Violation of Title VII of The Civil Rights Act Of 1964; (13) Count XIII – Retaliation in Violation of The Florida Civil Rights Act; (14) Count XIV –Discrimination in Violation of The Americans with Disabilities Act; (15) Count XV –Retaliation in Violation of The Americans With Disabilities Act; (16) Count XVI – Sexual Harassment; (17) Count XVII –Vicarious Liability; (18) Count XVIII – Negligent Supervision; (19) Count XIX- Negligent Retention; (20) Count XX- Emergency Injunction; (21) Count XXI- Temporary Injunction; (22) Count XXII- Permanent Injunction.

263.    Each one of the counts brought by Dr. Finkelstein against Defendants represents the violation of a cognizable substantive claim to which she can successfully demonstrate a likelihood of success on the merits. Likewise, this Court must grant the relief sought under Plaintiff's Motion.

ii.    <u>Likelihood Of Immediate And Irreparable Harm</u>

264.    Without the requested remedy, Dr. Finkelstein faces irreparable harm as she is precluded from completing her Surgical Residency Program as required to fulfill her aspirations to become a reconstructive surgeon. This is the type of harm that has no adequate remedy at law in monetary damages.

265.    Defendants' misconduct has caused, and continues to cause, Dr. Finkelstein irreparable harm by not only directly interfering with her attempts to secure a spot with a new residency program but also actively interfering with Plaintiff's attempt to earn an income with her medical training. Absent this Court granting the requested relief under Plaintiff's Motion, Dr. Finkelstein will continue to suffer irreparable harm to her professional and academic endeavors as

Defendants continue to spread falsities about her tenure as a resident on the Surgical Residency Program.

266.    The type of harm the Defendants continue to inflict upon Dr. Finkelstein is irreparable because it is the kind of damage is not entirely reduced to a perfect calculation. *Hatfield v. AutoNation, Inc.*, 939 So. 2d 155, 157 (Fla. Dist. Ct. App. 2006) (citing to *JonJuan Salon, Inc. v. Acosta*, 922 So. 2d 1081, 1084 (Fla. Dist. Ct. App. 2006), holding that "[A]n injury is irreparable where the damage is estimable only by conjecture, and not by any accurate standard.")

267.    In fact, the harm inflicted on Plaintiff caused by Defendants' misconduct is so pervasive and widespread that Dr. Finkelstein can only speculate on the magnitude of the ramifications of Defendants' intimidation tactics and defamatory campaigns because it is still undetermined the extent to which Defendants misrepresented relevant facts pertaining to Dr. Finkelstein's tenure as a general surgery resident at MSMC, and to how many potential employers and residency programs these falsities have intentionally been shared with. Defendants' persistence in extorting Dr. Finkelstein's signature and agreement to a General Release exonerating Defendants from any potential claims Dr. Finkelstein may otherwise have had against Defendants have likely cost her surgical career and continue to stop her from earning an income as a medical professional.

268.    Additionally, since Defendant's misconduct has precluded Dr. Finkelstein from earning an income as a medical professional and continue to develop her career as a physician, she has also been denied the right to make more favorable student loans payment which is only available for a limited period of time, a right that cannot be reduced to a monetary amount, and which continues to cause Plaintiff harm that can only be speculated. At the outset of the Covid-19 pandemic, and as one of the measures implemented to address some of the financial hardships

imposed by the then-novel Global epidemic, the Federal Government ordered that federal student loan borrowers be allowed to skip payments. *See* Haverstock, Eliza, "WHEN DO STUDENT LOAN PAYMENTS RESUME?" (Jan 10, 2023). (Available at https://www.nerdwallet.com/article/loans/student-loans/federal-student-loan-forbearance-extended-yet-again).

269.    The interest loans were set to 0%, and collections activities have been halted on default loans. *Id.* Since then, the federal government, via both the Trump and Biden administrations, has renewed this student loan forbearance program several times, and it was supposed to expire by January 2023. *Id.* However, this latest expiration date has expired without further guidance, placing loaners such as Plaintiff in limbo. This occurred due to a policy providing partial relief to loaners, as this policy is currently being challenged for its constitutionality and pending Supreme Court decision. Thus, this ongoing constitutional challenge to the proposed policy, which has effectively extended the original federal student loan program indefinitely, allows thousands of loaners such as Plaintiff to repay federal loans faster as any payments submitted during this forbearance period go directly towards the loan's principle. Likewise, but for Defendants' continuous interference with Plaintiff's attempt secure new employment and be able to earn an income with her surgical and medical training precludes Plaintiff from submitting loan payment under these indisputably more beneficial conditions like others similarly situated.

270.    Defendants' misconduct, which includes, but is not limited to, intentionally delaying the release of Dr. Finkelstein's records and the Completion Documents, as well as a continuous defamatory campaign, far from an innocent mistake, was intentionally executed by Defendants by utilizing questionable methods which have caused, and continue to cause, Dr. Finkelstein to suffer mental anguish, emotional distress, humiliation and embarrassment, as Dr.

Finkelstein was rendered unable to complete her residency program by Defendants' conduct, has suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

271.    Additionally, any allegations that Plaintiff is not entitled to a temporary injunction because she delayed seeking this injunction are wholly unfounded and not supported by the facts because Defendants continued to withhold her access to her records and Completion Documents until after the filing of Plaintiff's Motion. Further, until the parties have fully complied with the discovery process, this Court cannot determine with any degree of certainty that Defendants are not still engaged in the alleged misconduct.

272.    Because the harm to which the relief sought by Plaintiff's Motion is the type to which Plaintiff can only estimate by conjecture, Plaintiff did not impermissibly delay seeking this remedy, and Dr. Finkelstein has requested a permanent injunction, this Court must find that the type of harm being inflicted by Defendants upon Dr. Finkelstein is irreparable, thus justifying the granting of Plaintiff's Motion.

iii.    <u>The Threatened Injury To Defendant If The Emergency Injunction Is Granted, If Any, Is Minimal, Speculative, And Remote.</u>

273.    Dr. Finkelstein's educational and professional background sufficiently show that she is qualified to either join a new residency program, where she could continue her education under more impartial circumstances, but that she is also qualified to act as a medical professional, as indicated by MSBI's job offer. Likewise, instead of having the intention of protecting society at large, Defendants' misconduct is solely designed to intimidate Dr. Finkelstein into signing a General Release, thus avoiding the medical community and the community at large, learning of Defendants' impermissible misconduct.

274.     Clearly, Dr. Finkelstein's injury without an injunction outweighs the impact an injunction would have on Defendants. Indeed, Defendants would not suffer any injury at all if Dr. Ben-David were enjoined from divulging defamatory remarks about Dr. Finkelstein. Dr. Ben-David's statements to residency programs and prospective employers are false, and he should not be making them to begin with.

iv.     <u>An Injunction Is Consistent With The Public Interest</u>

275.     Here, the public interest in precluding the chilling effect that the defamatory campaigns perpetuated as retaliation for reporting discriminatory practices can cause weighs in favor of enjoining Defendants from any further violation of Dr. Finkelstein's rights.

276.     Granting the Injunctive Relief sought pursuant to Plaintiff's Motion serves the public interest by avoiding the chilling effect that Defendants' misconduct was designed to have on any potential witnesses. Here, Public Interest is served when this Court avoids the chilling effect that intimidation, extortion, and defamatory campaigns, such as the one being used by MSMC and Dr. Ben-David, individually and on behalf of MSMC, can have on potential witnesses or victims of similar misconduct and/or discriminatory practices. Further, the public interest is further served by virtue of exposing the alleged misconduct to potential applicants to the Surgical Residency Program so that applicants can be fully informed of the program's conditions before committing to a match with MSMC.

WHEREFORE, the Plaintiff, Dr. Paige Finkelstein, respectfully requests that this Court grant her Temporary Injunctive Relief as hereinabove stated for the reasons provided upon, together with all further relief deemed just and proper by this Court, and that the Court convert that Temporary Injunction to a Permanent Injunction after the trial of this matter by the trier of fact.

**COUNT XXII – PERMANENT INJUNCTION**

**(Against Defendants MSMC and Dr. Ben-David)**

277.     This is an action for the imposition of permanent injunctive relief.

278.     Plaintiff incorporates, reiterates, and restates all of the Allegations Common to All Counts as more fully as set forth and full.

279.     Plaintiff requests that a Permanent Injunction be entered by this Honorable Court prohibiting Dr. Ben-David from providing any information to Third Parties relating to the performance by Dr. Finkelstein as a General Surgery Resident at Mount Sinai and requiring another representative of MSMC to be agreed upon by Plaintiff and MSMC, to provide such information in a fair and objective way.

280.     In order to obtain a permanent injunction, the moving party must show: "(1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief." *UBS Fin. Servs., Inc. v. Bounty Gain Enterprises, Inc.*, No. 14-81603-CIV, 2016 WL 1541438, at *6 (S.D. Fla. Apr. 11, 2016) (citing *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005).)

i.     Merits Of The Claim

281.     Plaintiff is entitled Injunctive Relief because she is likely to prevail on the merits of this case and will suffer irreparable harm if Injunctive Relief is not granted.

282.     There is a substantial likelihood that Dr. Finkelstein would succeed on all counts it brings against Defendants, including for: (1) Count I- Wrongful Termination and Breach Of Contract (against Dr. Ben-David); (2) Count II- Wrongful Termination and Breach Of Contract (Against MSMC); (3) Count III- Intentional Infliction of Emotional Distress (against Dr. Ben-David); (4) Count IV- Intentional Infliction of Emotional Distress (against MSMC); (5) Count V – Tortious Interference (against Dr. Ben-David); (6) Count VI – Tortious Interference (against

MSMC); (7) Count VII- Defamation (against Dr. Ben-David); (8) Count VIII- Defamation (against MSMC); (9) Count IX- Extortion (against Dr. Ben-David and MSMC); (10) Count X – Sex Discrimination in Violation of Title VII of The Civil Rights Act Of 1964; (11) Count XI – Sex Discrimination in Violation of The Florida Civil Rights Act; (12) Count XII – Retaliation in Violation of Title VII of The Civil Rights Act Of 1964; (13) Count XIII – Retaliation in Violation of The Florida Civil Rights Act; (14) Count XIV –Discrimination in Violation of The Americans with Disabilities Act; (15) Count XV –Retaliation in Violation of The Americans With Disabilities Act; (16) Count XVI – Sexual Harassment; (17) Count XVII –Vicarious Liability; (18) Count XVIII – Negligent Supervision; (19) Count XIX- Negligent Retention; (20) Count XX- Emergency Injunction; (21) Count XXI- Temporary Injunction; (22) Count XXII- Permanent Injunction.

283.    Each one of the counts brought by Dr. Finkelstein against Defendants represents the violation of a cognizable substantive claim to which she can successfully demonstrate a likelihood of success on the merits. Likewise, this Court must grant the relief sought under Plaintiff's Motion.

ii.    <u>There is no adequate remedy at law for the violation of Dr. Finkelstein's rights;</u>

284.    Because the harm to which the relief sought by Plaintiff's Motion is the type to which Plaintiff can only estimate by conjecture, Plaintiff did not impermissibly delay seeking this remedy, and Dr. Finkelstein has requested a permanent injunction, this Court must find that the type of harm being inflicted by Defendants upon Dr. Finkelstein is irreparable, thus justifying the granting of Plaintiff's Motion.

iii.    <u>Likelihood Of Immediate And Irreparable Harm</u>

285.    Without the requested remedy, Dr. Finkelstein faces irreparable harm as she is precluded from completing her Surgical Residency Program as required to fulfill her aspirations

to become a plastic surgeon. This is the type of harm that has no adequate remedy at law in monetary damages.

286.    Defendants' misconduct has caused, and continues to cause, Dr. Finkelstein irreparable harm by not only directly interfering with her attempts to secure a spot with a new residency program but also actively interfering with Plaintiff's attempt to earn an income with her medical training. Absent this Court granting the requested relief under Plaintiff's Motion, Dr. Finkelstein will continue to suffer irreparable harm to her professional and academic endeavors as Defendants continue to spread falsities about her tenure as a resident on the Surgical Residency Program.

287.    The type of harm the Defendants continue to inflict upon Dr. Finkelstein is irreparable because it is the kind of damage is not entirely reduced to a perfect calculation. *Hatfield v. AutoNation, Inc.*, 939 So. 2d 155, 157 (Fla. Dist. Ct. App. 2006) (citing to *JonJuan Salon, Inc. v. Acosta*, 922 So. 2d 1081, 1084 (Fla. Dist. Ct. App. 2006), holding that "[A]n injury is irreparable where the damage is estimable only by conjecture, and not by any accurate standard.")

288.    In fact, the harm inflicted on Plaintiff caused by Defendants' misconduct is so pervasive and widespread that Dr. Finkelstein can only speculate on the magnitude of the ramifications of Defendants' intimidation tactics and defamatory campaigns because it is still undetermined the extent to which Defendants misrepresented relevant facts pertaining to Dr. Finkelstein's tenure as a general surgery resident at MSMC, and to how many potential employers and residency programs these falsities have intentionally been shared with. Defendants' persistence in extorting Dr. Finkelstein's signature and agreement to a General Release exonerating Defendants from any potential claims Dr. Finkelstein may otherwise have had against

Defendants have likely cost her surgical career and continue to stop her from earning an income as a medical professional.

289.    Additionally, since Defendant's misconduct has precluded Dr. Finkelstein from earning an income as a medical professional and continue to develop her career as a physician, she has also been denied the right to make more favorable student loans payment which is only available for a limited period of time, a right that cannot be reduced to a monetary amount, and which continues to cause Plaintiff harm that can only be speculated. At the outset of the Covid-19 pandemic, and as one of the measures implemented to address some of the financial hardships imposed by the then-novel Global epidemic, the Federal Government ordered that federal student loan borrowers be allowed to skip payments. *See* Haverstock, Eliza, "WHEN DO STUDENT LOAN PAYMENTS RESUME?" (Jan 10, 2023). (Available at https://www.nerdwallet.com/article/loans/student-loans/federal-student-loan-forbearance-extended-yet-again).

290.    The interest loans were set to 0%, and collections activities have been halted on default loans. *Id.* Since then, the federal government, via both the Trump and Biden administrations, has renewed this student loan forbearance program several times, and it was supposed to expire by January 2023. *Id.* However, this latest expiration date has expired without further guidance, placing loaners such as Plaintiff in limbo. This occurred due to a policy providing partial relief to loaners, as this policy is currently being challenged for its constitutionality and pending Supreme Court decision. Thus, this ongoing constitutional challenge to the proposed policy, which has effectively extended the original federal student loan program indefinitely, allows thousands of loaners such as Plaintiff to repay federal loans faster as any payments submitted during this forbearance period go directly towards the loan's principle. Likewise, but

for Defendants' continuous interference with Plaintiff's attempt secure new employment and be able to earn an income with her surgical and medical training precludes Plaintiff from submitting loan payment under these indisputably more beneficial conditions like others similarly situated.

291.     Defendants' misconduct, which includes, but is not limited to, intentionally delaying the release of Dr. Finkelstein's records and the Completion Documents, as well as a continuous defamatory campaign, far from an innocent mistake, was intentionally executed by Defendants by utilizing questionable methods which have caused, and continue to cause, Dr. Finkelstein to suffer mental anguish, emotional distress, humiliation and embarrassment, as Dr. Finkelstein was rendered unable to complete her residency program by Defendants' conduct, has suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

292.     Additionally, any allegations that Plaintiff is not entitled to a temporary injunction because she delayed seeking this injunction are wholly unfounded and not supported by the facts because Defendants continued to withhold her access to her records and Completion Documents until after the filing of Plaintiff's Motion. Further, until the parties have fully complied with the discovery process, this Court cannot determine with any degree of certainty that Defendants are not still engaged in the alleged misconduct.

293.     Plaintiff is entitled to permanent injunctive relief because: (1) she is likely to prevail on the merits of this case and will suffer irreparable harm if injunctive relief is not granted, (2) without the requested remedy, Dr. Finkelstein faces irreparable harm as she is precluded from completing her Surgical Residency Program as required to fulfill her aspirations to become a

reconstructive surgeon, and (3) the type of violation of Dr. Finkelstein's rights is the type of harm that has no adequate remedy at law in monetary damages.

294.   Here, the public interest in precluding the chilling effect that the defamatory campaigns perpetuated as retaliation for reporting discriminatory practices can cause weighs in favor of enjoining Defendants from any further violation of Dr. Finkelstein's rights.

WHEREFORE, the Plaintiff, Dr. Paige Finkelstein, respectfully requests that this Court grant her Temporary Injunctive Relief as hereinabove stated for the reasons provided upon, together with all further relief deemed just and proper by this Court, and that the Court convert that Temporary Injunction to a Permanent Injunction after the trial of this matter by the trier of fact.

### JURY TRIAL DEMAND

Plaintiffs demand a trial by jury for all claims so triable as of right.

Dated: July 25, 2023.                          Respectfully submitted,

                                               */s/ Richard H. Levenstein*

Richard H. Levenstein
Florida Bar No. 235296
Gabrielle O. Sliwka
Florida Bar No. 1022654
Abby M. Spears
Florida Bar No. 44662
Primary E-mail: rlevenstein@nasonyeager.com
gsliwka@nasonyeager.com;
aspears@nasonyeager.com
Secondary E-mail: ptreadway@nasonyeager.com;
creyes@nasonyeager.com
NASON, YEAGER, GERSON,
HARRIS & FUMERO, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, Florida 33410
Telephone:     (561) 686-3307
*Attorneys for Plaintiff, Paige Finkelstein, M.D.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was emailed on July 25, 2023, or in the manner specified on all counsel or parties of record on the Service List below:

***<u>Attorneys for Defendant, Mount Sinai Medical Center of Florida and Defendant, Kfir Ben-David, MD</u>***
Martin B. Goldberg, Esq.
David R. Ruffner, Esq.
Clark Splichal, Esq.
Ashley P. Singrossi, Esq.
Lash & Goldberg LLP
Miami Tower
100 S.E. 2nd Street
Suite 1200
Miami, Florida 33131
Primary Email: mgoldberg@lashgoldberg.com; csplichal@lashgoldberg.com
druffner@lashgoldberg.com; asingrossi@lashgoldberg.com
Secondary Email: rdiaz@lashgoldberg.com; mwallace@lashgoldberg.com

***<u>Attorneys for Defendant, Kfir Ben-David, MD</u>***
Gary A. Orseck, Esq.
Lauren Cassady Andrews, Esq.
Kramer, Levin, Naftalis, & Frankel, LLP
2000 K Street, NW, 4th Floor
Washington, DC  20006
Primary Email: gorseck@kramerlevin.com; landrews@kramerlevin.com


By:    /s/ Richard H. Levenstein
          Richard H. Levenstein
          Florida Bar No. 235296
          Gabrielle O. Sliwka
          Florida Bar No. 1022654
          Abby M. Spears
          Florida Bar No. 44662