IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF FLORIDA

MIAMI DIVISION

| | |
|---|---|
| PAIGE FINKELSTEIN, M.D., ) | |
| ) | |
| Plaintiff, ) | Case No. 1:23-CV-20188-RKA |
| ) | |
| v. ) | |
| ) | |
| MOUNT SINAI MEDICAL CENTER OF ) | |
| FLORIDA, INC., a Florida Not For Profit ) | |
| Corporation, and KFIR BEN-DAVID, M.D., ) | |
| ) | |
| Defendants. | |

**PLAINTIFF'S EXPEDITED MOTION FOR ENTRY OF TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS,
<u>MOUNT SINAI MEDICAL CENTER AND KFIR BEN-DAVID, M.D.</u>**

Page(s)

Cases

17-CV-22620-KMW,
    2017 WL 6987706 (S.D. Fla. July 14, 2017) ............................................................................... 7
*Arthur J. Gallagher Serv. Co. v. Egan*,
    514 F. App'x 839 (11th Cir. 2013) ........................................................................................... 18
*Axelrod v. Califano*,
    357 So. 2d 1048 (Fla. Dist. Ct. App. 1978) ............................................................................. 12
*Blizzard v. Appliance Direct, Inc.*,
    16 So. 3d 922 (Fla. Dist. Ct. App. 2009)................................................................................. 16
*Datto v. Univ. of Miami*,
    No. 18-CV-21053, 2019 WL 13255542 (S.D. Fla. Nov. 18, 2019)............................................ 8
*Elrod v. Burns*,
    427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) .......................................................... 19
*Fac. Senate of Fla. Int'l Univ. v. Winn*,
    477 F. Supp. 2d 1198 (S.D. Fla. 2007).................................................................................. 8, 9
*Fernandez-Roque v. Smith*,
    671 F.2d 426 (11th Cir. 1982).................................................................................................. 8
*Fla. Atl. Univ. Bd. of Trustees v. Parsont*,
    No. 19-81644-CIV, 2020 WL 4501808 (S.D. Fla. May 8, 2020) ............................................. 8
*Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*,
    601 F.2d 199 (5th Cir. 1979).................................................................................................... 8
*Gayle v. Meade*,
    No. 20-21553-CIV, 2020 WL 3041326 (S.D. Fla. June 6, 2020) ........................................... 18
*Gay-Straight All. of Okeechobee High Sch. v. Sch. Bd. of Okeechobee Cnty.*,
    483 F. Supp. 2d 1224 (S.D. Fla. 2007)................................................................................... 22
*Gonzalez ex rel. Gonzalez v. Reno*,
    No. 00-11424-D, 2000 WL 381901 (11th Cir. Apr. 19, 2000) ................................................. 9
*Greenberg v. BellSouth Telecommunications, Inc.*,
    498 F.3d 1258 (11th Cir. 2007).............................................................................................. 14
*Hart v. United States*,
    894 F.2d 1539 (11th Cir. 1990).............................................................................................. 11
*Hodge v. Hughes*,
    No. 18-CV-21571, 2018 WL 2688800 (S.D. Fla. Apr. 23, 2018) ............................................ 7
*Holly*,
    492 F.3d............................................................................................................................... 15
*Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*,
    783 So. 2d 353 (Fla. Dist. Ct. App. 2001)......................................................................... 16, 17
*In re Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*,
    524 F. Supp. 3d 1346 (S.D. Fla. 2021)................................................................................... 10
*Leon v. Cont'l AG*,
    301 F. Supp. 3d 1203 (S.D. Fla. 2017)................................................................................... 13
*Linafelt v. Beverly Enterprises-Fla., Inc.*,
    745 So. 2d 386 (Fla. Dist. Ct. App. 1999).............................................................................. 12

*Nazareth v. Herndon Ambulance Serv., Inc.*,
   467 So. 2d 1076 (Fla. Dist. Ct. App. 1985) ................................................................ 16
*Nicholas v. Bd. of Trustees of Univ. of Alabama*,
   251 F. App'x 637 (11th Cir. 2007) ............................................................................. 14
*Noah v. Assor*,
   379 F. Supp. 3d 1284 (S.D. Fla. 2019) ....................................................................... 11
*Oliver v. Fam. Tree Concept, Inc.*,
   No. 17-24659-CIV, 2018 WL 3413036 (S.D. Fla. Apr. 4, 2018) ............................... 18
*Schiavo ex rel. Schindler v. Schiavo*,
   403 F.3d 1223 (11th Cir. 2005) .................................................................................... 7
*Shedrick v. Dist. Bd. of Trustees of Miami-Dade Coll.*,
   941 F. Supp. 2d 1348 (S.D. Fla. 2013) ....................................................................... 15
*Sussman v. Fla. E. Coast Properties, Inc.*,
   557 So. 2d 74 (Fla. Dist. Ct. App. 1990) .................................................................... 17
*Thomas v. Jacksonville Television, Inc.*,
   699 So. 2d 800 (Fla. Dist. Ct. App. 1997) .................................................................. 12
*TransUnion Risk & Alternative Data Sols., Inc. v. Challa*,
   676 F. App'x 822 (11th Cir. 2017) ............................................................................. 18
*Valenzuela v. GlobeGround N. Am., LLC*,
   18 So. 3d 17 (Fla. Dist. Ct. App. 2009) ...................................................................... 14
*Witover v. Celebrity Cruises, Inc.*,
   161 F. Supp. 3d 1139 (S.D. Fla. 2016) ....................................................................... 17
*Yule v. Ocean Reef Cmty. Ass'n*,
   No. 19-10138-CIV, 2020 WL 3051505 (S.D. Fla. June 8, 2020) .............................. 11

Statutes

18 U.S.C.A. § 1962 (West) ................................................................................................ 13
42 U.S.C.A. § 2000e-3(a) (West) ...................................................................................... 15
42 U.S.C.A. § 12102(1) (West) ......................................................................................... 15
42 U.S.C.A. § 12112(b)(5)(A) ........................................................................................... 15
Fla. Stat. Ann. § 760.10(7) (West) .................................................................................... 15

Rules

Fed. R. Civ. P. 65 ................................................................................................................ 4

COMES NOW the Plaintiff, PAIGE FINKELSTEIN, MD, MPH ("Dr. Finkelstein" or "Plaintiff"), by and through her undersigned counsel of record, pursuant to Fed. R. Civ. P. 65 moves, on an expedited basis pursuant to Local Rule 7.1(d)(2), the Court for entry of a Temporary Restraining Order, and upon expiration of the temporary restraining order, a preliminary injunction against MOUNT SINAI MEDICAL CENTER OF FLORIDA, INC. ("MSMC"), a Florida Not for Profit Corporation, and KFIR BEN-DAVID, M.D. ("Dr. Ben David" or "Residency Program Director") (together, "Defendants"), compelling MSMC to engage in good faith negotiations with Dr. Finkelstein to denominate and appoint a new faculty member of the Surgical Residency Program to address any inquiries submitted by academic and/or professional entities. In support thereof, Dr. Finkelstein respectfully refers the Court to the following Memorandum of Law.

## SUMMARY OF ARGUMENT AND GROUNDS FOR RELIEF

Dr. Finkelstein submits that her Verified Motion for Emergency Temporary Injunction ("Plaintiff's Motion" or the "Motion") must be granted because it requests injunctive relief specifically requested to preserve the status quo and prevent Defendants from further continuous and intentional misconduct, such as tortious interference with prospective employment and educational contracts, as well as a defamatory campaign designed to harm Dr. Finkelstein's reputation and professional pursuit.

## FACTUAL BACKGROUND

1. Dr. Finkelstein submits this Motion for Temporary Injunction, not as a grudge, but as a wholly justified effort to salvage her medical career from further harm, which harm continues to be caused by Defendants' misconduct. Also, as further detailed and explained in Plaintiff's Second Amended Complaint for Injunctive Relief and Damages, filed on February 17, 2023, Defendants' misconduct, failures, and negligence in administrating and supervising MSMC's General Surgery Residency Program (the "Surgical Residency Program") have harmed, and continue to harm and interfere with Dr. Finkelstein's academic and professional pursuits. A copy of Plaintiff's Second Amended Complaint for Injunctive Relief and Damages is attached hereto as **Exhibit "1."** ("Second Amended Complaint" Or "SAC.")

2. Defendant Dr. Ben-David was designated by MSMC as program director and made responsible for the residency program, thus being accountable for the entire program. *See* Exhibit S to Finkelstein Decl. at 39-40. As such, Dr. Ben-David, on behalf of MSMC, was expected to be a role model for faculty members and residents, both professionally and morally. *Id*., at 52, 69-72.



*Id.*

3. Since Plaintiff's forced resignation from the Surgical Residency Program, Defendants refused to release to Dr. Finkelstein, even after she retained legal representation, documents that are required to be provided to every resident by the American Counsel of Graduate Medical Education (ACGME), including, but not limited to, a Summative Evaluation, Proof of Completion for at least two years of surgical residency, and her Diploma for completing the intern year of the General Surgery Residency ("Completion Documents"), unless Plaintiff agreed to sign a Non-Disclosure Agreement and General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing Defendants from liability with respect to any and all claims related to Dr. Finkelstein's Surgical Residency Program experience. A copy of Dr. Finkelstein's Affidavit addressing her account of the events is attached hereto as **Exhibit "2."** ("Finkelstein Decl."); *see also* Exhibit X to Finkelstein Decl. Defendants, Dr. Ben-David and MSMC, only provided Dr. Finkelstein with the Completion Documents after Dr. Finkelstein filed a Complaint with the ACGME and this lawsuit. *See* SAC at ¶¶ 10-11.

4. While seeking access to her record, which is essential to Dr. Finkelstein's attempts to mitigate the damages sustained by her as a result of the Defendants' mismanagement of the

Surgical Residency Program, Plaintiff continued to seek and apply to be matched with other residency programs. *See* Finkelstein Decl. at ¶¶ 32-41. Likewise, although Plaintiff sought to, and continues to, do her best to mitigate the damages sustained by her this far as a result of Defendants' misconduct and negligence, most of which cannot be reduced to a monetary value, Defendants sought to, and continue to seek to, intimidate Dr. Finkelstein into signing a Non-Disclosure Agreement and General Release in favor of Defendants, as well as by continuously failing to disclose records and information which are material to Plaintiff's endeavors to secure new academic and/or professional opportunities, or provide incomplete and/or incorrect information to Dr. Finkelstein's prospective new resident programs or employers. *See* Second Amended Complaint at ¶¶ 10-11, 33-36; 39-45; 49-51. *see also* Finkelstein Decl. at ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB.

5. Dr. Finkelstein's efforts were ultimately torpedoed by Defendants, who continued to impermissibly withhold Plaintiff's records, as well as providing either incomplete or false information when approached by representatives of residency programs or prospective employers. Finkelstein Decl. at ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB. Defendants' intentional misconduct and defamatory campaign continue to victimize Dr. Finkelstein, thus continuously inflicting injury to her career and academic pursuits and attempts to mitigate damages, thus consistently avoiding the maintenance of the status quo, to which the parties, including Plaintiff, is entitled to until this Court makes a final decision on the case at hand and its multiple claims.

6. As such, solely as a means to preserve the status quo by preventing incurring further damages, monetary or otherwise, Dr. Finkelstein moved this Court to grant Plaintiff's Motion, not as a vindictive stratagem or with a wicked animus, but as a last resort to ensure the maintenance of the status quo. With Plaintiff's Motion, Dr. Finkelstein seeks to finally stop Defendants from causing further harm to Dr. Finkelstein's academic and professional efforts and, thus, increasing the damages inflicted upon Dr. Finkelstein by Defendants' intentional misconduct and/or negligence. Moreover, Plaintiff's Motion will further ensure the preservation of the status quo by precluding Defendants from interfering with Dr. Finkelstein's abilities to continue her career as a medical professional, thus mitigating Plaintiff's damages, monetary or otherwise.

## **MEMORANDUM OF LAW**

7. To obtain a temporary restraining order, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not

granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that the entry of the relief would serve the public interest." *Hodge v. Hughes*, No. 18-CV-21571, 2018 WL 2688800, at *1 (S.D. Fla. Apr. 23, 2018). The same standards apply to requests for a temporary restraining order. *See J.P. Morgan Sec. LLC v. McBee*, 17-CV-22620-KMW, 2017 WL 6987706, at *1 (S.D. Fla. July 14, 2017) ("To obtain a temporary restraining order, a movant must demonstrate: '(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; (4) that entry of the relief would serve the public interest.'") (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005)).

8. Generally, the purpose of a preliminary injunction is to preserve the status quo, typically by prohibiting certain conduct by a party. *Datto v. Univ. of Miami*, No. 18-CV-21053, 2019 WL 13255542, at *8 (S.D. Fla. Nov. 18, 2019), *report and recommendation adopted,* No. 18-21053-CIV, 2019 WL 13255528 (S.D. Fla. Dec. 30, 2019). "One inherent characteristic of a temporary restraining order"—which distinguishes it from a preliminary injunction—"is that it has the effect of merely preserving the status quo rather than granting most or all of the substantive relief requested in the complaint." *Fla. Atl. Univ. Bd. of Trustees v. Parsont*, No. 19-81644-CIV, 2020 WL 4501808, at *1 (S.D. Fla. May 8, 2020) (citing *Fernandez-Roque v. Smith*, 671 F.2d 426, 429 (11th Cir. 1982).)

9. Here, an application of the facts to the aforementioned factors weighs strongly in favor of granting a temporary restraining order and preliminary injunction to Dr. Finkelstein, and absent temporary and preliminary injunctive relief, Dr. Finkelstein will continue to suffer irreparable harm as a result of the Defendants' unlawful conduct.

I. **Dr. Finkelstein Is Likely To Succeed On the Merits of Her Claims**

10. Plaintiff is entitled to Injunctive Relief because, based on the records, she is likely to prevail on the merits of this case and will suffer irreparable harm if Injunctive Relief is not granted. *Fac. Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1203 (S.D. Fla. 2007); *see also* SAC, generally. The determination of whether there is a substantial likelihood of success on the merits "does not contemplate a finding of fixed quantitative value. Rather, a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Faculty Senate of Florida Intern.*

*University*, 477 F. Supp. 2d at 1203 (quoting *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 (5th Cir. 1979).) For example, where " 'the balance of equities weighs heavily in favor of granting the [injunction],' the movant[s] need only show a substantial case on the merits." *Faculty Senate of Florida Intern. University*, 477 F. Supp. 2d at 1203 (quoting *Gonzalez ex rel. Gonzalez v. Reno*, No. 00-11424-D, 2000 WL 381901, at *1 (11th Cir. Apr. 19, 2000) (citation omitted).)

11. It is well documented that: (i) that Defendants devised an illegal enterprise to extort a General Release of all Claims and Non-Disclosure Agreement Non-Disclosure Agreement and General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience, as a pre-condition to producing to Plaintiff the Completion Documents, which Defendants were required to provide to her by law, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* SAC ¶¶ 33-36; 125-136. *See also* Finkelstein Decl. ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB; (ii) that Dr. Ben-David, individually and on behalf of MSMC, sought to advance this illegal enterprise by providing false or otherwise incomplete information to prospective residency programs and employers, intentionally interfering with Dr. Finkelstein's ability to secure a new position. *See* SAC ¶¶ 39-42; 83-124. *See also* Finkelstein Decl. ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB; (iii) that Dr. Finkelstein is well qualified for the positions of resident and house-surgeon. Finkelstein Decl. ¶¶ 32-41; Exhibits Y and Z; (iv) that Dr. Finkelstein has Attention Deficit Hyperactivity Disorder ("ADHD"). *See* SAC ¶¶ 18-19; 182-195. *See also* Finkelstein Decl. ¶14; Exhibits G and H; (v) that Dr. Ben-David, individually and on behalf of MSMC, and MSMC denied the accommodations that Defendants knew Dr. Finkelstein was entitled to while a resident at MSMC. *See* Finkelstein Decl. ¶14; (vi) that Defendants violated the Graduate Medical Education Program Agreement ("GME Agreement") by both fostering a hostile work environment in which sexual discrimination and harassment ran rampant, as well as by virtue of failing to ensure an educational environment in which residents such as Dr. Finkelstein could raise and resolve issues without fear of intimidation or retaliation. *See* SAC ¶¶ 20-24; 137-160. *See also* Finkelstein Decl. ¶19; Exhibit S at 52, 69, 72, 93, 94, 231, and 232; (vii) that Dr. Ben-David, individually and/or on behalf of MSMC, subjected Dr. Finkelstein to a relentless campaign to discredit her, ultimately leading to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her

training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter. *See* SAC ¶¶ 39-42; 83-124. *See also* Finkelstein Decl. 32-41; Exhibits W, X, Y, Z, AA, and BB; (viii) that Defendants subjected Dr. Finkelstein, a woman, to discrimination based on her gender. *See* SAC ¶¶ 33-36; 137-160. *See also* Finkelstein Decl. ¶¶ 8, 29; Exhibits B and C; (ix) that Defendants retaliated against Dr. Finkelstein's reporting of sexual discrimination and harassment. *See* SAC ¶¶ 33-36; 161-181. *See also* Finkelstein Decl. ¶¶ 9, 15, 19, 26, and 33; Exhibits P, T, and W; (x) that Dr. Ben-David is aware of Dr. Finkelstein's knowledge of his personal affairs. *See* Finkelstein Decl. ¶28; and (xi) that Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment as a result of the Defendants' actions, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake. *See* Second Amended Complaint, generally; *see also* Finkelstein Decl. at ¶¶ 32-41, Exhibits W, X, Y, Z, AA, and BB.

### a. The Wrongful Termination and Breach Of Contract Claims:

12. Dr. Finkelstein is substantially likely to succeed in her breach of contract claims. To state a claim for breach of contract under Florida law, a plaintiff must plead and establish (1) the existence of a contract, (2) a material breach of that contract, and (3) damages resulting from the breach. *In re Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*, 524 F. Supp. 3d 1346 (S.D. Fla. 2021).

13. Dr. Finkelstein is likely to prove that MSMC and Dr. Ben-David, as part of the obligations created by the Agreement, were required to provide a harassment-free work environment for Dr. Finkelstein to perform her duties as Resident Physician, pursuant to Paragraph 6 of the Graduate Medical Education Program Agreement. *See* SAC ¶¶ 39-42; 54-82, Exhibit A. *See also* Finkelstein Decl. ¶¶20, 31; Exhibit S at 52, 69, 72, 93, 94, 231, and 232.

14. Exhibit A. MSMC has breached the above-mentioned GME Agreement provision by both fostering a hostile work environment in which sexual discrimination and harassment ran rampant, as well as by virtue of failing to ensure an educational environment in which residents such as Dr. Finkelstein could raise and resolve issues without fear of intimidation or retaliation.

### b. Intentional Infliction of Emotional Distress Claims:

15. Dr. Finkelstein is substantially likely to succeed in her intentional infliction of emotional distress claims. *See* SAC ¶¶ 39-42; 83-103. *See also* Finkelstein Decl. ¶¶32-41; Exhibits W, X, Y, Z, AA, and BB.

16. To state a claim for intentional infliction of emotional distress under Florida law, Dr. Finkelstein must allege that: (1) Defendants engaged in intentional or reckless conduct; (2) the conduct was "outrageous"; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. *Yule v. Ocean Reef Cmty. Ass'n*, No. 19-10138-CIV, 2020 WL 3051505, at *5 (S.D. Fla. June 8, 2020) (citing *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990).) What constitutes "outrageous" conduct is a question of law. *Id.* (citing *Noah v. Assor*, 379 F. Supp. 3d 1284, 1299 (S.D. Fla. 2019).)

17. Dr. Finkelstein is likely to prove that she was the victim of a relentless campaign to discredit her perpetrated by Dr. Ben-David, individually and on behalf of MSMC, which ultimately led to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter.

   c. **Tortious Interference Claims:**

18. Dr. Finkelstein is substantially likely to succeed in her tortious interference claims. *See* SAC ¶¶ 39-42; 104-112. *See also* Finkelstein Decl. ¶¶32-41; Exhibits W, X, Y, Z, AA, and BB.

19. The elements of the tort of intentional interference with an advantageous business relationship are (1) the existence of a business relationship not necessarily evidenced by an enforceable contract, (2) the knowledge of the relationship on the part of the defendant, (3) an intentional and unjustified interference with that relationship by the defendant, and (4) damage to the plaintiff as the result of the breach of the relationship. *Linafelt v. Beverly Enterprises-Fla., Inc.*, 745 So. 2d 386, 389 (Fla. Dist. Ct. App. 1999).

20. Dr. Finkelstein is likely to prove that Dr. Ben-David made representations so disparaging of Dr. Finkelstein's professionalism, which, although not based on factual evidence, resulted in Dr. Finkelstein losing her position as a House Surgeon at Mount Sinai Beth Israel.

   d. **Defamation Claims:**

21. Dr. Finkelstein is substantially likely to succeed in her defamation claims. *See* SAC ¶¶ 39-42; 113-124. *See also* Finkelstein Decl. ¶¶32-41; Exhibits W, X, Y, Z, AA, and BB.

22. The elements of a defamation claim include "a false and defamatory statement concerning another." *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 803 (Fla. Dist. Ct. App. 1997). A defamatory statement is one that tends to harm someone's reputation in the community or deters others from associating with the person. *See id.* "When the words published concerning a person tend to degrade him, bring him into ill repute, destroy confidence in his integrity, or cause other like injury, such language is actionable per se." *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. Dist. Ct. App. 1978).

23. Dr. Finkelstein is likely to prove that Dr. Ben-David, individually and on behalf of MSMC, has defamed Dr. Finkelstein by capriciously providing statements to prospective employers, statements that were "knowingly false," "deliberately misleading," or "rendered with a malicious purpose." *Linafelt*, 745 So. 2d at 389. Specifically, Dr. Ben David's misrepresentations pertaining to Dr. Finkelstein's "lack of professionalism" or "abilities" as a prospective resident or medical professional to residency programs or prospective employers, whether done individually or on behalf of MSMC, were knowingly false and not based on her experience as a member of the Surgical Residency Program. This is easily verifiable by comparing Dr. Ben-David's assessment, who had observed Dr. Finkelstein as a resident only a handful of times, to the assessment made by Dr. Finkelstein's faculty and mentors, as she has received several recommendation letters which debunk the falsities divulged by Dr. Ben-David with the purpose of tarnishing Dr. Finkelstein's reputation.

  e. **Extortion Claims:**

24. Dr. Finkelstein is substantially likely to succeed in her extortion claim. *See* SAC ¶¶ 33-36; 125-136. *See also* Finkelstein Decl. 32-41; Exhibits W, X, Y, Z, AA, and BB. To state a civil RICO claim, Plaintiff must successfully allege that Defendants: (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity. *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1232 (S.D. Fla. 2017). An enterprise, for purposes of civil claim under RICO, must possess three qualities: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. 18 U.S.C.A. § 1962 (West). Id. Similarly, a pattern of racketeering activity is shown when a racketeer commits at least two distinct but related predicate acts. *Leon*, 301 F. Supp. 3d at 1232.

25. Dr. Finkelstein is likely to prove that the Defendants, through MSMC's counsel, Arnie Jaffe, had open conversations with Dr. Finkelstein's former legal counsel, Barry Wax,

representing more than once that the Completion Documents would only be provided after she signed a General Release and a Non-Disclosure Agreement. *See* SAC ¶¶ 33-36; 125-136. *See also* Finkelstein Decl. 32-41; Exhibits W, X, Y, Z, AA, and BB. Further, Dr. Ben-David, individually and on behalf of MSMC, engaged in this concerted effort by disseminating disparaging comments about Plaintiff to prospective employers and residency programs across the country, including California, Florida, and New York, mischaracterizing Dr. Finkelstein's tenure as a resident at MSMC, consistently referring to her as unprofessional, in efforts to discredit her. The falsities spread by Dr. Ben-David as part of this illegal enterprise were so injurious that a prospective employer advised Dr. Finkelstein that she should consider a career outside of clinical medicine.

    **f. Sex Discrimination in Violation of Title VII of The Civil Rights Act Of 1964 and Sex Discrimination in Violation of The Florida Civil Rights Act Claims:**

26.    Dr. Finkelstein is substantially likely to succeed in her sex discrimination claims. *See* SAC ¶¶ 33-36; 137-160. *See also* Finkelstein Decl. ¶¶ 8, 29; Exhibits B and C. In order to succeed on a claim of sex discrimination under Title VII or the FCRA, a plaintiff must first establish a prima facie case, which requires a showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside her protected class more favorably. *Nicholas v. Bd. of Trustees of Univ. of Alabama*, 251 F. App'x 637, 643 (11th Cir. 2007). FCRA claims are subject to the same analysis as Title VII claims. *See Valenzuela v. GlobeGround N. Am., LLC*, 18 So. 3d 17, 21–22 (Fla. Dist. Ct. App. 2009).

27.    Dr. Finkelstein is likely to prove that the Defendants have routinely subjected Dr. Finkelstein, a woman, qualified for her position as a resident, to discrimination based on her gender. During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein voiced her concerns about the disparate treatment of female and male residents; while male residents were provided appropriate safety equipment, including, but not limited to, female residents were only provided ill-fitting equipment, such as gloves and lead aprons, which exposed female residents to the risk of thyroid cancer and other illnesses.

    **g. Discrimination in Violation of The Americans with Disabilities Act Claim:**

28.    Dr. Finkelstein is substantially likely to succeed in her discrimination in violation of the ADA claim. *See* SAC ¶¶ 33-36; 182-195. *See also* Finkelstein Decl. ¶14; Exhibits G and H. In order to establish a prima facie case of employment discrimination under the ADA, a plaintiff

must show that: (1) she has a disability; (2) she is a qualified individual; and (3) the employer discriminated against her because of her disability. *Id.* (citing *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007)) (interpreting prior version of Act).)

29. Dr. Finkelstein is likely to prove that (1) her AD/HD status is a significant mental impairment that substantially limits one or more major life; (2) she is fully qualified to hold a position as a resident; and (3) Dr. Ben-David and MSMC's agents unlawfully discriminated against her because of her disability by not making reasonable accommodations to her knows mental limitations when Dr. Finkelstein was otherwise qualified to perform her job, and the accommodations would not impose an undue hardship on the operation of the General Surgery Residency Program. *See* 42 U.S.C.A. § 12112(b)(5)(A); see also *Holly*, 492 F.3d at 1262; 42 U.S.C.A. § 12102(1) (West).

### h. Retaliation Claims:

30. Dr. Finkelstein is substantially likely to succeed in her retaliation claims. *See* SAC ¶¶ 33-36; 161-181. *See also* Finkelstein Decl. ¶¶ 9, 15, 19, 26, and 33; Exhibits P, T, and W. Plaintiffs asserting retaliation claim under Title VII or Florida Civil Rights Act (FCRA) must show that (1) she engaged in protected activity, (2) she suffered an adverse action, and (3) causal link exists between protected activity and adverse action; "protected activity" may involve opposing unlawful employment practices or participating in making charge, testifying, assisting, or participating in any manner in investigation, proceeding, or hearing regarding unlawful employment practices. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a) (West); Fla. Stat. Ann. § 760.10(7) (West). *See also Shedrick v. Dist. Bd. of Trustees of Miami-Dade Coll.*, 941 F. Supp. 2d 1348 (S.D. Fla. 2013).

31. Dr. Finkelstein is likely to prove that Defendants have regularly perpetrated actions that constitute discrimination under the ADA, and other impermissible unlawful employment practices, which Plaintiff has objected to and reported to her superiors, only to be met with retaliation by virtue of being placed under unwarranted probations, and eventually wrongfully forced out of the Surgical Residency Program.

### i. Sexual Harassment Claim:

32. Dr. Finkelstein is substantially likely to succeed in her sexual harassment claim. To establish a hostile work environment sexual harassment claim based on harassment by a

supervisor, Plaintiff must show: (1) that she is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there is a basis for holding the employer liable. *Blizzard v. Appliance Direct, Inc.*, 16 So. 3d 922, 927 (Fla. Dist. Ct. App. 2009).

33. Dr. Finkelstein is likely to prove that the Defendants have routinely subjected Dr. Finkelstein, a woman, to a hostile environment caused by rampant sexual harassment.

  **j.**  **Vicarious Liability Claim:**

34. Dr. Finkelstein is substantially likely to succeed in her vicarious liability claim. Under the doctrine of respondeat superior, an employer can be held liable for the tortious or criminal acts of an employee when the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer. *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 356–57 (Fla. Dist. Ct. App. 2001) (citing *Nazareth v. Herndon Ambulance Serv., Inc.*, 467 So. 2d 1076, 1078 (Fla. Dist. Ct. App. 1985)). An employee's conduct is within the scope of his or her employment where: (1) the conduct is of the kind he or she was employed to perform; (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed; and (3) the conduct is activated at least in part by a purpose to serve the master. *Id.* at 357 (citing *Sussman v. Fla. E. Coast Properties, Inc.*, 557 So. 2d 74, 75–76 (Fla. Dist. Ct. App. 1990)).

35. Dr. Finkelstein is likely to prove that Defendant MSMC is vicariously liable for Dr. Ben-David's misconduct because Dr. Ben-David's misconduct was committed during the course of his employment as the Director of the General Surgery Residency Program at MSMC and to further MSMC's interests in raising MSMC's Surgical Residency Program's prestige.

  **k.**  **Negligent Supervision and Retention Claims:**

36. Dr. Finkelstein is substantially likely to succeed on her negligent supervision and negligent hiring claims. Like claims for negligent supervision, to state a claim for negligent hiring or retention against a principal, a plaintiff must prove that "(1) the agent/employee/contractor was incompetent or unfit to perform the work; (2) the employer knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate

cause of the plaintiff's injury." *Witover v. Celebrity Cruises, Inc.*, 161 F. Supp. 3d 1139, 1148 (S.D. Fla. 2016). To satisfy the second element of a negligent hiring or retention claim, a plaintiff must allege facts "showing that the employer was put on notice of the *harmful propensities* of the [agent/employee/contractor]." *Id.* Liability for negligent retention "occurs after employment begins, where the employer knows or should know of an employee's unfitness and fails to take further action such as investigating, discharge or reassignment." *Id.*

37. Dr. Finkelstein is likely to prove, through the process of discovery, that several MCMC employees, including female physicians, nurses, and staff, have reported Dr. Ben-David to MSMC for inappropriate behavior tantamount to discrimination and harassment, only to later suffer retaliatory actions sanctioned by MSMC. Further, Dr. Ben-David and MSMC, through its agents, used their position of power to extort General Releases and Non-Disclosure Agreements, similar to the conduct carried out by MSMC's counsel, Arnie Jaffe. Thus, MSMC is liable for any and all acts performed by Dr. Ben-David and Arnie Jaffe that this Court deems to have occurred outside the scope of their employment.

WHEREFORE, Dr. Finkelstein is likely to succeed on the merits of her claims, and this Court must grant the relief sought under Plaintiff's Motion.

## II. Dr. Finkelstein Is Being Irreparably Harmed By Defendants' Conduct

38. Defendants' misconduct has caused, and continues to cause, Dr. Finkelstein irreparable harm by not only directly interfering with her attempts to secure a spot with a new residency program but also actively interfering with Plaintiff's attempt to earn an income with her medical training. *See* Second Amended Complaint at ¶¶ 33-51; *see also* Finkelstein Decl. at ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB. Absent this Court granting the requested relief under this Motion, Dr. Finkelstein will continue to suffer irreparable harm to her professional and academic endeavors as Defendants continue to spread falsities about her tenure as a resident on the Surgical Residency Program. Furthermore, the record reflects that Dr. Finkelstein has been unable to continue her medical training without obtaining a truthful verification of her tenure at MSMC. Since securing a match with a new residency program is an integral aspect of becoming a reconstructive surgeon, Dr. Finkelstein will suffer irreparable harm if the requested relief is not granted.

39. In general, "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Oliver v. Fam. Tree Concept, Inc.*, No. 17-24659-CIV, 2018 WL 3413036, at *2 (S.D.

Fla. Apr. 4, 2018) (quoting *Arthur J. Gallagher Serv. Co. v. Egan*, 514 F. App'x 839, 843 (11th Cir. 2013).) Moreover, "[f]or an injury to be irreparable, it must be 'neither remote nor speculative, but actual and imminent.' " *Id.* (quoting *TransUnion Risk & Alternative Data Sols., Inc. v. Challa*, 676 F. App'x 822, 825 (11th Cir. 2017).) "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 3041326, at *20 (S.D. Fla. June 6, 2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).)

40. Dr. Finkelstein sufficiently alleges with specificity why the level of harm inflicted upon her by Defendants is irreparable. *See* Second Amended Complaint at ¶¶ 33-51; *see also* Finkelstein Decl. at ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB. In fact, the harm inflicted on Plaintiff caused by Defendants' misconduct is so pervasive and widespread that Dr. Finkelstein cannot definitively ascertain the magnitude of the ramifications of Defendants' intimidation tactics and defamatory campaigns because it is still undetermined the extent to which Defendants misrepresented relevant facts pertaining to Dr. Finkelstein's tenure as a general surgery resident at MSMC, and to how many potential employers and residency programs these falsities have intentionally been shared with. Defendants' persistence in extorting Dr. Finkelstein's signature and agreement to a Non-Disclosure Agreement and General Release exonerating Defendants from any potential claims Dr. Finkelstein may otherwise have had against Defendants have likely cost her surgical career and continue to stop her from earning an income as a medical professional.

41. Defendants continued to withhold Dr. Finkelstein's access to her records and Completion Documents until after the filing of this lawsuit and a Complaint with the ACGME. Further, until the parties have fully complied with the discovery process, this Court cannot determine with any degree of certainty that Defendants are not still engaged in the alleged misconduct.

42. Additionally, since Defendant's misconduct has precluded Dr. Finkelstein from earning an income as a medical professional and continuing to develop her career as a physician, she has also been denied the right to make more favorable student loans payment which is only available for a limited period of time, a right that cannot be reduced to a monetary amount, and which continues to cause Plaintiff harm that can only be speculated. At the outset of the Covid-19 pandemic, and as one of the measures implemented to address some of the financial hardships imposed by the then-novel Global epidemic, the Federal Government ordered that federal student

loan borrowers be allowed to skip payments. *See* Haverstock, Eliza, "When do Student Loan Payments Resume?" (Jan 10, 2023). (Available at https://www.nerdwallet.com/article/loans/student-loans/federal-student-loan-forbearance-extended-yet-again). The interest loans were set to 0%, and collections activities have been halted on default loans. *Id.* Since then, the federal government, via both the Trump and Biden administrations, has renewed this student loan forbearance program several times, and it was supposed to expire by January 2023. *Id.* However, this latest expiration date has expired without further guidance, placing loaners such as Plaintiff in limbo. This occurred due to a policy providing partial relief to loaners, as this policy is currently being challenged for its constitutionality and pending Supreme Court decision. Thus, this ongoing constitutional challenge to the proposed policy, which has effectively extended the original federal student loan program indefinitely, allows thousands of loaners such as Plaintiff to repay federal loans faster as any payments submitted during this forbearance period go directly towards the loan's principle. Likewise, but for Defendants' continuous interference with Plaintiff's attempt secure new employment and be able to earn an income with her surgical and medical training precludes Plaintiff from submitting loan payment under these indisputably more beneficial conditions like others similarly situated.

43. Defendants' misconduct, which includes, but is not limited to, intentionally delaying the release of Dr. Finkelstein's records and the Completion Documents, as well as a continuous defamatory campaign, far from an innocent mistake, was intentionally executed by Defendants by utilizing questionable methods which have caused, and continue to cause, Dr. Finkelstein to suffer mental anguish, emotional distress, humiliation, and embarrassment, as Dr. Finkelstein was rendered unable to complete her residency program by Defendants' conduct, has suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

**III.   The Balance Of Hardships Weighs Decisively In Dr. Finkelstein's Favor**

44. The balance of hardships favors Dr. Finkelstein. Compliance with a preliminary injunction will require only that Defendant MSMC engage in good faith negotiations with Dr. Finkelstein to denominate and appoint a new faculty member of the Surgical Residency Program to address any inquiries submitted by academic and/or professional entities.

45. Dr. Finkelstein's educational and professional background sufficiently shows that she is qualified to either join a new residency program, where she could continue her education under more impartial circumstances, but that she is also qualified to act as a medical professional, as indicated by MSBI's job offer. Likewise, instead of having the intention of protecting society at large, Defendants' misconduct was solely designed to intimidate Dr. Finkelstein into signing a Non-Disclosure Agreement and General Release, thus avoiding the medical community and the community at large, learning of the treatment to which Dr. Finkelstein was subjected to by Defendants.

46. Clearly, Dr. Finkelstein's injury without an injunction outweighs the impact an injunction would have on the Defendants. Indeed, Defendants would not suffer any injury at all if Dr. Ben-David were enjoined from divulging defamatory and inflammatory remarks about Dr. Finkelstein. Dr. Finkelstein's statements to residency programs and prospective employers are false, and he should not be making them to begin with.

## IV.   The Public Interest Would Be Advanced By The Issuance Of The Requested Injunction

47. Here, the public interest in precluding the chilling effect that the defamatory campaigns perpetuated as retaliation for reporting discriminatory practices can cause weighs in favor of enjoining Defendants from any further violation of Dr. Finkelstein's rights. A preliminary injunction would not be adverse to the public interest; rather, as recognized in similar cases in other jurisdictions, it would ensure compliance with federal law and help protect valued constitutional expressive liberties. *Gay-Straight All. of Okeechobee High Sch. v. Sch. Bd. of Okeechobee Cnty.*, 483 F. Supp. 2d 1224, 1231 (S.D. Fla. 2007).

48. Granting the Injunctive Relief sought pursuant to Plaintiff's Motion serves the public interest by avoiding the chilling effect that the Defendants' misconduct was designed to have on any potential witnesses. Here, Public Interest is served when this Court avoids the chilling effect that intimidation, extortion, and defamatory campaigns, such as the one being used by MSMC and Dr. Ben-David, individually and on behalf of MSMC, can have on potential witnesses or victims of similar misconduct and/or discriminatory practices. Further, the public interest is further served by virtue of exposing the alleged misconduct to potential applicants to the Surgical Residency Program so that applicants can be fully informed of the program's conditions before committing to a match with MSMC.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, Paige Finkelstein, M.D., MPH, respectfully requests that the Court enter a Temporary Restraining Order:

1. Compelling MSMC and Dr. Ben-David to consent that Dr. Finkelstein can designate a new faculty member of the Surgical Residency Program of her choice to serve as reference provider, which MSMC and Dr. Ben-David shall not unreasonably withhold consent or object without just cause;

2. Restraining and enjoining Defendants from continuing to employ Defendants' intimidation tactics and defamatory campaigns against Dr. Finkelstein;

3. Setting Plaintiff's Motion for Preliminary Injunction for hearing on a date certain; and

4. Granting such further relief as the Court deems just and proper.

## CONCLUSION

WHEREFORE, the Plaintiff, Dr. Paige Finkelstein, respectfully requests that this Court grant her Temporary Restraining Order as hereinabove stated for the reasons provided above, together with all further relief deemed just and proper by this Court.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed with the Clerk of Court and served by E-Mail through the Florida Courts E-Filing Portal on February 24, 2023 to the following:

***Attorneys for Defendants***
Martin B. Goldberg, Esq.
David R. Ruffner, Esq.
Clark Splichal, Esq.
Lash & Goldberg LLP
Miami Tower
100 S.E. 2nd Street
Suite 1200
Miami, Florida 33131
Primary Email: mgoldberg@lashgoldberg.com; csplichal@lashgoldberg.com
druffner@lashgoldberg.com
Secondary Email: rdiaz@lashgoldberg.com; mwallace@lashgoldberg.com

*Attorneys for Plaintiff, Paige Finkelstein, M.D.*
NASON, YEAGER, GERSON,
HARRIS & FUMERO, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, Florida 33410
Telephone:   (561) 686-3307
Facsimile:   (561) 686-5442
Richard H. Levenstein, Esq.
Primary E-mail: rlevenstein@nasonyeager.com
Secondary E-mail: ptreadway@nasonyeager.com;
creyes@nasonyeager.com


By:   /s/ *Richard H. Levenstein*
      Richard H. Levenstein
      Florida Bar No. 235296