# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

PAIGE FINKELSTEIN, M.D., )
)
    Plaintiff, ) Case No. 1:23-CV-20188-RKA
)
v. )
)
MOUNT SINAI MEDICAL CENTER OF )
FLORIDA, INC., a Florida Not For Profit )
Corporation, and KFIR BEN-DAVID, M.D., )
)
    Defendants.

**PLAINTIFF'S, PAIGE FINKELSTEIN, REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT FOR HER EXPEDITED MOTION FOR ENTRY OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## PRELIMINARY STATEMENT

COMES NOW the Plaintiff, PAIGE FINKELSTEIN, MD, MPH ("Dr. Finkelstein" or "Plaintiff"), by and through her undersigned counsel of record, hereby submit this reply to Defendants' MOUNT SINAI MEDICAL CENTER OF FLORIDA, INC. ("MSMC"), a Florida Not for Profit Corporation, and KFIR BEN-DAVID, M.D. ("Dr. Ben David" or "Residency Program Director") (together, "Defendants"), Response in Opposition (the "Response") (ECF No. 60) to Plaintiff's Expedited Motion for Entry of Temporary Restraining Order and Preliminary Injunction (the "Motion") (ECF No. 39).

## FACTUAL BACKGROUND

Shortly after Dr. Finkelstein joined MSMC's surgical residency program (the "Program"), Defendants have consistently subjected DR. Finkelstein to discriminatory practices, both based on her gender and her ADHD status, as well as a hostile workplace and retaliation each time she exercised her right and duty to report such wrongdoings, and for reporting issues concerning the safety of patients. Additionally, after refusing to provide the legally required accommodations for Dr. Finkelstein's well-documented ADHD, which caused her American Board of Surgery In-Training Examination ("ABSITE") scores to suffer, Defendants forced Dr. Finkelstein out of the program using the very same traits which are known to be associated with ADHD as a pretext. *See* Response at 6. *See also* Plaintiff's Second Amended Complaint ("SAC") (ECF No. 38) at ¶¶ 183-194 (how the flaws raised by Defendants, such as issues with communication, impulsivity, and low testing scores, are commonly observed in adults with ADHD.)[1] All of these wrongful actions by the Defendants resulted in the forced resignation of Plaintiff, in lieu of her termination by MSMC.

Having both notice and knowledge of their wrongdoing, Defendants employed, and continue to employ, different manners to discredit Dr. Finkelstein and extort her into signing a Non-Disclosure Agreement and General Release agreeing not to divulge any events or facts concerning the Surgical Residency Program and releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience, as a pre-condition to receiving essential documents to her securing a placement with a new residency program, including a Summative Evaluation, Program Director's Letter, Proof of Completion for

---

[1] The ABSITE test is not a requirement of the American Board of Surgery for a Residents in accredited residency programs nor for board certification in General Surgery. (See Ex. A)

at least two years of surgical residency, and her Diploma for completing the intern year of the General Surgery Residency (the "Completion Documents"), which Defendants were required to provide to her by law. Further, Defendants continued to misrepresent the nature of the circumstances leading to Dr. Finkelstein's forced resignation, disseminating a false narrative to potential employers based upon vague and unspecified references to "professionalism" and other unspecified issues, thus precluding her from continuing her surgical education. Further, this attitude of the Defendants toward Plaintiff continues in their outrageous allegations about her in the pleadings filed in this action, i.e., that Plaintiff is "delusional", "fabricating evidence", and living in a "through the looking glass world".

Dr. Finkelstein refused to sign the Non-Disclosure Agreement and General Release, and, until the filing of this action and a complaint was filed with the ACGME, despite repeated demands, Defendants have refused to provide the Completion Documents to her, which caused Dr. Finkelstein to not succeed in her endeavors in securing a position at a new residency program to continue her surgical training. Also, although Defendants continue to misstate the nature of the communications between MSMC's agents and Dr. Ben-David with Dr. Finkelstein's prospective employers, even on the Response, there is substantial evidence that Dr. Ben-David held telephonic conversations with Dr. Finkelstein's prospective employers in which he deliberately disparaged Dr. Finkelstein's reputation as a resident, intentionally sabotaging her chances to secure a new residency program position, likely in furtherance of Defendants' attempts to extort a Non-Disclosure Agreement and General Release from Plaintiff. A copy of Dr. Goodman's Affidavit, a prospective employer's then Head of Surgical House-staff, is attached hereto as **Exhibit "B."**

As such, solely as a means to preserve the status quo by preventing incurring further damages, monetary or otherwise, Dr. Finkelstein moves this Court to grant Plaintiff's Motion, not as a vindictive stratagem or with a wicked animus, but as a last resort to ensure the maintenance of the status quo. With Plaintiff's Motion, Dr. Finkelstein seeks to stop Defendants from causing further harm to Dr. Finkelstein's academic and professional efforts and, thus, increasing the damages inflicted upon Dr. Finkelstein by Defendants' intentional misconduct and/or negligence. Moreover, the Motion will further ensure the preservation of the status quo by precluding Defendants from interfering with Dr. Finkelstein's abilities to continue her career as a medical professional, thus mitigating Plaintiff's damages, monetary or otherwise. Dr. Ben-David is, by his

post and present actions toward Plaintiff, even in this action, disqualified from ever providing any reference letter for Plaintiff, with any fairness, or objectivity.

## MEMORANDUM OF LAW

To obtain a temporary restraining order, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam). The requirements for issuing a preliminary injunction are the same as those for granting a temporary restraining order. *See* ; *see also Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994).

Defendants' attempt to heighten the applicable standard to decide whether a temporary injunction is warranted here falls short because it fails to explain how Plaintiff's Motion is, in reality, a Mandatory Injunction, which is generally disfavored and should only be used where the rights are clear and certain. *Spradley v. Old Harmony Baptist Church*, 721 So. 2d 735 (Fla. Dist. Ct. App. 1998). While Defendants rely on numerous legal authorities as well as a series of conclusory statements to advance the argument that Dr. Finkelstein is really seeking a mandatory injunction instead of a temporary one, they fail to explain how the case law cited is applicable in the case of Plaintiff's Motion. Further, while Dr. Finkelstein's right to the relief sought is clear, the remedy sought by Dr. Finkelstein by virtue of Plaintiff's Motion cannot be considered a mandatory injunction as, contrary to Defendants' conclusory statements, it does not seek to change the status quo. *See Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011) (holding that the purpose of the preliminary injunction is to preserve the positions of the parties as best the court can until a trial on the merits may be held.)

Generally, the purpose of a preliminary injunction is to preserve the status quo, typically by prohibiting certain conduct by a party. *Datto v. Univ. of Miami*, No. 18-CV-21053, 2019 WL 13255542, at *8 (S.D. Fla. Nov. 18, 2019), *report and recommendation adopted,* No. 18-21053-CIV, 2019 WL 13255528 (S.D. Fla. Dec. 30, 2019). "One inherent characteristic of a temporary restraining order"—which distinguishes it from a preliminary injunction—"is that it has the effect of merely preserving the status quo rather than granting most or all of the substantive relief requested in the complaint." *Fla. Atl. Univ. Bd. of Trustees v. Parsont*, No. 19-81644-CIV, 2020 WL 4501808, at *1 (S.D. Fla. May 8, 2020) (citing *Fernandez-Roque v. Smith*, 671 F.2d 426, 429 (11th Cir. 1982).)

Here, Dr. Finkelstein has met her burden for showing entitlement to a preliminary injunction by establishing the likelihood of success on the merits, the likelihood of irreparable harm, the inadequacy of a remedy at law, that the harm to Plaintiff outweighs the harm to Defendants and the public interest in protecting former employees from being extorted into signing General Release of all Claims and Non-Disclosure Agreement benefitting former employers or educational institutions.

Further, although Plaintiff has sought to mitigate the damages inflicted upon her by Defendants by seeking to secure placement at different residency programs, or even a position as a house surgeon, while Defendants have relentlessly sabotaged Plaintiff's attempts to mitigate her damages, Dr. Finkelstein continues to seek the preservation of the status quo, until such time a trial on the merits can be held, by asking this court to grant the remedy sought by virtue of Plaintiff's Motion, thus precluding Defendants from further inflicting irreparable harm upon Dr. Finkelstein. *Bloedorn*, 631 F.3d 1218.

Until such time as this Court grants Plaintiff's Motion, Defendants will continue to feel emboldened to sabotage Dr. Finkelstein's career in furtherance of their attempt to intimidate her into signing a Non-Disclosure Agreement and General Release benefiting Defendants.

## I. **Defendants Have Failed To Demonstrate Why Dr. Finkelstein Is Not Entitled To The Requested Injunctive Relief**

Defendants have advanced multiple arguments for denying the requested injunctive relief, none of which have merit.

### a. **Dr. Finkelstein has properly pled that she is entitled to the requested injunctive relief preventing Defendants from tortiously interfering with Plaintiff's contractual and business relationships**

The elements of the tort of intentional interference with an advantageous business relationship are (1) the existence of a business relationship not necessarily evidenced by an enforceable contract, (2) the knowledge of the relationship on the part of the defendant, (3) an intentional and unjustified interference with that relationship by the defendant, and (4) damage to the plaintiff as the result of the breach of the relationship. *Linafelt v. Beverly Enterprises-Fla., Inc.*, 745 So. 2d 386, 389 (Fla. Dist. Ct. App. 1999).

An action for intentional interference is appropriate "even though it is predicated on an unenforceable agreement, if the jury finds that an understanding between the parties would have been completed had the defendant not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*,

647 So. 2d 812, 814 (Fla. 1994) (citation omitted). Regular work for clients or with customers sufficiently establishes a protected business relationship. *See Ins. Field Servs., Inc. v. White & White Inspection & Audit Serv., Inc.*, 384 So. 2d 303 (Fla. Dist. Ct. App. 1980). Interference is "unjustified" or "wrongful" if, among other possibilities, it is unlawful or tortious, including defamatory. *See, e.g., Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So. 2d 1371, 1376 (Fla. Dist. Ct. App. 1987) (picketing with defamatory placards or messages); Restatement (Second) of Torts § 767 (1979) (unjustified (wrongful) conduct in tortious interference claim includes fraudulent misrepresentations and knowing defamations).

Dr. Finkelstein is likely to succeed in proving each of the foregoing elements. First, as described in the Goodman Declaration, in July 2021, Dr. Finkelstein received an offer from Mount Sinai Beth Israel ("MSBI") Hospital in New York to serve as a House Surgeon. *See* Plaintiff's Second Amended Complaint ("SAC") (ECF No. 38) at ¶99; *see also* SAC Ex. E; Goodman Decl. at ¶¶ 5-7. MSBI's surgical staff was excited to have Dr. Finkelstein join their team, as she had sufficient experience and was qualified for the house surgeon position. *See* SAC at ¶99, Ex. E-G; *see also* Goodman Decl. at ¶¶ 5-7.

Second, the facts and circumstances here clearly demonstrate that Defendants knew that Dr. Finkelstein had received an offer from MSBI, as Dr. Goodman contacted professionals involved with MSMC's General Surgery Residency Program, including Dr. Ayad, Dr. Lee, Dr. Bao, Dr. Burt, and Defendant, Dr. Ben-David, to obtain further information regarding Dr. Finkelstein's tenure at MSMC's General Surgery Residency Program. *See* Goodman Decl. at ¶¶ 8-9.

Third, Defendants' interference with Dr. Finkelstein's relationship with MSBI is clearly intentional and unjustified. Defendants, through Dr. Ben-David, as the Program Director, are specifically directing to Dr. Finkelstein's prospective employers and residency programs false statements calling into question Dr. Finkelstein's unspecified "professionalism"[2]. Defendants did this solely to damage Dr. Finkelstein's reputation as a means to extort from her a General Release of all Claims and Non-Disclosure Agreement, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience.

---

[2] See **Exhibit "C"**, the exhibits to the EEOC response (emails) submitted by the Defendants to the EEOC.

Fourth, it is obvious that Defendants' statements pertaining to Dr. Finkelstein, specifically when coming from Dr. Ben-David, as the Program Director, have and continue to irreparably harm Dr. Finkelstein. Here, Dr. Ben-David made representations so disparaging of Dr. Finkelstein's professionalism, which, although not based on factual evidence, and contradicted by Dr. Ayad, Dr. Lee, Dr. Bao, and Dr. Burt's positive references, resulted in Dr. Finkelstein losing her position as MSBI house surgeon. This is easily verifiable by comparing the assessment of Dr. Ben-David, who had observed Dr. Finkelstein perform surgery as a resident less than twelve times, to the assessments made by Dr. Finkelstein's faculty and mentors, as she has received several recommendation letters which debunk the falsities divulged by Dr. Ben-David with the purpose of tarnishing Dr. Finkelstein's reputation. *See* SAC ¶¶ 115- 116 and Ex. G and I; *see also* Finkelstein Decl. at ¶ 27, Ex. V. Thus, Dr. Ben-David created this narrative pertaining to Dr. Finkelstein's "unspecified professionalism issues" which are, even now, unverified but which served the purpose of sabotaging Plaintiff's attempts to resume her surgical education, thus causing Dr. Finkelstein to suffer irreparable harm. Also see **Exhibit "D"**, the Federation Credentials Verification Service Report, including MSMC's comments, and Plaintiff's responsive comments highlighted and/or underlined pages.

### b. Defendants Do Not, and Cannot, Prove The Statements At Issue Are True

Unlike Plaintiff, which has submitted affidavits on first-hand knowledge attesting to the falsity of the statements in this suit, Defendants have solely relied on affidavits that are, at best, inadmissible hearsay. That their submission is not reliable -- and their continuing proclivity for false statements -- is shown by their very opposition brief: "Plaintiff, a former surgical resident, was terminated from MSMC's surgical residency program (the "Program") based on her persistent unprofessionalism and mistreatment of patient and peers."

Based upon the guidance and instructions of MSMC and Dr. Ben-David, MSMC employees who had never interacted with Dr. Finkelstein submitted harmful documents designed solely to damage her reputation and force her out of the Program. *See* SAC at ¶¶ 199-206; Finkelstein Decl. at 12. However, this narrative pertaining to the "unspecified professionalism issues" is easily contradicted by the positive evaluations and references provided to Plaintiff by numerous others affiliated with Defendants and the Program, including Dr. Philip Bao, who was Dr. Ben-David's Assistant Program Director and second in command while the Plaintiff was a resident.

Further, the evidence reveals, and Dr. Finkelstein will demonstrate, that Defendants continued to circulate their falsities even though they knew Dr. Finkelstein's performance and behavior created no issues of professionalism, and was further retaliation as a result of her reporting issues of patient safety, and also related to her ADHD condition, Defendants were aware of Plaintiff's ADHA, but refused to provide the legally mandated accommodations as required to Dr. Finkelstein, Defendants weaponized her multiple reports of patient safety issues and her ADHD status by using the characteristics displayed by Dr. Finkelstein as a pretext to force her out of the program, essentially ending her medical career. *See* SAC at ¶¶ 199-206. Defendants' continued reliance on the false narrative created by Defendants as a pretext to dismiss Dr. Finkelstein from the Program, and later to ruin her reputation by tortiously interfering with her business relationships, is fraudulent and knowingly false.

### c. **The First Amendment Does Not Bar The Requested Relief**

Not being able to show that Defendants' statements about Dr. Finkelstein are true or privileged, Defendants attempt to attack the constitutionality of the injunctive relief requested by arguing that the requested relief should be denied as an unconstitutional prior restraint on speech. *See* Response at 14. However, Defendants' reliance in *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976) and *Baker v. Joseph*, 938 F. Supp. 2d 1265, 1269 (S.D. Fla. 2013) is unfounded because, by focusing exclusively on Plaintiff's defamation claims, Defendants willfully ignore that the requested relief is appropriate under Plaintiff's additional claims, including the tortious interference with business relationship claims.

The Defendants' primary motive was to force Dr. Finkelstein into signing a Non-Disclosure Agreement and General Release, to protect their reputation and avoid litigating, and the risks attendant thereto. Further, Dr. Ben-David's derogatory statements made to Dr. Goodman pertaining to Dr. Finkelstein, which have negatively impacted and destroyed that business relationship, and are communications uttered or published incident to another tort, constitute "verbal acts," which " 'are published or made as a part and parcel of a course of conduct deliberately carried on to further a fraudulent or other unlawful purpose' " and injunctive relief to prevent irreparable injury based on these verbal acts is proper. *See Zimmerman*, 505 So. 2d at 1375 (quoting *W. Willow Realty Corp. v. Taylor*, 23 Misc. 2d 867, 198 N.Y.S.2d 196, 198 (Sup. Ct. 1960)).

Defendants' underlying conduct, as alleged by the SAC and the Motion, involves malicious, defamatory speech that does not prevent this Court from issuing the requested injunctive relief, for, in this case, the defamatory statements are verbal acts in aid of another tort, and Defendants' sole goal was not to persuade public opinion, but to damage Dr. Finkelstein's business relationships, which Defendants were acutely aware, and to extort a non-disclosure agreement and release of claims from Dr. Finkelstein. Likewise, an order restraining defendants from disseminating disparaging and defamatory statements about Dr. Finkelstein does not interfere with protected speech. *See Zimmerman*, 505 So. 2d at 1376; *Murtagh v. Hurley*, 40 So. 3d 62, 66 (Fla. Dist. Ct. App. 2010).

Here, like in *Zimmerman*, Dr. Finkelstein makes a prima facie case for the appropriateness of the temporary injunctive relief, as the record supports an inference that Defendants' dissemination of falsities had a deleterious effect on Dr. Finkelstein securing a new employment or position at a new residency program. *See Zimmerman*, 505 So. 2d at 1373; *see also* SAC at ¶99, Ex. E-G; Goodman Decl. at ¶¶ 5-7. Injunctions comparable to the requested injunctive relief have been repeatedly upheld. *See, e.g., San Antonio Cmty. Hosp. v. S. California Dist. Council of Carpenters*, 125 F.3d 1230, 1233 (9th Cir. 1997) (upholding a preliminary injunction preventing defendants from making the fraudulent and defamatory statement that a non-union hospital was "FULL OF RATS," where the court found the statement was likely to lead patients to believe the hospital had a rodent problem); *Vondran v. McLinn*, No. C 95-20296 RPA, 1995 WL 415153 (N.D. Cal. July 5, 1995) (granting preliminary injunction motion where plaintiff alleged claims for trade libel, defamation, and interference with prospective economic advantage, and enjoining false or misleading statements regarding plaintiff and its product and articles concerning the product).

### d. Dr. Finkelstein Has Demonstrated A Substantial Likelihood That She Will Prevail In Her Claims Against Defendants

For the reasons better laid out in the SAC, the Motion, and Dr. Finkelstein's Response to Defendants' Motion to Strike or, in the alternative, to dismiss Plaintiff's Second Amended Complaint ("Plaintiff's Response" ) (ECF No. 70), Dr. Finkelstein sufficiently alleges the required main facts and supporting allegations in her Second Amended Complaint to survive Defendants' pending Motion to Dismiss. *See* SAC, generally; Finkelstein Decl. at ¶¶ 32-41, Exhibits W, X, Y, Z, AA, and BB; and Plaintiff's Response at 6 and 7. Also, the allegations in the SAC and the Motion are supported by 32 exhibits, which demonstrate: (i) that Defendants devised an illegal

enterprise to extort a General Release of all Claims and Non-Disclosure Agreement Non-Disclosure Agreement and General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience, as a pre-condition to producing to Plaintiff the Completion Documents, which Defendants were required to provide to her by law, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* SAC ¶¶ 33-36; 125-136. *See also* Finkelstein Decl. ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB; (ii) that Dr. Ben-David, individually and on behalf of MSMC, sought to advance this illegal enterprise by providing false or otherwise incomplete information to prospective residency programs and employers, intentionally interfering with Dr. Finkelstein's ability to secure a new position. *See* SAC ¶¶ 39-42; 83-124. *See also* Finkelstein Decl. ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB; (iii) that Dr. Finkelstein is well qualified for the positions of resident and house-surgeon. Finkelstein Decl. ¶¶ 32-41; Exhibits Y and Z; (iv) that Dr. Finkelstein has Attention Deficit Hyperactivity Disorder ("ADHD"). *See* SAC ¶¶ 18-19; 182-195. *See also* Finkelstein Decl. ¶14; Exhibits G and H; (v) that Dr. Ben-David, individually and on behalf of MSMC, and MSMC denied the accommodations that Defendants knew Dr. Finkelstein was entitled to while a resident at MSMC. *See* Finkelstein Decl. ¶14; (vi) that Defendants violated the Graduate Medical Education Program Agreement ("GME Agreement") by both fostering a hostile work environment in which sexual discrimination and harassment, was the norm, as well as by virtue of failing to ensure an educational environment in which residents such as Dr. Finkelstein could raise and resolve issues without fear of intimidation or retaliation. *See* SAC ¶¶ 20-24; 137-160. *See also* Finkelstein Decl. ¶19; Exhibit S at 52, 69, 72, 93, 94, 231, and 232; (vii) that Dr. Ben-David, individually and/or on behalf of MSMC, subjected Dr. Finkelstein to a relentless campaign to discredit her, ultimately leading to her receiving a letter of Non-Renewal of her Surgical Residency Program, in effect ending her training as a General Surgeon, and potentially ending her ability to become a General Surgeon anytime thereafter. *See* SAC ¶¶ 39-42; 83-124. *See also* Finkelstein Decl. 32-41; Exhibits W, X, Y, Z, AA, and BB; (viii) that Defendants subjected Dr. Finkelstein, a woman, to discrimination based on her gender. *See* SAC ¶¶ 33-36; 137-160. *See also* Finkelstein Decl. ¶¶ 8, 29; Exhibits B and C; (ix) that Defendants retaliated against Dr. Finkelstein's reporting of sexual discrimination and harassment. *See* SAC ¶¶ 33-36; 161-181. *See also* Finkelstein Decl. ¶¶ 9, 15, 19, 26, and 33; Exhibits P, T, and W; (x) that Dr. Ben-David is aware of Dr. Finkelstein's

knowledge of his personal affairs. *See* Finkelstein Decl. ¶28; and (xi) that Dr. Finkelstein has suffered and continues to suffer mental anguish, emotional distress, humiliation and embarrassment as a result of the Defendants' actions, was unable to competently and safely perform her duties, was unable to complete her residency program, suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake. *See* Second Amended Complaint, generally; *see also* Finkelstein Decl. at ¶¶ 32-41, Exhibits W, X, Y, Z, AA, and BB. *See also* Goodman Decl.

Further, the limited information obtained by Dr. Finkelstein so far heavily indicates that Defendants' underlying conduct was both taken in bad faith and in furtherance of numerous torts. *See* Goodman Decl. Thus, at a minimum, Dr. Finkelstein has established a substantial likelihood of success on the merits of her tortious interference claims against Defendants. This factor, coupled with Defendants' ongoing campaign to discredit Dr. Finkelstein and end her medical career by continuing to interfere by providing knowingly false statements about Plaintiff to known business relationships, warrants that this Court issue the requested injunctive relief.

### e. A Bond is Not Required as Defendants Would Not Be Harmed by The Requested Injunctive Relief

Rule 65(c) contemplates the necessity of a bond; however, "the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court, and the court may elect to require no security at all." *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (internal quotation marks and alterations omitted). "Security is generally was not required when, the party seeking the injunction has a high probability of succeeding on the merits of its claim, if bond is not requested, or if no evidence is presented that a party will suffer damages from the issuance of an injunction." *MSHK Ltd. v. Tuto Pazzo, Inc.*, No. 09-21367-CIV, 2009 WL 10700667, at *5 (S.D. Fla. June 16, 2009).

Here, the Court should not require a bond, as Dr. Finkelstein has demonstrated a substantial likelihood of succeeding on the merits of her claims against Defendants. Moreover, there is no harm in enjoining Defendants from continuing to spread false and misleading statements about Dr. Finkelstein's uncorroborated and unspecified professionalism issues to Plaintiff's business associates. Accordingly, Plaintiff respectfully requests that no bond be required to be posted or that if one is required, it be nominal.

    f.   **The Balance of Equities is in Dr. Finkelstein's Favor, and The Public Interest Would Be Advanced By The Issuance Of The Requested Injunction**

    The injunctive relief sought by Dr. Finkelstein would not prevent Defendants from fulfilling any requirements and procedures or from performing essential functions but only would bar Defendants from harming contractual and ongoing and future business relations with known false statements made in bad faith and in furtherance of another tort. Defendants have not, and cannot argue (although it is arguably inferred by the Response) that Dr. Finkelstein is not an "unsafe and incompetent practitioner" to which the public must be protected, nor consenting to a new reference provider designated by Dr. Finkelstein for this very specific reason would "put the community and population at risk." *See* Response at 23-24. Here, far from the apocalyptic picture painted by Defendants, in which appointing a fair reference provider who would factually and truthfully provide information and verify Dr. Finkelstein's experience and credentials would somehow be a risk for society at large, the requested injunctive relief does no more than enjoin the specific known falsehoods that Defendants have already disseminated. *See Storer Commc'ns, Inc. v. Mogel*, 625 F. Supp. 1194, 1203 (S.D. Fla. 1985) (reasoning that Defendants would suffer no harm if an injunction is issued which simply requires them to obey the law.)

    Further, it is not in the public interest for Defendants to spread false and misleading statements about Dr. Finkelstein's uncorroborated and unspecified professionalism issues. It is also not in the public interest for Defendants to utilize a pattern of misconduct designed to force former residents and employees into signing Non-Disclosure Agreements or Release of All Claims benefitting Defendants. If, as the factual record submitted by Dr. Finkelstein establishes, Dr. Finkelstein has never presented professionalism issues, and Defendants this false narrative to interfere with Dr. Finkelstein's business relationships as a stratagem to extort a Non-Disclosure Agreement and Release of All Claims from Plaintiff, then Defendants' knowingly false statements otherwise may be enjoined.

    g.   **Plaintiff has Suffered and Continues to Suffer Irreparable Harm Absent Issuance of an Injunction**

    In general, "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Oliver v. Fam. Tree Concept, Inc.*, No. 17-24659-CIV, 2018 WL 3413036, at *2 (S.D. Fla. Apr. 4, 2018) (quoting *Arthur J. Gallagher Serv. Co. v. Egan*, 514 F. App'x 839, 843 (11th Cir. 2013).) Moreover, "[f]or an injury to be irreparable, it must be 'neither remote nor speculative,

but actual and imminent.' " *Id.* (quoting *TransUnion Risk & Alternative Data Sols., Inc. v. Challa*, 676 F. App'x 822, 825 (11th Cir. 2017).) "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 3041326, at *20 (S.D. Fla. June 6, 2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).)

Dr. Finkelstein sufficiently alleges with specificity why the level of harm inflicted upon her by Defendants is irreparable. *See* Second Amended Complaint at ¶¶ 33-51; *see also* Finkelstein Decl. at ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB. In fact, other than the tortious interference which cost Dr. Finkelstein the house surgeon position at MSBI, a fact confirmed by Dr. Goodman, the harm inflicted on Plaintiff caused by Defendants' misconduct is so pervasive and widespread that Dr. Finkelstein cannot definitively ascertain, at this moment, the extent to which Defendants disseminated falsehoods pertaining to Dr. Finkelstein's tenure as a general surgery resident at MSMC, and to how many potential business relationships partners these falsities have intentionally been shared with.

Lastly, and perhaps, most importantly, Defendants have engaged in and will continue to engage in, unless enjoined, their pattern of tortious interference with Dr. Finkelstein's relationships with prospective residency programs and employers. This interference has the malicious purpose of harming Dr. Finkelstein's career as a physician and utilizes wrongful means (knowingly false statements) to do so. Thus, contrary to Defendants' assertions, the injury feared by Dr. Finkelstein is not speculative. If Defendants' unabashed resolve in forcing Dr. Finkelstein into signing a Non-Disclosure Agreement and Release of All Claims by any means necessary so far in order to safeguard Defendants' and the Program's prestige and reputation, including the commission of several torts are any indications of the lengths Defendants are willing to go, Defendants' actions if permitted to continue prior to final judgment, will irreparably Dr. Finkelstein, in ways that cannot be fully remedied by monetary relief at the end of the case, as she will soon be forever precluded from completing her surgical training. Here, Dr. Finkelstein seeks to preserve its relationships and goodwill with business relationships, including doctors, hospitals, and educational institutions. The damage done to these relationships by Defendants' actions, both presently and in the future, cannot be easily quantified. Therefore, Dr. Finkelstein has no adequate remedy at law.

## **CONCLUSION**

WHEREFORE, the Plaintiff, Dr. Paige Finkelstein, respectfully requests that this Court grant her Temporary Restraining Order as hereinabove stated for the reasons provided above, together with all further relief deemed just and proper by this Court.

Dated this 6th day of April, 2023.

Respectfully submitted,

*/s/Richard H. Levenstein*
Richard H. Levenstein, Esq.
Florida Bar No. 235296
NASON, YEAGER, GERSON,
HARRIS & FUMERO, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, Florida 33410
Telephone: (561) 686-3307
Facsimile: (561) 686-5442
Email: RLevenstein@nasonyeager.com
Trial Counsel for Plaintiff

Gabrielle Sliwka, Esq.
Florida Bar No. 1022654
NASON, YEAGER, GERSON,
HARRIS & FUMERO, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, Florida 33410
Telephone: (561) 686-3307
Facsimile: (561) 686-5442
Email: GSliwka@nasonyeager.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed with the Clerk of Court and served by E-Mail through the Florida Courts E-Filing Portal on this 6th day of April, 2023 to the following:

***Attorneys for Defendant, Mount Sinai Medical Center of Florida and Defendant, Kfir Ben-David, MD***
Martin B. Goldberg, Esq.
David R. Ruffner, Esq.
Clark Splichal, Esq.
Lash & Goldberg LLP
Miami Tower
100 S.E. 2nd Street
Suite 1200

Miami, Florida 33131
Primary Email: mgoldberg@lashgoldberg.com; csplichal@lashgoldberg.com
druffner@lashgoldberg.com
Secondary Email: rdiaz@lashgoldberg.com; mwallace@lashgoldberg.com

***Attorneys for Defendant, Kfir Ben-David, MD***
Gary A. Orseck, Esq.
Lauren Cassady Andrews, Esq.
Kramer, Levin, Naftalis, & Frankel, LLP
2000 K Street, NW, 4th Floor
Washington, DC 20006
Primary Email: gorseck@kramerlevin.com; landrews@kramerlevin.com

*Attorneys for Plaintiff, Paige Finkelstein, M.D.*
NASON, YEAGER, GERSON,
HARRIS & FUMERO, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, Florida 33410
Telephone:    (561) 686-3307
Facsimile:    (561) 686-5442
Richard H. Levenstein, Esq.
Primary E-mail: rlevenstein@nasonyeager.com
Secondary E-mail: ptreadway@nasonyeager.com; creyes@nasonyeager.com
Gabrielle O. Sliwka
Primary E-mail: gsliwka@nasonyeager.com
Secondary E-mail: ptreadway@nasonyeager.com; creyes@nasonyeager.com

By: ___/s/ *Richard H. Levenstein*___
    Richard H. Levenstein
    Florida Bar No. 235296
    Gabrielle O. Sliwka
    Florida Bar No. 1022654