# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION

| | | |
|---|---|---|
| PAIGE FINKELSTEIN, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:23-CV-20188-RKA |
| | ) | |
| v. | ) | |
| | ) | |
| MOUNT SINAI MEDICAL CENTER OF | ) | |
| FLORIDA, INC., a Florida Not For Profit | ) | |
| Corporation, and KFIR BEN-DAVID, M.D., | ) | |
| | ) | |
| Defendants. | | |

## PLAINTIFF'S, PAIGE FINKELSTEIN, MEMORANDUM OF LAW IN SUPPLEMENTARY SUPPORT FOR HER EXPEDITED MOTION FOR ENTRY OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Federal Cases

*S.E.C. v. Solow*, 554 F. Supp. 2d 1356, 1361–62 (S.D. Fla. 2008), *aff'd,* 308 F. App'x 364 (11th Cir. 2009) ............................................................................................................ 12

Cases

17-CV-22620-KMW,
   2017 WL 6987706 (S.D. Fla. July 14, 2017) ......................................................... 10
*Arthur J. Gallagher Serv. Co. v. Egan*,
   514 F. App'x 839 (11th Cir. 2013) ....................................................................... 17
*Canosa v. Ziff*,
   No. 18 CIV. 4115 (PAE), 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ................... 13
*Elrod v. Burns*,
   427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) ......................................... 17
*Fac. Senate of Fla. Int'l Univ. v. Winn*,
   477 F. Supp. 2d 1198 (S.D. Fla. 2007) .................................................................. 15
*Gay-Straight All. of Okeechobee High Sch. v. Sch. Bd. of Okeechobee Cnty.*,
   483 F. Supp. 2d 1224 (S.D. Fla. 2007) .................................................................. 20
*Leon v. Cont'l AG*,
   301 F. Supp. 3d 1203 (S.D. Fla. 2017) ............................................................ 15, 16
*Oliver v. Fam. Tree Concept, Inc.*,
   No. 17-24659-CIV, 2018 WL 3413036 (S.D. Fla. Apr. 4, 2018) ........................... 17
*Special Purpose Accts. Receivable Co-op. Corp. v. Prime One Cap. Co.*,
   202 F. Supp. 2d 1339 (S.D. Fla. 2002) .................................................................. 12
*TransUnion Risk & Alternative Data Sols., Inc. v. Challa*,
   676 F. App'x 822 (11th Cir. 2017) ....................................................................... 17

Statutes

18 U.S.C. §§ 1961 ........................................................................................................ 12
18 U.S.C.A. § 1962(a)-(d) (West) .................................................................................. 12
18 U.S.C.A. § 1964(c) (West) ........................................................................................ 13

As set forth in Plaintiff's Expedited Motion for Entry of Temporary Restraining Order and Preliminary Injunction (the "Expedited Motion") (ECF No. 39), Plaintiff, PAIGE FINKELSTEIN, MD, MPH ("Dr. Finkelstein" or "Plaintiff"), by and through her undersigned counsel of record, respectfully seeks a Temporary Restraining Order, a Preliminary Injunction, and other equitable relief, pursuant to Rule 65 of the Federal Rules of Civil Procedure against Defendants' MOUNT SINAI MEDICAL CENTER OF FLORIDA, INC. ("MSMC"), a Florida Not for Profit Corporation, and KFIR BEN-DAVID, M.D. ("Dr. Ben David" or "Residency Program Director") (together, "Defendants"). The relief requested by Dr. Finkelstein is necessary to prevent further irreparable harm to Dr. Finkelstein's career and medical training caused by the unlawful and/or illegal conduct of Defendants, individually and/or as agents and co-conspirators.

## INTRODUCTION

Dr. Finkelstein seeks an Expedited Motion for Entry of Temporary Restraining Order, Preliminary Injunction, and other equitable relief required in order to ensure that Dr. Finkelstein's efforts to continue her surgical training and medical education are not further sabotaged by Defendants' unlawful conduct; to preserve the status quo; to prevent further serious, substantial, ongoing irreparable injuries as a result thereof, and to protect Dr. Finkelstein from Defendants' unlawful conduct in violation of the Racketeer Influenced and Corrupt Organizations Act, individually and as co-conspirators. Without the relief requested, Defendants' unlawful conduct will continue through the pendency of this action, and the Defendants will continue to employ their intimidation tactics against Dr. Finkelstein, her reference providers, and any potential witnesses in this case, as well as tortiously interfering with Dr. Finkelstein's business relationships, all to the irreparable harm of Dr. Finkelstein's reputation and professional pursuit.

## FACTUAL BACKGROUND

### A. The Principal Parties

1.      The Plaintiff, Paige Finkelstein, M.D. ("Dr. Finkelstein" or "Plaintiff"), is a licensed physician in the State of Florida, a resident of the State of Florida, and otherwise *sui juris* in all respects.

2.      The Defendant, Mount Sinai Medical Center ("MSMC" or "Hospital"), is a Florida Not For Profit Corporation authorized and doing business in the State of Florida, with its principal place of business in Miami Beach, Florida.

3.      The Defendant, Dr. Kfir Ben-David ("Dr. Ben David" or "Residency Program Director"), is a physician licensed in the State of Florida, and an employee of the Defendant Mount Sinai, and a resident of Broward County, and otherwise *sui juris* in all respects.

4.      At all times material hereto, Dr. Finkelstein was a resident physician in the General Surgery Residency Program at MSMC (the "Surgical Residency Program" or "The Program") and completed two and a half (2.5) years of that general surgery residency.

5.      At all times material hereto, Dr. Ben-David was the Director of the Surgical Residency Program at, as well as the Chairman of the Department of Surgery at MSMC.  In those positions, Dr. Ben-David, on behalf of MSMC, exercised complete and total authority and control over the Surgical Residency Program at MSMC and, therefore, exercised complete and total authority and control over the Plaintiff while she was a part of that Surgical Residency Program.

6.      Although Dr. Finkelstein planned on becoming a reconstructive surgeon upon completion of the Program, both Defendants MSMC and Dr. Ben-David imploded Dr. Finkelstein's aspirations by fostering a culture of conformity in which the personal and professional growth of the Residents were sacrificed in favor of bolstering purported "quality metrics" that allegedly augmented the prestige of Mount Sinai Medical Center and Dr. Ben-David personally.

7.      As Surgical Residency Program Director and Chief of Surgery, Dr. Ben-David has managed to consolidate power in such a way that most of MSMC's surgical staff must answer to him. This is particularly problematic for the Program's residents and faculty, as Dr. Ben-David was left with little to no oversight or checks and balances while fulfilling the role of Program Director.

8.      Defendant Dr. Ben-David was designated by MSMC as Program Director and made responsible for the residency program, thus being accountable for the entire program. Accreditation Council for Graduate Medical Education, Program Director Guide to the Common Program Requirements (Residency), 52-56 (Mar. 2023) (Available at https://www.acgme.org/globalassets/pdfs/program-director-guide---residency.pdf).  Specifically, the ACGME Program Director Guide stipulates that the program director is *the* person who is ultimately responsible for the program. *Id*., at 53. As such, Dr. Ben-David, on behalf of MSMC, is expected to be a role model for faculty members and residents, both professionally and morally. *Id*., at 45, 51, 52-56, 70-72.



*Id*., at 54.

### B. Plaintiff's Tenure At The Program

9.      Dr. Finkelstein joined the Surgical Residency Program at Mount Sinai in June of 2018, as one of only three categorical female residents, after graduating from the University of Miami Miller School of Medicine with an MD Degree and Master of Public Health Degree. Prior to that time, she attended the Massachusetts Institute of Technology, where she graduated with Degrees in Chemical Engineering and Biology, and she has more than ten (10) years of experience as a Nationally Licensed Emergency Medical Technician.

10.      Defendants continually harassed and cajoled Dr. Finkelstein while she was a Resident, singling her out for unwarranted discipline, degrading criticism, and efforts designed solely to drive her out of the Surgical Residency Program.

11.      Within the first months of beginning her employment, Dr. Finkelstein was subjected to gender/sex and disability discrimination by members of the Surgical Residency Program leadership, including but not limited to Dr. Ben-David.

12.      During the time that she was a General Surgery Resident at MSMC, Dr. Finkelstein, on multiple occasions, requested a reasonable accommodation for her disability, Attention Deficit/Hyperactivity Disorder (ADHD), of additional time to complete certain examinations,

which were required as a term of her employment with MSMC. Dr. Ben-David responded to these reasonable requests for accommodation by ridiculing and minimizing Plaintiff's disability.

13.     Women living with ADHD, such as Dr. Finkelstein, are more likely to display the following symptoms, most of which Defendants have previously used to justifying holding Plaintiff back on her surgical training, giving her negative evaluations, and ultimately being used as a pretext to wrongfully terminating her: (i) being prone to making errors because of inattention; (ii) having trouble staying focused and on-task; (iii) being perceived as not paying attention when others talk ("zoning out"); (iv) starting projects easily while having trouble following through and completing them; (v) having issues organizing and setting priorities; (vi) disliking or avoiding boring or tedious tasks, such as paperwork; (vii) being prone to losing, misplacing or forgetting things; (viii) being easily distracted by what's happening around you or by your own thoughts; (ix) being forgetful or absentminded in daily routine; (x) fidgeting often; (xi) frequently needing to stand up and walk around; (xii) feeling restless often; (xiii) having trouble staying quiet; (xiv) being unusually active; (xv) talking excessively; (xvi) having conversational self-restraint problems; (xvii) having trouble being patient and waiting your turn; (xviii) having trouble understating social boundaries; (xix) presenting low self-esteem or confidence issues; (xx) presenting impairment in social behaviors, peer functioning, and interpersonal relationships; (xxi) presenting anxiety and affective disorders; (xxii) presenting impaired academic progress resulting in lower grades and lower rates of graduation; (xxiii)presenting oppositional defiant disorder. *See* Ex. E to the Finkelstein Decl., including a compilation of evaluations of Dr. Finkelstein's performance submitted by the Program faculty and Dr. Ben-David. *See also* Quinn, P., Madhoo, M., A REVIEW OF ATTENTION-DEFICIT/HYPERACTIVITY DISORDER IN WOMEN AND GIRLS: UNCOVERING THIS HIDDEN DIAGNOSIS, National Library of Medicine (Oct. 13, 2014). (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4195638/); ADHD IN WOMEN, Cleveland Clinic. (available at https://my.clevelandclinic.org/health/diseases/24741-adhd-in-women).

14.     Dr. Ben-David's refusal to provide reasonable accommodations to Dr. Finkelstein's disabilities impacted her Surgical Residency Program's evaluation results, which ultimately were used as a pretext for her constructive dismissal.

**C.  Defendants' Post-Termination Wrongful Conduct**

15.     Since Plaintiff's forced resignation from the Surgical Residency Program, Defendants refused to release to Dr. Finkelstein, even after she retained legal representation,

documents that are required to be provided to every resident by the American Counsel of Graduate Medical Education (ACGME), including, but not limited to, a Program Director's Letter, a Summative Evaluation, Proof of Completion for at least two years of surgical residency, and her Diploma for completing the intern year of the General Surgery Residency ("Completion Documents"), unless Plaintiff agreed to sign General Release freeing Defendants from liability with respect to any and all claims related to Dr. Finkelstein's Surgical Residency Program experience. *See* Dr. Finkelstein's Affidavit addressing her account of the events, attached as Exhibit 2 to the Expedited Motion (hereinafter "Finkelstein Decl."); *see also* Exhibit X to Finkelstein Decl, a copy of the communication between Plaintiff's then legal representative, Barry Wax, and Defendants' counsel, Arnold Jaffee. Nonetheless, Defendants only provided Dr. Finkelstein with the Completion Documents after Dr. Finkelstein filed a Complaint with the ACGME and commenced this lawsuit. *See* Plaintiff's Second Amended Complaint ("SAC") (ECF No. 38) at ¶¶ 10-11.

16.     While seeking access to her record, which is essential to Dr. Finkelstein's attempts to mitigate the damages sustained by her as a result of the Defendants' mismanagement of the Surgical Residency Program, Plaintiff continued to seek and apply to be matched with other residency programs. *See* Finkelstein Decl. at ¶¶ 32-41. Likewise, although Plaintiff sought to, and continues to, do her best to mitigate the damages sustained by her this far as a result of Defendants' misconduct and negligence, most of which cannot be reduced to a monetary value, Defendants sought to, and continue to seek to, intimidate Dr. Finkelstein into signing a General Release in favor of Defendants, as well as by continuously failing to disclose records and information which are material to Plaintiff's endeavors to secure new academic and/or professional opportunities, or provide incomplete and/or incorrect information to Dr. Finkelstein's prospective new resident programs or employers. *See* Second Amended Complaint at ¶¶ 10-11, 33-36; 39-45; 49-51. *see also* Finkelstein Decl. at ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB.

17.     Dr. Finkelstein's efforts were ultimately torpedoed by Defendants, who continued to impermissibly withhold Plaintiff's records, as well as providing either incomplete or false information when approached by representatives of residency programs or prospective employers. *See* Finkelstein Decl. at ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB. Defendants' intentional misconduct and defamatory campaign continue to victimize Dr. Finkelstein, thus continuously inflicting injury to her career and academic pursuits and attempts to mitigate damages, thus

consistently avoiding the maintenance of the status quo, to which the parties, including Plaintiff, is entitled to until this Court makes a final decision on the case at hand and its multiple claims.

18.     Further, since the filing of the Expedited Motion, Defendants have engaged in acts in furtherance of their alleged unlawful conduct, which requires Plaintiff to now amend the initially required remedy in order to preserve the status quo. Since the filing of the Expedited Motion, Defendants have filed a Supplementary Position Statement with the U.S. Equal Employment Opportunity Commission ("EEOC") indicating that Jonathan Zadeh, M.D., ("Dr. Zadeh") had submitted an online reference to a Mount Sinai Beth Israel ("MSBI"), a prospective employer, which purportedly contradicted a favorable Letter of Reference Dr. Zadeh had previously provided to Dr. Finkelstein. Copies of the original Letter of Reference letter provided by Dr. Zadeh, as well as the online reference submitted to MSBI are attached hereto as **Composite Exhibit "A."** Notably, Dr. Zadeh took screenshots of the online reference provided to MSBI, which is unseemly and highly irregular.

19.     Based on the amount of power that both MSMC and Dr. Ben-David hold over the professional lives of current and former Program residents, faculty, and attending physicians, Plaintiff now fears greatly that, unless enjoined, Defendants will potentially pressure or intimidate reference providers and witnesses to either withhold truthful letters of recommendation and or testimony in this matter.

20.     As a result of the foregoing unlawful conduct in violation of the Racketeer Influenced and Corrupt Organizations Act (hereinafter, "RICO") by Defendants, individually and as co-conspirators, Dr. Finkelstein has been deprived of completing her surgical training and medical education, and ultimately deprived of the opportunity to fulfill her life-long dream of becoming a reconstructive surgeon. Dr. Finkelstein's ability to secure a job in the medical field or a position in a new residency program has been hindered by her inability to access her Completion Document as well as by Defendants' unwillingness to provide an unbiased, truthful, accurate letter of recommendation by the Residency Program Director, which has further impaired Dr. Finkelstein' ability to provide medical services and to continue to pursue educational and professional opportunities.

21.     Defendants MSMC and Dr. Ben-David, individually and as co-conspirators, have intentionally violated the Graduate Medical Education Program Agreement ("GME Agreement"), and Dr. Finkelstein has been damaged as a result. Further, since Dr. Finkelstein's wrongful

termination, Defendants continued to engage in a pattern of unlawful conduct in violation of RICO, including the withholding of essential documents and tortious interference with Dr. Finkelstein's business relationships. Since virtually all open residency training position available within the Association of Program Directors in Surgery website, the portal relied upon residents and programs for transfers, currently requires all applicants to submit a letter of recommendation from the applicant's Program Director, as well as two additional letters of recommendation, on average, it is not an exaggeration to state that securing Plaintiff's right to access reference providers to obtain letters of recommendation is crucial for Plaintiff's chances to continue her surgical training and resuming her medical education. *See* OPEN TRAINING POSITIONS, Association of Program Directors in Surgery. (Available at https://apds.org/education-careers/open-positions/).

22. Thus, unless enjoined, Defendants will continue to cause further harm to Dr. Finkelstein's academic and professional efforts and, therefore, increase the damages inflicted upon Dr. Finkelstein by Defendants' intentional misconduct and/or negligence. As such, solely as a means to preserve the status quo by preventing incurring further damages, monetary or otherwise, Dr. Finkelstein moved this Court to grant Plaintiff's Motion, not as a vindictive stratagem or with a wicked animus, but as a last resort to ensure the maintenance of the status quo by allowing Plaintiff a fair opportunity to resume her training as a surgeon and continue her medical education.

## MEMORANDUM OF LAW

### A. The Standards For Granting An Emergency Temporary Restraining Order And Temporary Injunction

A district court may issue a preliminary injunction where the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Hodge v. Hughes*, No. 18-CV-21571, 2018 WL 2688800, at *1 (S.D. Fla. Apr. 23, 2018). *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). The same standards apply to requests for a temporary restraining order. *J.P. Morgan Sec. LLC v. McBee*, 17-CV-22620-KMW, 2017 WL 6987706, at *1 (S.D. Fla. July 14, 2017).

Defendants' misconduct, which includes, but is not limited to, intentionally withholding and delaying the release of Dr. Finkelstein's records and the Completion Documents, as well as a

continuous defamatory campaign, far from an innocent mistake, was intentionally executed by Defendants by utilizing questionable methods which have caused, and continue to cause, Dr. Finkelstein to suffer mental anguish, emotional distress, humiliation, and embarrassment, as Dr. Finkelstein was rendered unable to complete her residency program by Defendants' conduct, has suffered damages consisting of loss of earnings, past, present, and future loss of earning capacity, loss of reputation, and the inability to develop her skill as a surgeon and medical professional, and to practice the profession she has chosen and spent years of education and training to undertake. Further, Defendants have recently begun a campaign to intimidate or otherwise pressure reference providers to either provide less favorable reference letters perpetuating their fictitious account of the events or withholding previously provided letters of recommendation altogether. *See* Composite Exhibit A. Thus, without the injunctive relief sought, which complies with the purpose of Rule 65(d) and this Court's authority, Dr. Finkelstein will continue to suffer irreparable harm, for which there is no adequate legal remedy.

**B. The Injunctive Relief Requested Is Appropriate In Accordance With Rule 65(D) Of The Federal Rules Of Civil Procedure**

Rule 65(d) of the Federal Rules of Civil Procedure requires that every injunction or restraining order issued by a District Court (i) sets forth the reason for its issuance; (ii) be specific in its terms; and (iii) describe in reasonable detail the act or acts restrained or required so that an ordinary person reading the Court's order is able to ascertain from the document itself exactly what conduct is prescribed and that the parties to the injunctive order understood their obligations under the order. Fed. R. Civ. P. 65(d);  *E. Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*, 920 F.2d 722, 730 (11th Cir. 1990).

In the case at hand, the injunctive relief requested by Plaintiff meets Fed. R. Civ. P. 65(d) requirements because the injunctive relief sought by the Expedited Motion is essential in order to ensure that Dr. Finkelstein's efforts to mitigate her damages and to continue her surgical training and medical education are not further sabotaged by Defendants, describing in reasonable detail the acts restrained or required with specific terms widely familiar within Defendants' industry, and even utilized by Defendants, as demonstrated by Defendant MSMC's April 8, 2023, posting a General Surgery PGY-2 Preliminary Position job opening position requiring as indispensable application materials to be submitted a Program Director Letter.

**General Surgery PGY-2 Preliminary Position**

**Mount Sinai Medical Center**

Date Posted: April 8, 2023

The General Surgery residency program at Mount Sinai Medical Center in Miami Beach, Florida has a preliminary PGY-2 vacancy beginning June 24, 2023. Applicants must have completed 1 year of an ACGME accredited surgical residency training with in the last academic year and have been in good standing.

**How To Apply**

The following items must be provided in one PDF file via email to April Chisolm (April.Chisolm@msmc.com) to be considered: • Current CV. • Three letters of recommendation including one from current or most recent Program Director. • USMLE Step 1, 2 and 3 scores. • ABSITE score from PGY 1. • Semi Evaluations • ACGME operative case logs. • Certification of ACLS, BLS, ATLS, FLS, and FACS as applicable • Medical school diploma and transcripts • MSPE/Dean's letter

**Apply Now**

Thus, Defendants' recent position that it needed further clarification as to what a "Program Director Letter entailed" is misleading, at best, as Defendants cannot reasonably claim not to have knowledge about what is required of them, especially concerning the provision of a letter of recommendation from the Program Director as requested.

### C. Injunctive Relief Is Appropriate And Necessary For This Court To Render A Meaningful Final Decision On The Merits.

Injunctive relief is appropriate to prevent the destruction, transfer or concealment of Defendants' records, as these records are necessary for the Court to render a meaningful final decision on the merits. *Storer Commc'ns, Inc. v. Mogel*, 625 F. Supp. 1194, 1203–04 (S.D. Fla. 1985). (granting Preliminary Injunction against defendants.) In the case at hand, Dr. Finkelstein requests that Defendants' be precluded from destroying, transferring, concealing, or otherwise withholding Defendants' records, including meeting minute, organizational charts, communications, and any relevant documents or recording. Such records are pivotal to determine the merits of the case and, considering that Dr. Finkelstein has been improperly ousted from the Program, and Defendants' record of withholding access to relevant information, without the requested relief, Dr. Finkelstein's ability to litigate this case and the Court's ability to dispose of this matter based on its merits will be significantly, and potentially permanently, hindered.

### D. The Court's Powers to Grant the Relief Sought

Dr. Finkelstein respectfully moves this Court to enjoin Defendants from continuing to engage in conduct in violation of RICO or in furtherance of Defendants' illegal enterprise, as alleged on the SAC. Simply put, by granting the requested relief as stated, the Court would be enjoining Defendants from any practices that are violations of RICO's provisions, which previous decisions have determined to be within the powers conferred to this Court. *S.E.C. v. Solow*, 554 F. Supp. 2d 1356, 1361–62 (S.D. Fla. 2008), *aff'd,* 308 F. App'x 364 (11th Cir. 2009) (holding that an injunction that tracks the language of the sections of a statute or permit defendant was found to have violated is neither an impermissible obey-the-law injunction nor an overly broad and vague injunction.)

The Court's broad equity powers allow the Court to fashion injunctive relief necessary to stop Defendants' infringing activities. *Chanel, Inc. v. besumart.com*, 240 F. Supp. 3d 1283, 1291 (S.D. Fla. 2016); *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for ... [t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould [sic] each decree to the necessities of the particular case." (alterations added; citation and internal quotation marks omitted)); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 724, 64 S. Ct. 805, 88 L. Ed. 1024 (1944) ("Equity has power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole." (citations omitted)). The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq., provides civil and criminal liability for persons engaged in "a pattern of racketeering activity". 18 U.S.C.A. § 1962(a)-(d) (West). *Special Purpose Accts. Receivable Co-op. Corp. v. Prime One Cap. Co.*, 202 F. Supp. 2d 1339, 1346 (S.D. Fla. 2002). RICO provides a civil remedy to "[a]ny person injured in [her] business or property by" a RICO violation. 18 U.S.C.A. § 1964(c) (West) (emphasis added). *Canosa v. Ziff*, No. 18 CIV. 4115 (PAE), 2019 WL 498865, at *25 (S.D.N.Y. Jan. 28, 2019). Moreover, Florida Courts have previously held that RICO's civil remedies provision authorize a private plaintiff to obtain equitable or declaratory relief, as well as treble damages. *See* 18 U.S.C.A. § 1964; *In re Managed Care Litig.*, 298 F. Supp. 2d 1259 (S.D. Fla. 2003). 18 U.S.C.A. § 1962 defines the activities which are prohibited under RICO, including:

> **(c)** Conducting or participating, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt; and

(**d**) Conspiring to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C.A. § 1962. Thus, Defendants' continued violation of RICO, as alleged, warrants the granting of the requested relief by this Court.

Moreover, the requested relief, does more than require Defendants to obey RICO, which would have been inadequate. Instead, the relief requested, as stated, tracks the statutory language of the sections Defendants have violated, which Florida Courts have held to be permissible as they are neither an impermissible obey-the-law injunction nor an overly broad and vague injunction. 554 F. Supp. 2d at 1362. Therefore, and based on Defendants' recent pattern of behavior, which were not known by Plaintiff or the undersigned counsel at the time of the Expedited Motion filing, and for the sake of clarity, Dr. Finkelstein now reframes the original request so that the Court includes the following relief to its Temporary Restraining Order:

1.  Restraining and enjoining Defendants from continuing to engage in conduct in furtherance of the RICO violations, as alleged on the SAC, and in violation of 18 U.S.C.A. § 1962, including:

    a.  compelling MSMC and Dr. Ben-David to consent that Dr. Finkelstein can designate a new faculty member of the Surgical Residency Program of her choice to serve as reference provider, which MSMC and Dr. Ben-David shall not unreasonably withhold consent or object without just cause

    b.  withholding the sharing of complete and accurate reference verification, including an accurate Residency Program Director letter;

    c.  continuing to refer to, mention, or discuss unfounded professionalism claims when discussing Dr. Finkelstein's tenure in the General Surgery Residency Program at MSMC;

    d.  continuing to refer to, mention, or discuss Dr. Finkelstein's tenure as a resident in the General Surgery Residency Program at MSMC by mentioning Dr. Finkelstein's ADHD traits, including, but not limited to: (i) unspecified time management issues; (ii) unspecified communication skills issues (not being assertive enough and/or being abrasive); (iii) unspecified concentration or focusing issues; (iv) unspecified interpersonal skills issues; (v) unspecified professional behavior issues; (vi) unspecified issues with organizing and/or setting priorities ; (vii) unspecified issues pertaining to becoming "overwhelmed;" (viii) unspecified impulsivity issues; (ix) unspecified issues with either understanding or respecting social boundaries; (x) unspecified issues with respecting hierarchy; (xi) unspecified issues with self-confidence or self-esteem (not being confident enough or lacking humility); unspecified maturity issues; (xii) presenting below expectations grades and/or academic progress; and (xiii) unspecified maturity issues; and

e. enjoining the destruction, transfer, concealment, or otherwise withholding of Defendants' records, including meeting minutes, organizational charts, communications, and any relevant documents or recording.

Further, the Supreme Court previously held that orders granting injunctive relief similar to the relief requested by Plaintiff "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *See* 554 F. Supp. 2d at 1362 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192, 69 S. Ct. 497, 93 L. Ed. 599 (1949).) The Supreme Court has also stated that a "federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Id.* (citing *N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435, 61 S. Ct. 693, 85 L. Ed. 930 (1941).)

Here, Defendants have shown a proclivity for unlawful conduct by: (i) devising an illegal enterprise to extort a General Release of all Claims from Plaintiff, releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience, as a pre-condition to producing to Plaintiff the Completion Documents, which Defendants were required to provide to her by law, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (ii) seeking to advance this illegal enterprise by continuously referring to, mentioning, or otherwise discussing Dr. Finkelstein's unfounded professionalism claims with prospective residency programs and employers, often resorting to unfounded gender stereotypes and traits commonly associated with ADHD, such unspecified communication skills issues; unspecified interpersonal skills issues; unspecified professional behavior issues; unspecified issues with either understanding or respecting social boundaries; unspecified maturity issues; and presenting below expectations grades and/or academic progress, thus intentionally interfering with Dr. Finkelstein's ability to secure a new position; and (iii) seeking to advance this illegal enterprise by intimidating or otherwise pressuring reference providers to either withhold or provide less favorable reference letters perpetuating Defendants' fictitious account of the events. *See* SAC ¶¶ 33-36; 125-136. *See also* Finkelstein Decl. ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB. *See also* Composite Exhibit A.

Thus, the injunctive relief, as requested in this memo, is not only within this Court's authority, but it is also necessary to prevent further RICO violations by Defendants. *Solow*, 554 F.

Supp. 2d at 1361 ("Injunctive relief is appropriate where there is reasonable likelihood that a wrong will be repeated.")

### E.  Dr. Finkelstein Will Likely Succeed On Her RICO Violation Claim

Plaintiff is entitled to Injunctive Relief because, based on the record, she is likely to prevail on the merits of this case and will suffer irreparable harm if Injunctive Relief is not granted. *Fac. Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1203 (S.D. Fla. 2007); *see also* SAC, generally. The determination of whether there is a substantial likelihood of success on the merits "does not contemplate a finding of fixed quantitative value. Rather, a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Faculty Senate of Florida Intern. University*, 477 F. Supp. 2d 1198 For example, where " 'the balance of equities weighs heavily in favor of granting the [injunction],' the movant[s] need only show a substantial case on the merits." *Id.*

Although the Expedited Motion discusses in further detail why Dr. Finkelstein is likely to prevail in all of the claims brought on her behalf, for the purposes of this injunction, the undersigned counsel will focus solely on Defendants' continuous RICO violations, and how Dr. Finkelstein is likely to succeed on her RICO violation claim. *See* Expedited Motion ¶¶ 10-37; SAC ¶¶ 33-36; 125-136; SAC Exhibits H and J. *See also* Finkelstein Decl. 32-41; Exhibits W, X, Y, Z, AA, and BB. To state a civil RICO claim, Plaintiff must successfully allege that Defendants: (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity. *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1232 (S.D. Fla. 2017).  An enterprise, for purposes of civil claim under RICO, must possess three qualities: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. *Leon*, 301 F. Supp. 3d at 1232; 18 U.S.C.A. § 1962 (West).  Similarly, a pattern of racketeering activity is shown when a racketeer commits at least two distinct but related predicate acts. Id.

Here, Dr. Finkelstein has sufficiently alleged and is likely to demonstrate that Defendants have engaged in a series of predicated acts since her wrongful termination including, but not limited to: (i) holding open conversations with Dr. Finkelstein's legal counsel, Barry Wax, representing more than once that the Program Director Letter and Completion Documents would only be provided after she signed a General Release; and (ii) tortiously interfering with Dr. Finkelstein's business relationships by virtue of disseminating disparaging comments about

Plaintiff to prospective employers and residency programs across the country, including California, Florida, and New York, mischaracterizing Dr. Finkelstein's tenure as a resident at MSMC, consistently referring to her as unprofessional, while failing to cite any specific information to substantiate such allegations, in efforts to discredit her. *See also* Finkelstein Decl. ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB. The falsities spread by Dr. Ben-David as part of this illegal enterprise were so injurious that a prospective employer advised Dr. Finkelstein that she should consider a career outside of clinical medicine. *See* Finkelstein Decl. at ¶¶ 39-40; *see also* Finkelstein Decl. Exhibits AA and BB.

**F. Dr. Finkelstein Will Suffer Irreparable Injury Unless An Injunction Issues**

Defendants' misconduct has caused, and continues to cause, Dr. Finkelstein irreparable harm by not only directly interfering with her attempts to secure a spot with a new residency program but also actively interfering with Plaintiff's attempt to earn any income with her medical training. *See* Second Amended Complaint at ¶¶ 33-51; *see also* Finkelstein Decl. at ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB. Absent this Court granting the requested relief under this Motion, Dr. Finkelstein will continue to suffer irreparable harm to her professional and academic endeavors as Defendants continue to spread falsities about her tenure as a resident on the Surgical Residency Program. Furthermore, the record reflects that Dr. Finkelstein has been unable to continue her medical training without obtaining a truthful verification of her tenure at MSMC. Since securing a match with a new residency program is an integral aspect of becoming a reconstructive surgeon, Dr. Finkelstein will suffer irreparable harm if the requested relief is not granted.

In general, "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Oliver v. Fam. Tree Concept, Inc.*, No. 17-24659-CIV, 2018 WL 3413036, at *2 (S.D. Fla. Apr. 4, 2018) (quoting *Arthur J. Gallagher Serv. Co. v. Egan*, 514 F. App'x 839, 843 (11th Cir. 2013).) Moreover, "[f]or an injury to be irreparable, it must be 'neither remote nor speculative, but actual and imminent.' " *Id.* (quoting *TransUnion Risk & Alternative Data Sols., Inc. v. Challa*, 676 F. App'x 822, 825 (11th Cir. 2017).) "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Gayle v. Meade*, 614 F. Supp. 3d 1175 (S.D. Fla. 2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).)

Dr. Finkelstein sufficiently alleges with specificity why the level of harm inflicted upon her by Defendants is irreparable. *See* Second Amended Complaint at ¶¶ 33-51; *see also* Finkelstein Decl. at ¶¶ 32-41; Exhibits W, X, Y, Z, AA, and BB. In fact, the harm inflicted on Plaintiff caused by Defendants' misconduct is so pervasive and widespread that Dr. Finkelstein cannot definitively ascertain the magnitude of the ramifications of Defendants' intimidation tactics and defamatory campaigns because it is still undetermined the extent to which Defendants misrepresented relevant facts pertaining to Dr. Finkelstein's tenure as a general surgery resident at MSMC, and to how many potential employers and residency programs these falsities have intentionally been shared with. Defendants' persistence in extorting Dr. Finkelstein's signature and agreement to a General Release exonerating Defendants from any potential claims Dr. Finkelstein may otherwise have had against Defendants have likely cost her surgical career and continue to stop her from earning an income as a medical professional.

Defendants continued to withhold Dr. Finkelstein's access to her records and Completion Documents until after the filing of this lawsuit and a Complaint with the ACGME. Further, until the parties have fully complied with the discovery process, this Court cannot determine with any degree of certainty that Defendants are not still engaged in the alleged misconduct.

Additionally, since Defendant's misconduct has precluded Dr. Finkelstein from earning an income as a medical professional and continuing to develop her education, training, and career as a physician, she has also been denied the right to make more favorable student loans payment which is only available for a limited period of time, a right that cannot be reduced to a monetary amount, and which continues to cause Plaintiff harm that can only be speculated. At the outset of the Covid-19 pandemic, and as one of the measures implemented to address some of the financial hardships imposed by the then-novel Global epidemic, the Federal Government ordered that federal student loan borrowers be allowed to skip payments. Haverstock, Eliza, "When do Student Loan Payments Resume?" (Jan 10, 2023). (Available at https://www.nerdwallet.com/article/loans/student-loans/federal-student-loan-forbearance-extended-yet-again). The interest loans were set to 0%, and collections activities have been halted on default loans. *Id.* Since then, the federal government, via both the Trump and Biden administrations, has renewed this student loan forbearance program several times, and it was supposed to expire by January 2023. *Id.* However, this latest expiration date has expired without further guidance, placing borrowers such as Plaintiff in limbo. This occurred due to a policy

providing partial relief to borrowers, as this policy is currently being challenged for its constitutionality and is pending a Supreme Court decision. Thus, this ongoing constitutional challenge to the proposed policy, which has effectively extended the original federal student loan program indefinitely, allows thousands of borrowers such as Plaintiff to repay federal loans faster as any payments submitted during this forbearance period go directly towards the loan's principle. Likewise, Defendants' continuous interference with Plaintiff's attempt to secure new employment and ability to earn an income with her surgical and medical training precludes Plaintiff from submitting loan payment under these indisputably more beneficial conditions like others similarly situated borrowers.

Defendants' misconduct, which includes, but is not limited to, intentionally delaying the release of Dr. Finkelstein's records and the Completion Documents, as well as a continuous defamatory campaign, is, far from an innocent mistake, and was intentionally executed by Defendants by utilizing questionable methods which have caused, and continue to cause, Dr. Finkelstein to suffer mental anguish, emotional distress, humiliation, and embarrassment, as Dr. Finkelstein was rendered unable to complete her residency program by Defendants' conduct, has suffered damages consisting of loss of earnings, past present and future, loss of earning capacity, loss of reputation, and the inability to practice the profession she has chosen and spent years of education and training to undertake.

### G. The Threatened Injury To Defendants Outweighs Whatever Damage The Proposed Relief May Cause The Defendants

The balance of hardships favors Dr. Finkelstein. The relief sought by Dr. Finkelstein will not harm any of the Defendants; rather, it will only assure that the status quo, which should have always existed, is preserved pending resolution of this controversy. Defendants will be permitted to conduct business as usual, as long as they deliver a Residency Program Director letter objectively and fairly verifying Dr. Finkelstein's experience as a resident physician in the General Surgery Residency Program at MSMC, containing accurate factual information, and any other such reference required by prospective residency programs and/or prospective employers, and refrain from (1) withholding the sharing of complete and accurate reference verification, including an accurate Residency Program Director letter; (2) intimidating reference providers into either withholding information or recanting previously provided letters of recommendation; (3) continue to refer to, mention, or discuss unfounded and non-specific professionalism claims when

discussing Dr. Finkelstein's tenure in the General Surgery Residency Program at MSMC; (4) continue to refer to, mention, or discuss Dr. Finkelstein's ADHD traits when discussing Dr. Finkelstein's tenure in the General Surgery Residency Program at MSMC; (5) employing any additional steps to intimidating Dr. Finkelstein into agreeing to signing a General Release of all Claims; (6) further interfering with Dr. Finkelstein's business relationships; (7) destruct, transfer, conceal, or otherwise withhold Defendants' records, including meeting minute, organizational charts, communications, and any relevant documents or recording; and 8) intimidating or otherwise encouraging witnesses into recanting and/or withholding testimony.

Dr. Finkelstein's educational and professional background sufficiently shows that she is qualified to either join a new residency program, where she could continue her education under more impartial circumstances, and that she is also qualified to act as a medical professional, as indicated by MSBI's job offer. Likewise, instead of having the intention of protecting society at large, Defendants' misconduct was solely designed to selfishly intimidate Dr. Finkelstein into signing a General Release, thus avoiding the medical community and the community at large, learning of the treatment to which Dr. Finkelstein was subjected to by Defendants.

Clearly, Dr. Finkelstein's injury without an injunction far outweighs the impact an injunction would have on the Defendants. Indeed, Defendants would not suffer any injury at all if Dr. Ben-David were enjoined from divulging defamatory and inflammatory remarks about Dr. Finkelstein. Dr. Finkelstein's statements to residency programs and prospective employers are false, and he should not be making them to begin with. .

### H. The Requested Relief Will Not Be Adverse To The Public Interest

Similarly, the interest of the public will not be adversely affected by the entry of the injunctive relief requested. Furthermore, the public interest in precluding the chilling effect that the defamatory campaigns perpetuated as retaliation for reporting discriminatory practices can cause weighs in favor of enjoining Defendants from any further violation of Dr. Finkelstein's rights. A preliminary injunction would not be adverse to the public interest; rather, as recognized in similar cases in other jurisdictions, it would ensure compliance with federal law and help protect valued constitutional expressive liberties. *Gay-Straight All. of Okeechobee High Sch. v. Sch. Bd. of Okeechobee Cnty.*, 483 F. Supp. 2d 1224, 1231 (S.D. Fla. 2007).

Granting the Injunctive Relief sought pursuant to Plaintiff's Motion serves the public interest by avoiding the chilling effect that the Defendants' misconduct was designed to have on

any potential witnesses. Here, Public Interest is served when this Court avoids the chilling effect that intimidation, extortion, and defamatory campaigns, such as the one being used by MSMC and Dr. Ben-David, individually and on behalf of MSMC, can have on potential witnesses or victims of similar misconduct and/or discriminatory practices. Further, the public interest is further served by virtue of exposing the alleged misconduct to potential applicants to the Surgical Residency Program so that applicants can be fully informed of the program's conditions before committing to a match with MSMC.

## **<u>PRAYER FOR RELIEF</u>**

For these reasons, Plaintiff, Paige Finkelstein, M.D., MPH, respectfully requests that the Court enter a Temporary Restraining Order:

1. Restraining and enjoining Defendants from continuing to engage in conduct in furtherance of the RICO violations, as alleged on the SAC, and in violation of 18 U.S.C.A. § 1962, including:

    a. compelling MSMC and Dr. Ben-David to consent that Dr. Finkelstein can designate a new faculty member of the Surgical Residency Program of her choice to serve as reference provider, which MSMC and Dr. Ben-David shall not unreasonably withhold consent or object without just cause

    b. withholding the sharing of complete and accurate reference verification, including an accurate Residency Program Director letter;

    c. continuing to refer to, mention, or discuss unfounded professionalism claims when discussing Dr. Finkelstein's tenure in the General Surgery Residency Program at MSMC;

    d. continuing to refer to, mention, or discuss Dr. Finkelstein's tenure as a resident in the General Surgery Residency Program at MSMC by mentioning Dr. Finkelstein's ADHD traits, including, but not limited to: (i) unspecified time management issues; (ii) unspecified communication skills issues (not being assertive enough and/or being abrasive); (iii) unspecified concentration or focusing issues; (iv) unspecified interpersonal skills issues; (v) unspecified professional behavior issues; (vi) unspecified issues with organizing and/or setting priorities ; (vii) unspecified issues pertaining to becoming "overwhelmed;" (viii) unspecified impulsivity issues; (ix) unspecified issues with either understanding or respecting social boundaries; (x) unspecified issues with respecting hierarchy; (xi) unspecified issues with self-confidence or self-esteem (not being confident enough or lacking humility); unspecified maturity issues; (xii) presenting below expectations grades and/or academic progress; and (xiii) unspecified maturity issues; and

e. enjoining the destruction, transfer, concealment, or otherwise withholding of Defendants' records, including meeting minutes, organizational charts, communications, and any relevant documents or recording.

## **CONCLUSION**

For the foregoing reasons, the Plaintiff, Dr. Paige Finkelstein, is entitled to the requested emergency injunctive relief and other equitable relief deemed just and proper by this Court, in order to ensure and preserve the *status quo* by preventing the Defendants from further tortiously interfering with Dr. Finkelstein's business relationships, as well as actively withholding the provision of reference letters from its personnel, whether directly or through intimidation.

WHEREFORE, the Plaintiff, Dr. Paige Finkelstein, respectfully requests that this Court grant her Temporary Restraining Order as hereinabove stated for the reasons provided above, together with all further relief deemed just and proper by this Court.

Dated: June 01, 2023.                          Respectfully submitted,

                                         */s/ Richard H. Levenstein*

                                  Richard H. Levenstein
                                  Florida Bar No. 235296
                                  Gabrielle O. Sliwka
                                  Florida Bar No. 1022654
                                  Abby M. Spears
                                  Florida Bar No. 44662
                                  Primary E-mail: rlevenstein@nasonyeager.com
                                  gsliwka@nasonyeager.com;
                                  aspears@nasonyeager.com
                                  Secondary E-mail: ptreadway@nasonyeager.com;
                                  creyes@nasonyeager.com
                                  NASON, YEAGER, GERSON,
                                  HARRIS & FUMERO, P.A.
                                  3001 PGA Boulevard, Suite 305
                                  Palm Beach Gardens, Florida 33410
                                  Telephone:      (561) 686-3307
                                  *Attorneys for Plaintiff, Paige Finkelstein, M.D.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was emailed on May

24, 2023, or in the manner specified on all counsel or parties of record on the Service List below:

**<u>*Attorneys for Defendant, Mount Sinai Medical Center of Florida*</u>**
**<u>*and Defendant, Kfir Ben-David, MD*</u>**
Martin B. Goldberg, Esq.
David R. Ruffner, Esq.
Clark Splichal, Esq.
Lash & Goldberg LLP
Miami Tower
100 S.E. 2nd Street
Suite 1200
Miami, Florida 33131
Primary Email: mgoldberg@lashgoldberg.com; csplichal@lashgoldberg.com
druffner@lashgoldberg.com
Secondary Email: rdiaz@lashgoldberg.com; mwallace@lashgoldberg.com

**<u>*Attorneys for Defendant, Kfir Ben-David, MD*</u>**
Gary A. Orseck, Esq.
Lauren Cassady Andrews, Esq.
Kramer, Levin, Naftalis, & Frankel, LLP
2000 K Street, NW, 4th Floor
Washington, DC 20006
Primary Email: gorseck@kramerlevin.com; landrews@kramerlevin.com

By:    /s/ Richard H. Levenstein
           Richard H. Levenstein
           Florida Bar No. 235296
           Gabrielle O. Sliwka
           Florida Bar No. 1022654
           Abby M. Spears
           Florida Bar No. 44662