UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-cv-20188-ALTMAN/REID

PAIGE FINKELSTEIN, M.D.,

　　　　*Plaintiff*,

*v.*

MOUNT SINAI MEDICAL CENTER
OF FLORIDA, INC., *et al.*,

　　　　*Defendants.*

_____/

## OMNIBUS ORDER

　　　　A surgical resident sued her hospital and its residency director, alleging a litany of claims, including discrimination, retaliation, and harassment. The Defendants now move to strike certain allegations from the complaint, to dismiss all twenty-two counts, and to recover attorney's fees. We referred those motions to U.S. Magistrate Judge Reid, who recommended that we grant all three requests. After careful review, we agree and **GRANT** the Defendants' motions.

### THE FACTS

　　　　Our Plaintiff—Dr. Paige Finkelstein—"was a resident physician in the General Surgery Residency Program" at Mount Sinai Medical Center ("MSMC") who "planned on becoming a reconstructive surgeon upon completion of the program." Second Amended Complaint ("SAC") [ECF No. 125] ¶¶ 5, 7. She claims that Dr. Kfir Ben-David, the Director of the Surgical Residency Program and Chairman of the Department of Surgery at MSMC, "continually harassed and cajoled [her] while she was a Resident, singling her out for unwarranted discipline, degrading criticism, and efforts designed solely to drive her out of the Surgical Residency Program." *Id.* ¶ 12. And she alleges that, throughout her residency, she "voiced her concerns about the disparate treatment of female and

male residents," "observed and reported multiple instances in which female staff, including herself, were unprofessionally addressed," and "filed multiple whistleblower complaints, all concerning or related to patient safety and staff training issues." *Id.* ¶¶ 21, 23–24.

"As a result of making such reports of misconduct," the SAC maintains, "Dr. Finkelstein was formally disciplined." *Id.* ¶ 25. On one occasion, for instance, she was "placed on probation for two . . . months and accused of being rude and unprofessional." *Ibid.* And "[m]onths" later, MSMC again placed her on probation—and "accused [her] of being rude to Members of the Mount Sinai Staff and exhibiting a lack of professionalism"—after she reported an incident in which (she claimed) a psychiatric patient had "died as a result of the absence of necessary tools, supervision, and training to administer proper CPR." *Id.* ¶¶ 27–28.

"Shortly thereafter, on October 26, 2020," our Plaintiff received "a letter of Non-Renewal of her Surgical Residency Program." *Id.* ¶ 29. On January 13, 2021, she resigned from her residency. *See id.* ¶ 31. She did so, she claims, because she "was advised by Dr. Ben-David . . . that if she did not resign, she would be terminated." *Ibid.* But she alleges that, "[u]pon" her resignation, "Dr. Ben-David and MSMC Hospital Administration attempted to extort [her] into signing a General Release in exchange for being provided with . . . Completion Documents." *Id.* ¶ 33.[1]

In July 2021, Dr. Finkelstein "received an employment offer" from Mount Sinai Beth Israel Hospital ("Beth Israel") in New York "to serve as a House Surgeon." *Id.* ¶ 42. But after she "submit[ted] her credentials and application for medical staff privileges needed for that position," Beth Israel "denied" her application. *Ibid.* The SAC blames the Defendants for that rejection, alleging that "Dr. Ben-David either would not provide a reference or provided defamatory comments about her

---

[1] According to the SAC, Completion Documents are "documents required to be provided . . . by the American Counsel of Graduate Medical Education (ACGME), including a Summative Evaluation, Proof of Completion for at least two years of surgical residency, and [a] Diploma for completing the intern year of the General Surgery Residency." SAC ¶ 11.

to that Hospital, resulting in the Hospital rescinding its previous offer of employment for that position." *Ibid.* Our Plaintiff "has continued to interview with other hospital systems across the country," but "all of the applications which she submitted in order to continue her residency training and/or obtain[ ] employment as a physician were rejected." *Ibid.*

In September 2022, our Plaintiff sued MSMC and Dr. Ben-David (the "Defendants") in state court, asserting claims of wrongful termination and breach of contract, extortion, and intentional infliction of emotional distress ("IIED")—and seeking "emergency injunctive relief." *See* State Court Complaint [ECF No. 1-4] at 11. In November 2022, the Defendants "produced the Completion Documents." *Id.* ¶ 36. About a month later, in December 2022, our Plaintiff amended her complaint, adding discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Florida Civil Rights Act ("FCRA"). *See* Amended State Complaint [ECF No. 1-2]. So, in January 2023, the Defendants removed the action to federal court, invoking federal-question jurisdiction. *See* Notice of Removal [ECF No. 1] at 1; *see also* 28 U.S.C. § 1331. And, in July 2023, our Plaintiff filed the operative SAC.[2] As relevant here, two motions followed.

*First*, the Defendants filed a Motion to Dismiss and to Strike ("MTD") [ECF No. 146] in August 2023. That motion sought to dismiss all our Plaintiff's claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and argued that the SAC contained "certain frivolous allegations . . . that the parties had agreed Plaintiff would voluntarily excise lest Defendants file a Rule 11 motion for sanctions." *Id.* at 1. In September 2023, the Plaintiff filed a Response in Opposition to the MTD [ECF No. 155], and the Defendants filed a Reply in Further Support of their MTD [ECF

---

[2] Our Plaintiff first tried filing a *second* amended complaint in February 2023. *See* Second Amended Complaint [ECF No. 38]. But we struck that attempt because it was "an entirely new complaint" and because she failed to seek our leave before filing it. July 13, 2023, Paperless Order [ECF No. 111].

No. 162]. In January 2024, we referred the MTD to Magistrate Judge Lisette M. Reid. *See* Order of Referral [ECF No. 217].

*Second*, the Defendants filed a Motion for Attorney's Fees [ECF No. 201] in December 2023. That motion requested $85,430.34 in attorney's fees "incurred in (a) litigating the Sanctions Motion, (b) seeking this fee award, and (c) defending [against] Plaintiff's . . . Objection." *Id.* at 2.[3] The Plaintiff filed a Response in Opposition to the Motion for Attorney's Fees [ECF No. 210] that same month. In January 2024, the Defendants filed a Reply to the Response in Opposition to the Motion for Attorney's Fees [ECF No. 213]. We likewise referred the Motion for Attorney's Fees to Magistrate Judge Reid. *See* Order of Referral [ECF No. 204].

Starting with the MTD, Magistrate Judge Reid issued a Report and Recommendation ("R&R I") [ECF No. 223] in July 2024, recommending that we strike the relevant allegations from the SAC and grant the MTD. In July 2024, the Plaintiff filed her Objection to the R&R I ("Objection I") [ECF No. 226]. And, in August 2024, the Defendants filed their Response to that Objection ("Response I") [ECF No. 227].

As for the Motion for Attorney's Fees, Magistrate Judge Reid issued a Report and Recommendation ("R&R II") [ECF No. 234] in September 2025, recommending that we grant in part and deny in part the Defendants' Motion for Attorney's Fees. The Plaintiff objected to the R&R II that same month, *see* Plaintiff's Objections to R&R II ("Objection II") [ECF No. 235], and the

---

[3] In February 2023, we ordered [ECF Nos. 28, 36] our Plaintiff to "refrain from disseminating allegations concerning Dr. Ben-David's private life." Order on Defendants' Motion for Sanctions [ECF No. 191] at 1. But, in February 2023, we found that our Plaintiff's counsel had "violated the . . . Order . . . by raising the stricken allegations at [a] deposition," that his "failure to comply with the order" was in "bad faith," and that "[t]he appropriate sanction . . . [wa]s to assess attorney's fees." *Id.* at 7, 8. The Defendants thus filed their Motion for Attorney's Fees pursuant to our finding.

Defendants filed a response in October 2025, *see* Defendants' Response to Plaintiff's Objections ("Response II") [ECF No. 236].

## THE LAW

"District courts must review *de novo* any part of a magistrate judge's disposition that has been properly objected to." *Finkelstein v. Mount Sinai Med. Ctr. of Fla.*, 2023 WL 6118179, at *1 (S.D. Fla. Sept. 19, 2023) (Altman, J.); *see also* FED. R. CIV. P. 72(b)(3). "When a party timely objects to a magistrate judge's report and recommendation, the district judge must make a *de novo* determination 'of those portions of the report or specified proposed findings or recommendations to which objection is made.'" *Ibid.* (quoting 28 U.S.C. § 636(b)(1)). A "district court has broad discretion in reviewing a magistrate judge's report and recommendation." *Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009).

A motion challenging subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) may take the form of either a "facial attack" or a "factual attack." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990). "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Gainsburg v. Fla. Bar*, 2024 WL 2976742, at *2 (S.D. Fla. June 13, 2024) (Altman, J.) (cleaned up). And a "factual attack . . . challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony." *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008). In considering a factual attack on jurisdiction, "a district court is not limited to an inquiry into undisputed facts; it may hear conflicting evidence and decide for itself the factual issues that determine jurisdiction." *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991).

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Megladon, Inc. v.*

*Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1221 (S.D. Fla. 2023) (Altman, J.) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but legal conclusions without adequate factual support are entitled to no assumption of truth." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (cleaned up).

ANALYSIS

The Defendants move for three forms of relief. *First*, they ask us to strike allegations in the SAC that (they claim) violate an agreement between the parties. *Second*, they urge us to dismiss all twenty-two counts in the SAC. *Third*, they seek to recover $85,430.34 in attorney's fees pursuant to our earlier order imposing sanctions on the Plaintiff. We address these three requests in turn.

## I.      The Motion to Strike

We begin with the Defendants' request to strike certain allegations from the SAC. According to the Defendants, our Plaintiff "has not abided by her agreement" to "strike all portions of her SAC that allege or relate to Plaintiff's allegation that the Defendants sought to obtain a Non-Disclosure Agreement." MTD at 23 (cleaned up). Magistrate Judge Reid recommended that we "grant Defendants' motion and strike all references to a non-disclosure agreement from the SAC." R&R I at 7. We agree.

In June 2023, the Defendants moved to sanction the Plaintiff and her counsel under Federal Rule of Civil Procedure 11. *See* Motion for Sanctions [ECF No. 146, Exhibit 5]. In that motion, the Defendants explained that the Plaintiff had "advance[d] allegations that both she and her counsel know are false, specifically that Defendants 'extorted' her by trying to coerce her to sign a 'Non-Disclosure Agreement.'" *Id.* at 1; *see also ibid.* ("This allegation is directly contradicted by documentary

6

evidence *Plaintiff herself relies upon and attached* to her own pleadings, and . . . by her admissions in discovery that a 'Non-Disclosure Agreement' does not exist and sworn deposition testimony by her own lawyer that Mount Sinai never discussed, much less demanded, a non-disclosure agreement."). Our Plaintiff chalked up the issue to a "good faith misunderstanding." Goldberg Letter [ECF No. 146, Exhibit 6] at 1. And, on July 25, 2023, she moved to amend her complaint, noting that, "[i]n response to Defendants' service of a motion pursuant to [FRCP] 11, Plaintiff agreed to strike all portions of her . . . 'SAC' that allege or relate to Plaintiff's allegation that the Defendants sought to obtain a Non-Disclosure Agreement from Plaintiff." Amended Motion for Leave to Amend Complaint [ECF No. 119] at 4 n.1 (cleaned up).

That agreement went ignored. True, the SAC avoids using the terms "NDA" and "confidentiality agreement"—terms that had appeared fifty-two times in the previous version of the complaint. *See* R&R I at 6 n.2 (listing all references to those terms). But it attempts a workaround, cloaking those same allegations in different words. It insists, for instance, that the Defendants worked to "intimidate Dr. Finkelstein into signing a General Release, thus avoiding the medical community and the community at large, learning of Defendants' impermissible conduct." SAC ¶¶ 252, 273. And it recycles this approach repeatedly. *See, e.g., id.* ¶ 232 (alleging that the Defendants "used their position of power to extort General Releases"); *id.* ¶ 107 (alleging that the Defendants "forc[ed] her to sign a General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program"); *id.* ¶ 92 (describing "egregious attempts to prevent these facts from ever coming to light").

We take issue with our Plaintiff's attempt to circumvent our order. The SAC includes *fourteen* references to the Plaintiff's allegation that she was forced into silence, and those references effectively

mirror—in form and function—the NDA-related allegations our Plaintiff agreed to stop making.[4] And we're unpersuaded by her argument that "Magistrate Judge Reid erred in granting the Motion to Strike without considering the allegations in question and their relation to the controversy, or otherwise articulating how Defendants satisfy the 'exceedingly high standard' for striking any allegations." Objection I at 3. Magistrate Judge Reid reviewed the standard set out in Federal Rule of Civil Procedure 12(f), acknowledged the high bar for granting motions to strike, and explained that (in her view) the bar had been met in this case because of the Plaintiff's previous representation to this Court. *See* R&R I at 6–7. We see no error in that analysis—principally because we won't allow the Plaintiff to agree to remove certain untrue allegations from her complaint only to have her turn around and re-assert those same allegations using different words—and overrule the Plaintiff's objection.

## II.     The Motion to Dismiss

The Defendants argue that all twenty-two counts in the SAC fail to plausibly state a claim for relief. Magistrate Judge Reid agreed—and so do we.

### a.   Discrimination, Retaliation, and Harassment

The SAC asserts seven counts of sex discrimination, retaliation, disability discrimination, and sex harassment under Title VII, the FCRA, or the ADA. *See, e.g.*, Complaint ¶ 145 ("Dr. Finkelstein observed and reported multiple instances in which female staff was unprofessionally addressed as 'baby' and 'sweetheart' and asked if they were pregnant for 'acting hormonal.'"); *id.* ¶ 166 ("Dr. Finkelstein reported that female residents did not have the appropriately sized protection equipment, including lead vests and thyroid guards."); *id.* ¶ 190 ("Dr. Finkelstein, on multiple occasions, requested a reasonable accommodation for her disability, Attention Deficit/Hyperactivity Disorder (AD/HD)

---

[4] The Defendants highlight all fourteen paragraphs of the SAC that contain these references. *See* [ECF No. 146, Exhibit 4]. Those paragraphs include SAC ¶¶ 10, 41, 63, 64, 76, 79, 80, 92, 100, 107, 226, 232, 252, and 273.

to Dr. Ben-David," who "responded . . . by ridiculing and minimizing Plaintiff's disability."). Magistrate Judge Reid found that all these claims are "foreclosed as untimely." R&R I at 21. Our Plaintiff now argues that "Magistrate Judge Reid err[ed] in recommending that these claims be dismissed as time-barred on jurisdictional grounds." Objection I at 18. We disagree.

"Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1152 (11th Cir. 2020) (quoting 42 U.S.C. § 2000e–2(a)(1)). "Prior to filing a Title VII action, however, a plaintiff first must file a charge of discrimination with the EEOC." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004). "An EEOC charge is timely in a deferral state, like Florida, if filed within 300 days of the last discriminatory act." *Wen Liu v. Univ. of Miami Sch. of Med.*, 693 F. App'x 793, 796 (11th Cir. 2017). "Accordingly, only those claims arising within 300 days prior to the filing [with] the EEOC[ ] . . . are actionable." *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002).

Our Plaintiff resigned from Mount Sinai on January 13, 2021. *See* SAC ¶ 31. But she filed her charge with the EEOC *555* days later, on July 22, 2022—making it 255 days too late. *See id.* ¶ 138. Magistrate Judge Reid is thus correct that Counts X–XVI are untimely. Resisting this simple conclusion, the Plaintiff notes that the EEOC "did *not* determine that Plaintiff's negative reference allegations were time-barred." Objection I at 18; *see also* Notice of Right to Sue Letter [ECF No. 220-1] ("The EEOC will not proceed further with its investigation and makes no determination about whether future investigation would establish violations of the statute. This does not mean the claims

have no merits."). But that's irrelevant. Whether the EEOC said so or not, 555 is more than 300—and the statute required her to submit her claim within 300 days.[5]

"Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984). The "purpose" of the exhaustion requirement "is that the EEOC should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory*, 355 F.3d at 1279 (cleaned up); *see also Wu v. Thomas*, 863 F.2d 1543, 1548 (11th Cir. 1989) ("The purpose of the filing requirement is to insure that the settlement of grievances be first attempted through the office of the EEOC." (cleaned up)). Because we can't ignore the plain text of the statute—or the Supreme Court's description of its overarching purpose—we overrule the Plaintiff's objections as to Counts X–XVI.

**b.  Wrongful Termination and Breach of Contract**

Counts I and II of the SAC assert wrongful-termination and breach-of-contract claims. According to our Plaintiff, the parties entered into a Graduate Medical Education Program Agreement (the "GME"), under which they "had certain obligations," including to provide a "[h]arassment-free [w]ork [e]nvironment" and "[a]ccommodation[s] for [d]isabilities." SAC ¶ 59; *see also id.* ¶ 63 ("Also pursuant to that [GME] Agreement, Dr. Finkelstein was to serve as a resident in Surgical Residency without the imposition of any restrictive covenants by Defendants."). But she claims that the

---

[5] Our Plaintiff's FCRA and ADA claims—comprising Counts XI, XIII, XIV, and XV of the SAC—are similarly untimely. *See McClure v. Oasis Outsourcing II, Inc.*, 674 F. App'x 873, 874 (11th Cir. 2016) ("Plaintiffs proceeding under the ADA must comply with the same procedural requirements articulated in Title VII, and this includes the duty to exhaust administrative remedies."); *Rainey v. United Parcel Serv., Inc.*, 816 F. App'x 397, 401 (11th Cir. 2020) ("As a prerequisite to bringing an employment discrimination claim under the FCRA, an employee must file a complaint with the Florida Commission on Human Relations or the EEOC within 365 days of the alleged FCRA violation.").

Defendants breached that agreement by "fostering a hostile work environment in which sexual discrimination and harassment ran rampant" and by "failing to ensure an educational environment in which residents such as Dr. Finkelstein could raise and resolve issues without fear of intimidation or retaliation." *Id.* ¶ 61.[6]

Magistrate Judge Reid offered independent grounds for dismissing these counts. *First*, she urged us to dismiss them because the "Plaintiff's breach of contract claim is merely a work-around for her failure to timely satisfy the prerequisites for filing a discrimination claim in federal court." R&R I at 8. *Second*, she recommended dismissal because our "Plaintiff also failed to exhaust the grievance policy included in the binding GME." *Id.* at 10. *Third*, she noted that the GME lacked a restrictive covenant—and she pointed out, in any event, that the terms of that provision "do not last longer than Plaintiff's termination." *Id.* at 11. *Fourth*, she observed that "Dr. Ben-David was neither a party nor signatory to any agreement in his personal capacity." *Id.* at 12.[7]

Our Plaintiff offers two main objections to those findings. *First*, she contends that Magistrate Judge Reid's preemption analysis was "erro[neous]" because "Counts I and II allege nothing more, and nothing less, than a breach of the [GME]," and because Title VII forms an exclusive remedy only when a plaintiff is a "federal employee." Objection I at 5–6. *Second*, she insists that she "unequivocally

---

[6] Our Plaintiff further alleges that the Defendants breached the agreement by "tr[ying] to force Dr. Finkelstein into signing a General Release, agreeing not to divulge any events or facts concerning the Surgical Residency Program, and releasing both Defendants from liability with respect to any and all claims related to her Surgical Residency Program experience, as a pre-condition to receiving the Completion Documents." SAC ¶ 63. But we've now struck that allegation as violative of our Plaintiff's agreement to refrain from rehashing NDA-related allegations.

[7] Separately, Magistrate Judge Reid noted that "the Court has already decided that the ACGME cannot be used to state a private right of action by a resident." R&R I at 12. Our Plaintiff counters that "nowhere in Counts I or II does Plaintiff predicate her breach of contract claims on the ACGME," as "[b]oth causes of action are squarely based on the GME." Objection I at 12. Given that our Plaintiff now explicitly disclaims reliance on the ACGME as the predicate for her breach-of-contract claims, *see ibid.* ("The fact that Plaintiff dares to point out that Defendants also happen to be regulated by the ACGME does not and should not moot her well-pled causes of action for breach of the GME" (citations omitted)), we needn't address her ACGME argument.

did avail herself of the grievance policy"—which, in any event, "is permissive and not mandatory"—by "raising issues related to her working environment with Defendants." *Id.* at 9.

Fortunately, we needn't resolve the preemption question today[8] because Counts I and II fail for the simple reason that the Plaintiff—as she concedes—never *exhausted* the applicable grievance requirement. According to the SAC, "Defendant's breach of the GME Agreement was such that Plaintiff was not afforded the opportunity to exhaust her contractual remedies." SAC ¶ 64; *see also* MTD at 8 n.4 ("[T]he Designated Institutional Official for MSMC's residency programs . . . attests that no petition from Plaintiff was ever received by MSMC to appeal her termination.").

Our Plaintiff justifies this failure by arguing that "she was never advised that she had the right to such remedies, nor was she provided with a valid venue to dispute Defendants' findings and decisions." SAC ¶ 64. But nothing in the GME requires the Defendants to remind potential plaintiffs about the inner workings of the grievance procedure. *See generally* GME [ECF No. 125, Exhibit B]. And the GME provides a clear and neutral venue for pursuing claims. *See, e.g., id.* at 5 ("The APPOINTEE subject to a Disciplinary Action . . . may petition the Chief Executive Officer of the MEDICAL CENTER for an appeal hearing before a Disciplinary Hearing Committee within ten working days of receiving written notice of the action . . . . None of the members of the Committee

---

[8] But district courts within the Eleventh Circuit have held that "Title VII is intended to provide the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions." *Wainberg v. Piedmont Univ.*, 2023 WL 3931506, at *22 (N.D. Ga. Mar. 7, 2023); *see, e.g., Heatherly v. Univ. of Ala. Bd. of Trs.*, 2018 WL 3439341, at *20 (N.D. Ala. July 17, 2018) ("Title VII is the exclusive remedy for employment discrimination claims against federally funded programs."); *Tompkins v. Barker*, 2011 WL 3583413, at *5 (M.D. Ala. July 26, 2011) ("The undersigned can conceive of no reason why Congress would intend that a plaintiff-employee of a federally funded education institution be allowed to circumvent the unique legal and administrative requirements imposed on employees asserting identical employment discrimination claims under Title VII merely because the plaintiff is employed by a federally funded educational institution."); *Hazel v. Sch. Bd. of Dade Cnty.*, 7 F. Supp. 2d 1349, 1354 (S.D. Fla. 1998) ("[T]his Court believes that the line of cases that hold that Title VII is the exclusive remedy for employment discrimination claims on the basis of sex in federally funded educational institutions are the better reasoned cases.").

shall be from the APPOINTEE's department . . . . The parties to the hearing may call witnesses, present documentary evidence, and participate in the proceedings which shall be recorded.").

Nor can our Plaintiff excuse that failure on the theory "that any availment of these remedies would have been futile." Objection I at 10 n.7. The SAC alleges that, when the Plaintiff "inquired about her rights to appeal Defendants' decisions . . . she was intimidated against seeking any remedy, being told that she would not be able to secure a favorable recommendation unless she left quietly." SAC ¶ 64. This allegation suggests a fear of *backlash*, but not a fear that an administrative appeal would've inevitably resulted in a denial. Our Plaintiff thus never actually raised—and so forfeited—a futility argument.[9] *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits it.").

In sum, these claims fail on their own terms. If the GME qualifies as a contract, it requires exhausting available contractual remedies. *See Metro. Dade Cnty. v. Recchi Am., Inc.*, 734 So. 2d 1123, 1125 (Fla. Dist. Ct. App. 1999) ("Permitting parties to litigate in court where there is a legal or contractual obligation to proceed only administratively, constitutes a departure from the essential requirements of law." (cleaned up)). And if the GME is *not* a contract, then our Plaintiff cannot establish the breach of a binding agreement. We therefore overrule her objections as to Counts I and II.

### c. IIED

Counts III and IV of the SAC assert IIED claims. *See* SAC ¶¶ 83–96. Our Plaintiff alleges that she was "the victim of a relentless campaign to discredit her" and "subjected to constant outrageous

---

[9] Nor did our Plaintiff raise this argument in her Response to the MTD. Instead, she argued only that the "assertions . . . that Dr. Finkelstein's failure to exhaust the contractual remedies are fully addressed by the SAC," and that "even if these assertions were not sufficiently addressed by the SAC (they are), the contract sections in dispute are reasonably susceptible to more than one interpretation, and thus this issue should be decided at the summary judgment stage." *Id.* at 9.

verbal harassment, often lewd or sexual in nature," including references to "female organs." *Id.* ¶¶ 86, 93; *see, e.g.*, *id.* ¶ 14 ("Dr. Finkelstein was inappropriately questioned several times about her romantic relationships and whether she was single while also being told that she was not allowed to date 'any of the surgery residents.'"); *id.* ¶ 21 ("Dr. Finkelstein observed and reported multiple instances in which female staff, including herself, were unprofessionally addressed as 'baby' and 'sweetheart' and asked if they were pregnant for 'acting hormonal.' Defendants consistently dismissed these complaints, telling Dr. Finkelstein to 'toughen up.' On another such occasion, Dr. Ben-David also told Dr. Finkelstein that she was 'deficient in her maintenance of emotional health.'"). But Magistrate Judge Reid found that these allegations "do[ ] not rise to the high pleading standard required to state a cause of action for [IIED]." R&R I at 14. And we agree.

"In Florida, to prove [IIED], a plaintiff must show that (1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous, beyond all bounds of decency, and odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." *Moore v. Pederson*, 806 F.3d 1036, 1053 (11th Cir. 2015). "[T]ortious or criminal intent, or intent to inflict emotional distress, standing alone, is not enough." *Ibid.* "Instead, Florida courts have found liability only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Ibid.* (cleaned up); *see also* Restatement (Second) of Torts, § 46, Comment d (1965) ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'").

The allegations here fall well short of that standard. We agree with Magistrate Judge Reid that the conduct described in the SAC, "if true, is reprehensible." R&R I at 14; *see also* Objection I at 12. But "even allegations of reprehensible, objectionable, and offensive conduct have been rejected as

insufficient to state a claim for [IIED]" under Florida law. *Cooper v. Empower U, Inc.*, 603 F. Supp. 3d 1317, 1322 (S.D. Fla. 2022) (Bloom, J.) (cleaned up); *see also Williams v. Worldwide Flight SVCS., Inc.*, 877 So. 2d 869, 870 (Fla. Dist. Ct. App. 2004) ("Liability . . . does not extend to mere insults, indignities, threats, or false accusations."). And that's because "Florida courts use a very high standard in evaluating whether the facts alleged are sufficiently outrageous to support a claim for [IIED]." *Foreman v. City of Port St. Lucie*, 294 F. App'x 554, 557 (11th Cir. 2008); *see also Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1368 (11th Cir. 2024) ("[T]he standard for outrageous conduct is particularly high in Florida." (cleaned up)).

Still, our Plaintiff insists that Magistrate Judge Reid "err[ed] in concluding, as a matter of law, that Plaintiff's claims are untenable without permitting Plaintiff to develop an evidentiary record with respect to Defendants' conduct." Objection I at 14. Not so. "In Florida, whether conduct is outrageous enough to support a claim of [IIED] is a question of law to be decided by the courts at the earliest opportunity, not a question of fact for the jury." *Plowright*, 102 F.4th at 1368 (cleaned up). And that makes sense: "[A] high standard for determining what kind of emotional distress is remediable in a claim for intentional infliction is necessary to prevent the tort from becoming a venue for litigation over every emotional injury." *Brown*, 843 F. App'x at 189 (cleaned up).

In short, "[s]evere emotional distress means emotional distress of such a substantial quality or enduring quality that no reasonable person in a civilized society should be expected to endure it." *Brown v. Bellinger*, 843 F. App'x 183, 188 (11th Cir. 2021) (cleaned up). And, "[i]n deciding whether conduct reaches this level, courts must make an objective determination; the subjective response of the person suffering emotional distress does not control." *Gomez v. City of Miami*, 696 F. Supp. 3d 1176, 1195 (S.D. Fla. 2023) (Williams, J.); *see also Cooper*, 603 F. Supp. at 1321 ("Whether conduct is sufficiently outrageous to state a claim for IIED is a question of law for the Court to decide." (cleaned

up)). Because our Plaintiff fails to meet this high threshold, we overrule her objections as to Counts III and IV.

### d. Tortious Interference

Counts V and VI assert claims of tortious interference. According to our Plaintiff, Beth Israel "rescind[ed] its previous offer" because "Dr. Ben-David either would not provide a reference or provided defamatory comments about her to that Hospital." SAC ¶ 99. Magistrate Judge Reid offered two reasons for her suggestion that we dismiss those claims. *First*, she observed that the offer at issue here "appeared to be contingent upon information from Defendants," and a "conditional offer . . . does not generally give rise to sufficient legal rights to support a plaintiff's claim." R&R I at 16–17. *Second*, she found that, "[r]egardless of whether there was no, little, or much malice that caused Plaintiff's termination, it was not the *sole* cause." *Id.* at 17. Our Plaintiff objects to the first finding by arguing that the Beth Israel offer "unquestionably afforded Plaintiff a prospective contractual right to work for Beth Israel as a house surgeon." Objection I at 14. And she objects to the second by contending that the question of malice involves "a balancing of the evidence, which the Court cannot do on a motion to dismiss." *Id.* at 15. Both objections fail.

"It is the settled law in Florida that tortious interference requires proof of each of three elements: (1) [t]he existence of a business relationship under which the plaintiff has legal rights; (2) an intentional and unjustified interference with the relationship by the defendant; and (3) damage to the plaintiff as a result of the tortious interference with the relationship." *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1534 (11th Cir. 1985). "[W]here the plaintiff alleges only a *prospective* business relationship—and thus the plaintiff has a mere expectancy of a *new* relationship—the privilege of interference . . . bars only interference consisting of malicious conduct." *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1280 (11th Cir. 2015) (cleaned up). And to "succeed on a tortious interference claim under Florida law using an improper motive theory, the plaintiff must prove that

the defendant's motive was *purely* malicious." *KMS Rest. Corp. v. Wendy's Int'l*, 361 F.3d 1321, 1327 (11th Cir. 2004) (emphasis added).

Our Plaintiff concedes that she received a *prospective* offer from Beth Israel, which means she must allege pure malice. But the SAC claims only that the Defendants acted "in bad faith as part of [a] smear campaign motivated by discrediting [her]." SAC ¶ 100. So, nothing in the SAC suggests that the Defendants acted *only* out of malice.[10] *Cf. Gunder's Auto Ctr. v. State Farm Mut. Auto. Ins.*, 422 F. App'x 819, 822 (11th Cir. 2011) ("As a matter of law, there can be no claim for tortious interference with a business relationship where the action complained of is undertaken to safeguard or promote one's financial or economic interest." (cleaned up)). And nothing stops us from dismissing tortious-interference claims that haven't been plausibly alleged. *See, e.g.*, *Shenzhen Kinwong Elec. Co. v. Kukreja*, 574 F. Supp. 3d 1191, 1214 (S.D. Fla. 2021) (Altman, J.) ("It's simply implausible to believe, in other words, that the Plaintiffs' *sole* motive was to maliciously harm the Defendants."). Because we agree with Magistrate Judge Reid that the tortious-interference claim relies on "general allegations and speculative reasoning," we overrule our Plaintiff's objections as to Counts V and VI. *Ibid.*

### e. Defamation

Our Plaintiff also asserts two counts of defamation. She claims that Dr. Ben-David and other MSMC "agents" made "misrepresentations pertaining to [her] lack of professionalism or abilities as a prospective resident or medical professional to residency programs or prospective employers," and that those statements were "knowingly false." SAC ¶¶ 115, 120. Magistrate Judge Reid recommended

---

[10] In alleging that Beth Israel revoked its offer "because Dr. Ben-David either would not provide a reference or provided defamatory comments about her to that Hospital," our Plaintiff assumes an *entitlement* to a letter of recommendation. SAC ¶ 42. But that ignores the inconvenient fact that hospitals have little interest in recommending physicians who've been "formally disciplined and placed on probation." *Id.* ¶ 25. And, as the MTD points out, our Plaintiff "*expressly authorized* Beth Israel to contact MSMC regarding her credentialing application," undercutting the suggestion that the Defendants—driven *solely* by malice—sought proactively to tank her job prospects. MTD 11 n.7.

dismissing these claims because "there is no specific instance of a defamatory statement in [the] Complaint." R&R I at 18; *see also ibid.* ("Plaintiff alludes to such defamatory statements, but nowhere in her Complaint does she mention what precisely the defamatory statements were."). As our Plaintiff sees it, that finding "is error and contravenes the allegations of the Second Amended Complaint," which "plainly set forth the false statements that undergird [the] claims for defamation." Objection I at 16.

But we see no such false statements "plainly set forth" in the SAC. To the contrary, the SAC offers only that the Defendants made "misrepresentations" about the Plaintiff's "professionalism or abilities" and that the falsity of those statements "is easily verifiable by comparing Dr. Ben-David's assessment . . . to the assessment made by Dr. Finkelstein's faculty and mentors, as she has received several recommendation letters which debunk the falsities divulged by Dr. Ben-David with the purpose of tarnishing Dr. Finkelstein's reputation." SAC ¶ 115. These vague allusions to falsity don't suffice.

"To prove defamation under Florida law, a plaintiff must establish" five elements: "(1) publication; (2) falsity; (3) . . . knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligen[ce] on a matter concerning a private person; (4) actual damages; and (5) . . . defamatory [content]." *Johnston v. Borders*, 36 F.4th 1254, 1275 (11th Cir. 2022) (cleaned up). By failing to provide an *actual statement* attributed to the Defendants, our Plaintiff doesn't plausibly say whether the statements are "readily capable of being proven false" or whether they're "protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). Nor does she plausibly allege the publication, falsity, or defamatory nature of *any* specific statement. So, we agree with Magistrate Judge Reid that, "[i]f a defamation claim leaves the Court only to guess what the defamatory statement could be, it should be dismissed for failure to state a claim." R&R I at 19. We thus overrule the Plaintiff's objections as to Counts VII and VIII.

### f. Extortion

Count IX alleges extortion. According to our Plaintiff, the Defendants "refused to provide [her] with the Completion Documents unless she executed a General Release of All Claims and a Confidentiality Agreement" and "engaged in this concerted effort by disseminating disparaging comments about her to prospective employers and residency programs . . . in efforts to discredit her." SAC ¶¶ 130–31. On that basis, she alleges that Dr. Ben-David "used his position and influence as Program Director to conduct MSMC's affairs through an unlawful RICO pattern of activity, using MSMC as a vehicle." *Id.* ¶ 132; *see also id.* ¶ 134 ("Defendants' actions, as a continuing unit functioning with a common purpose, were therefore unlawful, and by requiring Plaintiff to sign General Releases as a condition to obtain documents to which Plaintiff was lawfully entitled to receive, these actions constitute extortion and blackmail, in violation of RICO.").

Magistrate Judge Reid rejected this theory too. *First*, Magistrate Judge Reid noted that, "even if Defendants failed to supply Plaintiff with Completion Documents, that single act cannot constitute a pattern of racketeering activity because it would constitute only a single act." R&R I at 20. *Second*, Magistrate Judge Reid concluded that our Plaintiff's "generalized contention that requiring her to sign a general release prevented her from obtaining a residency and/or obtaining employment as a physician is simply insufficient to establish proximate causation." *Id.* at 21. Our Plaintiff objects to both findings, arguing that the SAC "sets forth that Defendants committed more than one predicate act of extortion" because they "represent[ed] more than once that the Completion Documents would only be provided after she signed a General Release," and that "Magistrate Judge Reid [wa]s required to take Plaintiff's allegations with respect to proximate causation as true." Objection I at 17–18.

We agree with Magistrate Judge Reid that "there is nothing in Plaintiff's [SAC] to satisfy the elements of a RICO cause of action." R&R I at 20. "[T]o state a prima facie civil RICO claim under 18 U.S.C. § 1964(c), a plaintiff must establish three essential elements: first, that the defendant

19

committed a pattern of RICO predicate acts under 18 U.S.C. § 1962; second, that the plaintiff suffered injury to business or property; and, finally, that the defendant's racketeering activity proximately caused the injury." *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014) (cleaned up). Our Plaintiff falters at the first step because she hasn't shown that the Defendants "agreed to commit *two* predicate acts." *Republic of Panama v. BCCI Hldgs. (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997) (emphasis added). Instead, the SAC alleges that the Defendants engaged in only *one* predicate act—"extortion and blackmail, in violation of RICO." SAC ¶ 134.

Our Plaintiff argues that alleging only *that* one act suffices, since the Defendants tried extorting her "on multiple occasions." Objection I at 17. But even under that reading, the SAC still fails to show "[*c*]*ontinuity* of racketeering activity." *United States v. Browne*, 505 F.3d 1229, 1259 (11th Cir. 2007) (emphasis added). "To prove a RICO violation under both federal and Florida law, a plaintiff must establish, among other things, 'continuity,'" which requires showing *either* "a closed period of repeated conduct" *or* "past conduct that by its nature projects into the future with a threat of repetition." *Daedalus Cap. LLC v. Vinecombe*, 625 F. App'x 973, 976 (11th Cir. 2015) (cleaned up). Our Plaintiff shows neither. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not suffice." *Browne*, 505 F.3d at 1259. And the SAC acknowledges that the Defendants have already handed over the Completion Documents. *See* SAC ¶ 36 ("Defendants produced the Completion Documents only after the filing of a complaint with the ACGME and the filing of this action by Plaintiff in October of 2022.").

In sum, our Plaintiff fails to allege that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or that "the predicate offenses are part of an ongoing entity's regular way of doing business, including where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Browne*, 505 F.3d at 1260 (cleaned up); *see also Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1265 (11th Cir. 2004)

("The continuity element of a pattern of racketeering activity is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address—one that is part of a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into the future."). So, we overrule this objection too.

### g.  Negligent Supervision and Retention

Count XVIII brings a negligent-supervision claim. And Count XIX asserts a negligent-retention claim. According to the Plaintiff, "MSMC negligently placed, and continued to place, employees, such as Plaintiff, under the supervision of a repeat offender when it either knew or should have known that Dr. Ben-David had the propensity to create a hostile work environment due to continuous sexual harassment of MSMC's female employees and other discriminatory practices." SAC ¶ 227. Magistrate Judge Reid recommended that we dismiss both counts, finding that the claims "are, in fact, not torts but untimely civil rights claims cloaked as state law causes of action." R&R I at 23. Our Plaintiff objects to that finding, maintaining that the SAC "asserts a cause of action for [IIED], which is a recognized tort under Florida law." Objection I at 19. But that argument serves only to confirm Magistrate Judge Reid's holding.

Florida law requires that a plaintiff bringing claims of negligent supervision or retention "show that the employee engaged in a tort which is recognized under common law." *Footstar Corp. v. Doe*, 932 So. 2d 1272, 1278 (Fla. 2d DCA 2006); *see also Cendan v. Sch. Bd. of Broward Cnty.*, 628 F. Supp. 3d 1191, 1218 (S.D. Fla. 2022) (Altman, J.) ("Implicit in all this is a requirement that the employee engage in *some* tortious conduct."). But we've already determined that our Plaintiff has failed to state an IIED claim. And since our Plaintiff challenges Magistrate Judge Reid's finding solely on the basis of her IIED claim, we overrule her objection as to Counts XVIII and XIX.

### h.  Vicarious Liability

Count XVII advances a vicarious-liability claim against MSMC. According to our Plaintiff, "Defendant MSMC is vicariously liable for Dr. Ben-David's misconduct because . . . the . . . alleged misconduct was committed during the course of his employment . . . and to further MSMC's interests." SAC ¶ 222. In recommending that we dismiss this claim, Magistrate Judge Reid explained that, because our "Plaintiff's tort claims against Dr. Ben-David fail as a matter of law," the "claim against Mount Sinai also fails." R&R I at 23.

We agree. "[T]he principle of vicarious liability allows an otherwise non-faulty employer to be held liable for the negligent acts of that employee acting within the scope of employment." *Holland v. Carnival Corp.*, 50 F.4th 1088, 1094 (11th Cir. 2022) (cleaned up). But our Plaintiff fails to show that Dr. Ben-David acted negligently. *See* Objection I at 19 ("As Plaintiff has argued herein, her tort claims against Dr. Ben-David for intentional infliction of emotional distress, tortious interference, and defamation do not fail as a matter of law; hence, her claim against [MSMC] for vicarious liability must be preserved."). So, any claim for vicarious liability likewise fails. We thus overrule this objection.

### i.  Injunctive Relief

Finally, Counts XXI and XXII seek injunctive relief. *See* SAC ¶ 260 ("Plaintiff requests that an Emergency Injunction be entered . . . prohibiting Dr. Ben-David from providing any information to Third Parties related to the performance by Dr. Finkelstein as a General Surgery Resident at Mount Sinai and requiring another representative of MSMC to be agreed upon by Plaintiff and MSMC, to provide such information in a fair and objective way."); ¶ 279 (requesting a permanent injunction to the same effect). Recommending that we deny this relief, Magistrate Judge Reid explained that "[t]he Court has already ruled that injunctive relief is not warranted in this case." R&R I at 24.

Our Plaintiff counters that Magistrate Judge Reid "misapprehends the nature of Plaintiff's request," as "Plaintiff does not seek to regulate or control Defendants' speech" but insists that "Mount

Sinai work with her to designate somebody other than Dr. Ben-David to provide information about Plaintiff to third parties in a fair and objective way." Objection I at 20. This objection also fails.

We've already found that our Plaintiff "has failed to show irreparable harm." *Finkelstein*, 2023 WL 6118179, at *8. And that's an important element of her claims for injunctive relief. *See Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) ("In awarding preliminary injunctions, courts determine if a plaintiff is *likely* to succeed on the merits—along with the risk of irreparable harm, the balance of equities, and the public interest."). Plus, "any motion or suit for either a preliminary or permanent injunction must be based upon a cause of action." *Ala. v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005); *see also Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1098 (11th Cir. 2004) ("[A] traditional injunction is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed."). But our Plaintiff has utterly failed to state *any* viable cause of action. Since "the plaintiff's rights have not been violated, [s]he is not entitled to any relief, injunctive or otherwise," *ibid.*—and so we overrule this objection too.

### III.    Motion for Award of Attorney's Fees

We turn next to the Defendants' request for attorney's fees. The Defendants seek to recover $85,430.34 for 115.54 hours of work. *See* R&R II at 7–8 ("Specifically, according to Defendants' billing records, the requested fees are: (a) 57.1 hours and $35,872 for drafting the Motions for Fees; (b) 34.08 hours and $28,740.26 for drafting the Motions for Sanctions; (c) 16.76 hours and $12,449.50 for drafting Reply in Support of Motion[;] . . . and (d) 8.6 hours and $9,441 for drafting Response to Plaintiff's Objections to the November 6, 2023 Order."). Magistrate Judge Reid recommended that we award only $45,003.65 in fees. *See id.* at 12. The Defendants accept that recommendation, *see generally* Response II, but our Plaintiff objects, arguing that Magistrate Judge Reid relied on unreasonable rates, neglected to reduce the award sufficiently, and applied an across-the-board reduction to the wrong lodestar, *see* Objection II at 4–5, 8. We address these three objections in turn.

### a. Hourly Rates

The $85,430.34 in fees the Defendants seek reflect the work of five different attorneys. Three of those attorneys—Martin Goldberg, Clark S. Splichal, and Benjamin R. Shiekman—worked at the law firm of Lash Goldberg. The other two—Gary Orseck and Lauren Cassady Andrews—worked at Kramer Levin Naftalis & Frankel LLP ("Kramer Levin").[11] The Defendants requested an hourly rate of $895.00 (or else $760.75) for Goldberg, $493.00 for Splichal, $493.00 for Shiekman, $1,280.00 for Orseck, and $755.00 (or else $735.00) for Andrews. As to Splichal and Shiekman, Magistrate Judge Reid recommended that we approve the requested hourly rates. As to the others, Magistrate Judge Reid suggested that we approve an hourly rate of $850.00 for Goldberg, $850.00 for Orseck, and $755.00 for Andrews.

Our Plaintiff challenges that recommendation as to Goldberg, Orseck, and Andrews. As she sees it, "a rate . . . between $500 to $700 is far more appropriate" for Goldberg and Orseck, and "an hourly rate that is more in line with her co-counsel's of comparable experience" is more reasonable for Andrews. We disagree. This "court is itself an expert on th[is] question and may consider its own knowledge and experience concerning reasonable and proper fees." *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (cleaned up). And given the "skills, experience, and reputation" of Goldberg, Orseck, and Andrews, we find the proposed rates reasonable. *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984).

Goldberg is "a founding partner of Lash Goldberg," Orseck served as "co-managing partner of Kramer Levin's Washington D.C. office" and "Chair of Kramer Levin's Complex Commercial Litigation Practice," and Andrews at the time had "more than six years of complex litigation experience." R&R II at 5–6. Plus, as Magistrate Judge Reid explained, our District has awarded similar

---

[11] As Magistrate Judge Reid noted, Kramer Levin merged with another firm in May 2025 to form the new law form of Herbert Smith Freehills Kramer. *See* R&R II at 6 n.7.

fees to attorneys of like caliber. *See, e.g.*, *CITGO Petroleum Corp. v. Petroleum Logistics Serv. USA, Inc.*, 2022 WL 17716483, at *1 (S.D. Fla. Dec. 15, 2022) (Altman, J.) (adopting an hourly rate of $850 for partners at Willkie Farr & Gallagher LLP and at Jones Day); *Glob. Digital Sols., Inc. v. Grupo Rontan Electro Metalurgica, S.A.*, 2021 WL 7630524, at *2 (S.D. Fla. Aug. 16, 2021) (Middlebrooks, J.) (awarding an hourly rate of $820 for an "excellent" Boies Schiller Flexner LLP attorney); *Circuitronix, LLC v. Shenzhen Kinwong Elec. Co.*, 2020 WL 9458712, at *1 (S.D. Fla. Mar. 17, 2020) (Ungaro, J.) (adopting award of an hourly rate of $889.26 for a Shanghai-based attorney and of $787.50 for a Carlton Fields partner). We therefore overrule the Plaintiff's first objection to the fees ruling.

### b. Across-the-Board Reductions

The Lash Goldberg and Kramer Levin attorneys billed 115.54 hours of work. *See* R&R II at 7. Magistrate Judge Reid recommended "a 45% across-the-board reduction" in the hours billed by Kramer Levin and a "52% across-the-board reduction" in the hours billed by Lash Goldberg, leaving the Defendants to "recover a total of $45,003.65 in attorney's fees." *Ibid.*; *see also id.* at 9 (explaining that the reductions account for the fact that "the time expended is excessive and shows duplicative efforts"). Our Plaintiff "agrees with and appreciates Magistrate Judge Reid's decision to reduce each lodestar by approximately half," but "submits that greater reductions are warranted here." Objection II at 8.

We're satisfied with Magistrate Judge Reid's across-the-board reductions. Our Plaintiff argues that the "lodestar should be reduced even further to yield a fee award that reflects a more judicious application of legal resources." *Ibid.* Indeed, she insists that "[a]ny fee award here should be eliminated" because her "counsel did not violate the Court's directives." *Id.* at 8–9. But, as we explained above, we disagree with that revisionist history. Our Plaintiff failed to comply with this Court's order. And we agree with Magistrate Judge Reid that the award serves to "deter further violations of the orders of this Court." R&R II at 12. We thus overrule this second objection.

### c. Calculating the Lodestar

Finally, our Plaintiff points to "clerical errors" in Magistrate Judge Reid's calculations. Objection II at 5. She explains that Magistrate Judge Reid applied the across-the-board reductions to the *original*—as opposed to the *new*—lodestar, which means that the total award should've summed to $41,805.71, not $45,003.65. *See ibid.* The Defendants, in turn, "do not dispute Plaintiff's math," but contend that the error "is not a basis for the Court to reduce the amount awarded beyond the hefty discount [Magistrate] Judge Reid already applied." Response II at 8.

In our view, this clerical error doesn't change the fact that the Plaintiff's lawyer's misconduct spawned the additional briefing—and billing—in the first instance. *See, e.g.*, R&R II at 11–12 ("[T]he amount takes into account . . . the fact that the misconduct involved violating a simple order of the Court. Plaintiff's counsel understood he was not to refer to salacious and irrelevant material that had been stricken from Plaintiff's Complaint about Dr. Ben-David, yet he still questioned Dr. Ben-David's own colleagues on this topic."). Still, in the interest of correcting that clerical error, we reduce the proposed award from $45,003.65 to $41,805.71. So, we sustain the Plaintiff's third objection.

But that leaves one last item of business. The Defendants "request the opportunity to submit an application for fees incurred in responding to the Objection" as well as "leave to submit an application for fees incurred in preparing their reply in support of their fee application." Response II at 8 n.9. In light of the misconduct we've just described, we grant that request.

### IV.    Leave to Amend

Our Plaintiff never moved for leave to file a *third* amended complaint. But, in the final line of her Response in Opposition to Defendants' MTD [ECF No. 161], she requested "leave to amend as applicable" *if* "the Court is inclined to dismiss or strike any portion of the Second Amended Complaint." *Id.* at 17. Magistrate Judge Reid recommended dismissing the entirety of the SAC— without specifying whether that dismissal should be with prejudice. And, in objecting to the R&R I,

our Plaintiff argues that Magistrate Judge Reid "err[ed] by not considering Plaintiff's request for leave to amend." Objection I at 3. As she sees it, the need for leave to amend proves "especially" important here, since "the Report and Recommendation represents the first judicial review of Plaintiff's complaint by a state or federal court judge." *Id.* at 4.

The Defendants argue in turn that the R&R I "holds that Plaintiff's claims are dismissed with prejudice," since Magistrate Judge Reid "did not provide that Plaintiff has leave to amend her complaint yet again." Response II at 4. And they emphasize, among other things, that the "conditional, one-line request for leave to amend in [the] response to Defendants' [MTD] is not sufficient," that "[a] counseled plaintiff has no right to an amendment without submitting a motion for leave," and that another amended complaint would inflict "undue prejudice" and prove "futil[e]." *Id.* at 5–6.

We agree with the Defendants. Federal Rule of Civil Procedure 15 provides that "[a] party may amend its pleading once as a matter of course within . . . 21 days after serving it." FED. R. CIV. P. 15(a)(1)(A). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave," but "[t]he court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). As the Eleventh Circuit has made clear, "filing a motion is the proper method to request leave to amend a complaint, and that . . . motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) (cleaned up).

Our Plaintiff disregarded those requirements. Instead of moving for leave to amend, she tacked a cursory request to the close of her Response in Opposition to Defendants' MTD and did so without *any* argument as to how an amended complaint would overcome the deficiencies the Defendants (and Magistrate Judge Reid) identified in her SAC. But "[a] request for a court order must be made by motion" that "state[s] with particularity the grounds for seeking the order." FED. R. CIV. P. 7(b)(1). What's more, "where a request for leave to file an amended complaint simply is imbedded

27

within an opposition memorandum, the issue has not been raised properly." *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1277 (11th Cir. 2018) (cleaned up); *see also Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1298 (11th Cir. 2025) ("The only place that [Plaintiff] requested leave to amend was on the last page of his response in opposition to the defendants' motions to dismiss," so "it had no legal effect." (cleaned up)).

We've already allowed our Plaintiff to amend her complaint once before. *See* July 27, 2023, Paperless Order [ECF No. 119].[12] And we see no reason to ignore our procedural rules. We therefore deny the Plaintiff's improper request for leave to amend her complaint *again*.[13]

## CONCLUSION

After careful review, we hereby **ORDER and ADJUDGE** as follows:

1. Magistrate Judge Reid's R&R I [ECF No. 223] is **ADOPTED**.

    a. The Plaintiff's Objections to the R&R I [ECF No. 226] are **OVERRULED**.

---

[12] Plus, our Plaintiff had already amended her complaint back in February 2023. *See* Second Amended Complaint [ECF No. 38]. So, this is really her *third* bite at the apple. We don't think any litigant—especially a counseled one—deserves to put a set of defendants through *four* rounds of complaints.

[13] We see only two claims our Plaintiff could even conceivably attempt to supplement with additional facts. One is her tortious-interference claim—by alleging that the Defendants acted *purely* out of malice, something she hasn't done. The other is her defamation claim—by identifying a *specific* untrue statement, something (again) she hasn't done. On the record before us, we don't believe our Plaintiff could achieve either objective—and, as we've said, she hasn't properly moved for leave to amend. But even if she could amend these claims, that'd leave her with only *state-law* claims, given that her federal-law claims are time-barred. And that, in turn, would leave us without reason to exercise supplemental jurisdiction over those state-law claims under 28 U.S.C. § 1367. *See Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 30 (2025) ("If (as here) the plaintiff eliminates the federal-law claims that enabled removal, leaving only state-law claims behind, the court's power to decide the dispute dissolves."). With or without leave, in short, this is the end of the road for the Plaintiff's federal case.

     b.  The Defendants' request to strike all portions of the Second Amended Complaint [ECF No. 125] that allege or relate to the Plaintiff's allegation that the Defendants sought to obtain a Non-Disclosure Agreement is **GRANTED**.

     c.  The Defendants' Motion to Dismiss [ECF No. 146] is **GRANTED**.

     d.  Counts I–XXII are **DISMISSED** with prejudice and without leave to amend.

2.  Magistrate Judge Reid's R&R II [ECF No. 234] is **ADOPTED** in part and **REJECTED** in part.

     a.  The Plaintiff's Objections to the R&R II [ECF No. 235] are **SUSTAINED in part** and **OVERRULED in part**.

     b.  The Defendants' Motion for Attorney's Fees [ECF No. 201] is **GRANTED**.

     c.  We enter an award in favor of the Defendants for **$41,805.71** in attorney's fees. And we **GRANT** the Defendants' request to apply for any attorney's fees they incurred in responding to the Plaintiff's objections and in supporting their fee application. The Defendants shall file those requests by **December 21, 2025**.

3.  All other pending deadlines and hearings are **TERMINATED**. The Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida on November 24, 2025.

 

 

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record